UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MAX ALEXANDER SOFFAR

*Petitioner*,

*v.*

WILLIAM STEPHENS, Director,
Texas Department of Criminal Justice
Correctional Institutions Division

*Respondent*.

Civ. No. 4:12-cv-03783

**THIS IS A CAPITAL CASE**

## PETITION FOR A WRIT OF HABEAS CORPUS OF A PERSON IN STATE CUSTODY

Andrew G. Horne
Matthew F. Dexter
Kristin Sheffield-Whitehead
Beverly M. Baker
Lauren Sabol
    (all admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue,
New York, New York  10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-6460
Email:  andrew.horne@kirkland.com
        matthew.dexter@kirkland.com
        kwhitehead@kirkland.com
        beverly.baker@kirkland.com
        lauren.sabol@kirkland.com

Lawrence C. Marshall (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200
Email:     lawrence.marshall@kirkland.com

Seth Kretzer (State Bar No. 24043764)
LAW OFFICES OF SETH KRETZER
Lyric Center
440 Louisiana Street, Suite 200
Houston, Texas  77002
Telephone:     (832) 460-1714
Facsimile:     (713) 224-2815
Email:         seth@kretzerfirm.com

Jonathan Landers (State Bar No. 24070101)
2813 W. T.C. Jester
Houston, Texas  77018
Telephone:     (713) 301-3153
Facsimile:     (713) 685-5020
E-mail:        jlanders.law@gmail.com

# TABLE OF CONTENTS

Page

INTRODUCTION...................................................................................................1

PETITIONER'S UNLAWFUL CONFINEMENT ...................................................4

JURISDICTION ....................................................................................................5

PROCEDURAL HISTORY ....................................................................................5

    1.    The Conviction And Death Sentence At Issue. ....................................5

    2.    The Prior Conviction And Death Sentence..........................................6

THE TEXAS COURT'S BACKGROUND FINDINGS OF FACT ..........................7

    1.    The Instant Offense...........................................................................7

    2.    The Surviving Victim's Description Of The Crime And The Perpetrator..............8

    3.    Mr. Soffar's Arrest And Interrogation. ................................................9

CLAIMS FOR RELIEF .........................................................................................12

I.    THERE IS INSUFFICIENT EVIDENCE TO SUPPORT MR. SOFFAR'S CONVICTION. ........................................................................................12

    A.    Claim For Relief 1:  The Texas Court's Conclusion That The Evidence Against Mr. Soffar Was Sufficient To Support His Conviction was An Unreasonable Application Of *Jackson v. Virginia*, 443 U.S. 307 (1979)..............12

        1.    The Relevant Facts.................................................................12

        2.    The Applicable Standard..........................................................39

        3.    Habeas Relief Is Warranted. ....................................................40

        4.    The Claim Was Exhausted In The State Court Proceedings.....................61

II.    THE STATEMENTS MR. SOFFAR SIGNED ARE FALSE CONFESSIONS AND SHOULD, IN ANY EVENT, HAVE BEEN SUPPRESSED. .............................62

    A.    Claim For Relief 2:  The Texas Court's Conclusion That Mr. Soffar's Statements Were Voluntary Is Contrary To, Or, Alternatively, An Unreasonable Application Of, *Culombe v. Connecticut*, 367 U.S. 568 (1961)......................................62

        1.    The Relevant Facts.................................................................62

    2.      The Applicable Standard......................................................................64

    3.      Habeas Relief Is Warranted. .............................................................66

    4.      The Claim Was Exhausted In The State Court Proceedings....................67

B.    Claim For Relief 3:  The Texas Court's Conclusion That Mr. Soffar's
Right To Present A Defense Was Not Violated By The Exclusion Of
Media Reports Because That Exclusion Was Harmless Is Contrary To Or,
Alternatively, An Unreasonable Application Of *Crane v. Kentucky*, 476
U.S. 683 (1986) And *Holmes v. South Carolina*, 126 S. Ct. 1727 (2006)............68

    1.      The Relevant Facts...................................................................................68

    2.      The Applicable Standard......................................................................70

    3.      Habeas Relief Is Warranted. .............................................................75

    4.      The Claim Was Exhausted In The State Court Proceedings....................80

C.    Claim For Relief 4:  The Texas Court's Conclusion That Trial Counsel
Were Not Ineffective In Failing To Secure The Admission Of Media
Reports Is Contrary To, Or, Alternatively, An Unreasonable Application
Of, *Strickland v. Washington*, 466 U.S. 668 (1984). .............................................80

    1.      The Relevant Facts...................................................................................80

    2.      The Applicable Standard......................................................................81

    3.      Habeas Relief Is Warranted. .............................................................84

    4.      The Claim Was Exhausted In The State Court Proceedings....................85

D.    Claim For Relief 5:   The Texas Court's Conclusion That Trial Counsel
Were Not Ineffective In Failing To Investigate, Develop, And Present To
The Jury All Evidence Establishing That Mr. Soffar's Statements Are
False Is Contrary To, Or, Alternatively, An Unreasonable Application Of,
*Strickland v. Washington*, 466 U.S. 668 (1984). ...................................................85

    1.      The Relevant Facts...................................................................................85

    2.      The Applicable Standard......................................................................94

    3.      Habeas Relief is Warranted .................................................................94

    4.      The Claim Was Exhausted in the State Court Proceedings ....................104

E.    Claim For Relief 6:  The Texas Court's Conclusion That Mr. Soffar's
Right To Counsel Was Not Violated Is Contrary To, Or, Alternatively, An

Unreasonable Application Of, *Miranda v. Arizona*, 384 U.S. 436 (1966) And *Davis v. United States*, 512 U.S. 452 (1994). ...............................................105

    1.    The Relevant Facts.................................................................................105

    2.    The Applicable Standard.......................................................................107

    3.    Habeas Relief Is Warranted. .................................................................108

    4.    The Claim Was Exhausted In The State Court Proceedings..................112

F.    Claim For Relief 7:  The Texas Court's Conclusion That The Police Did Not Violate Mr. Soffar's Right To Remain Silent Is Contrary To, Or, Alternatively, An Unreasonable Application Of, *Miranda v. Arizona*, 384 U.S. 436 (1966) And *Michigan v. Mosley*, 423 U.S. 96 (1975). ........................112

    1.    The Relevant Facts.................................................................................112

    2.    The Applicable Standard.......................................................................113

    3.    Habeas Relief Is Warranted. .................................................................114

    4.    The Claim Was Exhausted In The State Court Proceedings..................115

G.    Claim For Relief 8: The Texas Court's Conclusion That Trial Counsel Were Not Ineffective In Failing To Investigate, Develop, and Present All Evidence Requiring The Suppression of Mr. Soffar's Statements Is Contrary To, Or, Alternatively, An Unreasonable Application Of, *Strickland v. Washington*, 466 U.S. 668 (U.S.) ...................................................115

    1.    The Relevant Facts.................................................................................116

    2.    The Applicable Standard.......................................................................119

    3.    Habeas Relief is Warranted. .................................................................119

    4.    The Claim Was Exhausted in the State Court Proceedings ...................125

III.    **ANOTHER MAN, PAUL DENNIS REID, COMMITTED THE CRIME FOR WHICH MR. SOFFAR IS SENTENCED TO DIE..........................................126**

    A.    Claim For Relief 9:  The Texas Court's Conclusion That Mr. Soffar's Constitutional Rights To Due Process, Compulsory Process, And To Present A Defense Were Not Violated By The Exclusion Of Evidence Of Paul Dennis Reid's Guilt Is Contrary To, Or, Alternatively An Unreasonable Application Of, *Holmes v. South Carolina*, 126 S. Ct. 1727 (2006)..................................................................................................126

        1.    The Relevant Facts.................................................................................126

2.      The Applicable Standard......................................................128

3.      Habeas Relief Is Warranted. .............................................129

4.      The Claim was Exhausted in the State Court Proceedings. ....................133

A.      Claim For Relief 10:  The Texas Court's Conclusion That Trial Counsel Were Not Ineffective In Failing To Investigate, Develop, and Present All Evidence Establishing Paul Dennis Reid's Guilt Is Contrary To, Or, Alternatively, An Unreasonable Application Of, *Strickland v. Washington*, 466 U.S. 668 (1984)..........................................................134

1.      The Relevant Facts...............................................................134

2.      The Applicable Standard......................................................137

3.      Habeas Relief Is Warranted. .............................................137

4.      The Claim Was Exhausted In The State Court Proceedings....................143

**IV.    MR. SOFFAR SHOULD NOT HAVE BEEN SENTENCED TO DEATH. ............144**

A.      Claim For Relief 11:  The Texas Court's Conclusion That Trial Counsel Were Not Ineffective In Failing To Investigate, Develop, And Present All Mitigating Evidence Is Contrary To, Or, Alternatively, An Unreasonable Application Of, *Strickland v. Washington*, 466 U.S. 668 (1984). ......................144

1.      The Relevant Facts...............................................................144

2.      The Applicable Standard......................................................158

3.      Habeas Relief Is Warranted. .............................................158

4.      The Claim Was Exhausted In The State Court Proceedings....................183

B.      Claim For Relief 12:  Relief Is Warranted Because The Wrongful Admission Of A Statement Mr. Soffar Signed Regarding A Rape Had A Substantial And Injurious Effect Or Influence In Determining The Jury's Verdict Of Death....................................................184

1.      The Relevant Facts...............................................................184

2.      The Applicable Standard......................................................189

3.      Habeas Relief Is Warranted. .............................................190

4.      The Claim Was Exhausted In The State Court Proceedings....................205

C.    Claim For Relief 13:  The Texas Court's Conclusion That Trial Counsel Were Not Ineffective In Failing To Investigate, Develop, And Present all Evidence Negating A Finding Of Future Dangerousness Is Contrary To, Or Alternatively, An Unreasonable Application Of, *Strickland v. Washington*, 466 U.S. 668 (1984)........................................................205

    1.    The Relevant Facts............................................................205

    2.    The Applicable Standard....................................................210

    3.    Habeas Relief Is Warranted. ............................................210

    4.    The Claim Was Exhausted In The State Court Proceedings...................215

D.    Claim For Relief 14:  The Texas Court's Conclusion That Trial Counsel Were Not Ineffective In Failing To Object To The Introduction Of Inadmissible Victim Impact Testimony Relating To A Victim Not Named In The Indictment Is Contrary To, Or, Alternatively, An Unreasonable Application Of, *Strickland v. Washington*, 466 U.S. 668 (1984). ......................215

    1.    The Relevant Facts............................................................215

    2.    The Applicable Standard....................................................216

    3.    Habeas Relief Is Warranted. ............................................216

    4.    The Claim Was Exhausted In The State Court Proceedings...................218

**V.    THE PROSECUTORS ENGAGED IN MISCONDUCT THAT RENDERED MR. SOFFAR'S RETRIAL FUNDAMENTALLY UNFAIR. ................................219**

A.    Claim For Relief 15:  The Texas Court's Conclusion That The Prosecution's Factually Inaccurate And Misleading Arguments To The Jury Did Not Deprive Mr. Soffar Of A Fair Trial Is Contrary To Or, Alternatively, An Unreasonable Application Of *Napue v. Illinois*, 360 U.S. 264 (1959), *Sullivan v. Louisiana*, 508 U.S. 275 (1993), And *Griffin v. California*, 380 U.S. 609 (1965). ........................................................219

    1.    The Relevant Facts............................................................219

    2.    The Applicable Standard....................................................221

    3.    Habeas Relief Is Warranted. ............................................221

    4.    The Claim Was Exhausted In The State Court Proceedings...................222

B.    Claim For Relief 16:  The Texas Court's Finding That Trial Counsel Were Not Ineffective In Failing To Object To The Prosecutors' Improper Summation Arguments Is Contrary To, Or, Alternatively, An

Unreasonable Application Of, *Strickland v. Washington*, 466 U.S. 668 (1984)..................................................................................................222

    1.    The Relevant Facts..................................................................222

    2.    The Applicable Standard..........................................................224

    3.    Habeas Relief Is Warranted. ....................................................224

    4.    The Claim Was Exhausted In The State Court Proceedings..................225

**VI.**    **CUMULATIVE ERROR.** ........................................................**226**

    A.    Claim For Relief 17:  The Texas Court's Conclusion That The Numerous Defects In Mr. Soffar's Retrial Were Harmless Is Contrary To Or, Alternatively, An Unreasonable Application Of *Chambers v. Mississippi*, 410 U.S. 284 (1973), *Taylor v. Kentucky*, 436 U.S. 487 (1978)........................226

    1.    The Relevant Facts..................................................................226

    2.    The Applicable Standard..........................................................226

    3.    Habeas Relief Is Warranted. ....................................................227

    4.    The Claim Was Exhausted In The State Court Proceedings..................227

**PRAYER FOR RELIEF**............................................................**229**

## INTRODUCTION

Five judges—two from the United States Court of Appeals for the Fifth Circuit and three from the Texas Court of Criminal Appeals—have now confirmed what the petitioner, Max Alexander Soffar, has said all along:  the only evidence against him is an unreliable "confession" that is completely at odds with the eyewitness testimony and the available forensic evidence.  As Judge DeMoss of the Fifth Circuit explained, this "is absolutely not a case where there [is] clear objective evidence of Soffar's guilt."  *Soffar v. Dretke*, ("*Soffar I*") 368 F.3d 441, 478-79 (5th Cir. 2004).  There is no eyewitness, blood, hair, fingerprint, ballistics, or other corroborating evidence to suggest that Mr. Soffar had anything to do with the crime.  *Id.* at 479.  That lack of corroborating evidence drove Judge DeMoss to lie "awake at nights agonizing over the enigmas, contradictions, and ambiguities which are inherent in the record."  *Soffar v. Dretke*, ("*Soffar II*"), 300 F.3d 588, 613 (5th Cir. 2002) (en banc) (DeMoss, J., dissenting).  Judge Cochran of the Texas Court of Criminal Appeals "feel[s] the same way," concluding that she "do[es] not have great confidence in the reliability or accuracy of applicant's written statements and hence in his culpability for the triple murders" at issue.  *Ex parte Max Alexander Soffar* ("*Soffar VI*"), Nos. WR-29980-03, WR-29980-04, 2012 WL 4713562, at *2, 12 (Tex. Crim. Appt. Oct. 3, 2012).  In her view, "[t]here is something very wrong about this case." *Id.* at *2.

What is "very wrong" is very simple:  Mr. Soffar has spent more than thirty years on death row because his constitutional rights have been repeatedly trampled upon from the moment he was arrested to the moment he was sentenced to death.  *First*, at the most basic level, Mr. Soffar has been sentenced to die even though the evidence against Mr. Soffar—a patently false statement—is woefully insufficient to support his conviction.  (*See infra* at I.A (Claim for Relief 1).)  To face execution based on insufficient evidence is a miscarriage of justice and a violation of the Fourteenth Amendment.  (*Id.*)

*Second*, not only is the false statement insufficient to support his conviction, the convicting court should never have admitted it in the first place. The statement was extracted in violation of Mr. Soffar's Fifth and Fourteenth Amendment rights to counsel and to remain silent and, in any event, it was not given voluntarily. (*See infra* at I.) To the extent the record before the convicting court was sufficient to justify admission of the statement—which it was not— Mr. Soffar was deprived his Sixth Amendment right to the effective assistance of counsel because his trial counsel could, and should, have presented the convicting court with additional evidence that would have left no doubt as to the statement's inadmissibility. (*See infra* at I.)

*Third*, even if the statement Mr. Soffar signed was admissible—which it is not—trial counsel should have presented the jury with a mountain of evidence establishing the statement's falsity. (*See infra* at I.) Since Mr. Soffar's fate turned on whether or not the jury believed the statement to be true, no competent capital defense attorney would have failed to offer all available evidence to the contrary. (*Id.*) The prejudicial impact of trial counsel's ineffectiveness was compounded by the convicting court's erroneous refusal to admit evidence establishing that much of the information in the statement had been published in newspapers and broadcast on television. (*See infra* II.B (Claim for Relief 3); *see also infra* at II.C (Claim for Relief 4).) The convicting court's refusal to admit that evidence deprived Mr. Soffar of his Sixth and Fourteenth Amendment rights to present a defense. (*See infra* II.B (Claim for Relief 3).)

*Fourth*, Mr. Soffar was also denied his right to present a defense when the convicting court refused to admit evidence establishing that another man—Paul Dennis Reid—committed the crime for which Mr. Soffar is sentenced to die. (*See infra* at III.A (Claim for Relief 9).) That evidence includes Mr. Reid's credible confession, Mr. Reid's striking resemblance to the robber, and the fact that Mr. Reid has committed other robbery-murders using the same *modus operandi*

as that used to commit the instant offense.  (*Id*.)  It is now clear, however, that the evidence the convicting court refused to admit is only the tip of the iceberg.  Had trial counsel complied with prevailing professional norms and conducted an adequate investigation, they would have easily located witnesses who saw Mr. Reid at the scene of the crime in the days leading up to the murders.  Even more critically, one of those witnesses would have testified that Mr. Reid threatened to kill him and Stephen Sims, one of the murder victims.  (*Id.*)  Specifically, Mr. Reid told them:  "'I'm going to blow your heads off.'"  (*Id.*)  That is precisely what Mr. Reid did to Mr. Sims on July 13, 1980.

*Fifth*, although Mr. Soffar's conviction is unconstitutional and should be overturned, if this Court were to find otherwise, his death sentence should nonetheless be vacated.  The jury should never have heard the centerpiece of the state's punishment phase case—a statement Mr. Soffar signed regarding a sexual assault—because the police had convinced Mr. Soffar to sign it in violation of his Sixth Amendment right to counsel.  (*See infra* at IV.B (Claim for Relief 12).)  Nor should the jury have heard highly prejudicial "victim impact" testimony from a witness who was not a relative of the named victim.  (*See infra* at IV.D (Claim for Relief 14).)  But the jury did hear that testimony because trial counsel sat back and did not object properly to its admission despite the fact that one of capital defense counsel's primary duties is to make timely and compressive objections.  (*Id.*)  In addition to failing to secure the exclusion of inadmissible evidence, trial counsel failed to present anything like a properly investigated and developed mitigation and future dangerousness case.  (*See infra* at IV.A, IV.C (Claims for Relief 11 and 13).)  Indeed, Mr. Soffar's lead counsel has admitted under oath that the defense was woefully unprepared and had not even drafted an opening statement when the jury announced its

3

guilty verdict , even though the sentencing hearing was to begin almost immediately.  (26 S.H.R. 6837-8.)

*Lastly*, trial counsel's apathetic approach to protecting Mr. Soffar's constitutional rights meant that they did nothing to prevent blatant prosecutorial misconduct.  Throughout their guilt-innocence ***and*** punishment phase summations, the prosecutors made egregious false and misleading statements about the facts and the applicable law.  (*See infra* at V.)  For example, in arguing in favor of a guilty verdict, one of the prosecutors told the jury:  Mr. Soffar "didn't bring you any evidence that he didn't commit this crime."  (35 R.R. 9.)  No competent defense attorney would have sat back and allowed such an argument, which flies in the face of one of the most central tenants of our justice system.  But sit back and watch is precisely what Mr. Soffar's trial counsel did time and again.  (*Id.*)

In sum, therefore, the police, the convicting court, the prosecutor, and even Mr. Soffar's own trial counsel, have engaged in conduct that violates his most fundamental constitutional rights.  There can be no doubt—or, at the very least, a reasonable probability exists—that, but for those violations, Mr. Soffar would not be sitting in a prison cell awaiting execution.  Accordingly, Mr. Soffar respectfully requests that this Court grant a writ of habeas corpus and release him from his unlawful confinement.[1]

## PETITIONER'S UNLAWFUL CONFINEMENT

Petitioner is unlawfully confined on death row at the Polunsky Unit in Livingston, Texas, under the charge of the Respondent, William Stephens.  His custody and sentence violate the

---

[1]   The instant petition is being filed pursuant to the Scheduling Order entered by this Court on October 25, 2012.  Although the petition—and all of the claims asserted in it—satisfies the applicable pleading standards in all respects, Mr. Soffar nonetheless intends to exercise his right to amend before the January 3, 2014 deadline because, among other things, his lead counsel, Andrew Horne, suffered a death in the family on the eve of the filing.

Constitution and laws of the United States of America.  He brings this petition for a writ of habeas corpus pursuant to the United States Constitution and 28 U.S.C. § 2254.

## JURISDICTION

This Court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Mr. Soffar was convicted in the 232nd Judicial District Court in Harris County, Texas.  Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

### 1.  THE CONVICTION AND DEATH SENTENCE AT ISSUE.

Mr. Soffar was convicted of murdering the complainant, Arden Alane Felsher, on February 22, 2006.  (33 S.H.R. 8905 at F.F ¶ 15.[2])  He was sentenced to death on March 2, 2006. (33 S.H.R. 8905 at F.F. ¶ 16.)  The Texas Court of Criminal Appeals affirmed his conviction and sentence on November 19, 2009.  *Soffar v. State* ("*Soffar III*"), AP-75363, 2009 WL 3839012 (Tex. Crim. App. Nov. 19, 2009).  That conviction and sentence became final on June 28, 2010, when the United States Supreme Court denied his petition for a writ of *certiorari*.  *Soffar v. Texas*, 130 S. Ct. 3507 (2010).

On February 8, 2008, Mr. Soffar filed an application for a writ of habeas corpus in the state convicting court asserting thirty-eight claims for relief.  (33 S.H.R.8905-6 at F.F. ¶ 17; *see also* 1 S.H.R.3.)  Amended applications were filed on February 12, 2008 and June 9, 2008, the

---

[2]    "F.F." refers to the findings of fact and "C.L." refers to the conclusions of law entered by the state convicting court on January 5, 2012, (33 S.H.R.8903.), and adopted, with minor changes, by the Texas Court of Criminal Appeals on October 3, 2012. *Soffar VI*, 2012 WL 4713562, at *2.  Citations to the operative state habeas record appear as "[volume number] S.H.R. [page number]."  Citations to the reporter's record in Mr. Soffar's retrial appear as "[volume number] R.R. [page number]," except where that record was amended in which case the citations appear as "[volume number] R.R. (Amend.) [page number]."  Citations to the clerk's record in Mr. Soffar's retrial appear as "[volume number] C.R. [page number]," with the exception of citations to the supplemental clerk's record, which appear as "[volume number] Supp. C.R. [page number]."  Citations to the reporter's record in Mr. Soffar's first trial appear as "[volume number] F.T.R.R. [page number]."  Citations to the clerk's record in Mr. Soffar's first trial appear as "[volume number] F.T.C.R. [page number]."  Citations to the state habeas record that followed Mr. Soffar's first trial appear as "[volume number] F.S.H.R. [page number]."

latter application being the operative pleading.  (3 S.H.R.469; 20 S.H.R. 5096.)  A supplemental application for a writ of habeas corpus was filed on January 6, 2010, in which Mr. Soffar asserted three claims that could not have been asserted in his first application.  (26 S.H.R. 6845.)  The convicting court denied Mr. Soffar's repeated requests for an evidentiary hearing.  (33 S.H.R. 8906 at F.F. ¶ 21.)  Instead, the court summarily recommended that relief be denied. *Soffar VI*, 2012 WL 4713562, at *2.  In doing so, the court adopted the state's proposed findings of fact, deleting only seven words that were unhelpful for the state.  (33 S.H.R. 8905.)  The Texas Court of Criminal Appeals accepted all but a handful of the convicting court's recommendations and denied relief on October 3, 2012.  *Soffar VI*, 2012 WL 4713562 at *2-3.

The applicable statute of limitations was tolled during the pendency of Mr. Soffar's state post-conviction proceedings.  28 U.S.C. § 2244(d)(2).  Accordingly, the statute of limitations for Mr. Soffar's present federal habeas petition would have expired on October 3, 2013.  28 U.S.C. § 2244(d)(1)(A).  This petition is timely because it is being filed on October 2, 2013, pursuant to this Court's Order dated October 25, 2012.  (Dkt. No. 8.)

### 2.  THE PRIOR CONVICTION AND DEATH SENTENCE.

Mr. Soffar's 2006 conviction and death sentence followed a retrial.  (33 S.H.R. 8903 at F.F. ¶ 2.)  Mr. Soffar was first convicted of murdering Ms. Felsher on March 31, 1981, and was sentenced to death on April 3, 1981.  (33 S.H.R. 8903 at F.F. ¶ 2)  Twenty three-years later, on April 21, 2004, a three-judge panel of the Fifth Circuit granted Mr. Soffar habeas relief due to the ineffective assistance of his defense counsel.  *Soffar v. Dretke* (*Soffar I*), 368 F.3d 441, 442 (5th Cir. 2004).  The United States District Court for the Southern District of Texas entered a final judgment granting habeas relief on December 8, 2004.  *Soffar v. Dretke*, Civil Action No. H-96-1281, slip. op. (S.D. Tex. Dec. 9, 2004).

## THE TEXAS COURT'S BACKGROUND FINDINGS OF FACT

The following summarizes the pertinent background facts as found by the convicting court.  The purpose of this summary is to provide a high-level description of the crime and Mr. Soffar's arrest and interrogation.  The operative facts relating to each Claim for Relief are discussed in detail in the "Claims for Relief" section below.  (*See infra* at I-VI.)

### 1.  THE INSTANT OFFENSE.

Around midnight on Sunday, July 13, 1980, an intruder gained access to the Fair Lanes Bowling Center (the "Bowling Alley") located at the intersection of Windfern Road and Northwest Freeway in Houston, Texas.  (33 S.H.R. 8906-7 at F.F. ¶ 22.)  The intruder shot and killed Stephen Sims, Tommy Temple, and Arden Alane Felsher.  (*Id.*)  A fourth victim, Greg Garner, sustained a gunshot wound to the head and was life-flighted to a hospital.  (*Id.*)

The police review of the crime scene that evening found Ms. Felsher's purse on the control booth counter.  (33 S.H.R. 8907 at F.F. ¶ 23.)  Mr. Sims's wallet was found in the parking lot.  (*Id.*)  A few days later, a truck driver recovered Mr. Garner's and Mr. Temple's wallets on the side of the Northwest Freeway and returned them to police.  (33 S.H.R. 8907 at F.F. ¶ 24.)  A white plastic jug was also seen sitting on the control booth counter but the police did not dust it for fingerprints.  (33 S.H.R.8907 at F.F. ¶¶ 23, 27.)  Other surfaces, however, were dusted but none of the fingerprints matched the victims, Mr. Soffar, or his alleged accomplice, Latt Bloomfield.  (33 S.H.R. 8907 at F.F. ¶ 27.)

Investigators also collected ballistics evidence.  (33 S.H.R. 8907 at F.F. ¶ 25.)  On the night of July 13, the police found:  a fired bullet under Ms. Felsher's body, a second fired bullet close to Mr. Sims's body, and eleven fragments under his body.  (*Id.*)  Several days later, the police returned to the Bowling Alley and inspected the carpet, its padding, and the cement beneath it.  (*Id.*)  In doing so, they found four bullet holes, a third fired bullet, an oxidized pellet,

and two additional fragments in, and immediately above, a divot in the cement floor.  (*Id.*)  A fourth bullet was recovered during Mr. Temple's autopsy and a bullet fragment was recovered from an abrasion on Mr. Sims's chest.  (*Id.*)

## 2.  THE SURVIVING VICTIM'S DESCRIPTION OF THE CRIME AND THE PERPETRATOR.

The convicting court found that Mr. Garner, the surviving victim, had sustained "severe trauma" to his brain and "suffered mental damage, including large gaps or deficits in his memory."  (33 S.H.R. 8907-8 at F.F. ¶ 29.)  Mr. Soffar disputes these findings, neither of which is supported by any record evidence.

Mr. Soffar does not, however, dispute the convicting court's—albeit incomplete—findings with respect to Mr. Garner's recollection of the perpetrator's *modus operandi*.  As Mr. Garner explained at Mr. Soffar's trial and in interviews he gave to the police in the days following the robbery, Mr. Sims locked the Bowling Alley doors at 11.30 p.m.  (33 S.H.R. 8908 at F.F. ¶ 31.)  At some point shortly thereafter, the intruder came to the front door carrying a white plastic container and asked for water.  (33 S.H.R. 8908 at F.F. ¶ 30.)  Mr. Garner, who was bowling at the time, turned toward the front door and saw Mr. Sims talking to a white male inside the Bowling Alley.  (33 S.H.R 8908 at F.F. ¶ 31.)  When Mr. Garner approached them, he saw that the intruder was pointing a gun at Mr. Sims.  (*Id.*)  The intruder asked Mr. Garner whether he knew how to open the cash register, and Mr. Garner responded in the negative.  (*Id.*)  Mr. Garner then complied with the intruder's demand and lay down on the floor.  (*Id.*)  Mr. Temple and Ms. Felsher, who had been in the rear of the Bowling Alley, came toward the front doors and were also told to lie down.  (*Id.*)  With the victims lying down, the intruder asked them about their wallets, in response to which Mr. Garner held his wallet in the air and the intruder grabbed it.  (*Id.*)  According to the convicting court, Mr. Garner then heard two to three

gunshots (a finding that Mr. Soffar disputes) and lost consciousness.  (*Id.*)  After waking up, Mr. Garner telephoned his mother for help. (*Id.*)

In addition to describing how the robbery took place, Mr. Garner also provided the jury with a description of the intruder.  (*Id.*)  According to Mr. Garner's trial testimony, the intruder was in his mid-twenties, approximately five feet eleven inches tall, with a medium build, and long hair that was black or dark brown.  (*Id.*)  The convicting court erroneously found that Mr. Garner could not remember whether the intruder had facial hair.  (*Id.*)  As discussed below, the composite Mr. Garner prepared and the description he gave to the police on numerous occasions shortly after the crime was committed shows an individual at odds with the description he gave at the retrial.  (33 S.H.R. 8908 at F.F. ¶ 30 (citing 32 R.R. (Amend.) 178-79; 45 R.R. Joint Exs. 1-4).)  For that reason, the convicting court's finding that relies exclusively on Mr. Garner's trial testimony is inconsistent with clear and convincing evidence to the contrary and should not—and cannot—be relied upon in ruling on the instant petition.  (*See infra* at I.A.)

### 3.  Mr. Soffar's Arrest And Interrogation.

On August 5, 1980, Officer Raymond Willoughby of the League City Police Department stopped Mr. Soffar for speeding on a stolen motorcycle.  (33 S.H.R. 8908-9 at F.F. ¶ 32.)  While Mr. Soffar was sitting in the back of Officer Willoughby's patrol car he told Detective James Palmire of the Friendswood Police Department that he was not going to the penitentiary over a stolen motorcycle and suggested that Detective Palmire check Houston for bigger things.  (*Id.*)  The court also found that Mr. Soffar later told Officer Willoughby that he had information about the Bowling Alley crime, which had occurred a few weeks before his arrest.  ((*Id.*)

Over the course of the next three days, Mr. Soffar signed a series of statements regarding the Bowling Alley crime.  (33 S.H.R. 8909 at F.F. ¶ 33.)  In the final August 7, 1980 statement,

Mr. Soffar claimed to have shot Ms. Felsher. (*Id*.)  He also claimed to have committed the crime with an accomplice, Latt Bloomfield.  (*Id*.)  A signed diagram that purported to show the layout of the interior and exterior of the Bowling Alley accompanied the statement.  (*Id*.)  Notably, Mr. Soffar signed both the statement and diagram after he learned that the police had released Mr. Bloomfield from custody due to a lack of evidence.  (*Id*.)

On August 6, 1980, the police placed Mr. Soffar in a lineup.  (33 S.H.R. 8909 at F.F. ¶ 34.)  Mr. Garner was not able to make a positive identification.  (*Id*.) Mr. Garner did say that his assailant "would look like three or four." (*Id*.)  Mr. Soffar stood in position three.  (*Id*.)

Later that same day, police detectives took Mr. Soffar to some of the locations mentioned in the statements he signed.  (33 S.H.R. 8909 at F.F. ¶ 35.)  The convicting court made a series of findings regarding statements that Mr. Soffar supposedly made while in the police officers' car.  (*Id*.)  But the Texas Court of Criminal Appeals had already held, on direct appeal, that those statements were inadmissible as a matter of Texas law.  *Soffar III*, 2009 WL 3839012 at *29. The convicting court should never, therefore, have made any findings regarding these statements much less relied upon them.

The Texas Court of Criminal Appeals did, however, uphold the admission of oral statements Mr. Soffar supposedly made to Lawrence Bryant (known as "Papa") and Mable Cass. Mr. Soffar had directed the police to Mr. Bryant and Ms. Cass on August 6.  (33 S.H.R. 8909 at F.F. ¶ 35.)  The convicting court's findings with respect to Ms. Cass and Mr. Bryant's stories are, however, completely contrary to the facts.  (*See infra* at I.A.)  During the trial, Ms. Cass testified that she had seen Mr. Soffar on four or five occasions in 1980.  (33 S.H.R. 8910 at F.F. ¶ 36.)  She claimed that Mr. Soffar said to her and Mr. Bryant that he was the "motherfucker" who killed the people at the Bowling Alley and that the police would never catch him.  (*Id*.)

According to her testimony, Mr. Soffar then showed Mr. Bryant and Ms. Cass a semiautomatic gun and commented, "this what I shot the motherfucker with right here." (*Id.*)

Lawrence Bryant had been killed by the time of Mr. Soffar's trial. (33 S.H.R. 8910 at ¶ 37.) Over defense objections, the prosecution read his first trial testimony into the record. In that testimony, Mr. Bryant claimed that the conversation with Mr. Soffar occurred during the last week of July, 1980. (33 S.H.R. 8910 at F.F. ¶ 37.) Mr. Soffar had supposedly driven up to Ms. Cass's house in a brown and beige Thunderbird car with a fat white male and a thin white male and was looking to sell a nine-millimeter nickel plated automatic gun. (*Id.*) He allegedly asked Mr. Bryant if he had heard about a bowling alley robbery and Mr. Bryant responded that he heard about a robbery on the news. (*Id.*) Mr. Bryant claimed that Mr. Soffar then asked "would I [Mr. Bryant] believe if he [Mr. Soffar] had done it," in response to which Mr. Bryant asked if Mr. Soffar was "crazy." (*Id.*) Mr. Soffar then supposedly grinned and laughed, claimed to have shot three people, and stated that there might have been "$15,000 or $1,500" on the counter. (*Id.*) Mr. Bryant purchased the gun and later sold it for drugs. (*Id.*)

The convicting court found that these individuals "corroborated portions of the applicant's written statement." (33 S.H.R. 8909 at F.F. ¶ 35.) As described more fully below, that finding is contrary to the clear and convincing evidence and cannot be relied upon in ruling on the instant petition. (*See infra* at I.A.) Indeed, far from corroborating the statements Mr. Soffar signed, Mr. Bryant's and Ms. Cass's testimony provides additional evidence of the falsity of these statements. (*Id.*)

CLAIMS FOR RELIEF

I.    **THERE IS INSUFFICIENT EVIDENCE TO SUPPORT MR. SOFFAR'S CONVICTION.**

     A.    **CLAIM FOR RELIEF 1: THE TEXAS COURT'S CONCLUSION THAT THE EVIDENCE AGAINST MR. SOFFAR WAS SUFFICIENT TO SUPPORT HIS CONVICTION WAS AN UNREASONABLE APPLICATION OF *JACKSON v. VIRGINIA*, 443 U.S. 307 (1979).**

As Judge DeMoss of the Fifth Circuit found in 2002 and 2004, the only evidence against Mr. Soffar is the third statement that he signed on August 7, 1980 (the "Third Statement"). *See Soffar v. Cockrell*, 300 F.3d 588, 641 (5th Cir. 2000) (DeMoss, J., dissenting) ("I am glad I will not be standing in [my fellow judge's] shoes, if and when Soffar is executed solely because of the third statement he signed in this case."). There is no eyewitness, fingerprint, property, hair, ballistics, or other evidence to corroborate the claim of responsibility made in it. *Soffar v. Dretke*, 368 F.3d 441, 478-79 (5th Cir. 2004) ("This is absolutely not a case where there was clear objective evidence of Soffar's guilt.") The Texas Court of Criminal Appeals nonetheless concluded otherwise, holding that "the evidence is legally and factually sufficient to support Soffar's conviction." *Soffar III*, 2009 WL 3839012, at *10, *25-*28. That holding, as explained below, involved an unreasonable application of well-settled federal law. (*See infra* at I.A.3.)

          **1.    The Relevant Facts.**

In order to appreciate just how erroneous and unreasonable the Texas court's conclusion of sufficiency was, it is necessary to outline the evidence presented to the jury concerning the manner in which the perpetrator committed the crime, the available forensic evidence, and the circumstances that caused Mr. Soffar to sign the Third Statement. Although some of these details are outlined above as part of the convicting court's findings of fact, (*see supra* at 7-11), the present claim for relief relates to the ***jury's*** verdict and, therefore, the question of sufficiency

turns on an examination of the evidence that was, and that should have been, admitted at Mr. Soffar's retrial and not the convicting court's findings of fact.

(1)      The Details Of The Crime

Late in the night of July 12, 1980, a burglary took place at the Bowling Alley.  (26 R.R. 128.)  The Bowling Alley stands on Route 290, also known as the Northwest Freeway, in northwest Houston.  (*Id*. at 163.)  The burglars entered the Bowling Alley by breaking a glass panel in the side door.  (*Id*. at 129.)  The only money the burglars stole were some coins from a vending machine.  (30 R.R. (Amend.) 122.)

The side door was not repaired the next day.  (29 R.R. (Amend.) 129.)  Because the manager—James Peters—was concerned about another break-in, he asked Messrs. Garner and Temple if they would be willing to stay at the Bowling Alley overnight.  (26 R.R. 129.)  Both agreed to do so.  (*Id.*)

That night, July 13, 1980, the Bowling Alley closed at 11:30 p.m.  (28 R.R. 151-52.)  In addition to Messrs. Garner and Temple (both of whom were employees of the Bowling Alley), Ms. Felsher (Mr. Temple's girlfriend) and Stephen Sims (the Bowling Alley's assistant manager) remained in the building after it closed.  (*Id*. at 150-51.)  Sometime around midnight, the robbery at issue took place.  (31 R.R. 12.)  During the robbery, Ms. Felsher and Messrs. Sims and Temple were fatally shot; Mr. Garner suffered a bullet wound to the head.  (26 R.R. 43, 48, 66, 68, 105-06, 113-14; 27 R.R. 10-12, 33; 28 R.R. 9, 110; 34 R.R. (Amend.) 1075.)  The robber escaped with approximately $1,000.  (26 R.R. 180.)

Mr. Garner was taken into surgery upon his arrival at the hospital.  (28 R.R. 110.)  His medical records admitted at trial indicate that, right up until the time he was anesthetized, he had been conscious, alert, and able to respond properly to commands.  (44 R.R. State Ex. 175; 44

R.R. State Ex. 175-A; 26 R.R. 83; 27 R.R. 6; 28 R.R. 120, 122-23.)  It appeared that Mr. Garner had only been unconscious for a very short period of time after being shot.  (28 R.R. 122.)

Two days later, Dr. McLaughlin, a neuropsychologist, conducted an examination of Mr. Garner.  (44 R.R. State Ex. 175; 44 R.R. State Ex. 175-A; 28 R.R. 113.)  Dr. McLaughlin administered several tests in the course of that evaluation.  (28 R.R. 113.)  One of those tests, the "GOAT test," was designed to determine the extent to which a patient may have amnesia.  (*Id*. at 127.)  Mr. Garner scored a perfect 100.  (44 RR State Ex. 175; 44 R.R. State Ex. 175-A; 28 R.R. 127.)

The next day, Mr. Garner's doctors declared him well enough to talk to the police.  (28 R.R. 125.)  During several interviews that the police conducted in the days immediately following the crime, Mr. Garner provided the police with a detailed description of how the robbery took place and what the robber looked like.  (*See, e.g., id*. at 174-75; 32 R.R. (Amend.) 62-149; 45 R.R. Joint Ex. 1; 45 R.R. Joint Ex. 2.)  In general, Mr. Garner's description of the robbery, which is broadly outlined above, was consistent and detailed.  (*See, e.g.,* 45 R.R. Joint Ex. 1; 45 R.R. Joint Ex. 2; *see supra* at 8-9.)  Of particular note, Mr. Garner recalled that:

- He was bowling on lanes 25 and 26 when the intruder came to the front doors;

- The doors were locked when the intruder first arrived;

- The intruder convinced Mr. Sims to unlock the doors by claiming that he had car trouble and needed to fill a water jug that he carried with him;

- The intruder went outside with Mr. Sims and then returned holding a gun to Mr. Sims's side;

- There was only one intruder;

- The intruder perpetrated the robbery in a calm and methodical manner;

- Mr. Sims, and not the intruder, retrieved the money from the cash register;

- The victims lay in a semi-circle;

- None of the victims screamed or tried to run and the intruder did not hit, kick, or otherwise touch them;

- After taking their wallets, the intruder said "goodbye" and shot each of the victims once in the head;

- When shot, the order of the victims, starting closest to the door, was Ms. Felsher, Mr. Sims, Mr. Garner, and then Mr. Temple;

- After being shot, Mr. Garner blacked out, woke up, walked to the control booth counter, picked up the telephone, pressed a button to obtain an outside line, dialed his seven-digit home telephone number, and spoke with his mother;

- While speaking with his mother, the other telephone line rang, causing him to place his mother on hold, press a button to answer the second line, speak with Mr. Peters, then return to his call with his mother;

- After speaking with his mother, he lay down next to Ms. Felsher rather than returning to the place where he was shot, which meant that the order of the victims when the police arrived was, starting with the victim closest to the door, Mr. Garner, Ms. Felsher, Mr. Sims, and then Mr. Temple.

(26 R.R. 105-07, 131-32, 162; 28 R.R. 152, 162-63, 173; 32 R.R. (Amend.) 47, 87-88, 109, 114, 166, 195; 45 R.R. Joint Ex. 1 at 1-7; 45 R.R. Joint Ex. 2 at 1-5, 7-10; 45 R.R. Joint Ex. 3 at 2.)

Mr. Garner also told the police that he could probably recognize the robber if he saw him again.  (45 R.R. Joint Ex. 1 at 4.)  Consistent with that belief, Mr. Garner provided the police with a description of the intruder.  (*See supra* at 8-9.)  That description was memorialized in, among other things, transcripts of interviews that the convicting court admitted into evidence. (45 R.R. Joint Ex. 1 at 2-3; 45 R.R. Joint Ex. 2 at 2, 4, 8, 11-14.)  Mr. Garner told the police that the intruder was approximately five feet, eleven inches tall, with a muscular build, weighing between 175 and 185 pounds, with a medium nose, small lips, and "weird" dark hair that fell

over his ears but did not touch his collar.  (45 R.R. Joint Ex. 1 at 2-3; 45 R.R. Joint Ex. 2 at 2, 4, 8, 11-14.)  He did not recall the intruder having facial hair.  (45 Joint Ex. 1 at 3.)  He also stated that the intruder did not appear to have been under the influence of drugs.  (*Id*. at 4.)  Mr. Garner's recollection was reflected in a composite of the intruder that he prepared with the assistance of a police officer.  (45 R.R. Joint Ex. 6.)  The police distributed that composite to the media.  (32 R.R. (Amend.) 175.)

Mr. Garner's recollection was corroborated by the available forensic evidence.  For example, the police found Mr. Garner's ring near lanes twenty-five and twenty-six, the lanes that he recalled bowling on when the intruder first approached the front door.  (26 R.R. 85; 32 R.R. (Amend.) 48; 45 Joint Ex. 2 at 1, 3; 28 R.R. 153, 180.)  Officers saw, but did not recover, a white jug that may very well have been the jug that the intruder carried.  (26 R.R. 184; 27 R.R. 295, 101; 32 R.R. (Amend.) 167-68; 45 R.R. Joint Ex. 1 at 6-7; 45 R.R. Joint Ex. 2 at 4-7.)  The ballistics evidence also confirmed the accuracy of Mr. Garner's memory.  The police recovered three bullets and a handful of bullet fragments.  (27 R.R. 74; 28 R.R. 12, 35; 33 R.R. (Amend.) 18, 44-46.)  One bullet came from under Ms. Felsher, one came from under or close to Mr. Sims, and the third was lodged in Mr. Temple's head and recovered during his autopsy.  (27 R.R. 80; 28 R.R. 12.)  This evidence was consistent with Mr. Garner's recollection of the order of the victims at the time they were shot.  (*See* 28 R.R. 173; 31 R.R. 154-55; 32 R.R. (Amend.) 166, 195; 33 R.R. (Amend.) 87-88; 45 Joint Ex. 3.)  Likewise, the autopsies confirmed—as Mr. Garner recalled—that none of the victims had been hit or otherwise injured.  (27 R.R. 238-39; 28 R.R. 19-25.)  And, although not relevant to Mr. Garner's recollection, none of the partial finger or palm-prints lifted from around the control booth, front door, and cash register areas was even similar to those of Mr. Soffar or his supposed accomplice.  (27 R.R. 164.)

Much, if not all, of the evidence recovered by the police and the details of the crime were broadcast widely in the Houston media.  (*See* 30 R.R. (Amend.) 101-06; 33 R.R. (Amend.) 4; 43 R.R. Def. Ex. 58-60.)  Although the jury did not hear about those media reports, the Texas Court of Criminal Appeals assumed that the exclusion was erroneous.  *Soffar v. State*, AP-75363, 2009 WL 3839012, at *20 (Tex. Crim. App. Nov. 18, 2009).  Had the jury heard the media evidence— which they should have—they would have learned that the following facts were in the public domain:

- Three men and one woman were shot;

- The murders happened during the course of a robbery;

- The robbery occurred at the Fairlanes Windfern Bowling Alley;

- The Bowling Alley had glass front doors;

- The crime took place around midnight;

- There were a few cars in the parking lot when the crime occurred;

- One man survived;

- The man who survived lost an eye;

- The woman was shot in the face as she looked up;

- The victims were forced to lie down before being shot;

- The bodies were found in a semi-circle;

- The victims had been shot execution style;

- The murder weapon was thought to be a .357 Magnum revolver;

- Money had been taken from a cash register;

- A victim's wallet had been found in the parking lot;

- The manager's office had not been entered;

- A reward had been offered;

- The Bowling Alley had been burglarized the night before;

- Money had been taken from the vending machines during the burglary.

(43 R.R. Def. Ex. 59, 63-71.)  The jury would also have learned that pictures of the following had been published or shown on television news reports:

- The interior of the Bowling Alley;

- The freestanding sign outside the Bowling Alley;

- The Bowling Alley parking lot;

- The exterior of the Bowling Alley;

- The victims bodies on the ground;

- A close-up of Mr. Garner's gunshot wound to the back of his head;

- The composite drawing that Mr. Garner helped prepare.

(43 R.R. Def. Ex. 59.)

(2)     August 5, 1980:  Mr. Soffar Signs The First Statement

Despite Mr. Garner's description and the composite, three weeks passed and the detectives had absolutely no suspects.  (30 R.R. (Amend.) 31.)  That changed at 3:30 p.m. on August 5, 1980, when Mr. Soffar signed a statement that implicated him in the robbery (the "First Statement").  (43 R.R. State Ex. 108; 30 R.R. (Amend.) 18-19.)  Officer Willoughby of the League City Police Department had arrested Mr. Soffar earlier that morning for riding on a stolen motorcycle.  (29 R.R. (Amend.) 21.)  At the time of his arrest, Officer Willoughby noted that Mr. Soffar's pupils were dilated, his speech was slurred, and he appeared to be intoxicated. (*Id.* at 38-39, 42-43.)  In his offense report, Officer Willoughby noted that Mr. Soffar was "very talkative" and that some of his statements were "incoherent."  (*Id.* at 38-39.)  Consistent with his intoxicated state, Mr. Soffar acted without any apparent forethought and immediately uttered the first lie in the chain of lies that led to his ultimate conviction:  he provided Officer Willoughby

with a false name and story about how he came to have the motorcycle.  (*Id*. at 22-23, 27-29.) He did so even though any rational person would have realized that Officer Willoughby could— and did—easily uncover the truth.  (*Id*. at 22-24.)

It was while in Officer Willoughby's custody that Mr. Soffar first mentioned the Bowling Alley robbery.  (*Id*. at 93-94, 96.)   He mentioned it to Detective James Palmire of the Friendswood Police Department who had dealt previously with Mr. Soffar.  (*Id*. at 91.) According to Detective Palmire, Mr. Soffar said:  "[I'm not] going to no penitentiary over a stolen motorcycle [but] [t]o check Houston for bigger things."  (*Id*. at 93-94.)  Mr. Soffar made that ambiguous, spur-of-the-moment comment in response to Detective Palmire calling him a "punk."  (*Id*. at 93-94, 96.)

After the conclusion of Mr. Soffar's brief, unrecorded exchange with Detective Palmire, at approximately 8:30 a.m., Officer Willoughby got into his patrol car and left with Mr. Soffar on the ten- to fifteen-minute trip to the police station.  (*Id*. at 30.)  During that trip, Mr. Soffar launched into an unrecorded monologue.  (*Id*.)  Among other things, he told Officer Willoughby that he had been providing information to the Harris County Sheriff's Department and that he wanted to speak with Sergeant Bruce Clawson.  (*Id*. at 31, 38-39.)  Mr. Soffar trusted Sergeant Clawson a great deal having worked for him as an informant for some time.  (*Id*. at 105, 140.) In addition to asking for his friend, Mr. Soffar told Officer Willoughby, just as he had told Detective Palmire, that "if he was going to prison it would not be for a motorcycle theft it would be for something bigger" and that he had "information about the Bowling Alley murders that had occurred in Houston a few weeks before."  (*Id*. at  31.)

When they arrived at the police station, at approximately 8:50 a.m., Officer Willoughby told Lieutenant Steve Johnson about what Mr. Soffar had supposedly said in the car.  (*Id*. at 33.)

Perhaps because of the information Officer Willoughby provided, Detective Bob Jones came and spoke with Mr. Soffar for a few minutes.  (*Id*. at 34.)  No evidence was elicited at the trial about what transpired between Detective Jones and Mr. Soffar nor is there any evidence that the conversation was recorded.  (*See, e.g., id*.)

While Mr. Soffar and Detective Jones were talking, Lieutenant Johnson called Sergeant Clawson and asked him to come to the police station.  (*Id*. at 106.)  When Sergeant Clawson arrived, at approximately 10 a.m., he went to talk with Mr. Soffar in the cell where he was being held.  (*Id*. at 106-07.)  Sergeant Clawson knew that Mr. Soffar was "child like" and had "fried his brains out on drugs."  (*Id*. at 134.) Shortly after this conversation—which was not recorded— Mr. Soffar was taken before a magistrate judge and charged with the unauthorized use of a motor vehicle.  (*Id*. at 34-38.)  In connection with ***that charge***, the magistrate judge read Mr. Soffar his statutory warnings.  (*Id*. at 36-38.)  By the time Mr. Soffar was taken back to the police station, at approximately 10:20 a.m., detectives from the Houston Homicide Division were there and ready to interrogate him.  (*Id*. at 38.)

Before the Houston detectives could begin their interrogation, Sergeant Clawson had another private, unrecorded conversation with Mr. Soffar in the cells beneath the police station.  (*Id*. at 110-11.)  This conversation lasted "a brief period of time."  (*Id*. at 107.)  At Mr. Soffar's trial, Sergeant Clawson testified that he read Mr. Soffar his statutory warnings and then discussed with him the motorcycle theft and the Bowling Alley robbery.  (*Id*. at 110.)  Beyond Sergeant Clawson's vague recollection as to the topics they discussed, the jury heard no evidence regarding what was said.  (*Id*.)

Once Sergeant Clawson was finished, the Houston homicide detectives finally got their chance to interrogate Mr. Soffar.  The first detective to question Mr. Soffar was Gilbert Schultz.

(30 R.R. (Amend.) 10.)  Detective Schultz had been involved in the Bowling Alley investigation for several weeks and was intimately familiar with the location of the Bowling Alley, its interior layout, its doors, how the victims were shot, the available forensic evidence, and the contents of Mr. Garner's detailed description of how the robbery had been committed.  (*Id*. at 30-32, 40-52, 121-22.)

Detective Schultz did not record his initial interrogation of Mr. Soffar.  (*Id*. at 14.) Nonetheless, at Mr. Soffar's trial Detective Schultz testified that he read Mr. Soffar his statutory warnings then questioned him for approximately half-an-hour in an effort to determine whether Mr. Soffar really knew something about the Bowling Alley robbery.  (*Id*. at 10-13.)  Sergeant Clawson was present for some of this interrogation.  (29 R.R. (Amend.) 113.)  Detective Schultz testified that, based on this initial interrogation, he was satisfied that Mr. Soffar did have actual knowledge of the crime because Mr. Soffar knew (i) where the Bowling Alley was located, (ii) the time of night the offense occurred, (iii) that the Bowling Alley had front doors, and (iv) that people were inside and a few cars were in the parking lot.  (30 R.R. (Amend.) 98-99.)  Indeed, Detective Schultz was sufficiently satisfied that Mr. Soffar was involved in the crime that he called Terry Wilson, a Harris County Assistant District Attorney, to come to the station and participate in the interrogation.  (*Id*. at 158, 163-64, 187.)   While they were waiting for Mr. Wilson to arrive, Detective Schultz continued to question Mr. Soffar.  (*Id*. at 164.)  This interrogation lasted approximately half-an-hour, was not tape-recorded, and there is no evidence about what was said.  (*Id*. at 164-65.)

The reliability and credibility of Detective Schultz's testimony was challenged on cross-examination and by the presentment of contradictory evidence.  (*See, e.g.,* 29 R.R. (Amend.) 148-51, 199; 30 R.R. (Amend.) 30-71, 53-55, 86-125; 31 R.R. 59-66; *see also* 43 R.R.

State Ex. 1B at 7:30-46, 7:51-57; 43 R.R. State Ex. 204-A at 31:01-31:27; 43 R.R. State Ex. 205-A at 12-17.)  *First*, when later questioned by different interrogators, Mr. Soffar was unable to tell them the location of the Bowling Alley, the time of night the crime took place, nor was he able to describe accurately the physical structure and internal layout of the building.  (29 R.R. (Amend.) 148-51, 199; 31 R.R. 59, 60-66; 43 R.R. State Ex. 1B at 7:30-46, 7:51-57; 43 R.R. State Ex. 204-A at 31:01-31:27; 43 R.R. State Ex. 205-A at 12-17.)  In other words, Mr. Soffar was unable to tell those other detectives the very same details that Detective Schultz testified Mr. Soffar spontaneously provided and which led Detective Schultz to believe Mr. Soffar was somehow involved in the crime.  (*Compare* 30 R.R. (Amend.) 98-99 *with* 29 R.R. (Amend.) 148-51, 199, *and* 31 R.R. 59, 60-66, *and* 43 R.R. State Ex. 1B at 7:30-46, 7:51-57, *and* 43 R.R. State Ex. 204-A at 31:01-31:27, *and* 43 R.R. State Ex. 205-A at 12-17.)

*Second*, consistent with Mr. Soffar's inability to provide basic information about the crime, Sergeant Clawson testified that, while he was observing Detective Schultz's interrogation, he saw that Mr. Soffar was unable to draw an accurate picture of the exterior layout of the Bowling Alley, was unable to tell Detective Schultz where in Houston the Alley was located, and did not know the road configuration leading to and from the Alley.  (29 R.R. (Amend.) 146-51.) Sergeant Clawson then saw Detective Schultz draw Mr. Soffar a diagram of the interior layout of the Alley.  (*Id*. at 151.)

*Third*, trial counsel showed that at least one of the facts upon which Detective Schultz relied—the location of the Bowling Alley—had been widely reported in the Houston news media.  (30 R.R. (Amend.) 107.)  But for the convicting court's erroneous exclusion of media report evidence, *Soffar III*, 2009 WL 3839012, at *20, trial counsel would have shown that **all** of the information Mr. Soffar supposedly knew was publicly available.  (*See* 43 R.R. Def. Exs.

58-60 (demonstrating that the following facts had been reported in the media:  (i) where the Bowling Alley was located, (ii) the time of night the offense occurred, (iii) that the Bowling Alley had front doors, (iv) that people were inside, and (v) and that a few cars in the parking lot when the crime occurred).)

*Finally,* Detective Schultz admitted that Mr. Soffar had told him about his history of drug abuse, had taken Quaaludes earlier that day, was coming down from using drugs, and had not slept in a couple of days.  (30 R.R. (Amend.) 53-55.)  Detective Schultz had no reason to doubt Mr. Soffar's claim that he was under the influence of some substance because he had reached that conclusion himself based upon Mr. Soffar's appearance.  (*Id*. at 53.)

By the time Mr. Wilson arrived—sometime between 11:30 a.m. and 1 p.m.—a potentially intoxicated Mr. Soffar had already spoken with five different police officers and been substantively interrogated for as much as two hours, none of which appears to have been recorded or reduced to writing.  (*See, e.g.,* 29 R.R. (Amend.) 21, 22-32, 29-30, 34, 93-94, 106-07, 109-111, 191; 30 R.R. (Amend.) 10-14.)  Mr. Wilson took a different approach.  Just before entering the interrogation room, he turned on a micro-cassette recorder and hid it in his pocket.  (29 R.R. (Amend.) 217-18.)  Although Mr. Wilson testified that his entire contact with Mr. Soffar was recorded—a total of nineteen minutes—(*id*. at 204-05), he previously testified that he spoke with Mr. Soffar for as much as forty-five minutes (4 R.R. 195).  If Mr. Wilson's prior testimony—rather than his retrial testimony—is true, parts of his interrogation were either not recorded or parts of the tape have been lost or destroyed.  One way or another, Mr. Wilson's testimony has no credibility.

The tape recording, however, speaks for itself.  Although garbled in parts, what is audible shows that Mr. Soffar:

- Did not know the caliber of weapon used to commit the crime;

- Did not know the amount of money stolen;

- Did not know where in Houston the Bowling Alley was located;

- Did not know the day of the week the crime took place;

- Did not know the time of night the crime occurred;

- Did not know whether the Bowling Alley had a security camera;

- Had learned information about the Bowling Alley robbery from media reports;

- Was impaired by the effects of two days of sleep deprivation and drug use;

- Had spent three years in a mental hospital;

- Was unable to recall what he did week-to-week; and

- Was determined to see his friend, Latt Bloomfield, blamed for the robbery because he had "throwed [*sic*] down on [Mr. Soffar] the other day behind [*sic*] drugs."

(43 R.R. State Ex. 1B at 2:47-52, 3:01-03, 3:19-30, 6:47-7:06, 7:25-29, 7:32-43, 9:30-40, 10:56-11:06, 13:52-14:24, 12:16-20, 12:48-51, 13:03-06, 14:28-15:03; 18:27-19:11.)

From this point forward, the chronology of what transpired on August 5, 1980, is unclear but it seems that Mr. Wilson left the interrogation room followed shortly thereafter by Detective Schultz. (29 R.R. (Amend.) 201, 206.) Mr. Soffar had told Detective Schultz that he would not talk to Mr. Wilson anymore. (*Id*. at 206.) This was the second time that Mr. Soffar had refused to speak with a police officer that day. (*Id*. at 112.) It was either at this point, or sometime later, that Detective Schultz asked Sergeant Clawson to talk to Mr. Soffar. (*See id*. at 188-89.) As Sergeant Clawson testified, it was his impression that Detective Schultz had "hit a brick wall with Mr. Soffar." (*Id*. at 187-88.) It was also his impression that the reason why he was at the police station was to "hold Max's hand" and to "get Max to talk." (*Id*. at 146.) Indeed, Sergeant

24

Clawson later wrote in his report that he was called because "Soffar refused to talk."   (*Id*. at 119.)

Despite having seen that Mr. Soffar lacked even basic information about the Bowling Alley robbery, (*see supra* at I.A.1(2)), Sergeant Clawson agreed to speak with Mr. Soffar and exploit the trust Mr. Soffar had in him because he felt pressure not to impede the investigation. (*Id*. at 145-51, 157-63.)   During this conversation, Mr. Soffar asked four questions to which Sergeant Clawson responded as follows:

| MR. SOFFAR'S QUESTION | SERGEANT CLAWSON'S ANSWER |
|---|---|
| Should I get a lawyer or talk to the police? | If you're guilty, talk to the police; if you're innocent, get a lawyer. |
| How do I get a lawyer? | Can you afford one? |
| How long does it take to get a court appointed attorney? | I don't know.  It could take a day, a week, or a month.  I don't know how it works in Harris County. |
| Am I on my own? | Yes you are. |

(*Id*. at 113, 115-17, 157-60.)  As Sergeant Clawson admitted, he knew that Mr. Soffar could ***not*** afford an attorney.  (*Id*. at 115, 159.)  He also knew that suspects could not be held for more than seventy-two hours, but did not tell Mr. Soffar that fact.  (*Id*. at 159.)   And he knew that Mr. Soffar did not appreciate the seriousness of the potential charges against him.  (*Id*. at 162-63.)   Sergeant Clawson's answers had the desired effect:  Mr. Soffar went back into the interrogation room.  (*Id*. at 182-83.)

Unable to interrogate Mr. Soffar himself, Mr. Wilson handed his tape recorder to Detective Schultz who returned to the interrogation room with Mr. Soffar.  (*See* 30 R.R. (Amend.) 26.)  At approximately 2 p.m.—after three hours of interrogation—Detective Schultz

asked a stenographer to join him.  (*Id*. at 15.)  Although Detective Schultz had Mr. Wilson's tape

recorder with him for some time, Detective Schultz apparently turned the recorder on only when

the stenographer began transcribing the interrogation.  (*Id*. at 16; 43 R.R. State Ex. 1B at

19:30-32:52.)  The portion of the tape recording during which the stenographer was present

shows that Mr. Soffar:

- Was unable to state accurately the date or day of the week on which the crime occurred claiming, incorrectly, that the crime occurred in early July;

- Claimed, falsely, to have burglarized the Bowling Alley on the night before the robbery;

- Claimed, incorrectly, that the victims were forced to their knees;

- Was unable to state accurately the number of cars in the parking lot, initially stating, incorrectly, that there were no cars and later stating, after prompting by Detective Schultz, that there were as many as eight cars, which was also incorrect;

- Was unable to describe accurately the exterior of the Bowling Alley, initially stating, incorrectly, that there were windows on the front wall and only changing his answer to doors after prompting by Detective Schultz;

- Was unable to state accurately the amount of money stolen, claiming, incorrectly, that $400 was taken;

- Claimed, incorrectly, that the perpetrator had only money in his hands when he left the Bowling Alley;

- Was unable to state accurately the type, caliber, or barrel length of the weapon used; and

- Said that he had been verbally threatened by an officer.

(*See* 43 R.R. State Ex. 1B at 21:36-22:50, 23:47-55, 22:24-54, 23:14-30, 26:00-25, 26:25-31,

28:55-29:20, 31:28-39.)   The stenographically recorded interrogation ended at 2:12 p.m.  (43

R.R. State Ex. 1B at 32:30-32:52.)

Detective Schultz continued to interrogate Mr. Soffar while they waited for the stenographer to create a statement.  (43 R.R. State Ex. 1B at 33:30-44.)  This interrogation was recorded.  The recording shows that Mr. Soffar:

- Had watched television news reports about the Bowling Alley robbery;

- Had seen pictures of the surviving victim and knew that he had lost an eye;

- Continued to maintain, falsely, that he had burglarized the Bowling Alley on the night before the robbery;

- Could spend $200-$300 per day on drugs (which, today, is $565-$850 after adjusting for inflation);

- Was "coming down" from drug use at the time of the interview;

- Had not slept for a couple of days at the time of the interview, a fact confirmed by several audible yawns;

- Believed he might be able to obtain bail, despite claiming to having been involved in a triple-homicide;

- Was eager to see Mr. Bloomfield charged with capital murder; and

- Was aware of the existence—and amount—of a reward.

(30 R.R. (Amend) 122.)  The recording also shows that Detective Schultz told Mr. Soffar:

- The ages of the victims;

- How many people were shot;

- How many people survived;

- That the police were not aware of any witnesses other than Mr. Garner;

- That none of the victims had fought back; and

- That none of the victims had a weapon.

(43 R.R. State Ex. 1B.)

The stenographer returned to the interrogation room shortly before 3.30 p.m. with a typewritten statement (the "First Statement").  (30 R.R. (Amend.) 16-20; 43 R.R. State Ex. 108.)  Mr. Soffar signed the statement.  (30 R.R. (Amend.) 18-19, 24; 43 R.R. State Ex. 108.)  The statement read:

> In the first part of July I was just riding around with Lad Bloominfield.   We went to Houston one night but I don't remember what night it was or what day of the week it was.  I went to the bowling alley and entered through a side door and checked the cash drawer. There was petty cash and I left it and went out the door.  The next night Lad asked me to take his pistol to go in the bowling alley and I wasn't going to do it.  I told him I would drive if he went in the bowling alley and did it himself and that is the way it happened.  He went in.  I parked in front and I watched out through the outside.  There was no movement and it was quiet. There were about five cars, six or eight.  There weren't very many. He (Lad) went inside and I saw him move some people around and he walked around.  While he was out of my sight I heard two shots. The people walked in front of the doors of the bowling alley and I saw him walk towards them and I saw him point at them and told them to get down on the ground.  They were laying on their knees. He pointed the gun at the people and told them to come here and put the gun back on them.  The person walked up.  It was a young looking person. I moved the car forward and I heard a shot and I pulled up and started to leave. I pulled up about 25 yards and I heard a couple of more shots.  I heard about five shots altogether.  I heard two.  I barely heard them and then I thought I heard a couple of more.  I was so scared I didn't know what was going on.  He (Lad) ran outside and he had a whole lot of money (bunch of 20's, 10's and 5's).  We bought about $380.00 in drugs but he had a pistol beside money when he came out.  He was pretty scared, nervous and I told him what happened and he said somebody came from the back and he shot them.  I don't know just what happened. We got in the car and left.  We turned right, went by a stop sign and turned right again. We went down and then he drove and went to Scotts St. around 610 and bought a bunch of drugs and went to Galveston.   He committed a robbery over there. He robbed a U-Totem.  He told him if he did not give him the money he would kill him.  That is when I realized how crazy and stupid he could be on drugs.  He is a fool and I do not know why he shot those people. We did not go with intent to hurt anybody.  He had a 357 38 gun. I do not know whether it is a regular but its a cheap model. It has a 3" barrel or 2-3/4" and the color was blue.  When I pulled in the

parking lot I saw three people.  I saw two people by the machine
and the one he (Lad) waved over there.  A couple had long hair
and I think it was a male but it might have been a girl.  I do not
know.  I was so messed up and I was scared and when I heard
those shots I lost all sense of direction and I wanted to get away.
This is bothering me for a long time.  No promises were made to
me to make this statement.  No I have not been abused in any way
by any Officers.  Nobody is beating me to make this confession
and it is being made on my own will.  Like I said I did not go with
the intention to hurt someone.  I did not know he was that sick just
to shoot somebody down.

(43 RR State Ex. 108; 30 R.R. (Amend.) 19.)  After signing the statement, Mr. Soffar was taken

to Houston.  (30 R.R. (Amend.) 63.)

> (3)    August 6, 1980:  Mr. Soffar Signs The Second Statement

At approximately 9 a.m. on August 6, 1980, Detective Kenneth Williamson checked

Mr. Soffar out of the county jail and took him to the homicide office for questioning.  (31 R.R.

55-56.)  This interview was tape-recorded.  (*Id*. at 56.)   The tape recording—and transcript—

was admitted into evidence at trial.  (*See* 43 State Ex. 204-A; 43 State Ex. 205-A; 31 R.R. 59.)

Just as the tape recordings of the prior day's interrogations had shown, the tape recording of the

first August 6, 1980 interrogation shows that Mr. Soffar knew next to no accurate facts about the

Bowling Alley robbery.  (*See, e.g.*, 43 State Ex. 204-A at 8:07-48; 8:55-9:14; 19:36-20:09; Ex.

205-A.)  Specifically, the recording and transcript show that Mr. Soffar:

- Did not know where the Bowling Alley was located in Houston;

- Did not know the road upon which the Bowling Alley sat;

- Had seen the surviving victim on television;

- Claimed that, after leaving the Bowling Alley, he drove onto
  Interstate 10 or 610, a claim disproven by evidence showing that
  the Bowling Alley actually stands on Highway 290/Northwest
  Freeway and is nowhere near those Interstate roads;

- Claimed that Mr. Bloomfield had nothing in his hands other than
  his pistol when he left the Bowling Alley, a claim disproven by

29

evidence showing that the intruder took the victims' wallets with him;

- Claimed that Mr. Bloomfield wore a stocking over his head while committing the crime, a claim disproven by evidence that the intruder wore no disguise;

- Continued to blame Mr. Bloomfield for the crime;

- Agreed with the Detective that his mind was not clear on August 5, 1980;

- Claimed that he was coming down from drugs at the time of the crime, a claim disproven by Mr. Garner's recollection that the perpetrator did not appear to be under the influence of any substance; and

- Claimed that he went to Scott Street after the crime to buy drugs from "Pops," a claim that the police were never able to verify.

(43 R.R. State Ex. 204-A; 43 R.R. State Ex. 205-A at 5-7, 11, 17, 19, 23; 26 R.R. 79, 192, 195; 28 R.R. 168-70; 30 R.R. (Amend.) 154; 31 R.R. 32; 32 R.R 68.)  Perhaps because Mr. Soffar was unable to describe the location of the Bowling Alley, Detective Williamson drew him a map showing the building, the location of the front doors, the freeway running past it, and the parking lot lines in front of the entrance.  (31 RR 60-66; 43 RR State Ex. 204-A at 31:01-31:27.)

> Yeah.  O.K . . . Where did, uh, let me draw you a map the best I can remember of that parking lot and if you can remember, tell me about where, O.K . . .  There's an entrance right here . . . The parking lot's something . . . , something like this . . . This is the road out here.  The building . . . , sets something like that.  There's a—some lanes, parking lanes, right here in front . . . There's two rows as a matter of fact . . . I'm thinking there's some rows back here and I think there's some rows back over here too.  O.K., this is the entrance to the parking lot here and the door to the bowling alley would be right in here.

(43 R.R. State Ex. 204; 43 R.R. State Ex. 205-A at 14-15.)  Detective Williamson also helpfully told Mr. Soffar which parts of his statements were correct.  For example, when Mr. Soffar claimed that the victims were lined up, lay down, and then shot, Detective Williamson said:

"That's the way it appears to us."  (31 R.R. 5.)  Notably, however, Mr. Soffar later said in the same interview that the victims were shot while kneeling  (43 R.R. State Ex. 204-A; 43 R.R. State Ex. 205-A at 16.)

Detective Williamson's interview concluded at approximately 10 a.m., at which point Mr. Soffar was led away to be placed in a lineup that the police asked Mr. Garner to view.  (43 R.R. State Ex. 204-A; 43 R.R. State Ex. 205-A; 43 R.R. 201; 30 R.R. (Amend.) 170, 174; 31 R.R. 57-58.)  Mr. Garner did not positively identify Mr. Soffar.  (32 R.R. 193-94.)  The police also showed Mr. Garner a lineup featuring Mr. Bloomfield.  (43 R.R. State Ex. 202; 31 R.R. 57-58.)  Mr. Garner did not positively identify him either.  (32 R.R. (Amend.) 193-94.)  Nor did the police recover any forensic evidence when they searched Mr. Soffar's and Mr. Bloomfield's houses and Mr. Bloomfield's car.  *See Soffar I*, 368 F.3d at 453 n.18.  Because Mr. Bloomfield refused to provide a statement, with no forensic or eyewitness evidence linking him to the crime, the police released him the following afternoon.  (31 R.R. 29-30.)

The police did not release Mr. Soffar.  Instead, Detective Williamson quickly resumed his questioning of him, this time with Detective Ladd's assistance.  (28 R.R. 40-41; 30 R.R. (Amend.) 135-36.)  One to two hours later, Detective Ladd typed up a statement for Mr. Soffar to sign.  (30 R.R. (Amend.) 138, 140-49.)  Mr. Soffar signed that statement at 2:44 p.m. on August 6, 1980 (the "Second Statement").  (30 R.R. (Amend.) 140-49; 43 RR State Ex. 109.)  The statement read as follows:

> I met Lat Bloomfield about three years ago in the Forest Bank Park out by my house.  I didn't really start running with him until about the last six months.  I would hear bits and pieces about Lat and his brother Link doing burglaries around Forest Bend and Wedgewood from Ray Leonard.  It was about five months ago that Lat started coming by my house regularly.  It was about two to three months ago that he brought some cocaine to my house that he had stolen from Lou Bransteader.  She lives on Blackhawk near Friendswood

31

Link Road and the county had done a raid on her house for cocaine.

Lat and Link were doing burglaries there close to home and he once told me that he had hit a couple of houses there on Paint Rock and Hybiscus. He would say that he liked to burglarize in his neighborhood so that he could watch the people before he would do it. I didn't like to pull stuff around my neighborhood. Lat was pretty well into coke but I did mainly only preludes and grass.

Right around the time this bowling alley deal happened Lat was living in an apartment off 45. I think it was the Westminster apartments. He had moved in shortly before the bowling alley killings happened. I was staying at home at nights but was running real regular with Lat. A couple of days before we went to the bowling alley we were up on preludes. The night before the bowling alley we were in Lat's t-bird riding around in Houstol looking for something to do. Lat was driving and was talking about robbing a convience store. He drove up to this bowling alley and it was late sometime after midnight. There were no cars in the parking lot and he parked and we got out and walked around looking in the windows and doors to see if we could see anyone inside. We didn't and I walked over to the door on the right hand side and was at this side door and fixing to bust in. Lat was afraid of an alarm so he went back to the car. I kicked at the door and it wouldn't break so I found a rock or something and threw it and it cracked the glass. Then I kicked it again and the bottom half of the door broke out. I went in and there was an office or something there by the door. I tried to get in but the door was locked. I kicked it but it didn't come open. Then I walked over to the front desk and leaned over to the cashregister. The drawer was partly open and I pulled it open the rest of the way and there was about six dollars in change there. I took it from the drawer and about that time Lat came in to see what I was getting. I then went past the front doors and right after the doors was a snack bar on my left. It also had a cash register drawer and I leaned over and looked in there and there was change in it too. I took some of the change out of it and left some too. Then Lat told me that we had better leave so we went back out the way I had broke in. When we went back to the car I saw another car that had come into the parking lot. It looked like a cutlass or something and it had the dome light on. There was one man and one woman in the car. We pulled out onto the highway heading back towards Houston and Lat was driving. I do not know my way around out there and he drove back to 45 somehow and then we went back to Friendswood. When we got to Friendswood we talked about robbing the Safeway store there. Lat had his 357 pistol with him. He had got this pistol out of a

burglary somewhere and it was blue steel with a three or four inch barrel.  Lat something was said about the Safeway store having cameras and so I didn't want to do this.  He wanted me to go to my house and get my ski mask and come back and do this robbery but I didn't want to.  So then we just drove around in Friendswood and Forest Bend looking for dark houses with no cars in front.  I told Lat that this was crazy because there could still be someone home in the houses.  He then took me back to my house and let me out. He left but I don't know if he went to his parents house on David Glen St. or to his apartment.

The next day I think this was on a weekend, Lat came to my house and picked me up around one in the afternoon.  He was driving his brown t-bird and we went up to Forest Bend park.  After there we went to Snoots house.  Snoot is a Martin Naylor who lives in the Lakeshire apartments on El Dorado.   Over at Snoots we were drinking beer and smoking weed.  We told Snoot that we might be getting some preludes.  A couple of days before this we had been up on prelude and were just coming down.  Lat was kind of jumpy from this.  Me and lat left Snoots around 3 or 4PM and went by the local parks.  We went to Galveston County Park and Bay Area looking for some people to rip off. At Galveston County Park we found this guy that wanted to buy a lid of grass.  We told him that we could get him some for 35 dollars and he gave it to us.  We said we would bring it back but took off with his money for Houston. We got some gas and more beer with some of that money.  It was around 7 PM when we got to Houston.  Lat was driving and we cruised by some Weingartens and K-Marts and were checking some of these places out to rob.  There were too many people in these places as it was too early so we did not do any of these.  Lat gave me his gun to hold and he thought that I would go in and rob someplace they found but I wasn't going to go do it.  I was going to have him do it if we found the right place.  Lat drove back to the bowling alley that we had burglarized the night before. We got there around 9 or 9:30 and there were a lot of people there so we parked out by the street and drank beer.  When everybody had left except for a few cars we talked over how we would do it.  I told him that I didn't want to do it and that I would go look around.  I walked up to the door andlooked inside and saw some people still inside.  I went back and got into the car and told Lat that there were a few people in front and some to the side.  He pulled the car up to the left side of the bowling alley but still in front.   The drivers side of the car was closest to the front of the building.  He asked me if I was going to do it and I told him no.  He grabbed the gun from me and walked around to the passenger side and I scooted over to drive and he got in the passenger side.  I drove to the front of the bowling alley and was parked right in front of the

doors trying to block the view inside if someone would happen to be looking.  Lat walked to the front and he had the gun hid in his shirt.  He tried one door and it was locked and then tried a second and it was open and he went on in.  When he got in he was approached by two people.  I think one of these was a girl by the look of her hair.  Then Lat was approached by another man.  He made these three people lay down right in front of the door.  At first they went down on their knees and then laid on their face.  I could see Lat waiving and pointing the gun back to my right and motioning someone else to come over.  From my view I lost sight of the gun but could still see Lat when I heard the first shot.  It was only one shot and while he was looking back to my right and was waiving and motioning with his other hand.  When the first shot went off I pulled the car up about five feet.  I could still see partially into the bolwing alley and saw some feet from one of the people laying down.  Then I heard another shot and drove on up to the edge of the building.  I thought something had gone wrong and someone might come out and try to get a look at our car.  After I pulled to the front I heard several other shots.  I was turning around and fixing to leave when Lat came running out the front door.  He had the gun in one hand and he had this lady's stocking in the other.  Lat had pulled a woman's stocking over his hair before going into the bowling alley to rob it.  This stocking was kind of tied up on the top of his head and covered his hair and part of his forehead.  He jumped in the car and I pulled out of the parking lot going back to the right.  I drove straight on the highway for several miles and didn't know where I was going.  I pulled into a Spin-in market or Plantation or something and parked.  Lat got out and put the gun in the trunk under the spare tire and took off the shirt he had been wearing.  This shirt was a blue long sleeve that looked like the one I saw today in the homicide office that the detectives had with them.  Lat was still wearing the t-shirt he had on under the long sleeve blue shirt.  Lat said that he had shot someone in the bowling alley because they had pulled a gun on him.  I asked him why he shot so many time and he said that he did what he had to do.  When he counted the money at the convenience store he told me that we had hit the jackpot.  When we left there he did the driving.  The night this happened I was wearing blue jeans and a brown t-shirt.  When we left the convience store we drove around and ended up on the freeway and went towards 610.  We drove around on 610 and came off on Scott street.  At Scott and the 610 Loop we came in towards town and driving in Scott came two blocks to Mainer.  At Mainer we went back to the left and went down about two blocks to Pop's apartment.  I have scored Prelude several times by going to Pops.  Pops apartment is on the left had side and I think it is #7.  Pop went with us down the block farther

and I gave him 380 dollars.  He came back with 380 dollars worth of prelude and they were 12 dollars each.  We gave Pop a few and then we came on back to Friendswood.  I was back over at Pops a few weeks ago and told him about this deal at the bowling alley.  I asked him if he heard about it and that Lat and I had done it.  He thought we were just kidding.

Other than the drugs we got out from Pop I didn't get anything else other than beer and cigarettes and stuff.

While here at the police station I feel that I have been treated fairly by everyone and have been given food and cokes and coffee and some cigarettes.  I now feel better within myself for having come forward and told what I know about this.  I regret ever being with Lat and regret and feel sorry for the people and their parents that we hurt.

(30 R.R. 140-48; 43 R.R. State Ex. 109.)

Shortly after signing the Second Statement, Detectives Williamson and Ladd put Mr. Soffar in the back of a police car and took him on a seven-hour ride around Houston.  (30 R.R. (Amend.) 150, 156.)  One of the purposes of the trip was to try to locate "Pops" from whom Mr. Soffar claimed to have bought drugs after the robbery.  (*Id*. at 153-54.)  The police never found "Pops," but they did find someone, allegedly pointed out by Mr. Soffar, named "Papa." (31 R.R. 38.)  After interviewing Papa—whose real name was Lawrence Bryant—on the side of the road for two to three hours the detectives arranged for a patrol car to take him back to the police station for further questioning.  (*Id*. at 72-73; 32 R.R. (Amend.) 20.)  Mr. Soffar then apparently led the police to another person, Mable Cass.  (31 R.R. 73.)  She, too, was taken to the police station to give a statement.  (*Id*. at 73.)

Once at the police station, Detectives interrogated Mr. Bryant for a further four to seven hours. (32 R.R. (Amend.) 20.)  According to Mr. Bryant, on August 1, 1980, Mr. Soffar arrived at Mr. Bryant's girlfriend's house in a car with two other men.  (*Id*. at 6.)  Mr. Soffar supposedly wanted to sell a gun.  (*Id*. at 9-10.)  After discussing the sale of the weapon, the conversation

allegedly turned to a bowling alley robbery.  (*Id*. at 10-11.)  Mr. Bryant claimed that Mr. Soffar asked Mr. Bryant whether he had heard anything about a bowling alley robbery.  (*Id*. at 11.) Mr. Bryant said that he had heard about a robbery in Texas City or Galveston.  (*Id*. at 12.) Mr. Soffar responded by asking Mr. Bryant if he "would believe if [Mr. Soffar] had done it." (*Id*. at 12-14)  Mr. Soffar also supposedly claimed to have shot three people and stolen "15 or 20 or 25."  (*Id*. at 12-14.)  In turn, Mr. Bryant asked Mr. Soffar if he was "crazy."  (*Id*. at 12.)

Ms. Cass also signed a statement at the police station.  (31 R.R. 173-74.)  According to her trial testimony, three white men (one of whom she identified as Mr. Soffar) and "Papa" arrived at her apartment at around 4 p.m.  (*Id*. at 174.)  Mr. Soffar allegedly referenced a bowling alley robbery in "Galveston" that had been on television and said, "you wouldn't suspect who killed the people at the bowling alley."  (*Id*. at 176, 183.)  Mr. Bryant responded by saying, "ah man not you" and Mr. Soffar supposedly said yes.  (*Id*. at 176.)  Mr. Soffar then went to the car and retrieved a semi-automatic gun with a clip that came out the bottom, which he showed to Mr. Bryant and Ms. Cass.  (*Id*. at 177-78.)  He said that the weapon was the one he used to commit the robbery.  (*Id*. at 188.)

While Mr. Bryant and Ms. Cass were being questioned, Detectives Ladd and Williamson, and Mr. Soffar, resumed their drive around Houston.  (*See id*. at 26-28.)  Mr. Soffar apparently took the police to a Weingarten's store that he claimed Mr. Bloomfield had robbed some six months earlier.  (*Id*. at 26-27.)  When the police investigated this claim, they found that no such robbery had occurred.  (*Id*. at 26-27.)  Similarly, Mr. Soffar allegedly led the Detectives to a U-Totem store in Galveston that he claimed he and Mr. Bloomfield robbed on the same night as the Bowling Alley robbery.  (*Id*. at 27.)  When the police investigated this claim, they found that it, too, was false.  (*Id*. at 28.)  The car ride concluded at 11 p.m.  (*Id*. at 28-29.)

36

(4)      August 7, 1980:  Mr. Soffar Signs The Third Statement

At some point on August 7, 1980, Mr. Soffar found out that the police had released Mr. Bloomfield without charge.  (30 R.R. (Amend.) 29-31.)  Incensed, he asked to speak with the detectives again.  (31 R.R. 146.)   When he returned to the police station, Mr. Soffar expressed his anger at the decision to let Mr. Bloomfield go.  (*Id*. at 30.)  The detectives then proceeded to interrogate Mr. Soffar once more.  (*See id*. at 77.)  At 9:25 p.m., Mr. Soffar signed a third, and final, statement (the "Third Statement").  (30 R.R. (Amend.) 159-64; 31 R.R. 77; 43 R.R. State Ex. 110.)  The statement read as follows:

> Lat drove in and we were in his brown thunderbird.  Lat pulled right to the front door so that the passenger side was next to the bowling alley.  I think that there was a couple of cars in the parking lot when Lat pulled to the door.  Lat pulled a stocking over his hair so that his hair would be pulled back.  I pulled up my t-shirt over my nose and mouth.  Lat had his 357 revolver which I think is an R-G model.  This gun had about a three inch barrel.  He had the gun under his shirt when we walked in a guy asked what we were doing.  Lat pulled the revolver and stuck it in this guys face and said, "This is a robbery." Lat pulled this guy by the hair and made him get down on his knees. Three other people were over by the snack bar and they saw the man on his knees and xx walked up. This was two dudes and a girl. Lat told them to get on the floor and if they didn't do what he told them that he would shoot this first guy who was already on the floor.  They got down on their knees away from the counter and Lat made them come back closer to the control counter and they did.  They were laying from the door so that there was a dude and then a girl and then another dude and then the last dude. The second dude was trying to look up and Lat told him not to be looking and to turn around and lay facing the way all the others were.  He then turned around so that they were all facing back towards the snack bar.  The second dude kept looking around so Lat fired a warning shot into the floor. The girl screamed and then Lat told her to shut up and she kept screaming. Lat kicked the girl in the back and then the second dude who was the one who kept looking up started to raise up. He was about half way up when Lat shot him in the back of the head. Then Lat just turned around and shot the third dude. This third dude was the first one Lat grabbed and made get on the floor. He shot him the same way as the first one that he shot. Lat threw me the gun and told me to shoot the other two. I hesitated and then he said,

"Shoot them now." I aimed the gun and the other guy who was still xx left who was closest to the door and fired one time. I hit him in the back of the head behind the ear. I walked around the other side of them and heasitated and Lat said, "Shoot her." She had her face down and she just looked up at me and I aimed and turned my head and shot her. I think I hit her in the cheek. I had the gun and ran around and looked in the cash register over by where you get the shoes. I got all the bills and a little of the change and then went to the office but the door was locked. I went over to the cash register by the snack bar and took bills out of it too. I put the money in my pockets. I went back by the office and tried to force the door open but I couldn't get it opened. Lat was looking under the counter for a money bag and I think he got 50 or 60 dollars. He walked over by the office and I told him I thought I saw some headlights. I went outside but I didn't see anyone so when I came back in Lat was rumageing through their pockets and took the wallets out of their pockets. He took the money and I think that he kept the wallets. We looked around to make sure that nobody was looking and we didn't x see anybody. I asked him if he wanted to check in the back and he said no. So, we looked in the bathrooms making sure no body was in there. Then we left. I still had the gun. Lat drove and we had the windows down to his car . He made a right on the highway and drove down for a little bit and then turned around and came back past the bowling alley. I asked him why he shot the dudes and he said he shot the dude for raising up and playing hero. He said he made me shoot the other two so that I would be as guilty as him if we got caught. I put the gun under the front seat after I reloaded it and it only had one live bullet in it before reloading. . . . We went to score some pills and got xxxxxxxx 24 pills over at the dope house. These were preludins. . . . We went to my house and did some preludin and Lat said he was afraid someone had seen his car so he went and took it home. He walked back over to my house that night and we did the rest of the pills. We stayed up all day and went to the park the next day. I was scared and that is the reason that I did not tell the whole truth before and I feel like shit and feel bad about what happened and ought to take my punishment for it. I think Lat and me both ought to pay for what we did.

(43 State Ex. 110.)  In addition to having him sign a statement, a diagram was prepared showing

the location of the victims at the time Mr. Soffar and Mr. Bloomfield allegedly shot them.  (31

R.R. 88-89.)  The diagram depicts the crime scene as described in the Third Statement:  the

victims in a straight line ordered male, female, male, male.  (*Id*. at 89; 43 RR State Ex. 207; 43

R.R. Def. Ex. 32).  This diagram was inconsistent with that drawn by Mr. Garner and the forensic evidence, which showed the victims arranged in a semi-circle ordered female, male, male, male.  (*Compare* 31 R.R. 89 *with* 45 R.R. Joint Ex. 3.)  Mr. Soffar was convicted based on this Third statement.  *See Soffar v. Cockrell*, 300 F.3d 588, 641 (5th Cir. 2000) (DeMoss, J., dissenting) ("I am glad I will not be standing in [my fellow judge's] shoes, if and when Soffar is executed solely because of the third statement he signed in this case.")  As explained below, the Third Statement is legally insufficient to justify his conviction and death sentence.

### 2.    The Applicable Standard.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court established that a conviction based on insufficient evidence violates the due process guarantee of the Fourteenth Amendment to the United States Constitution.  *Id.* at 319, 326; U.S. CONST. amend IVX.  The standard of review for an insufficient evidence claim raised in a federal habeas corpus proceeding is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319; *United States v. Moreland*, 665 F.3d 137, 148 (5th Cir. 2011) (applying *Jackson* standard and finding evidence insufficient).  It is the "responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences."  *Jackson*, 443 U.S. at 319.  The question for the reviewing court is whether the conviction violates the fundamental protection of due process of law.  *Id.*

The *Jackson* standard is clearly established federal law for the purposes of 28 U.S.C. 2254(d)(1).  *See, e.g., Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (applying *Jackson* standard); *Carvos v. Smith*, 132 S. Ct. 2, 6 (2011) (same); *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (same); *Pilon v. Bordenkircher*, 444 U.S. 1, 2 (1979) (same); *Moreland*, 665 F.3d

at 148 (same); *see also Schlup v. Delo*, 513 U.S. 298, 330 (1995) (articulating *Jackson* standard);

*United States v. Aguilar*, 515 U.S. 593, 613 (1995) (referring to the "familiar standard of *Jackson*

*v. Virginia*") (Scalia, J., dissenting); *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 318

(1984) (articulating *Jackson* standard); *White v. Estelle*, 459 U.S. 1118, 1121 (1983) (same)

(Marshall, J., dissenting); *Butler v. South Carolina*, 459 U.S. 932, 936 (1982) (same) (Marshall,

J., dissenting); *Tibbs v. Florida*, 457 U.S. 31, 45 (1982) (same); *Simmons v. Epps*, 654 F.3d 526,

535 (5th Cir. 2011) (applying *Jackson* to punishment phase); *Miller v. Quarterman*, No.

H-09-1305, 2009 WL 2513531, at *4 (S.D. Tex. 2009) (applying *Jackson* standard); *Green v.

Dretke*, No. H-06-0815, 2006 WL 2091004 (S.D. Tex. 2006) (applying *Jackson* standard).

### 3.     Habeas Relief Is Warranted.

> (1)     Mr. Soffar's Constitutional Rights Were Violated Because The
> Evidence Against Him Is Insufficient Under The Standard Articulated In
> *Jackson v. Virginia*, 443 U.S. 307 (1979).

In assessing entitlement to habeas relief, federal courts consider first whether the

petitioner's constitutional rights were violated and then whether the state court's decision to the

contrary was an unreasonable application of well-settled federal law.  *See*, *e.g., Williams v.

Taylor*, 529 U.S. 362, 378-79 (2000) (explaining that 28 U.S.C. 2254(d)(1) requires courts to

consider whether a constitutional violation has occurred and then consider whether the state

court's decision to the contrary was unreasonable); *Weeks v. Angelone*, 528 U.S. 225, 237 (2000)

(adopting the same approach); *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (same); *Penry

v. Johnson*, 532 U.S. 782, 792-93 (2001) (same); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002)

(same); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Yarborough v. Gentry*, 540 U.S. 1, 4

(2003) (*per curiam*) (same); *Yarborough v.Alvarado*, 541 U.S. 652, 655 (2004); *Brown v.

Payton*, 544 U.S. 133, 141 (2005) (same); *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (same);

*Uttecht v. Brown*, 551 U.S. 1, 20 (2007 (same); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246

(2007) (same); *Brewer v. Quarterman*, 550 U.S. 286, 289 (2007) (same); *Waddington v. Sarausad*, 555 U.S. 179, 190-93 (2009) (same); *Knowles v. Mirzayance*, 556 U.S. 111, 121-28 (2009) (same); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009) (*per curiam*) (same); *McDaniel v. Brown*, 558 U.S. 120, 130-33 (2010) (*per curiam*) (same); *Smith v. Spisak*, 558 U.S. 139, 144-49 (2010) (same); *Berghuis v. Smith*, 559 U.S. 314, 325-33 (2010) (same); *Berghuis v. Tompkins*, 130 S. Ct. 2250, 2259-64 (2010) (same); *Harrington v. Richter*, 131 S. Ct. 770, 788-792 (2011) (same); *see also* RANDY HERTZ & JAMES S. LIEBAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE 1768-69 (6th Ed. 2011) ("[T]he Federal court should ordinarily examine the merits of the claim first and then, if the court finds constitutional error, move on to a review of the state court's decision to determine whether the criteria of section 2254(d)(1) preclude a grant of Federal habeas corpus relief.")  In this case, because "[t]he only connection between [Mr. Soffar] and the 1980 triple murder at the Fair Lanes Bowling Center in Houston is applicant's custodial confession to the police," *Soffar VI*, 2012 WL 4713562, at *2 (Cochran, J., concurring), the determinative question is whether that "confession" alone is sufficient evidence to support Mr. Soffar's conviction under the *Jackson* standard.  It is not.

It has long been understood that a defendant cannot be convicted based solely on his own statement.  *See Roberts v. United States,* 416 F.2d 1216, 1222 (5th Cir. 1969) ("Cocco and Roberts correctly assert that their conviction cannot be based solely upon their confessions or incriminating statements."); *United States v. Corona-Garcia*, 210 F.3d 973, 978 (9th Cir. 2000); *United States v. Pahl*, 11 F. App'x 882, 884-85 (9th Cir. 2001)*; United States v. Gargiso*, 456 F.2d 584, 587-88 (2d Cir. 1972) (holding that confessions by defendants are sufficient to establish guilt when there is adequate and independent corroboration for those confessions); *United States v. Gresham*, 585 F.2d 103, 106 (5th Cir. 1978) (holding that corroboration of

details in a confession can sustain a conviction); *United States v. Lopez-Alvarez*, 970 F.2d 583, 593 (9th Cir. 1992) (confession alone insufficient); *United States v. Polydoor*, 189 F.3d 476, at *1 (9th Cir. 1999) (same); *United States v. Stephens*, 482 F.3d 669, 672 (4th Cir. 2007) (holing that a conviction cannot rest entirely on an uncorroborated confession ); *United States v. Bryce*, 208 F.3d 346, 354-56 (2d Cir. 2000); *United States v. Fearn*, 589 F.2d 1316, 1321-22 (7th Cir. 1978).   Instead, there must be "substantial independent evidence which would tend to establish the trustworthiness of the statement."  *Opper v. United States*, 348 U.S. 84, 93 (1954); *United States v. Abu Ali*, 528 F.3d 210, 234-35 (4th Cir. 2008); *United States v. Surtain*, No. 11-30525, 2013 WL 1846625, at *7 (5th Cir. May 2, 2013) (same); *United States v. Bryce*, 208 F.3d 346, 354 (2d Cir. 2000) (same); *United States v. Irving*, 452 F.3d 110, 118 (2d Cir. 2006) (same).  For that reason, court's evaluating a sufficiency claim in a case involving a confession routinely look beyond the confession to determine if there is independent evidence of guilt. *See, e.g., Pemberton v. Collins*, 991 F.2d 1218, 1227 (5th Cir. 1993) (finding sufficient evidence in light of a confession ***and*** other circumstantial evidence); *United States v. Morris*, 57 F. App'x 797, 798 (10th Cir. 2003) (finding independent evidence established the trustworthiness of the confession); *Beck v. Thaler*, CIV.A. H-08-2963, 2011 WL 2313153, at *8 (S.D. Tex. June 9, 2011) (referencing the record "which ***includes*** [the defendant's confession] . . . .") (emphasis added); *Spivey v. Sternes*, 20 F. App'x 514, 517 (7th Cir. 2001) (concluding that a state court's finding of sufficiency was not unreasonable where there was ample evidence to corroborate facts in a confession); *Lucas v. Johnson*, 132 F.3d 1069, 1078 (5th Cir. 1998) (evidence "***including*** [the defendant's] confession" was adequate) (emphasis added); *United States v. Strickland*, ACM 35610, 2005 WL 2875117, at *2-4 (A.F. Ct. Crim. App. Sept. 8, 2005) (finding that competent evidence ***beyond*** confession sufficient to support conviction);

*United States v. Faison*, ACM37464, 2010 WL 2265833, at *3-4 (A.F. Ct. Crim. App. Apr. 19, 2010) (same); *United States v. Gutierrez-Gonzalez*, 891 F.2d 296 at *2 (9th Cir. 1989) (independent evidence proved the truth of a confession where absence of certificate of legal entry); *United States v. Irving*, 452 F.3d 110, 118 (2d Cir. 2006) (sufficient evidence establishing trustworthiness of statement); *United States v. Payne*, ACM S31556, 2009 WL 136745, at *2 (A.F. Ct. Crim. App. Jan. 15, 2009) (finding confession was sufficiently corroborated); *United States v. Athearn*, ACM 30397, 1994 WL 711894, at *4 (A.F. Ct. Crim. App. Dec. 9, 1994) (noting there was "ample evidence" independent of the appellant's statements); *White v. Estelle*, 669 F.2d 973, 979 (5th Cir. 1982) ("circumstantial evidence ***together with*** White's confession, was amply sufficient.") (emphasis added).  Here, none of the types of evidence that courts have found establish a statement's trustworthiness exists.  There is no eyewitness to the crime other than Mr. Garner, whose recollection is inconsistent with the Third Statement, no property linked to the crime was found in Mr. Soffar's possession, there was no in-court admission, there is no evidence that places Mr. Soffar at the Bowling Alley at any time much less on the night of the crime, the surviving victim failed to identify Mr. Soffar in a lineup, the autopsy findings are inconsistent with Mr. Soffar's statements, and there is no evidence that Mr. Soffar ever made any prior threats.  *Cf. United States v. Dreizler*, 78 F. App'x 734, 735 (2d Cir. 2003) (eyewitness testimony); *Pemberton v. Collins*, 991 F.2d 1218, 1227 (5th Cir. 1993) (contemporaneous threats); *Beck v. Thaler*, CIV.A. H-08-2963, 2011 WL 2313153, at *8 (S.D. Tex. June 9, 2011) (DNA evidence); *Spivey v. Sternes*, 20 F. App'x 514, 517 (7th Cir. 2001) (medical examiner independently corroborated facts); *United States v. Strickland*, ACM 35610, 2005 WL 2875117, at *4 (A.F. Ct. Crim. App. Sept. 8, 2005) (medical evidence and testimony); *United States v. Faison*, ACM37464, 2010 WL 2265833, at *5 (A.F. Ct. Crim. App. Apr. 19, 2010) (eyewitness

testimony); *United States v. Gutierrez-Gonzalez*, 891 F.2d 296 (9th Cir. 1989) (certificate of no record of legal entry sufficient to prove admission); *United States v. Irving*, 452 F.3d 110, 119 (2d Cir. 2006) (employment records and passport); *United States v. Payne*, ACM S31556, 2009 WL 136745, at *2 (A.F. Ct. Crim. App. Jan. 15, 2009) (positive urinalysis test); *United States v. Athearn*, ACM 30397, 1994 WL 711894, at *4 (A.F. Ct. Crim. App. Dec. 9, 1994) (eyewitness testimony); *White v. Estelle*, 669 F.2d 973, 979 (5th Cir. 1982) (tire tracks and eyewitness testimony).   In Judge DeMoss's words, there is no "clear objective evidence of Soffar's guilt," *Soffar I*, 368 F.3d at 478-79, a finding with which Judge Cochran of the Texas Court of Criminal Appeals agrees, *Soffar VI*, 2012 WL 4713562, at *2.

The Fifth Circuit's decision in *Summit v. Blackburn*, 795 F.2d 1237 (5th Cir. 1986) is on point.   There, the petitioner asserted that he had been denied the effective assistance of counsel due to his attorney's failure to move for post-judgment verdict based on insufficient evidence. *Id.* at 1244.  The Fifth Circuit agreed, holding that there was a reasonable probability that such a motion would have been granted because the only evidence implicating the petitioner in the alleged robbery was his own statement.  *Id.* 1244-45 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).   Precisely the same is true here:  the only evidence against Mr. Soffar is the Third Statement and, for the same reasons articulated in *Summit*, it is insufficient to support his conviction.

Mr. Soffar's plea of insufficiency is, in fact, even more compelling than that advanced in *Summit*.   Although courts must "review[] the evidence in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, the evidence must, at a minimum,  be "plausible."  *Tash v. Roden*, 626 F.3d 15, 20 (1st Cir. 2010); *King v. MacEachern*, 665 F.3d 247, 252 (1st Cir. 2011) (same).  The Third Statement is utterly implausible because, among other things, it is

completely inconsistent with the undisputed evidence of how the crime was committed.   The

following chart catalogues those inconsistencies:

| THIRD STATEMENT | UNDISPUTED EVIDENCE |
|---|---|
| Mr. Soffar wore a t-shirt over his nose and mouth.<br><br>43 R.R. State Ex. 110 | The robber wore no disguise.<br><br>45 R.R. Joint Ex. 1 at 2-4;<br>45 R.R. Joint Ex. 2 at 2-5, 8, 11-14 |
| Mr. Bloomfield wore a lady's stocking over his head.<br><br>43 R.R. State Ex. 110 | The robber wore no disguise.<br><br>45 R.R. Joint Ex. 1 at 2-4;<br>45 R.R. Joint Ex. 2 at 2-5, 8, 11-14 |
| Mr. Bloomfield's gun had a 3-inch barrel.<br><br>43 R.R. State Ex. 110 | The robber used a long barreled weapon.<br><br>31 R.R. 20<br>32 R.R. (Amend.) 108 |
| Mr. Soffar and Mr. Bloomfield went into the Bowling Alley together.<br><br>43 R.R. State Ex. 110 | There was only one robber.<br><br>45 R.R. Joint Ex. 1 at 1, 3;<br>45 R.R. Joint Ex. 2 at 7 |
| The Bowling Alley door was open when they entered.<br><br>43 R.R. State Ex. 110 | The Bowling Alley door was locked; Mr. Sims had to unlock the door to let the robber inside.<br><br>45 R.R. Joint Ex. 1 at 5-6;<br>45 R.R. Joint Ex. 2 at 1-3 |
| When inside, they met a man who asked them what they were doing.<br><br>43 R.R. State Ex. 110 | Mr. Sims talked to the robber at the front door about the robber's supposed car trouble.<br><br>45 RR Joint Ex. 1 at 2, 6-7;<br>45 R.R. Joint Ex. 2 at 4, 6 |
| Mr. Bloomfield pulled his gun from under his shirt as soon as he entered the Bowling Alley.<br><br>43 R.R. State Ex. 110 | The robber did not display a gun right away, but showed it when he forced Mr. Sims back into the Bowling Alley.<br><br>45 R.R. Joint Ex. 1 at 1, 7;<br>45 R.R. Joint Ex. 2 at 5, 7 |
| Mr. Bloomfield stuck his gun in the man's face.<br><br>43 R.R. State Ex. 110 | The robber held the gun to Mr. Sims's side.<br><br>45 R.R. Joint Ex. 1 at 1, 7;<br>45 R.R. Joint Ex. 2 at 5, 7;<br>28 R.R. 156 |

45

| THIRD STATEMENT | UNDISPUTED EVIDENCE |
|---|---|
| Mr. Bloomfield announced: "This is a robbery." <br><br> 43 R.R. State Ex. 110 | The robber did not announce that it was a robbery. <br><br> 32 R.R. (Amend.) 108 |
| Mr. Bloomfield pulled the man by the hair and forced him to his knees. <br><br> 43 R.R. State Ex. 110 | The robber did not physically hit or touch the victims. <br><br> 45 R.R. Joint Ex. 2 at 5, 8-9 <br> 28 R.R. 188 |
| The other victims were standing by the snack bar when he and Mr. Bloomfield entered. <br><br> 43 R.R. State Ex. 110 | Mr. Garner was bowling on lanes 25 and 26 and Mr. Temple and Ms. Felsher where in the back of the Bowling Alley when the robber entered. <br><br> 45 R.R. Joint Ex. 2 at 1, 3 |
| When the three people at the snack bar saw the man on his knees, they walked up. <br><br> 43 R.R. State Ex. 110 | Mr. Garner, who was bowling on lanes 25 and 26, approached the robber separately from Mr. Temple and Ms. Felsher, who had to be called to come to the control counter. <br><br> 28 R.R. 152-54 |
| Mr. Bloomfield told the victims to get down on the floor.  He threatened to shoot the man who was on his knees if they did not do so. <br><br> 43 R.R. State Ex. 110 | Although the robber told the victims to get on the floor, he did not threaten to shoot Mr. Sims if they did not do so. <br><br> 45 RR Joint Ex. 1 at 4; <br> 45 R.R. Joint Ex. 2 at 8-9 |
| The victims initially got down on their knees. <br><br> 43 R.R. State Ex. 110 | All of the victims lay down on their stomachs. <br><br> 45 R.R. Joint Ex. 1 at 2, 3-4, 7; <br> 45 R.R. Joint Ex. 2 at 4, 8-9; <br> 28 R.R. 156 |
| The victims did not lie down where Mr. Bloomfield had instructed them; he had to make them move closer to the control booth. <br><br> 43 R.R. State Ex. 110 | The victims lay down; the robber did not ask them to move. <br><br> 45 R.R. Joint Ex. 1 at 4; <br> 45 R.R. Joint Ex. 2 at 8-9 |

| THIRD STATEMENT | UNDISPUTED EVIDENCE |
|---|---|
| When they were shot, the order of the victims, starting closest to the door, was a man, a woman, a man, and a man.<br><br>43 R.R. State Ex. 110 | When they were shot, the order of the victims, starting closest to the door, was a woman, a man, a man, and a man.<br><br>32 R.R. 109;<br>45 R.R. Joint Ex. 3 at 2 |
| The victims were lying in a straight line.<br><br>43 R.R. State Ex. 110 | The victims were lying in a semi-circle.<br><br>32 R.R. (Amend.) 166<br>33 R.R. (Amend.) 93 |
| Mr. Bloomfield fired a warning shot into the floor.<br><br>43 R.R. State Ex. 110 | The robber did not fire a warning shot.<br><br>28 R.R. 90;<br>33 R.R. 65-66, 125;<br>32 R.R. 70, 129 |
| Ms. Felsher screamed and Mr. Bloomfield ordered her to "shut up."<br><br>43 R.R. State Ex. 110 | None of the victims screamed.<br><br>45 R.R. Joint Ex. 2 at 5, 8-9 |
| Mr. Bloomfield kicked Ms. Felsher in the back.<br><br>43 R.R. State Ex. 110 | The robber did not physically hit or touch the victims.<br><br>45 R.R. Joint Ex. 2 at 5, 8-9<br>28 R.R. 188 |
| Mr. Soffar and Mr. Bloomfield shot all of the victims from a distance.<br><br>43 R.R. State Ex. 110 | The robber shot Mr. Temple at close range such that the coroner described the wound as a "contact wound. "<br><br>43 R.R. State Ex. 123 |
| Mr. Bloomfield shot two men then threw the gun to Mr. Soffar for him to shoot the other victims.<br><br>43 R.R. State Ex. 110 | There was only one robber.<br><br>45 R.R. Joint Ex. 1 at 1, 3<br>45 R.R. Joint Ex. 2 at 7 |
| After shooting the victims, he ran around to look in the control booth cash register.<br><br>43 R.R. State Ex. 110 | Mr. Sims took the money out of the cash register before the robber shot the victims.  The robber did not go into the area in which the cash register was located.<br><br>45 R.R. Joint Ex. 1 at 4;<br>45 R.R. Joint Ex. 2 at 8 |

| THIRD STATEMENT | UNDISPUTED EVIDENCE |
|---|---|
| He took money out of the control booth cash register.<br><br>43 R.R. State Ex. 110 | Mr. Sims took the money out of the control booth cash register; the robber did not go into the area in which the cash register was located.<br><br>45 R.R. Joint Ex. 1 at 4;<br>45 R.R. Joint Ex. 2 at 8 |
| He took money out of the snack bar cash register.<br><br>43 R.R. State Ex. 110 | The only money that the robber stole came from the control booth cash register.<br><br>26 R.R. 177 |
| Mr. Bloomfield got fifty or sixty dollars from underneath the control booth counter.<br><br>43 R.R. State Ex. 110 | The only money that the robber stole came from the control booth cash register.<br><br>26 R.R. 179 |
| Mr. Bloomfield took money out of the victims' pockets after shooting them.<br><br>43 R.R. State Ex. 110 | The victims handed the robber their wallets before he shot them.<br><br>28 R.R. 159-60;<br>45 R.R. Joint Ex. 1 at 5;<br>45 R.R. Joint Ex. 2 at 8 |
| Mr. Bloomfield kept the wallets.<br><br>43 R.R. State Ex. 110 | The robber left Ms. Felsher's purse on the control booth counter.  The robber dropped Mr. Sims's wallet in the parking lot and disposed of Mr. Garner and Mr. Temple's wallets a short distance away along Route 290.<br><br>26 R.R. 79, 120-21 |
| He and Mr. Bloomfield did not leave the Bowling Alley until after shooting the victims.<br><br>43 R.R. State Ex. 110 | After speaking with Mr. Sims, the robber and Mr. Sims left the Bowling Alley and returned a few moments later.<br><br>45 R.R. Joint Ex. 1 at 1, 7;<br>45 R.R. Joint Ex. 2 at 5, 7 |

Of the few factual accurate statements, all but two had been broadcast on television news reports or published in newspapers.  (*See* 30 R.R. (Amend.) 101-06; 33 R.R. (Amend.) 4; 43 R.R. Def. Ex. 58-60.)  Of the two that had not appeared in the media directly, one—that there were only two cars in the parking lot when the crime was committed—is disproven by evidence

not presented to the jury.  (*See* App'x A, Ex. 1 [•first offense report•]).  The other fact not directly broadcast—that the manager's office door was locked—is nothing more than a reasonable deduction from the media reports that the office was not broken into.  (*See* 30 R.R. (Amend.) 101-06; 33 R.R. (Amend.) 4; 43 R.R. Def. Ex. 58-60.)  But perhaps more importantly, Mr. Soffar's claim that he attempted to force the office door is disproven by evidence not presented to the jury that shows that the only damage to the door was caused during the burglary the night before.  (*See* App'x A, Ex. 2 [•first offense report•].)  In sum, therefore, there are ***no*** factually accurate statements in the Third Statement that were not in the public domain or that are not disproven by indisputable evidence.

In addition to being utterly inconsistent with the facts, Mr. Soffar's statements are internally inconsistent.  (*Compare*  43 R.R. State Ex. 110 *with* 43 RR State Ex. 108 *and* 43 R.R. State Ex. 109 *and* 43 R.R. State Ex. 204-A *and* 43 R.R. State Ex. 205-A *and* 43 R.R. State Ex. 1B.)  The evidence shows that Mr. Soffar could not keep one story straight from the other during his three days of interrogation, which is hardly surprising since his stories have no basis in fact.  Most significantly, the Third Statement contains various "details" that Mr. Soffar did not know when initially questioned.  For example, when first questioned on August 6, 1980, he was unable to offer even a guess as to the caliber of weapon that was used, how many cars were in the parking lot, and what the Bowling Alley's exterior looked like.  (*See* 43 R.R. State Ex. 1B at 2:47-52, 3:01-03, 3:19-30, 6:47-7:06, 7:25-29, 7:32-43, 9:30-40, 10:56-11:06, 13:52-14:24, 12:16-20, 12:48-51, 13:03-06, 14:28-15:03; 18:27-19:11; 21:36-22:50, 23:47-55, 22:24-54, 23:14-30, 26:00-25, 26:25-31, 28:55-29:20, 31:28-39.)  But the Third Statement contains all of those, albeit inaccurate, details.  (43 R.R. State Ex. 110.)  The following chart catalogues just some of the inconsistencies in Mr. Soffar's stories:

**INCONSISTENCES BETWEEN STATEMENTS AND TRANSCRIPTS**

| THIRD STATEMENT | FIRST STATEMENT | AUGUST 5 TRANSCRIPT | SECOND STATEMENT | August 6 TRANSCRIPT |
|---|---|---|---|---|
| The crime was committed as soon as Mr. Soffar and Mr. Bloomfield arrived at the Bowling Alley | [Statement is silent as to this issue] | [Transcript is silent as to this issue] | Mr. Soffar and Mr. Bloomfield parked on the street and drank beers while they waited for people to leave | [Transcript is silent as to this issue] |
| Mr. Bloomfield drove to the Bowling Alley | Mr. Soffar drove to the Bowling Alley | Mr. Soffar drove to the Bowling Alley | [Statement is silent as to this issue] | Mr. Soffar drove to the Bowling Alley |
| Mr. Bloomfield pulled his car up to the Bowling Alley so that the passenger side of the car was closest to the front door | [Statement is silent as to this issue] | [Transcript is silent as to this issue] | The driver's side was closest to the front door | The driver's side was closest to the front door |
| There were a couple cars in the parking lot | There were about five, six, or eight cars in the parking lot | There were about five, six, or eight cars in the parking lot | There were a few cars in the parking lot | [Transcript is silent as to issue] |
| Mr. Soffar and Mr. Bloomfield wore disguises | [Statement is silent as to this issue] | [Transcript is silent as to this issue] | [Statement is silent as to this issue] | Mr. Bloomfield wore a stocking over his hair |
| Both Mr. Bloomfield and Mr. Soffar entered the Bowling Alley | Mr. Soffar did not enter the Bowling Alley | Mr. Soffar did not enter the Bowling Alley | Mr. Soffar did not enter the Bowling Alley | Mr. Soffar did not enter the Bowling Alley |

| THIRD STATEMENT | FIRST STATEMENT | AUGUST 5 TRANSCRIPT | SECOND STATEMENT | August 6 Transcript |
|---|---|---|---|---|
| Mr. Bloomfield had a .37 revolver (perhaps R-G model) with a three inch barrel | Mr. Bloomfield had a cheap .357 or .38 gun | Mr. Bloomfield had a cheap .357 or .38 gun | Mr. Bloomfield had a .357 blue steel revolver with a three or four inch barrel | Mr. Bloomfield had a .357 Magnum or .44 blue steel revolver with a three or four inch barrel |
| The victims were on their knees when shot | [Statement is silent as to this issue] | [Transcript is silent as to this issue] | The victims were told to lie face down | The victims knelt down and put their hands up |
| Mr. Bloomfield fired three shots and Mr. Soffar fired two shots | Mr. Bloomfield fired at least five shots | Mr. Bloomfield fired "two or three" shots | Mr. Bloomfield fired two shots followed by several other shots | Mr. Bloomfield fired four or five shots |
| After committing the crime, they turned right and got onto a highway | [Statement is silent as to this issue] | [Transcript is silent as to this issue] | [Statement is silent as to this issue] | Mr. Soffar didn't remember which way he turned |
| Mr. Bloomfield said he shot one of the men because he started to rise up and play hero | Mr. Bloomfield said that he shot someone who came from the back | Mr. Bloomfield said that he shot someone because someone moved inside or threw down on him | Mr. Bloomfield said that he shot someone because they pulled a gun on him | Mr. Bloomfield said that a guy pulled a gun on him |
| Mr. Soffar put the gun under the front seat of the car | [Statement is silent as to this issue] | [Transcript is silent as to this issue] | Mr. Bloomfield put the gun in the trunk under the spare tire | [Transcript is silent as to this issue] |

51

| THIRD STATEMENT | FIRST STATEMENT | AUGUST 5 TRANSCRIPT | SECOND STATEMENT | August 6 TRANSCRIPT |
|---|---|---|---|---|
| Mr. Bloomfield drove the car from the Bowling Alley to the dope house | Mr. Soffar drove the car from the Bowling Alley to the dope house | Mr. Soffar began to drive the car from the Bowling Alley until they pulled over and Mr. Bloomfield drove to the dope house | Mr. Soffar drove the car from the Bowling Alley to a market or plantation | Mr. Soffar drove the car from the Bowling Alley to the dope house; Mr. Bloomfield never got back into the driver's side |
| After buying drugs, Mr. Soffar and Mr. Bloomfield went to Mr. Soffar's house in Friendswood | After buying drugs, Mr. Soffar and Mr. Bloomfield went to Galveston where Mr. Bloomfield committed a robbery | After buying drugs, Mr. Soffar and Mr. Bloomfield went to Galveston where Mr. Bloomfield committed a robbery | [Statement is silent as to this issue] | After buying drugs, Mr. Soffar and Mr. Bloomfield went to Galveston |

(*See* 43 R.R. State Ex. 110; 43 RR State Ex. 108; 43 R.R. State Ex. 109; 43 R.R. State Ex. 204-A; 43 R.R. State Ex. 205-A; 43 R.R.

State Ex. 1B.)

52

That Mr. Soffar was willing and able to make up detailed confessions to crimes that he did not commit is confirmed by the undisputed fact that Mr. Soffar did falsely confess to other crimes during his interrogation.  (*See* 31 R.R. 26-28.)  Most notably, the First and Second Statements contain purported confessions to the burglary of the Bowling Alley that took place on the night before the robbery.  (43 R.R. State Ex. 108; 30 R.R. (Amend.) 19; 30 R.R. 140-48; 43 R.R. State Ex. 109.)  Even the interrogating officers knew that this confession was false.  (30 R.R. (Amend.) 25.)  Despite being a complete fabrication, Mr. Soffar's description of the burglary is nonetheless highly detailed:

> The night before the bowling alley we were in Lat's t-bird riding around in Houston looking for something to do.  Lat was driving and was talking about robbing a convenience store.  He drove up to this bowling alley and it was late sometime after midnight.  There were no cars in the parking lot and he parked and we got out and walked around looking in the windows and doors to see if we could see anyone inside.  We didn't and I walked over to the door on the right hand side and was at this side door and fixing to bust in.  Lat was afraid of an alarm so he went back to the car.  I kicked at the door and it wouldn't break so I found a rock or something and threw it and it cracked the glass.  Then I kicked it again and the bottom half of the door broke out.  I went in and there was an office or something there by the door.  I tried to get in but the door was locked.  I kicked it but it didn't come open.  Then I walked over to the front desk and leaned over to the cash register.  The drawer was partly open and I pulled it open the rest of the way and there was about six dollars in change there.  I took it from the drawer and about that time Lat came in to see what I was getting.  I then went past the front doors and right after the doors was a snack bar on my left.  It also had a cash register drawer and I leaned over and looked in there and there was change in it too.  I took some of the change out of it and left some too.  Then Lat told me that we had better leave so we went back out the way I had broke in.  When we went back to the car I saw another car that had come into the parking lot.  It looked like a cutlass or something and it had the dome light on.  There was one man and one woman in the car.

(43 R.R. State Ex. 108; 43 R.R. State Ex. 109; 30 R.R. 19, 140.)  Mr. Soffar's ability to make up detailed stories about crimes that he had indisputably not committed was reaffirmed during his

August 6, 1980, car ride round Houston with Detectives Ladd and Williamson.  During that car ride, Mr. Soffar claimed to have committed at least two robberies, including one on the night the Bowling Alley robbery took place.  (31 R.R. 26-28.)  The police knew that these claims were false.  (*Id*. at 26-28.)  The record evidence clearly establishes that Mr. Soffar was prepared to tell the police anything they wanted to hear and tell it in great detail.

In sum, even if a confession could, standing alone, constitute sufficient evidence to support a capital murder conviction and death sentence—which it cannot—the Third Statement at issue is so implausible that it is not evidence at all.  *See Tash v. Roden*, 626 F.3d 15, 20 (1st Cir. 2010) (disregarding implausible evidence); *King v. MacEachern*, 665 F.3d 247, 252 (1st Cir. 2011) (same).  Accordingly, even if the Third Statement is viewed "in the light most favorable to the prosecution . . . [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  Accordingly, Mr. Soffar's conviction violates the Fourteenth Amendment to the United States Constitution.  *Id.*

> (2)  Habeas Relief Is Warranted Because The Texas Court's Finding That The Evidence Against Mr. Soffar Is Sufficient Is Based On An Unreasonable Determination Of The Facts And, Independently, An Unreasonable Application Of *Jackson v. Virginia*, 443 U.S. 307 (1979).

Habeas relief should be granted pursuant to 28 U.S.C. § 2254(d) for two reasons:  *First*, the state court's decision was based on an unreasonable determination of the facts in light of the evidence before it.  *Id.* at § 2254(d)(2).  *Second*, and independently, the state court's decision constituted an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979).  28 U.S.C. § 2254(d)(1).

A state court's decision is based on an unreasonable determination of the facts where, as here, the court misconstrued or misstated the record.  *See Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (state court's "partial reliance on an erroneous factual finding" produced unreasonable

state court decision); *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003) ("Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony demonstrating that the Dallas County District Attorney's Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past."); *Ali v. Hickman*, 571 F.3d 902, 921 (9th Cir. 2009) ("California appellate court . . . reached a conclusion regarding the prosecutor's intent [in peremptorily striking an African American venireperson] that was not only incorrect, but unreasonable" by "failing to consider comparative evidence in the record before it that undeniably contradicted the prosecutor's purported motivations"); *Smith v. Grams*, 565 F.3d 1037, 1044, 1045, 1047 (7th Cir. 2009) (state appellate court "made unreasonable factual determination [in finding] that trial counsel began meaningful preparations for the penalty phase at a point prior to the eve of the penalty phase" where the "record includes no evidence to that end" and the evidence "flatly contradicts that view."); *Guidry v. Dretke*, 397 F.3d 306, 325-27, 329 (5th Cir. 2005), *cert. denied*, 547 U.S. 1035 (2006) ("[S]tate trial court's omission, without explanation, of findings on evidence crucial to Guidry's habeas claim" rendered the state court's determination of facts unreasonable for purposes of section 2254(d)(2)); *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) (a factual determination is "unreasonable" under section 2254(d)(2) if "the finding is unsupported by sufficient evidence" and the state court ignored "key aspects of the record"); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (Texas court's ruling on petitioner's claim of racial discrimination in jury selection in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"); *Batchelor v. Cain*, 682 F.3d 400, 402, 413 (5th Cir. 2012) ("[S]tate court's implicit finding of waiver [of right of self-representation under *Faretta v. California*, 422 U.S. 806 (1975)] was unreasonable in light of the evidence

presented in the state court proceeding" because the "record admits of no basis for a finding that Batchelor waived his request to represent himself prior to its erroneous denial by the [state trial] court"); *Blystone v. Horn*, 664 F.3d 397, 421 (3d Cir. 2011) (state postconviction court's "assertion that . . . [competency] report contained no indications of mental illness was an unreasonable determination of the facts" because "the record . . . demonstrated quite the opposite"); *Rice v. White*, 660 F.3d 242, 257 (6th Cir. 2011) ("No fair and reasonable reading of the record would permit the Michigan Supreme Court to find, as a matter of fact, that the trial judge did not discredit the prosecutor's proffered race-neutral reasons" because "[n]othing in the record even suggests as much."); *Doody v. Ryan*, 649 F.3d 986, 1023 (9th Cir.) (en banc), *cert. denied*, 132 S. Ct. 414 (2011) ("Arizona Court of Appeal's conclusion that the Miranda warnings were 'clear and understandable' constituted both an unreasonable determination of the facts and an unreasonable application of clearly established Federal law" because "clear, convincing and contrary evidence" showed that "Detective Riley downplayed the warnings' significance, deviated from an accurate reading of the Miranda waiver form, and expressly misinformed Doody regarding his right to counsel."); *Maxwell v. Roe*, 628 F.3d 486, 504-05 (9th Cir. 2010), *cert. denied*, 132 S. Ct. 611 (2012) ("Based on our review of the state court records, and in particular the evidence that was presented at the Superior Court's evidentiary hearing, we conclude that the state court's conclusion that [jailhouse informant] Storch testified truthfully was an unreasonable determination of the facts" because "[t]here is simply too much evidence of Storch's pattern of perjury to conclude otherwise."); *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008) (state court's factual finding that "communication between [counsel and client] . . . had not completely broken down" was unreasonable under section 2254(d)(2) because "[t]he record reveals absolutely no support for the state trial court's determination" and "the record is

littered with statements by . . . [counsel and petitioner] himself that communications had completely broken down"); *Rolan v. Vaughn*, 445 F.3d 671, 681, 683 (3d Cir. 2006) (state court's rejection of ineffective assistance claim "was based on an unreasonable determination of the facts in light of the evidence presented in the [state postconviction] proceeding" in that the central factfinding underlying the ultimate conclusion—that a potential witness who defense counsel refused to call at trial would not have been willing to testify for defense in any event—was contradicted by the record at the state postconviction hearing); *Nelson v. Washington*, 172 Fed. App'x. 748, 750-51 (9th Cir. 2006) (factual "findings yielded by the [state court] hearing are contradicted by the record that was developed there" and accordingly "findings constituted an unreasonable determination of the facts in light of the evidence"); *Miller v. Dormire*, 310 F.3d 600, 603-04 (8th Cir. 2002) (state court's finding that petitioner "affirmatively waived his right to a jury trial" was an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2) because the "record is devoid of any direct testimony from Miller regarding his consent to waive trial by jury.").  In this case, the state court's determinations of the facts upon which it relied are unreasonable because those determinations are contrary to the evidence.

*First*, the Texas court found that Mr. Soffar "confessed to police that he participated in the robbery and shot two of the four victims."  *Soffar v. State*, AP-75363, 2009 WL 3839012, at *9 (Tex. Crim. App. Nov. 18, 2009).  That finding ignores the implausibility of the statement at issue.  (*See supra* at I.A.1, I.A.3.)  It was unreasonable for the Texas court to rely on implausible evidence.  *Tash*, 626 F.3d at 20.

*Second*, the Texas court relied heavily on its finding that Mr. Soffar "said that he told 'Pops' about his involvement in the crime a few weeks after the crime, a fact that was later confirmed by both Lawrence Bryant and Mable Cass."  *Soffar III*, 2009 WL 3839012, at *9.

Mr. Soffar did no such thing.  Instead, he allegedly told the police that he went to buy drugs from Pops on the night of the offense, not several weeks later.  (30 R.R. 140-48; 43 R.R. State Ex. 109.)  And Mr. Bryant was not "Pops"; in fact, the police never found a man named "Pops."  (31 R.R. 38.)  Mr. Bryant and Ms. Cass did not, therefore, "confirm" Mr. Soffar's statements and the convicting court's finding to the contrary is clearly unreasonable.

*Third*, similarly unreasonable is the convicting court's finding that Mr. Soffar correctly identified the type of weapon used to commit the crime.  *Soffar III*, 2009 WL 3839012, at *9.  The undisputed evidence shows that Mr. Soffar did not do so.  In fact, Mr. Soffar identified entirely the ***wrong*** type of weapon.  Although he did claim that the weapon might have been a .38 or .357, it is undisputed that Mr. Soffar told Mr. Bryant and Ms. Cass—two prosecution witnesses—that the weapon used was a semi-automatic.  (31 R.R. 188; 32 R.R. (Amend.) 27-28.) But the state's own expert testified that the weapon used was a revolver.  (28 R.R. 92, 94.) Given this inconsistency, it was clearly unreasonable for the court to conclude that Mr. Soffar's claim regarding the type of weapon used confirmed the accuracy of the Third Statement.

*Fourth*, also contrary to the undisputed evidence is the court's finding that "the evidence, viewed in the light most favorable to the verdict, could have led jurors to rationally find that there was a warning shot."  *Soffar III*, 2009 WL 3839012, at *10.  The Texas court correctly noted, however, that the defense expert testified unequivocally that, in his opinion, only four shots were fired.  (33 R.R. (Amend.) 55.)   But what the court failed to mention is that the same expert also opined that there "is no physical evidence of any kind" to support the theory that five shots were fired.  (*Id.* at 59.)  The state's firearms examiner, by contrast, testified that he could not determine how many shots were fired.  (28 R.R. 90.)  In other words, there was no ***evidence*** in the record to contradict the defense expert's opinion.  And even if the defense expert's

testimony were to be rejected, there would still be no evidentiary basis upon which the jury could find that a warning shot was fired.

*Finally*, although acknowledging that there are "several discrepancies between Soffar's and Garner's multiple statements to police," *Soffar III*, 2009 WL 3839012, at *9, the Texas court nonetheless found that "some important aspects were consistent" and that "portions of Soffar's statements were consistent with some of the physical evidence," *id*.  In particular, the court cited the fact that:  (a) although disputed, a warning shot may have been fired, (b) Mr. Garner told the police that the robber encountered Mr. Sims and then Mr. Garner, Mr. Temple, and Ms. Felsher later approached the robber, which was supposedly consistent with one line in Mr. Soffar's statement, and (c) wallets were recovered on the inbound side of the highway, which was supposedly consistent with Mr. Soffar's statement that he turned right out of the parking lot.  *Id*. Strangely, the court also cited the fact that Mr. Soffar gave the police varying accounts of how the crime was committed and that he was eager to implicate Mr. Bloomfield after hearing that a reward had been offered, both facts that tend to undermine—not support—the Third Statement. *Id*. at *10.  The court also stated that Mr. Garner's account of the robbery was inconsistent.  *Id*. But the court did recognize that there were "numerous inconsistencies" between the Third Statement and Mr. Garner's account.  *Id*.

> Their accounts were inconsistent regarding:  whether there were one or two robbers; whether the robber or robbers were disguised; how the robber or robbers gained entry to the bowling alley; whether any of the victims screamed or were kicked; whether a warning shot was fired; the positions of the victims when they were shot; whether the cash register was emptied before or after the shootings; and whether the victims' wallets were taken before or after the shootings.

*Id*.  The court concluded that the outcome of the case turned, therefore, on a credibility choice: whether to believe Mr. Soffar or Mr. Garner.  *Id*.  Because the jury's decision on that issue was

entitled to "almost complete deference," the court found the evidence sufficient. *Id*. But the court's finding is perverse. Even if the jury were faced with a credibility choice, by the Texas court's logic, the jury would have had to reject the testimony of the prosecution's own witness, Mr. Garner. Such a result is patently absurd. In short, because the facts upon which the convicting court relied in rendering its opinion are not supported by, and are contrary to, the evidence, the Texas court's decision was based on an unreasonable determination of the facts and habeas relief can, and should be granted. 28 U.S.C. § 2254(d)(2).

Independently, habeas relief can, and should, be granted pursuant to 28 U.S.C. 2254(d)(1) because the Texas court's ruling is an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979). As a threshold matter, although a state court's findings of fact are normally entitled to deference and a presumption of correctness, such deference and that presumption is not applicable here because the Texas court's findings were clearly erroneous (*see supra* at I.A.1, I.A.3); 28 U.S.C. § 2254(d)(2); *State v. Collins*, 973 F.2d 1198, 1204 (5th Cir. 1992); *Clayton v. Whitley*, 32 F.3d 565, at *4 (5th Cir. 1994). Accordingly, this court can—and should—conduct its own de novo review of the record. *Collins*, 973 F.2d at 1203-04.

Even the most cursory review of the record establishes that the Texas court's holding was unreasonable. As described above, there is not a shred of plausible evidence connecting Mr. Soffar to the crime. (*See supra* I.A.) It is axiomatic that it is unreasonable to find the evidence against an accused be sufficient where no evidence exists at all. *See Donahue v. Cain*, 231 F.3d 1000, 1003-05 (5th Cir. 2000). Even if the Third Statement could be considered plausible in any respect—which it cannot—it was still unreasonable for the Texas court to conclude that the evidence against Mr. Soffar was sufficient because there is no "substantial independent evidence which would tend to establish the trustworthiness of the statement."

*Opper v. United States*, 348 U.S. 84, 93 (1954).  Five judges have now written or concurred in opinions that specifically note the absence of corroborating evidence.  *See Soffar v. Dretke*, 368 F.3d 441, 478-79 (5th Cir. 2004); *Soffar VI*, 2012 WL 4713562 at *2.  Since an uncorroborated confession cannot serve as the basis for a conviction, *Opper v. United States*, 348 U.S. 84, 93 (1954), the Texas court's finding to the contrary was clearly unreasonable.  *Taylor v. Maddox,* 366 F.3d at 999 (factual determination is "unreasonable" under section 2254(d)(2) if "the finding is unsupported by sufficient evidence").

Because Mr. Soffar's constitutional rights were violated, that violation resulted in harm to him—he was convicted and sentenced to death—and the Texas Court's conclusion to the contrary was factually and legally unreasonable, Mr. Soffar respectfully submits that a writ of habeas corpus should be granted.

**4.    The Claim Was Exhausted In The State Court Proceedings.**

Mr. Soffar raised this claim as his Seventh Point of Error in his direct appeal to the Texas Court of Criminal Appeals.  (4 S.H.R. 863.)  The Point was entitled:  "Rooted in a completely unreliable confession, Appellant's conviction rests on legally and factually insufficient evidence and violates his right to due process of law."  *Id.*  The Court of Criminal Appeals overruled that Point of Error, concluding:  "[T]he evidence is legally and factually sufficient to support Soffar's conviction."  *Soffar III*, 2009 WL 3839012, at *10, *25-28.  For the reasons set forth above, that finding is erroneous and contrary to, or an unreasonable application of well-settled federal law. (*See supra* at I.A.3.)

## II.   THE STATEMENTS MR. SOFFAR SIGNED ARE FALSE CONFESSIONS AND SHOULD, IN ANY EVENT, HAVE BEEN SUPPRESSED.

### A.   CLAIM FOR RELIEF 2: THE TEXAS COURT'S CONCLUSION THAT MR. SOFFAR'S STATEMENTS WERE VOLUNTARY IS CONTRARY TO, OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *CULOMBE v. CONNECTICUT*, 367 U.S. 568 (1961).

#### 1.   The Relevant Facts.

Mr. Soffar is intellectually sub-normal.  Dr. I. Bruce Frumkin, an expert clinical and forensic psychologist, has measured Mr. Soffar's intelligence quotient in the lower sixteenth percentile and his verbal comprehension index score in the lower twelfth percentile.  (Frumkin Aff. at 6.)  At the time of his interrogation, Mr. Soffar was "hyperactive, impulsive, distracted, had racing thoughts, and oftentimes had unrestrained behavior without regard to the consequences."  (*Id.* at 8.)  These problems contributed to a "mental state at the time of interrogation [that] would have made it exceedingly difficult for him to adequately make use of and process information given to him."  (*Id.* at 8.)  Moreover, the diffuse type of brain damage that Professor Pincus and Dr. Gelbort found in their own tests support Dr. Frumkin's conclusions, as that type of brain damage is characteristic of impulsivity and lack of regard for consequences. (*See* Pincus Aff. at ¶ 37.)

Mr. Soffar's intoxication and subsequent withdrawal at the time of his interrogation would have led to a further impaired mental state that "would have caused him to be incapable of appreciating the significance of his and other's statements.  He would not have been able to fully understand things nor mak[e] rational decisions based on what he heard."  (Frumkin Aff., Ex. B at 8.)  The police were aware of his impaired mental state.  Officer Willoughby noted that Mr. Soffar was intoxicated at the time of his arrest.  (4 RR 45-46.)  And Mr. Soffar told the police that he was "nervous as hell.  Tired. . . . Drugs" during one of his tape-recorded August 5 interrogations.  (*See* 43 RR State Ex. 1 at 12:16-12:20; 43 RR State Ex. 1A at 10.)

Adding to Mr. Soffar's mental deficiencies was the fact that Mr. Soffar "tried to feel good about himself by attempting to gain acceptance from police officers." (Frumkin Aff., Ex. B at 8.)  His life of minor crime led to numerous arrests and convictions, which led Mr. Soffar to begin to hang around with the police.  (4 RR 119-20.)  He seemed to treat several officers as his friends and he quickly became a police informant for multiple police departments.  (4 RR 82, 120; 38 RR 109.)  By virtue of this contact, police officers were well aware of his brain damage, mental health problems, intellectual limitations, drug abuse, impulsiveness, and attention-seeking behavior.  (4 RR 89, 96, 119; 29 RR 134; App. II, Ex. 18:   State Habeas Transcript, August 17, 1994, at 217-18.)   Officers also knew that he was eager to please, impulsive, immature, unable to see into even the near future, and had a poor grasp on reality.  (*See, e.g.,* 4 RR 80-81, 119; 29 RR 134.)  He was, in Sergeant Clawson's opinion, someone who had "fried his brain out" and had the intellectual capacity of a ten- or eleven-year-old.  (29 RR 134; *see also* 4 RR 119.)  Sergeant Clawson described him as a "puppy dog."  (B. Clawson Aff. at ¶ 10.)

The police exploited Mr. Soffar's sub-normal intellectual ability and desire to please the police during their days-long interrogation.  They also brought considerable pressure to bear, the most obvious example of which is the verbal threat that an unidentified police officer made during one of the many hours of unrecorded interrogation that took place on August 5.  (43 RR State Ex. 1A at 22; 43 RR State Ex. 1 at 31:24-39.)  Although a verbal threat may seem relatively minor, the fact that it was made at all raises significant red flags about the interrogative techniques that the police officers employed during their unrecorded interrogations and the fact that it was made to a child-like, impulsive, brain damaged, and mentally ill individual is significant in evaluating the totality of the circumstances surrounding Mr. Soffar's confession.

In addition to threatening Mr. Soffar, the police lied to him on a number of occasions. On August 5, Detective Palmire falsely told Mr. Soffar that he was going to jail for life because he was a habitual criminal. Later that same day, Sergeant Clawson exploited Mr. Soffar's mental infirmities to deceive him into believing that he had no practical ability to consult with an attorney. (4 RR 107-09, 133, 144; 7 RR 94.)

On August 6, the police showed Mr. Garner a line-up featuring Mr. Soffar. (7 RR 31; 31 RR 57-58; *see also* 43 RR State Ex. 201.) Mr. Garner failed to positively identify Mr. Soffar in the line-up. (7 RR 62; 32 RR 193-94.) But the police falsely told Mr. Soffar that Mr. Garner had picked him out of a line-up. All of these lies, told to a man whom they knew was easily manipulated, could have been designed with only one purpose in mind—to extract a "confession." And indeed, the lies had their intended effect. Shortly after the police told Mr. Soffar that Mr. Garner had picked him out of a line up, Mr. Soffar signed his second statement. (43 RR State Ex. 109 (1:25 p.m.).)

In short, Mr. Soffar is mentally deficient and notably suggestive, he was functionally isolated from all but his interrogators for the vast majority of his three-day interrogation, the police exploited the trust that he had in Sergeant Clawson, the police threatened and lied to him, and he was not assisted by counsel as a result of Sergeant Clawson's deception, and his statements are facially suspect.

### 2.    The Applicable Standard.

It is a fundamental principle of Texas and United States constitutional law that a statement must be made voluntarily to be admissible against a criminal defendant. U.S. CONST. amends. V and XIV; TEX. CONST. art I, § 10; TEX. CODE CRIM. PROC. ANN. art. § 38.21 (2001); *Brown v. Mississippi*, 297 U.S. 278, 287 (1936) (a confession obtained by coercion is inadmissible against defendant); *Lego v. Twomey*, 404 U.S. 477, 483-85 (1972). A statement is

made involuntarily where it is not "the product of an essentially free and unconstrained choice." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961); *see also Rogers v. Richmond*, 365 U.S. 534, 544 (1961). Determining whether a statement was made voluntarily requires a review of the totality of the circumstances surrounding the statement. *Jurek v. Estelle*, 623 F.2d 929, 939 (5th Cir. 1980) (en banc).

The "totality of the circumstances" analysis is broad. Among other things, it includes evaluating the mental and emotional state of the suspect, the type of pressure that was placed on the suspect, the environment in which the interrogation took place, the length of the interrogation, the relationship between the suspect and the interrogating officers, and the extent to which the interrogating officers misled or deceived the suspect. *See, e.g.*, *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960) (a confession made by a defendant who was mentally impaired at time of the confession and was subjected to a sustained interrogation in small room was involuntary and its admission deprived the defendant of due process of law); *Spano v. New York*, 360 U.S. 315, 324 (1959) (a confession obtained as a result of a prolonged interrogation of a suspect with a history of emotional instability who had confessed to a policeman friend was involuntary and its admission deprived the defendant of due process of law); *Clewis v. Texas*, 386 U.S. 707, 712 (1967) (an incriminating statement made by a sleep deprived suspect after days of interrogation was involuntary and its admission deprived the defendant of due process of law); *Culombe*, 367 U.S. at 625, 631, 635 (confessions made by an intellectually limited and suggestible defendant who was detained in effective custody for four days during which he was questioned repeatedly were involuntary and their admission deprived the defendant of due process of law); *Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980) (a confession given by a mentally deficient suspect was involuntary).

### 3.     Habeas Relief Is Warranted.

Here, the totality of the circumstances show that Mr. Soffar is a brain damaged, mentally ill, intellectually sub-normal, impulsive, suggestible, easily led, individual who lacks good judgment, foresight, has difficulty processing information, and has a talent for making up stories to attract attention—particularly the attention of police officers.  At the time of his interrogation, Mr. Soffar was under overwhelming stress, which would only have exacerbated his mental limitations.  (4 RR 45-46; 29 RR 21-23, 27-28.)  By the time he gave his August 7 statement, Mr. Soffar had been interrogated for three days and verbally threatened by police officers under pressure to solve a brutal murder for which they had no leads and no suspects.  Capitalizing on his mental impairments and the pressure he was under, the police—including his friend Sergeant Clawson—cajoled, coached, lied and pressured the childlike, sleep deprived and intoxicated Mr. Soffar for nearly three days until finally he signed a statement that had been drafted by one of the interrogating officers.  (*See* 43 RR State Ex. 1 (Side A) at 7:32-43, 10:56-11:06, 13:52-14:24, 12:16-20, 12:48-51, 13:03-06, 7:25-29, 14:28-15:03; 43 State Ex. 1 (Side B) at 6:47-7:06, 9:30-40, 18:27-19:11; 43 State Ex. 1A at 6-7, 9-10, 25, 28, 32; 4 RR 102-03; 43 State Ex. 110.)  A statement signed in these circumstances is clearly not the product of an "essentially free and unconstrained choice."  *Culombe*, 367 U.S. at 602; *see also* Meissner Aff. at ¶¶ 19-23.

Indeed, the circumstances under which Mr. Soffar gave his statements are far more disturbing than those in which the United States Court of Appeals for the Fifth Circuit came to the "inescapable conclusion" that a "mentally deficient" defendant's confession was involuntary. *Jurek*, 623 F.2d at 941.  In *Jurek*, the Fifth Circuit suppressed a statement given by a mentally deficient man after two days of interrogation.  In so finding, the Court focused on the facts that Mr. Jurek was

> (1) mentally deficient . . . (2) functionally isolated form all but his interrogators, (3) . . . was not assisted by counsel, (4) . . . had executed a valid confession to murder, essentially solving the crime under investigation, was (5) the subject of continuing purposeful and suggestive interrogation directed (6) towards an amendment of his earlier confession to include information so minimally suggested as to amount to a prosecutorial 'hunch,' the renewed investigation producing (7) a confession which is facially suspect and which (8) achieves the precise result sought by the prosecutors, (9) enhance, in a manner unknown to the accused, the potential penalty to that of death, a consideration which would cause any person made aware of it to pause and consider the truthfulness of any additional information suggested.

*Jurek*, 623 F.2d at 942.

All of these factors—and more—exist here.  Accordingly, the only conclusion that can reasonably be reached is that Mr. Soffar's statements were not made voluntarily.  Since the statements—including the August 7, 1980 written statement on which the State's case rests—were not "the product of an essentially free and unconstrained choice" they are inadmissible against him.  *Culombe*, 367 U.S. at 602.  And the convicting court's conclusion to the contrary is an unreasonable application of settled federal law.

### 4.    The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar exhausted his claim that his statements were not made voluntarily both in his direct appeal and in his state habeas proceeding.  During the direct appeal, Mr. Soffar raised the issue in his Tenth Point of Error, subsection (e).  The Court of Criminal Appeals overruled each point of error.  *See Soffar III*, 2009 WL 3839012, at *25-28.  Mr. Soffar also raised the issue in his state application for writ of habeas corpus at Section II.C.  The convicting court rejected Mr. Soffar's claim that his right to counsel was violated and Court of Criminal Appeals adopted that ruling.  *See Soffar VI*, 2012 WL4713562, at *1.

**B.**    <u>CLAIM FOR RELIEF 3</u>: THE TEXAS COURT'S CONCLUSION THAT MR. SOFFAR'S RIGHT TO PRESENT A DEFENSE WAS NOT VIOLATED BY THE EXCLUSION OF MEDIA REPORTS BECAUSE THAT EXCLUSION WAS HARMLESS IS CONTRARY TO OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF *CRANE V. KENTUCKY*, 476 U.S. 683 (1986) AND *HOLMES V. SOUTH CAROLINA*, 126 S. CT. 1727 (2006).

    **1.**    **The Relevant Facts.**

Between July 14, 1980, and August 1, 1980, the Houston television and print media widely publicized details of the robbery, including the following: (1) four people had been shot execution style; (2) one man had survived; (3) one of the victims was a female, who was shot in the cheek; (4) money was taken from a cash register; (5) the shootings took place at the Fairlanes Windfern bowling center; (6) a .357 Magnum was used; (7) reward money was available; (8) at least one victim's wallet had been taken; (9) the manger's office had not been entered; and (10) the Bowling Alley was burglarized the night before.  (*See* 43 R.R. Def. Exs. 58-60, 66.).  The images broadcast by the media included the following: (1) the exterior of the Bowling Alley, including the Fairlanes Windfern sign and how the building was situated on the parking lot; (2) the interior of the building; (3) a close-up of Greg Garner's gunshot wound, showing its location; and (4) the bodies of the victims inside the bowling alley.  (43 R.R. Def. Exs. 58, 60; *see also* 45 R.R. 3; 43 R.R. Def. Exs. 63-71.)  Notably, the media also reported that Mr. Garner was "closest to the door"—a fact contained in the Third Statement but which is inconsistent with the position of the victim when they were shot.  (*Compare* 31 R.R. 89 *with* 45 R.R. Joint Ex. 3.)

In short, the few factually accurate details of the crime that are contained in the Third Statement (and certain incorrect details) were known to the public having been widely disseminated by the media in the weeks between the crime and Mr. Soffar's arrest.  (*See, e.g.,* 29 R.R. 186-87; 30 R.R. 21-23, 150-52, 160-64; 43 R.R. State Ex. 1A at 26-27.)

Moreover, evidence presented at trial showed that Mr. Soffar had followed the Bowling Alley story in the local media.   Mr. Soffar's sister, Jackie Soffar Butler, testified that Mr. Soffar's family typically watched Channel 13 eyewitness news on television and that the family subscribed to the Houston Post.  (32 R.R. 238-40.)   The Police were also aware that Mr. Soffar had learned facts about the crime from the media.   For example, Mr. Soffar repreatedly told Detective Schultz that he had read about the Bowling Alley crime in the "paper" and heard about it on the "news."  (43 R.R. State's Ex. 1A at 9, 25, 28, 36-37; 30 R.R. 95-96.)

The defense theory of the case was that Mr. Soffar had signed a false confession and that he had obtained details contained in the statements from the media.   To that end, the defense tried (unsuccessfully) to cross-examine the interrogating police officersabout what details had been published and broadcast to the public and was prepared to introduce evidence that various media sources broadcast these details through the testimony of a witness who could summarize the voluminous information contained in the various media reports.  (30 R.R. 100-09; 33 R.R. 4-5, 7.)  The defense argued that the evidence was admissible to support the defense's position that the information Mr. Soffar provided to the police reflected nothing more than information broadcast to the general public.  (33 R.R. 4-5, 7; *see also* 31 R.R. 4-8.)

Initially, the prosecution agreed not to object to a summary witness, but it later changed its position.  (31 R.R. 4).  Over defense objections, the convicting court precluded the witness from testifying (33 R.R. 5; 30 R.R. 119.)  Although the trial judge did not state the basis for her ruling, (*see id*), the court had earlier suggested that the evidence would be irrelevant unless the defense could show that Mr. Soffar had seen specific news articles or watched specific television broadcasts.  (31 R.R. 6.)   When the court precluded the witness, the defense sought the alternative remedy of admitting only evidence of stories from the Houston Post and Channel 13

Eyewitness News, which the evidence showed Mr. Soffar read and watched.  (32 R.R. 238-40; 33 R.R. 5.)  The court, however, rejected this alternative remedy.  (31 R.R. 8).

Exploiting the exclusion of the media evidence, the prosecution argued in summation that Mr. Soffar's confession was reliable because it contained details only the perpetrator could have known.  (35 R.R. 11, 22-23.)  Specifically the prosecution argued that the confession was reliable in spite of the fact Mr. Soffar lied about burglarizing the Bowling Alley the night before the murders because "[h]e talks about the snack bar, the control counter, gives the police details about the inside of that bowling alley."  (35 R.R. 11.)  The prosecution also placed the burden on the defendant by pointing out that he did not prove his confession was false:

> [T]hey didn't bring you any evidence that the Defendant falsely confessed to this.  They didn't bring you any evidence that he didn't commit this crime. They didn't bring you any evidence that someone other than the Defendant committed this crime. The Defense basically has picked at all the little details in hopes that you will ignore that the Defendant admitted he committed this crime. His very own words when he talks to the police tell you that he's guilty of capital murder.

(*Id.* at 9.)

### 2.    The Applicable Standard.

The Supreme Court has long held that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  *Holmes v. South Carolina*, 126 S. Ct. 1727, 1731 (2006) (internal quotation omitted); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (finding violation of right to present defense where the defendant was prevented from introducing evidence to show at trial that his confession was unreliable, and neither the state court nor the prosecution "advanced any rational justification"); *Chambers v. Mississippi*, 410 U.S. 284 (1973)

70

(finding violation of right to present defense, in part, because court precluded statement against penal interest inculpating an alternative perpetrator); *Washington v. Texas*, 388 U.S. 14 (1967) (noting that the "right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies")).  This guarantee limits a court's ability to exclude evidence from criminal trials.  *Holmes*, 126 S. Ct. at 1731.  Specifically, a court may not exclude evidence if its exclusion "infringe[s] upon a weighty interest of the accused" and is "arbitrary or disproportionate to the purposes they are designed to serve."  *Id.* (citation and internal quotation marks omitted).

In *Crane v. Kentucky*, the Supreme Court reversed a conviction for murder on the grounds the defendant was deprived of a meaningful opportunity to present a defense.  476 U.S. 683 (1986).  *Crane* involved the murder of a liquor store clerk which took place during the course of a robbery.  *Id*. at 685.  Much like Mr. Soffar's case, "[a] complete absence of identifying physical evidence hampered the initial investigation of the crime."  However, a week later Crane was arrested for his suspected participation in an unrelated robbery, and (just like Mr. Soffar) Crane signed statements implicating himself in a host of local crimes.  *Id*.  He eventually confessed to the liquor store murder as well.  *Id*.

At trial the prosecution explained that their "case rested almost entirely on petitioner's confession and on the statement of his uncle, who had told the police that he was also present during the holdup and murder."  *Id*. at 685.  The defense outlined the reasons the confession could not be trusted:

> The confession was rife with inconsistencies, counsel argued.  For example, petitioner had told the police that the crime was committed during daylight hours and that he had stolen a sum of money from the cash register.  In fact, counsel told the jury, the

> evidence would show that the crime occurred at 10:40 p.m. and that no money at all was missing from the store.  Beyond these inconsistencies, counsel suggested, "[t]he very circumstances surrounding the giving of the [confession] are enough to cast doubt on its credibility."  In particular, she continued, evidence bearing on the length of the interrogation and the manner in which it was conducted would show that the statement was unworthy of belief.

*Id.* The defense strategy of attacking the Crane's statement however was hampered by the convicting court's ruling that "the defense could inquire into the inconsistencies contained in the confession, but would not be permitted to 'develop in front of the jury' any evidence about the duration of the interrogation or the individuals who were in attendance."  *Id.*

The Supreme Court had "little trouble concluding on the facts of this case that the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial."  *Id.*.  In so holding the Court recognized that it had "never questioned that 'evidence surrounding the making of a confession bears on its credibility'" and that it was the "defendant's traditional prerogative to challenge the confession's reliability during the course of the trial."  *Id.* at 688.  The Court explained the monumental importance of a defendant's ability to challenge a confession:

> Confessions, even those that have been found to be voluntary, are not conclusive of guilt.  And, as with any other part of the prosecutor's case, a confession may be shown to be "insufficiently corroborated or otherwise . . . unworthy of belief."  Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?  Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.

*Id.* at 689 (citing *Lego v. Twomey*, 404 U.S. at 485–486.)  The Court noted that the opportunity to present a complete defense "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence."  *Id.* (citation omitted).

As the Supreme Court made clear in *Crane*, clearly established Federal law requires a defendant to be permitted to challenge his confession's reliability during trial.  *Crane*, 476 U.S. at 690.  This Court may grant habeas relief when a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  *Hughes v. Dretke*, 412 F.3d 582, 588-89 (5th Cir. 2005) (citing 28 U.S.C. § 2254(d)).  The Texas Court of Criminal Appeal unreasonably applied Supreme Court precedent because, while it correctly assumed that the convicting court's decision to preclude evidence of media reports was wrong, it erred in determining that the error was harmless.  Among other things, the court failed to recognize that while the deprivation of the right to present a defense is subject to harmless error review, the Supreme Court has also indicated that such a deprivation is inherently prejudicial.  *Crane*, 476 U.S. at 690-01.  Because it occurs only when the exclusion of evidence "undermine[s] fundamental elements of the defendant's defense," *United States v. Scheffer*, 523 U.S. 303, 315 (1998), a violation of a defendant's constitutional right to present a defense is "by nature prejudicial."  *Fry*, 551 U.S. at 124 (Stevens, J., dissenting in part and concurring in part).  The Texas appellate court's opinion is rife with unreasonable determinations of facts.

Further, the Texas Court of Criminal Appeal misapplied the Supreme Court's harmless error jurisprudence by failing to recognize that: (1) harmless-error analysis aims to find only "unimportant and insignificant" errors, (*Chapman v. California*, 386 U.S. 18, 22 (1967)), (2)

reviewing courts must conduct this analysis in light of the entire record, (*United States v. Hasting*, 461 U.S. 499, 509 (1983)), (3) the state's exploitation of constitutional error in its closing argument weighs heavily against a finding of harmlessness, (*Chapman*, 386 U.S. at 24-25), and (4) the burden of proving a constitutional error harmless beyond a reasonable doubt falls exclusively on the state, "the beneficiary of the error," (*id*. at 24).

Where a federal court is called upon to review the harm flowing from constitutional error during federal habeas review, the harm analysis should be conducted "under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)]." *Wesbrook v. Thaler*, 585 F.3d 245, 255 (5th Cir. 2009). Thus, "in assessing the reasonableness of the state court's application of harmless error review, [this Court] must resolve whether the violation of [Mr. Soffar's right to present a defense] had a substantial and injurious effect on the verdict." *Id*. at 255-56. Stated another way, "the *Brecht* standard subsumes the standards announced in AEDPA." *Burbank v. Cain*, 535 F.3d 350, 356-57 (5th Cir. 2008).

The Fifth Circuit has explained that the *Brecht* standard of harm should be made "in light of the record as whole." *Gongora v. Thaler*, 710 F.3d 267, 278 (5th Cir. 2013) (finding harm and granting habeas relief where the prosecution improperly commented on the defendant's right to remain silent and urged the jury to convict based on those statements). Further, "the *Brecht* standard does not require the petitioner to establish that it is more likely than not that the constitutional violation resulted in actual prejudice: 'When a Federal judge in a habeas proceeding is in grave doubt about whether a trial error of Federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win.'" *Id*. (Internal citations omitted). Several factors should be taken into account: whether extensive comments were made by the state related to the error, whether the

state urged the jury to convict based on the statements, and whether there is evidence that could have supported acquittal.  *Id.* at 278.  In this case, each of the factors weighs in favor of, and compels, a finding harm.

### 3.    Habeas Relief Is Warranted.

The credibility of the statements Mr. Soffar signed was the determinative question in this case.  The prosecution argued to the jury that the confession was credible because Mr. Soffar knew details only the perpetrator could have known.  (35 R.R. 11, 21-25.)  But the jury never learned that in July and August of 1980 the Houston media widely broadcast those details.  (43 R.R. Def. Exs. 58-60.)  Over defense objections citing Mr. Soffar's constitutional right to present a defense, (30 R.R. 100-06; 31 R.R. 114-16; 33 R.R. 4-5), the convicting court excluded this vital evidence, depriving the jury of the information it needed to determine whether the state had carried its weighty burden of proof.  The convicting court's erroneous ruling deprived Mr. Soffar of "a meaningful opportunity to present a complete defense."  *Crane*, 476 U.S. at 690.[3]  The Texas Court of Criminal Appeals decision that the error was harmless was contrary to clearly established federal law and resulted in an unreasonable determination of the facts presented in the convicting court.

---

3    *See also Woods v. State,* 696 P.2d 464, 470 (Nev. 1985).  In *Woods*, the defendant appealed the trial court's "refusal to admit a set of newspaper articles . . . to show that all the details provided [his confession] could have been gleaned from news accounts of the murder."  *Id.*  As here, the state argued in its summation that the "confession . . . contained information which only the murderer could have known."  *Id.*  The Nevada Supreme Court reversed on the grounds Woods was "denied . . . a fair opportunity to present a defense."  *Id.* at 137.  It explained that newspaper articles are admissible if they are offered for the "fact of their publication." *Id.*  It also rejected the trial court's rationale "that there was no evidence that [the defendant], who did not testify, had read any of the news accounts."  *Id.*  The court held that the articles were relevant and admissible because they showed that the details of the crime were public knowledge, refuting the prosecution's argument to the jury that defendant's confession contained details known only by the true perpetrator.  *Id.*

The concurring opinion of Justice Cochran of the Texas Court of Criminal Appeals illustrates plainly how erroneous the finding of harmlessness was.  In that concurrence, Justice Cochran explained that Mr. Soffar's case is "quite troubling" because:

> The only connection between applicant and the 1980 triple murder at the Fair Lanes Bowling Center in Houston is applicant's custodial confession to the police. The sole corroboration of that confession is his offhand street-corner comments to a friend vaguely admitting involvement in the robbery-murders. Applicant's capital-murder conviction and death sentence depend entirely upon the accuracy and reliability of his confession. But many, if not most, of the details concerning the triple murder that applicant related in his confession were contradicted by, or inconsistent with, the crime-scene evidence, the forensic evidence, and the statements or testimony of the sole surviving victim. In sum, applicant's confession does not inspire confidence in its accuracy; it appears to be a tale told by one who heard about the robbery-murders rather than by one who committed them.

*Soffar VI*, 2012 WL 4713562, at *2.  Recognizing that Mr. Soffar's strongest argument was that his "confession to the police was simply not true," Justice Cochran nevertheless concluded that there was no error because Mr. Soffar "fully and fairly presented it to the jury and the jury rejected it."  *Id.* at *6.  The problem with that conclusion, however, is that the convicting court prevented Mr. Soffar from presenting the evidence necessary to show that his confession was false.  In the context of the present Claim for Relief, the convicting court did not allow Mr. Soffar to present evidence that ***every factually correct statement he made was reported in local media accounts of the murder published prior to his arrest***.  The convicting court therefore prevented Mr. Soffar from rebutting the prosecution's claim that Mr. Soffar knew details only the perpetrator could have known.  (35 R.R. 11, 21-25.)

The Texas Court of Criminal Appeals' direct appeal decision that "any constitutional error did not contribute to Mr. Soffar's conviction was based on four contradictory ideas.  *First*, the Court concluded that Mr. Soffar didn't establish any "affirmative link between his statements

about the offense and the various media reports that were issued about the offense." *Soffar III*, 2009 WL 3839012, at *20.  The state appellate court argued that "Soffar failed to present any evidence showing that he had been exposed to all of the various media reports that he submits in support of this trial theory."  *Id*.  The court believed that "[w]ithout establishing any affirmative link between his statements about the offense and the various media reports that were issued about the offense, Soffar's argument is weak."  *Id.*

But the appellate court's second rationale contradicts the first.  The court held that Mr. Soffar was not "prevented from presenting general evidence in support of his claim," pointing out that the evidence showed Soffar had mentioned to police "he had seen and heard about the crime, the reward, and the surviving victim on the news."  *Id.*  In other words, the court found that Mr. Soffar's claim was weak because he ***was*** able to present affirmative links between himself and the informative news reports:

> Soffar was not prevented from presenting general evidence in support of his claim that his confession was unreliable because it could have been gleaned from media reports about the offense. Schultz and Williamson testified that the media reported on the crime. The evidence showed that when Schultz interrogated Soffar on August 5th, Soffar mentioned that he had seen and heard about the crime, the reward, and the surviving victim on the news. Additionally, when Assistant District Attorney Terry Wilson interrogated Soffar, Soffar told Wilson that he had watched television news coverage about the crime the next night. Soffar's sister also testified that Soffar generally read the newspaper and listened to the news on television and the radio. She also testified that Soffar had told her "[t]hat there was a $10,000.00 reward" and "[t]hat the composite drawing looked like Latt and that he wanted to turn him in."

*Id.*

The Texas court cannot have it both ways.  Either Mr. Soffar presented evidence proving that he was exposed to multiple news sources discussing the facts of the case (which was established at trial), or he did not.  It is unreasonable to claim both that he did not present this

evidence, and then to claim he suffered no harm because he was able to present a small portion of the evidence.

*Second*, according to the Court of Criminal Appeals, the statements Mr. Soffar signed included two facts not reported the media: the manger's office door was locked and the victim's wallets were taken during the offense. *Id.* But both of those facts were, at a minimum, alluded to in the newspaper reports Mr. Soffar attempted to introduce. (*See* 43 Def. Ex. 63, 66.) A newspaper article published in the Houston Chronicle, which the defense was not permitted to the show the jury, specifically states that "[o]ne employee's wallet was found in the bowling alley parking lot." (*See* 43 Def. Ex. 63, 66.) Further, multiple newspaper articles reported that the manager's office was not entered during the robbery. (*See, e.g.,* 43 Def. Ex. 59.) The idea that these two facts were not reported in the media is therefore false, and the Texas Court's decision to the contrary resulted unreasonable determination of the facts in light of the evidence presented at the trial.

*Third*, the Court of Criminal Appeals asserted that Mr. Soffar's admission during a drug deal showed he was guilty, *id.*, an admission Judge Cochran described as "offhand street-corner comment to a friend vaguely admitting involvement in the robbery-murders," *Soffar VI*, 2012 WL 4713562, at *2. Regardless of whether that offhand comment should be credited—and it should not—it has nothing to do with whether the convicting court's decision to exclude the media reports was harmless. Indeed, the Supreme Court in *Holmes* unanimously held that the mere existence of evidence supporting the prosecution's argument could not justify a decision to exclude evidence supporting the defense theory of the case. *Holmes*, 126 S. Ct. at 1734-35.

Moreover, the Texas court completely ignored the prosecution's exploitation in closing of the convicting court's unconstitutional ruling. Having succeeded in keeping out the media

evidence, the prosecution falsely argued to the jury that it should find Mr. Soffar guilty because he knew facts about the Bowling Alley that only the perpetrator could have known. (35 R.R. 11, 22-23).   The prosecution also argued that the defense did not present evidence showing the confession was false—an argument that, in itself, warrants habeas relief because it is unquestionably prosecutorial misconduct.   (*Id*. at 9.)   The prosecutor could not have made these patently prejudicial arguments but for the convicting court's constitutional error.

Finally, in assessing harm, it is important to recognize that the prosecution's case against Mr. Soffar was essentially non-existent and amounted to an implausible statement.   As the Fifth Circuit stated after reviewing virtually dentical evidence from Mr. Soffar's first trial:

> No eyewitness testimony placed either Soffar or Bloomfield at the crime scene. No fingerprints lifted from the crime scene matched the fingerprints of either Soffar or Bloomfield.  Nothing was taken from the crime scene and later found in the possession of either Soffar or Bloomfield.  No blood or hair samples were found at the crime scene that matched those of Soffar or Bloomfield.  The gun used to commit this crime was neither found nor introduced into evidence. Neither Soffar nor Bloomfield were linked to a weapon of the same caliber as the bullets recovered from the crime scene. Nothing Soffar told the police in his statements led the police to discover any evidence they did not already have relating to the bowling alley murders.

*Soffar*, 368 F.3d at 479.  These observations are equally true of the second trial, where the only evidence against Soffar were his own highly questionable statements.

In sum, in light of the fact that the statements Mr. Soffar signed are uncorroborated and riddled with inaccuracies, evidence that the few accurate facts in those statements were widely known would have been the last nail in the coffin of any conceivable credibility they might have had.  As a result, the convicting court's exclusion of those facts could not possibly have been "harmless" as the Court of Criminal Appeals concluded.  For that reason, the state's decision was an unreasonable determination of the facts and contrary to, or, in the alternative, an unreasonable

application of, clearly established Federal law.  As such, Mr. Soffar respectfully requests that a writ of habeas corpus be granted.

### 4.    The Claim Was Exhausted In The State Court Proceedings.

This issue was raised as the "Appellant's Fourth Point of Error" in the direct state appeal. *Soffar III*, 2009 WL 3839012, at *18-*22.  The Court of Criminal Appeals, after discussing the issue, assumed that convicting court "erred in refusing to admit Soffar's media evidence."  *Id.* at 20.  However, the court also decided, "beyond any reasonable doubt, that any constitutional error did not contribute to Soffar's conviction."  *Id.*

### C.    CLAIM FOR RELIEF 4:  THE TEXAS COURT'S CONCLUSION THAT TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO SECURE THE ADMISSION OF MEDIA REPORTS IS CONTRARY TO, OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984).

### 1.    The Relevant Facts.

As explained above in Claim for Relief 3, the Houston television and print media widely publicized the details of the bowling alley robbery murders.  *See also Soffar VI*, 2012 WL 4713562, at *3 (Tex. Crim. App. Oct. 3, 2012) (Cochran, J., concurring) ("The Houston media gave great attention to the triple-murder case and the police investigation of it.  Television and newspaper accounts of the crime itself, the victims, Greg's survival, and his description of the robber-murderer featured prominently in the news for weeks after the event.  Most of the crime details were in the public domain, and the media repeatedly broadcast the fact that a reward had been offered for information leading to the arrest of the murderer.").  Although Mr. Soffar's counsel presented evidence that he regularly watched Channel 13 news and received the Houston Post, (32 R.R. 239)—both of which extensively covered the robbery-murders—the jury did not see these media reports because the trial court incorrectly ruled that they were inadmissible.  (*See supra* at II.B.)  While the court did not explain its ruling, to the extent that the ruling was based

on trial counsel's failure to show the relevance of the evidence and lay a proper foundation for its admission, trial counsel's performance was objectively unreasonable.

### 2.    The Applicable Standard.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI.  A petitioner's claim that he was denied such assistance is measured against the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Id.* at 690.  One act or omission can render counsel's performance inadequate, regardless of how well counsel performed in other respects.  *Strickland*, 466 U.S. at 686; *Cronic*, 466 U.S. at 659; *Bell*, 535 U.S. at 697; *Burger*, 483 U.S. at 788; *Darden*, 477 U.S. at 184.   *Strickland* is well-settled federal law.  *See, e.g., Bell v. Cone*, 535 U.S. 685, 697 (2002); *Kimmelman*, 477 U.S. at 388; *Cullen*, 131 S. Ct. at 1426; *Knowles v. Mirzayance*, 556 U.S. 111, 113 (2009); *Harrington*, 131 S. Ct. at 778; *Missouri v. Frye*, 132 S. Ct. 1399, 1408-49 (2012); *Florida v. Nixon*, 543 U.S. 175, 191 (2004); *Porter v. McCollum*, 130 S. Ct. 447, 452-53 (2009); *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 522; *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Premo v. Moore*, 131 S. Ct. 733, 741 (2011); *Cullen*, 131 S. Ct. at 1407; *Bobby v. Van Hook*, 558 U.S. 4, 18 (2009); *Knowles*, 556 U.S. at 124; *Bell*, 535 U.S. at 702; *Burger v. Kemp*, 483 U.S. 776, 794 (1987); *Darden v. Wainright*, 477 U.S. 168, 186 (1986); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986);

*Yarborough v. Gentry*, 540 U.S. 1, 11 (2003); *see also United States v. Juarez*, 672 F.3d 381, 388 (5th Cir. 2012).

Applying the *Strickland* test is straightforward:  (a) the court must ascertain which acts or omissions the petitioner has identified as constituting ineffectiveness, (b) the court then determines the relevant prevailing professional norms, (c) after identifying those norms, the court evaluates whether the challenged acts and omissions complied with them, and (d) finally, the court decides whether there is a reasonable probability that the result of petitioner's trial would have been different but for counsel's unprofessional conduct.  *Strickland*, 466 U.S. at 690.  In applying this test, courts are prohibited from evaluating counsel's performance based on their own sense of what is prudent or reasonable.  *Cullen*, 131 S. Ct. at 1407.  Instead, the focus of the inquiry is on objective "prevailing professional norms" of capital representation.  *Strickland*, 466 U.S. at 688; *see also Porter*, 130 S. Ct. at 452-53; *Wiggins*, 539 U.S. at 522; *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010); *Rompilla*, 545 U.S. at 383; *Nixon*, 543 U.S. at 192; *Williams*, 529 U.S. at 396; *Roe*, 528 U.S. at 480; *Kimmelman*, 477 U.S. at 385; *Cullen*, 131 S. Ct. at 1407.  Although "[n]o particular set of detailed rules for counsel's conduct" can be prescribed, *Strickland*, 466 U.S. at 688, the Supreme Court has referred to certain sources in identifying applicable norms.  *See also Cullen*, 131 S. Ct. at 1406 (noting that specific guidelines are not appropriate).  Those sources include the American Bar Association Standards for Criminal Justice, the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, the National Legal Aid and Defender Association Performance Guidelines for Criminal Defense Representation, the Department of Justice Office of Justice Programs Compendium of Standards for Indigent Defense Systems, state bar professional standards, state and federal court rules and statutes, the decisions of other courts,

expert opinions, amicus briefs, treatises, law review articles, transcripts of oral arguments in unrelated cases, and continuing legal education materials. *See, e.g., Frye,* 132 S. Ct. at 1408-49 (the STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (A.B.A. 3d Ed. 1999) ("ABA STANDARDS"), case law, bar regulations, and state court rules); *Kimmelman,* 477 U.S. at 385 (case law); *Nixon,* 543 U.S. at 191 (law review articles, the GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (A.B.A. rev. ed. 2003) ("ABA GUIDELINES"), and a transcript of a closing argument by Clarence Darrow); *Padilla,* 130 S. Ct. at 1482 (the PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION (Nat'l Legal Aid & Defender Assoc. 1995) ("NLAD GUIDELINES"), treatises, law review articles, the COMPENDIUM OF STANDARDS FOR INDIGENT DEFENSE SYSTEMS, STANDARDS FOR ATTORNEY PERFORMANCE (Dept. of Just., Office of Just. Programs 2000) ("DOJ STANDARDS"), continuing education materials, and case law); *Porter,* 558 U.S. at 38-40, 130 S. Ct. at 452-53 (case law and professional norms); *Roe,* 528 U.S. at 479 (the ABA STANDARDS and a state statute); *Rompilla,* 545 U.S. at 387 (the ABA GUIDELINES); *Strickland,* 466 U.S. at 688 (the ABA STANDARDS); *Wiggins,* 539 U.S. at 522 (the ABA STANDARDS and ABA GUIDELINES); *Williams,* 529 U.S. at 396 (the ABA STANDARDS); *Bell,* 535 U.S. at 697 n.4 (Stevens, J., dissenting) (expert evidence).

While counsel's decisions are usually entitled to deference, *Strickland,* 466 U.S. at 521-22, the fact that counsel may have had a reason for their actions does not end the inquiry; instead, the court must look behind that subjective reason and consider whether it was objectively reasonable. *Wiggins,* 539 U.S. at 521-22; *Williams,* 529 U.S., at 396. Moreover, decisions made without adequate investigation are not accorded deference. *Wiggins,* 539 U.S. at 522; *Cullen,* 131 S. Ct. at 1406; *Primo,* 131 S. Ct. at 741. Indeed, prevailing professional norms

impose on counsel a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *Wiggins*, 539 U.S. at 510; *cf. Burger*, 483 U.S. at 794.  Where counsel consciously decided not to pursue a line of investigation, that decision is only reasonable to the extent professional judgment supports that decision. *Strickland*, 466 U.S.at 690-91.

### 3.    Habeas Relief Is Warranted.

At oral argument on Mr. Soffar's direct appeal, the state asserted that Mr. Soffar's trial counsel failed to take all of the steps that they could have done to lay a foundation for the admission of the media reports.  (App. IV, Ex. 72: Audio Recording of Hearing on Cause No. AP-75,363, *Max Alexander Soffar (Appellant) v. State of Texas (Appellee)* at 42:02-43:36.) Specifically, the state argued that trial counsel could have called Mr. Soffar to testify solely for the limited purpose of establishing that he "picked bits and details out of what [he] saw in the Houston Post or on Channel 13."  (*Id.* at 42:16-42:31.)  Although Mr. Soffar does not believe that any such foundation was necessary and that the media reports should have been admissible for the reasons discussed in Claim for Relief 3 above, if this court finds otherwise, no reasonable strategic rational can justify trial counsel's failure secure the admission of those media reports and thus trial counsel's failure to do so constitutes deficient performance.

The credibility of the statements Mr. Soffar signed was the central issue in the case.  *See Soffar VI*, 2012 WL 4713562, at *2 (Cochran, J., concurring) ("Applicant's capital-murder conviction and death sentence depend entirely upon the accuracy and reliability of his confession.").  As a result, it is clear that counsel's failure to secure admission of the media reports prejudiced Mr. Soffar.  As discussed in more detail in Claim for Relief 3 above, the media reports prove that the few accurate facts in those statements were in the public domain at the time of his interrogation, thus undermining the state's (inaccurate) argument that the

statements are reliable because they contain facts that only the true robber could have known. *Id.* at \*2 (stating that the statements "appears to be a tale told by one who heard about the robbery-murders rather than by one who committed them"). And because the State's case rested on the jury believing that the statements Mr. Soffar signed were reliable, it is reasonably probable that had the jury seen the media reports, the outcome of Mr. Soffar's trial would have been different. The Texas court's finding otherwise is contrary to, or, at the very least, an unreasonable application of, clearly established federal law. Thus, Mr. Soffar respectfully submits that his Sixth Amendment right to the effective assistance of counsel was violated and that his habeas relief can, and should, be granted.

### 4. The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar exhausted this claim for relief in his state habeas proceedings. This claim for relief was raised as Claim for Relief VI.F.5 in Mr. Soffar's state application for writ of habeas corpus. The convicting court rejected Mr. Soffar's claim that his trial counsel were ineffective and the Court of Criminal Appeals adopted that ruling. *See Soffar VI*, 2012 WL 4713562, at \*1; 33 S.H.R. 8954 at ¶¶ 190-193, 8985.

### D. CLAIM FOR RELIEF 5: THE TEXAS COURT'S CONCLUSION THAT TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO INVESTIGATE, DEVELOP, AND PRESENT TO THE JURY ALL EVIDENCE ESTABLISHING THAT MR. SOFFAR'S STATEMENTS ARE FALSE IS CONTRARY TO, OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984).

### 1. The Relevant Facts.

As the Supreme Court has recognized, "stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). This was the

challenge facing the trial lawyers representing Mr. Soffar. They needed to overcome a lay jury's natural disbelief that a normal person would ever confess to an awful crime he did not commit. There was a way to do this.  Among other things, trial counsel needed to show (and easily could have shown) the jury that Mr. Soffar is anything but "normal."  And trial counsel needed to show (and easily could have shown) that the particular interrogation techniques that led to Mr. Soffar's statements were known to cause individuals with Mr. Soffar's particular mental impairments to capitulate to police pressure and police suggestion by signing false statements, something "normal" people typically would not do.

The way to provide this information was through expert witnesses, such as psychiatrists, neurologists, psychologists, toxicologists, and experts on how various interrogation techniques affect people with particular mental limitations and disorders.  Yet, despite the obvious power of such evidence, which was admissible under Texas law, the jury that decided on Mr. Soffar's guilt or innocence never heard a word of it.  In the end, then, the jury had no explanation for that critical question of why Mr. Soffar would possibly have confessed had he not committed the crime.  Without that evidence, the jury had no reason to doubt the words of the prosecutor in his closing: "Why? Why would a person admit to shooting . . . people and killing then during the course of a robbery if he wasn't even there?" (35 RR 77)  Without that evidence, the jury accepted the veracity of Mr. Soffar's confessions and convicted him.[4]

---

[4]   This is hardly surprising. There have been countless cases in which thoroughly innocent individuals have been convicted because jurors simply could not get past the widespread (but mistaken) belief that innocent people do not confess. See generally Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA Age*, 82 N.C.L. Rev. 891 (2004) (analyzing 125 cases of proven false confessions and finding that 81% of proven false confessors who went to trial were wrongfully convicted despite the fact that little or no other credible evidence supported their confessions). It is precisely for this reason that expert testimony about a suspect's particular mental and psychiatric makeup, and how these traits interaction with interrogation techniques, is so vital. See generally Nadia Soree, *When the Innocent Speak: False Confessions, Constitutional Safeguards and the Role of Expert Testimony,* 32 Am. J. Crim. L. 191 (2005).

In the state habeas petition, habeas counsel presented the court with a set of affidavits from experts whose testimony would have shed great light on the fundamental question of how Mr. Soffar could possibly have confessed if innocent.  Three of these experts focused directly on the ways in which the particular interrogation techniques that were used would likely interplay with Mr. Soffar's specific mental impairments and incapacities.  Five other experts evaluated Mr. Soffar's mental abnormalities and how they affected his cognitive capacity, decision-making, impulsivity and other relevant traits.

The three witnesses who specialize in the impact of interrogations stated that, had they been asked to consult with the trial counsel, they would have been prepared to testify as follows:

> **Dr. Richard Leo** works and writes in the fields of social psychology and criminal justice. He is an Associate Professor of Law at the University of San Francisco and a fellow at the University of California's Institute of Legal Research Criminal Justice Program. For many years, he served on the faculty of the University of California, Irvine, as an Associate Professor of Psychology and Social Behavior. He has been qualified as an expert witness in over 150 cases, and state, federal and military courts—including the state of Texas. After analyzing Mr. Soffar's medical, psychiatric and educational records, as well as the records regarding the interrogation, Dr. Leo concluded there was a high risk that a person with Mr. Soffar's conditions would have confessed, even if innocent. For example, Dr. Leo wrote, "Mr. Soffar is brain-damaged, easily led, eager to please, impulsive, has a short attention span, feels overwhelmed, is mentally ill, is unable to foresee consequences, has a tendency to make up stories to get attention, and has a poor grasp of reality," all of which are "personality traits that are associated with an increased likelihood of a risk of false confession." (Aff. 45 at ¶ 39 (Vol. III).) Dr. Leo examined the specific techniques the police used in interrogating Mr. Soffar and found that several of them created particular high risk that someone like Mr. Soffar would tell the police whatever they wanted to hear. He further explained that in situations where the suspect's condition creates an increased risk of false confession, it is particularly critical to compare the facts the suspect provided in the confession with the actual known facts of the case. Material inconsistencies are significant indicators that

the confession is something other than a true account of what occurred. (*Id.*)

**Dr. I. Bruce Frumkin** is a Board Certified clinical psychologist who has written, lectured and testified widely on assessing suspects' mental capacity and conditions in relation to interrogations. Dr. Frumkin interviewed Mr. Soffar, administered a battery of eight psychological tests, and reviewed voluminous materials about Mr. Soffar's background and interactions with the police. Dr. Frumkin concluded that Mr. Soffar's low intelligence, difficulties integrating and processing information, suggestibility, poor capacity for reasoning, and emotional imbalance all impacted heavily on what happened during the interrogations. This spoke directly to his capacity to understand and waive his *Miranda* rights, but went much further than that as well. For example, Dr. Frumkin concluded that "Mr. Soffar feels overwhelmed and he will impulsively make the situation worse by acting out, generally in self-destructive ways." (Aff. 18 at 7 (Vol. I).)  Ultimately, Dr. Frumkin came to conclude that even if Mr. Soffar did not commit the offense, "his distorted thinking, caused by both psychological and neurological factors, would explain why he would confess to a crime he did not commit." (*Id.* at 10.)

**Dr. Christian A. Meissner,** is an Associate Professor in the Departments of Psychology and Criminal Justice at the University of El Paso in Texas. He is a widely published author and serves as the Associate Editor of Applied Cognitive Psychology.  Dr. Meissner is an expert on the ways in which various interrogation techniques affect suspects, and how a suspect's mental and psychological characteristics interact with those techniques. Many of the conditions with which Mr. Soffar has been diagnosed are ones that have been shown, according to Dr. Meissner, to enhance the chances that a particular suspect will confess to a crime he did not commit. (Aff. 42 (Vol. II).)

In addition to these experts, habeas counsel has also presented affidavits from other medical and psychological specialists whose testimony would have spoken directly to Mr. Soffar's mental defects in ways that informed analysis of the confessions' value—what should have been the central issue of the trial.  These experts were as follows:

**Professor Jonathan Pincus** is a Board Certified neurologist who is the Chairman Emeritus of Neurology at Georgetown University in Washington, D.C., and Chief of Neurology at the Veterans Administration Medical Center, also in Washington, D.C.  He has

published over 140 books and articles and has been qualified as an expert witness by courts. In preparation for the state habeas corpus proceedings, Professor Pincus examined Mr. Soffar and reviewed various medical records, affidavits, and testimony of experts who had previously tested Mr. Soffar or evaluated his conditions. Professor Pincus's assessment revealed that Mr. Soffar suffers from bipolar disease and has defects, abnormalities and dysfunction in his right anterior brain. These defects "were sustained at birth or during the prenatal period" (Aff. 24 at ¶ 38 (Vol. I)).    According to Professor Pincus, these abnormalities "would make him impulsive [and] less likely to see the outcome of certain plans, actions, [and] statements." *Id.* at ¶ 37. Professor Pincus also indicated he suspected that the abnormalities were "related to maternal drinking and possibly drug use during pregnancy." *Id.* at ¶ 38. In addition, Professor Pincus found numerous scars on Mr. Soffar's body, which were consistent with his having been beaten as a child.[5]

**Dr. Paul Connor** is a psychologist who serves as a clinical faculty member in the University of Washington's Department of Psychiatry and Behavioral Science's Fetal Alcohol and Drug Unit. He has published and lectured extensively on neuropsychology and the effects of fetal alcohol syndrome. In preparation for the state habeas corpus proceedings, Dr. Connor examined Mr. Soffar and reviewed the affidavits of several other experts who had performed evaluations. Dr. Connor performed 16 tests on Mr. Soffar and found a wide array of deficiencies in Mr. Soffar's cognitive and processing capacities. For example, Dr. Connor found that when Mr. Soffar was age 21, he had the functional receptive abilities of a normal child age three years, seven months.    Similarly, Mr. Soffar's coping skills at age 21 were functionally equivalent to a normal child's skills at age five years, six months. Dr. Connor concluded that Mr. Soffar "evidences a complex pattern of behavior and cognitive abnormalities that is consistent with guidelines for the diagnosis of Fetal Alcohol Spectrum Disorders." (Aff. 51 at ¶ 9 (Vol. V)) This syndrome denotes the presence of significant brain and cognitive damage caused by his mother's prenatal consumption of alcohol.[6]

---

[5]    There were several witnesses available who would have confirmed that Mr. Soffar was subject to beatings by his father. Indeed, one neighbor has stated in a sworn affidavit that he remembers watching Mr. Soffar's father beat him as his sister and mother held him down. (33 S.H.R. 8930-1 at F.F. ¶¶ 107-108.).

[6]    A number of witnesses from Mr. Soffar's childhood could have confirmed that, even as an infant, he exhibited behavior consistent with Dr. Connor's conclusion and with the other experts' conclusions that Mr. Soffar was brain-damaged from birth.    For example Dr. Saul Soffar (an obstetrician who is Mr. Soffar's cousin) would have testified that there was "something very seriously wrong with Max from birth," and that, based on his

**Dr. Joseph Rodricks** is a toxicologist who serves as a principal in a company dealing with toxicology and human health risk assessment, and as an Adjunct Professor at the Johns Hopkins Bloomberg School of Public Health, where he teaches graduate courses in toxicology and risk analysis. He has been a diplomat of the American Board of Toxicology since 1981 and has served on 25 expert Committees of the National Academy of Sciences and the Institute of Medicine. He has authored more than 120 scientific publications and has been accepted as an expert in toxicology by state and federal courts. In preparation for the state habeas corpus proceeding, Dr. Rodricks reviewed documents pertaining to Mr. Soffar's medical history and chemical exposure history. This history revealed exposure to four substances: solvents (specifically toluene), tetraethyl lead, alcohol and Phenobarbital. Dr. Rodricks concluded that Mr. Soffar's chronic exposure to various substances led or contributed to the structural and functional brain damage with which he was diagnosed. Specifically, Dr. Rodricks concluded that Mr. Soffar exhibits many of the symptoms associated with exposure to these toxins, including brain damage that causes deficits in cognitive functioning, attention span, speed of information processing, inhibition, and reasoning. (Aff. 50 (Vol. V.)[7]

**Dr. Michael M. Gelbort** is a clinical psychologist who specializes in neuropsychology and medical psychology. Among the positions he has held, Dr. Gelbort served for four years as the Chief Psychologist and Head of the Department of Neuropsychology at the Institute for Rehabilitation and Research in the Houston Medical Center. He has been qualified to testify as an expert in state and federal courts. In preparation for the state habeas corpus proceedings, Dr. Gelbort examined Mr. Soffar over two days and administered a battery of tests, and he reviewed records pertaining to Mr. Soffar's medical and social history and evaluations. Dr.

---

professional training, he was sure that Mr. Soffar "suffered from severe intellectual, psychological and emotional deficiencies . . . that were evident from such a young age and were so pronounced that I believe he was not born with the same capabilities, capacities and strengths as other children." (Aff. 29 at ¶ 4 ((Vol. I)). The defense could also have presented recorded testimony of Mr. Soffar's adopted mother (who had died prior to the second trial), and the live testimony of his sister and two aunts, all to the effect that he had been abnormal since infancy. (Aff. 30 (Vol. I); Aff. 6 (Vol. I); Aff. 28 (Vol. I); Aff. 2 )Vol. I)).

[7]  A number of witnesses could have corroborated Mr. Soffar's exposure to various toxins. For example, witnesses would have testified that Mr. Soffar's mother gave him non-prescribed Phenobarbital to quiet him as an infant; that he was already sniffing glue and "huffing" leaded gasoline when he was four years old (to the point that he was once found at that age passed out next to a car with a gas cap beside him); that he would consume drugs from the family medical cabinet and would otherwise consume a wide array of licit and illicit drugs; and that he began abusing alcohol at a very young age. *See* D. Soffar Aff. 28 at ¶ 2; Z. Soffar Aff. 30 at ¶¶ 3, 8; C. Amdur Aff. 1 at ¶ 4; J. Soffar Aff. 6 at ¶ 20; R. Amdur Aff. 2 at ¶ 7.

Gelbort concluded that his tests "produce[d] data which supports a
diagnosis of the presence of neurocognitive impairments and
dysfunction attributable to anteriorly located areas of the brain."
(Aff. 19 at ¶ 22 (Vol. I).). Of particular significance here, Dr.
Gelbort was prepared to testify that, "to a reasonable degree of
neuropsychological certainty, the demonstrated deficits are of the
type which have a negative impact on Mr. Soffar's ability to reason
normally, control impulses with normal inhibitory processes,
consider alternatives in a rational fashion, learn from mistakes and
experiences, and engage in adaptive and effective goal-directed
and socially desirable behavior in a normal fashion." (*Id.* at ¶ 23.)

As indicated above, during the guilt phase trial counsel did not call any of these witnesses
or any other witness in any of these various disciplines.

Nor did defense counsel seek to call, or present the earlier testimony of, three expert
witnesses who had assessed Mr. Soffar during the habeas proceedings following the first trial to
some—but by no means all—of these issues.  The decision not to call those witnesses could
perhaps be defended on the grounds that trial counsel wanted to prevent the jury from knowing
there had been an earlier trial.  But that strategy, of course, would not explain any decision to
forgo exploring the possibility of calling new witnesses who could testify to the wide range of
issues central to allowing the jury to make a meaningful, informed assessment of the
confessions' significance.

In affidavits presented as part of the state habeas proceedings, trial counsel stated that
they had not secured any examinations of Mr. Soffar prior to the second trial.  They stated that
this decision was a "considered one." (Kase Aff. at ¶ 11; Nyland Aff. at ¶ 8.)  But other than that
characterization, they provided only one reason for not having had Mr. Soffar examined by any
experts.  One of the trial lawyers, Kathryn Kase, wrote that one reason they did not secure any
examinations because it "was my belief that doing so would open the door for allowing the State
to conduct its own examination and evaluation of Mr. Soffar.  Our decision was based on our
understanding of the Texas Court of Appeals' decision in *Lagrone v. State*, 942 S.W.2d 602

(1992)."  (Kase Aff. at ¶ 12.)  Ms. Kase's affidavit further stated that she was aware of some litigation in which even when government experts are allowed to examine a defendant, information from that evaluation is kept from the prosecution until the time that is becomes relevant.  She recognized in her affidavit that "I agree that we should have challenged any *Lagrone* ruling allowing access by prosecution experts to Mr. Soffar and disclosure of their evaluations prior to trial as an unconstitutional violation of Mr. Soffar's Sixth Amendment right to effective assistance of counsel."  (*Id.*)  With regard to the decisions to avoid consulting with a an experts on interrogations and false confessions, or presenting other relevant testimony from experts who would not have needed to actually examine Mr. Soffar, no explanations were offered—only the repeated characterizations of all decisions as "considered" ones.

In support of the claim that trial counsel was ineffective in failing to investigate and present this type of testimony, the state habeas petition included a declaration from Professor Sean D. O'Brien, a veteran capital defense lawyer, who serves as an Associate Professor of Law at University of Missouri Kansas City School of Law. Since he began working on death penalty cases in 1983, Professor O'Brien has represented capital defendants or assisted and advised counsel in capital cases in 17 states and in the federal courts.  He has been qualified as an expert on performance of counsel issues in several courts.  Professor O'Brien concluded that it was essential for the lawyers representing Mr. Soffar to thoroughly investigate presenting evidence, including expert witness testimony, that would contextualize the interrogation and his statements, thereby enabling the jury to understand how the confessions were not inconsistent with Mr. Soffar's factual innocence.  Professor O'Brien stated that the evidence trial counsel were obliged to pursue included "the circumstances of Max Soffar's confessions, and the effect that his well-documented emotional, neurological, intellectual and psychiatric impairments have

on the reliability of his confession" as well as "the pressures that contributed to Max's false confessions." (O'Brien Aff. at ¶ 13.) This evidence could have been presented through experts, as supplemented by a variety of witnesses who were familiar with the Mr. Soffar's impairments from lay perspectives. (*Id.* at ¶¶ 15-19.)

In rejecting Mr. Soffar's claim of ineffective assistance of counsel on this issue, the Texas court observed that trial counsel were not ignorant about the possibility of calling expert witnesses—they had access to earlier mental health evaluations and testimony, and they consulted with experts on a variety of different issues prior to trial. The court thus found that trial counsel "was aware of and considered using additional experts" in various aspects of the case and declined to do so. (33 S.H.R. 8941 at F.F. ¶ 142.) With regard to virtually each challenged aspect of trial counsel's performance, the Texas court simply declared trial counsel's decisions "considered" and "strategic," without providing any elaboration on what those considerations may possibly have been and why they were reasonable. Ultimately, in its Conclusions of Law relating to these issues, the Texas court made clear it was making its findings that counsel was effective, not based on assessing each individual claim Mr. Soffar was advancing, but on a generalized sense that trial counsel had done a good job:

> Based on the totality of the representation afforded the applicant at trial, as demonstrated by counsel's vigorous defense of the applicant, the Applicant's claim that he was denied effective representation at trial is without merit. Trial counsel's representation of the Applicant at trial fell within the range of reasonable professional assistance; counsel conducted a thorough investigation of the primary offense, possible defenses, and potential punishment evidence; counsel made reasonable strategy decisions, within the boundaries allowed by evidentiary rules and case law, in the presentation of evidence during the pre-trial, guilt/innocence and punishment phases of the trial; and, counsel lodged appropriate objections and vigorously questioned witnesses. *See Wilkerson v. State,* 726 S.W.2d 542, 548 (Tex. Crim. App. 1986) (analysis for ineffective assistance of counsel

93

claim is undertaken in light of the "totality of the representation" rather than by examining isolated acts or omissions of trial counsel).

(33 S.H.R. at 8982 at C.L. ¶ 15.)[8]

With regard to the impact that the various examples of ineffective assistance had on the trial, the Texas court declared summarily, "[t]he applicant fails to establish that the applicant was harmed on the basis of any alleged deficiency in the trial counsel's representation." (*Id.*)

The Court of Criminal Appeals adopted the trial court's Findings of Fact and Conclusions of Law on these issues, with the exception of the finding that testimony of a false confession expert would have been inadmissible under Texas law.

## 2. The Applicable Standard

The governing standard applicable to ineffective assistance of counsel claims is discussed in Claim for Relief 4.  (*See infra* II.C.2 (Claim for Relief 4).)

## 3. Habeas Relief is Warranted

As described through the affidavits of the various experts who examined Mr. Soffar *after* trial and the experts on false confessions who were consulted by Mr. Soffar's habeas counsel *after* trial, there was extraordinarily powerful evidence available to allow the to the jury to understand that the fact Mr. Soffar confessed was by no means conclusive of his guilt.  That was the core of the entire case, yet trial counsel inexplicably opted to forego presenting hard scientific evidence that would have provided a solid foundation for the claim that Mr. Soffar had confessed even though he was wholly innocent.   No amount of deference to trial counsel's

---

[8]   In recommending denial of the habeas corpus petition, the Texas trial court also found that the decision to refrain from presenting expert testimony on false confessions was reasonable because "various courts, including the Court of Criminal Appeals in an unpublished opinion, have held that expert testimony on confessions is inadmissible." (33 S.H.R. 8940-1 at F.F. ¶ 141. The Court of Criminal Appeals struck this finding, however, and refused to rely upon it as a basis for denying the Petition.

strategy can render it reasonable that Mr. Soffar is now on death row with the jury never having heard a word of this critical testimony.   And no amount of deference to a state court's determination can render it reasonable for the Texas court to have declared all of trial counsel's decisions to have been "considered" ones and to deny Mr. Soffar relief on that basis.

(1)   The "Performance" Prong

It is impossible to exaggerate the importance of the information trial counsel failed to put before the jury.   There is a vast difference between asking a juror to accept the premise that a relatively "normal" person confessed despite being innocent, as opposed to asking a juror to accept the idea that a deeply disturbed individual—with organic brain damage, bipolar disease, cognitive incapacities, Fetal Alcohol Syndrome, brain damage occasioned by exposure to toxins, and other severe impairments—might well admit to anything at all.   And when that juror is also informed that interrogation techniques can generate certain responses (including false confessions) in mentally impaired individuals quite different than typical responses of a "normal" person, the idea that such a person's confession might reflect his mental illness, not his guilt, becomes completely understandable.   The incomprehensible become comprehensible.   But only if the jury is provided the information it needs.

Despite the life-and-death implications of providing this information to the jury, trial counsel made no efforts to have Mr. Soffar examined by any experts and never spoke with any false confession experts to learn what such an expert might be able to say.   The Texas court's decision rejecting Mr. Soffar's habeas claim that this failure constituted ineffective assistance of counsel is plagued by each of the three vices the law specifies as a basis for granting federal habeas corpus relief: (a) the Texas court's approach to evaluating the ineffective assistance of counsel claims was "directly contrary" to established precedent of the Supreme Court of the

95

United States; (b) the Texas court unreasonably applied settled Supreme Court precedent; and (c) the Texas court made unreasonable determinations of fact in light of the evidence presented.

There are several ways in which the Texas court applied legal standards "directly contrary" to settled Supreme Court precedent.  First, as discussed above, the court made clear that, in applying the *performance* prong of *Strickland*, it was using a "totality of the circumstances" standard to determine whether, on balance, trial counsel did an adequate job. The court was announcing that it would ignore any particular example of misfeasance by trial counsel if the court concluded that, on balance when looking at the entire proceeding, trial counsel performed adequately.  This approach is "directly contrary" to the decisions of the United States Supreme Court.  As *Strickland* and its progeny establish, in applying the *performance* prong, courts must assess the reasonableness of the specific "identified omissions," not weigh the competent aspects of the representation against the incompetent aspects and declare there was more competence than incompetence.  *See Strickland*, 466 U.S. at 690.  It is clear that one specific identified omission can render counsel's performance inadequate, regardless of how well counsel performed in other respects.  *See Bell*, 535 U.S. at 697; *Burger*, 483 U.S. at 788; *Darden*, 477 U.S. at 184; *Cronic*, 466 U.S. at 659.

This improper focus on holistically assessing trial counsels' performance over the entire course of the representation was evidenced in a great number of the court's findings.  Over and over, the Texas court deflected any claims about what trial counsel failed to do, by pointing to things they had done—even though there was absolutely no incompatibility between trial counsel doing what they had done while also doing what the habeas petition demonstrated that they should have done.  For example, in response to the claim that trial counsel should have used experts to attack the validity of the confession, the Texas court held that trial counsel was

reasonable because they had, in fact, sought to attack the confession by showing its inconsistencies with Mr. Garner's accounts of the crime and because they did ask some police officers about Mr. Soffar's general truthfulness. (33 S.H.R. 8940-1 at F.F. ¶ 141.)  But the fact that trial counsel did those things says nothing about whether they were required, as part of their duty to provide reasonable representation, to also present the available evidence about Mr. Soffar's mental conditions and about interrogations that would have powerfully bolstered the efforts trial counsel had made to defuse the confession.  The question under *Strickland* is not whether trial counsel did some good things.  They did many.  The question is whether they failed to do some things that were critical to Mr. Soffar's defense.  They did.  A surgeon may have yielded a scalpel artfully for six hours of surgery, but that does not mean that has acted reasonably if she loses concentration momentarily and nicks a patient's aorta.

In addition, with regard to virtually each claim Mr. Soffar advanced, the Texas court applied a reasonableness test that was thoroughly contrary to the Supreme Court's directives. Despite the fact that the defense had presented an extensive affidavit from a recognized expert in the prevailing standards of capital representation, the Texas court made no effort to apply either the standards Professor O'Brien articulated or those established in any of the other types of authorities the Supreme Court has instructed courts to examine.  *See supra* at II.C.2 (discussing sources of standards).  It is black letter law that the performance inquiry is an "objective" one that must be assessed in light of "prevailing professional norms."  *Strickland*, 466 U.S. at 688; *see also Cullen*, 131 S. Ct. at 1406-07; *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010).  Not only did the Texas court pay no heed to that requirement, it also failed to ever assess whether most of the challenged performance was, in fact, reasonable. Rather, the court functionally equated the word "strategic" with the word "reasonable" and provided near absolute immunity to

any decision it classified as "strategic."  This is decidedly not the law. Deferential review—even highly deferential review—is still review. *See Wiggins*, 539 U.S. at 524.

Because the Texas court's analysis was infected by its use of standard that are directly contrary to Supreme Court precedent, AEDPA establishes that it is not entitled to the deference a decision applying the proper legal standards would receive. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010).  Thus, this Court should engage in *de novo* review of Mr. Soffar's ineffective-assistance-of-counsel claims, given that deference to a decision rendered pursuant to an improper legal standard is plainly unacceptable. That review shows that Mr. Soffar is entitled to issuance of the writ.  But Mr. Soffar's right to relief does not depend on whether this court engages in *de novo* review.  Even were the court to apply a deferential standard of review, Mr. Soffar would be entitled to relief because the result the Texas court reached here was unmistakably unreasonable.

(2)     This Misreading Of *Lagrone*

The only actual explanation any lawyer or court has ever offered in defense of trial counsel's failure to develop and present the expert evidence was offered in Ms. Kase's affidavit. She stated there—under oath—that the defense's decision not to have Mr. Soffar evaluated was based in part on her belief that the decision in *Lagrone* holds that any defense *request* for such an evaluation opens the door for the prosecution to secure its own examination of the defendant. This explanation establishes, for a number of reasons, that trial counsel acted unreasonably in failing to secure the critical examinations of Mr. Soffar.

To begin with, no fair reading of *Lagrone* supports the conclusion that the prosecution's right to have a defendant examined is triggered by the mere fact that the defense has secured an examination of its own.  Rather, the court in *Lagrone* was clear that the prosecution's right to secure its own examination is triggered "when the defense introduces, *or plans to introduce*," its

98

own mental health testimony.  *Lagrone*, 942 S.W.2d at 611 (emphasis in original); *see also id*. (the prosecution's right begins once the defense "has indicated an intent" to present the testimony).  Thus, the court in *Lagrone* proclaimed, "We now hold that when the defense *demonstrates the intent to put on future dangerousness expert testimony*, trial courts may order defendants to submit to an independent, state-sponsored psychiatric exam prior to the actual presentation of the defense's expert testimony."  *Id*. at 612 (emphasis added).  No Texas case has expanded the prosecution's right to any earlier time.  *See, e.g., Ward v. State*, AP-74,695, 2007 WL 1492090 (Tex. Crim. App. 2007) (prosecution's right to secure an examination starts with "indication of [the defense's] intent to present such testimony").

It goes without saying that a decision to have a client evaluated by an expert is a far cry from "indicating an intent" to have that expert actually testify or to revealing a "plan to introduce" such testimony.  It is commonplace to consult with experts and then decide not to pursue that line of evidence; indeed, such consultations are afforded special protection as part of the work product doctrine.  *See Pope v. State*, 207 S.W.3d 352, 357-58 (Tex. Crim. App. 2006) (describing work product protection afforded to experts with whom counsel has consulted, but who have not yet been designated as testifying experts).  Plainly, then, trial counsel could have secured expert examinations of Mr. Soffar without thereby allowing the prosecution to do likewise unless and until the defense disclosed its intent to present one or more of those experts at trial. Trial counsels' decision to forego examinations of Mr. Soffar because of *Lagrone* was, therefore, based on an unreasonable misreading of the governing law and, as such, is not entitled to any deference as a reasonable strategic decision.  *See Kimmelman v. Morrison*, 477 U.S. 363, 385 (1986) (counsel's failure to file motion to suppress was not based on "strategy," but instead betrayed "a startling ignorance of the law").

The mistake of law was compounded by an additional mistake of law: trial counsel's failure to consider the fact that *Lagrone* also describes procedures to ensure that the prosecution will not be given access to the reports or information about any state-sponsored examination until such disclosure becomes necessary.  *See Lagrone*, 942 S.W.2d at 610 n.6, 612 n. 8.  Under these procedures, the state-sponsored report would be given to the judge to be held *in camera*. This procedure would have thoroughly protected Mr. Soffar's interest in preventing the prosecution from securing access to a state-sponsored examination unless Mr. Soffar was about to present expert testimony of his own.  Yet, once again, trial counsels' misunderstanding of the law meant that Mr. Soffar lost his critical opportunity to have the jury learn about his mental conditions from doctors and other experts who examined him.

To the extent there was any uncertainty about whether merely requesting an examination would have opened the door for the prosecution to secure examinations and immediately receive the ensuing reports, there was no conceivable justification for the defense not to file a motion with the trial court asking for a determination on that issue.  Had trial counsel done so, there is more than a reasonable probability (in fact, there is a near certainty) that the trial court would have followed *Lagrone* and ruled that the testing itself is not significant; the intent to present the testimony is.  And there is more than a reasonable probability that the trial court would have followed the procedures described in *Lagrone* for protecting the information from the prosecution. Either way, the defense would have known that it could secure the examinations at no risk.  It would then have the benefit of knowing exactly what those witnesses would say before deciding whether to present testimony from any or all of them.  And in the extremely unlikely event that the trial court had somehow read *Lagrone* as holding that any effort by the defense to have Mr. Soffar examined would immediately open the door for the prosecution to

secure its own examination and get access to it, the defense should have challenged such a ruling as a fundamental interference with its right to prepare a defense.  *See generally Brooks v. Tennessee*, 406 U.S. 605 (1972) (rule requiring a defendant to decide whether to testify at the outset of the trial unconstitutionally interfered with his rights); *see also Smith v. McCormick*, 914 F.2d 1153 (9th Cir. 1990) (automatic full disclosure of expert evaluations "impermissibly compromises presentation of an effective defense"); *United States v. Alvarez*, 519 F.2d 1036, 10946 (3d Cir. 1975) (undue interference with the defense right to secure evaluations of a defendant impairs of ineffective assistance of counsel).

It is quite significant that in denying the habeas petition, the Texas court did not hold that it was reasonable to read *Lagrone* as defense counsel attested to having read it. Instead, without any explanation for the basis of its determination, the court announced a finding of fact that trial counsel's decision was not made on the basis of *Lagrone*. 126.  This finding is the essence of an "unreasonable determination of fact in light of the evidence presented in the state court."  28 U.S.C. § 2254(d)(3).  How could a court, in the absence of any contrary evidence, reasonably make a finding disclaiming the lawyer's sworn explanation about why some action was not taken?

The court also stated that, even if the decision was based in part on a mistaken understanding of *Lagrone*, there were "additional strategic considerations" behind the decision as well.  (33 S.H.R. 8937 at F.F. ¶ 127.)  Here again, though, the court provided no hint of what those considerations might have been, much less why they were reasonable.[9] Equally curious is

---

9    In its Findings of Fact on the state habeas petition, the trial court also provided another basis for finding that counsel were not ineffective in failing to even consult with any experts on interrogations and their impact of the mentally impaired. The court found that "counsel's decision was reasonable based on case law regarding the admissibility of such testimony. The Court finds that various courts, including the Court of Criminal Appeals in an unpublished opinion, have held that expert testimony on confessions is inadmissible." (33 S.H.R. 8941 at F.F. ¶ 142.)  (citing two cases).  It is very significant that the Texas Court of Criminal Appeals struck this finding and did not base its denial of relief on this basis. It had good reason. In one of the two cases the trial

the Texas court's discussion of whether trial the habeas claim that counsel should have, if in doubt about what *Lagrone* meant, asked the trial court for a ruling on the issue or challenged *Lagrone*, as trial counsel understood it.  The court ruled that "there were no rulings at the trial level regarding issues of prosecution experts' access to the applicant," so trial counsel could not have been ineffective in not filing a challenge to any *Lagrone* ruling.  (33 S.H.R. 8937 at F.F. ¶ 128.  This reasoning entirely misses the point that, if trial counsel were being chilled in their defense of Mr. Soffar because of their understanding of *Lagrone* (which they should not have been, in the first place), they had a duty to *proactively* seek out a ruling by the trial court and, if that ruling were adverse, to lodge a constitutional challenge.

What emerges, then, is that the only way to reject Mr. Soffar's claim that trial counsel performed unreasonably in failing to pursue and present any expert testimony on his mental health and its relation to the confessions is to label trial counsel's failure as "strategic" and then ask no further questions.  This is not what the law requires.  When the right questions are asked—about how these omissions comport with the governing standard of care—it becomes clear that there were no *reasonable* strategic reasons.  Rather, the decisions were driven by a

---

court cited, the court affirmed the denial of funding for a false confession expert on the ground that there was "no showing that the falsity of her confession was a 'significant issue' in her trial." *Basso v. State*, No. 73672, 2003 WL 1702283 (Tex. Crim App. 2003). And the case did not involve any issues around mental illness or cognitive impairment, which explains why the court observed that expert testimony was not *required* in that case to assist the jury. *Id.* at * 6. The second case the trial court cited actually stands for the proposition that testimony of this sort is admissible. See *Scott v. State*, 165 S.W.3d 27 (Tex. App. 2005). In *Scott*, the trial court *allowed* Dr. Richard Leo (one of the same experts involved here) to testify about a range of issues pertaining to interrogations, but the court had declined to allow him to testify about some specific areas the court found to be insufficiently tested. The Court of Appeals affirmed the limitations, explaining that Dr. Leo had been allowed to testify about many of the core issues. Notably, those limitations were justified by the fact that Dr. Leo was not suggesting that the defendant "was particularly susceptible" to making a false confession. *Id.* at 57. As Dr. Leo's affidavit states, he has testified before in the Texas courts and there is no doubt that such evidence is by no means prohibited. See, *e.g., Contreras v. State*, No. 08-06-00205, 2011 WL 2474155 (Tex. App. 2011) (mentioning that Dr. Richard Ofshe, another false confession expert, had testified). In any event, the key here is that the Texas Court of Criminal Appeals affirmatively rejected the trial court's finding on this fact and it played no role in that court's judgment.

misunderstanding of the law and by other supposed considerations that have never been articulated by any lawyer or court.  *See generally Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990) (granting habeas relief because counsel was ineffective in not presenting expert testimony to support claim of incompetency or insanity).

(3)   The "Prejudice" Prong

This question of whether Mr. Soffar was prejudiced by trial counsel's performance on this issue requires little analysis.  It is uncontested that had the jury developed any reasonable doubt as to whether the confessions conclusively proved Mr. Soffar's guilt, Mr. Soffar would have been acquitted.  And it cannot seriously be disputed that the evidence from these experts would have been enormously powerful in giving the jury significant bases to doubt the probative nature of those confessions.  There is therefore, at the very least, a "reasonable probability" that this evidence would have led the jury to acquit, especially when taken with the other evidence casting doubt on the confessions.

The Fifth Circuit recognized the centrality of attacks on the confessions when it granted Mr. Soffar relief in 2004.  Discussing the failure of counsel at the first trial to present evidence that contradicted parts of the confessions, the court wrote:

> We are of the opinion that Soffar's defense counsel's failure to conduct an adequate pretrial investigation had a clear negative impact on the outcome of the trial. The evidence of Soffar's guilt in this case was not so extensive as to render harmless defense counsel's errors. . . .
>
> This is absolutely not a case where there was clear objective evidence of Soffar's guilt. . . .
>
> Had the jury been confronted with this considerable evidence favorable to Soffar, there is a reasonable probability it would have reached a different result. In particular, had the jury been so confronted, there is a reasonable probability that at least one juror would have refused to return a verdict of guilty. The available evidence casting doubt on the truth and veracity of Soffar's

103

> confessions is strong enough that the failure to present any of it for the jury's consideration undermines confidence in the outcome. *Strickland*, 466 U.S. at 694.

*Soffar*, 368 F.3d at 478-479.

That conclusion is just as strong now as it was then.  Showing inconsistencies between a confession and the known facts is powerful, to be sure, but it still leaves the possibility a juror might be unable to get around his or her belief that no innocent person could possibly confess. (And the possibility that such a juror will try to reconcile the errors in the confession with his or her certainty that innocent people do not confess by accepting the theory that the lone surviving eyewitness, Mr. Garner, might be mistaken about many of the key facts.)  The expert testimony that could have been, and should have been, presented here would have destroyed that conception by proving up the broad range of Mr. Soffar's mental abnormalities and showing how through hard scientific evidence how directly those impact on the likelihood of a false confession.  In denying habeas, the Texas court issued a boilerplate finding, with no analysis at all, that Mr. Soffar was not prejudiced by any of the alleged deficiencies.  This finding is simply unreasonable, no matter how much deference it is afforded.  Because Mr. Soffar has shown that his counsel performed unreasonably in failing to investigate and present these expert witnesses, and because there is a reasonable probability that such evidence would have led to his acquittal, and because the convicting court's ruling to the contrary cannot survive AEDPA scrutiny, Mr. Soffar is entitled to issuance of the writ.

### 4.     The Claim Was Exhausted in the State Court Proceedings

This issue was raised in Claims VI A, B, C, and F.1. The Court of Criminal Appeals, as discussed above, reached the merits of the claims and denied them.

E.  CLAIM FOR RELIEF 6: THE TEXAS COURT'S CONCLUSION THAT MR. SOFFAR'S RIGHT TO COUNSEL WAS NOT VIOLATED IS CONTRARY TO, OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *MIRANDA v. ARIZONA*, 384 U.S. 436 (1966) AND *DAVIS v. UNITED STATES*, 512 U.S. 452 (1994).

1.  **The Relevant Facts.**

During their interrogation of Mr. Soffar on August 5, the police wanted to make sure that they kept him talking at all costs.  For that reason, the police brought Sergeant Clawson to the station after Mr. Soffar "suddenly stopped talking" during the interrogation.  (Clawson Aff. ¶ 16.)  Detective Schultz had hit a "brick wall" with Mr. Soffar.  (4 RR 131.)  And as Sergeant Clawson later noted in his offense report, Mr. Soffar was "refus[ing] to talk."  (App. II, Ex. 29, Report of Investigation, Galveston County Organized Crime Control Unit, by Sergeant Bruce Detective Schultz's solution was to ask Sergeant Clawson to persuade Mr. Soffar to cooperate. (*See* 4 RR 107, 131-32; B. Clawson Aff. at ¶¶ 18-19; App. II, Ex. 29:  Bruce Clawson Investigation.)  Clawson (hereinafter "Bruce Clawson Investigation"), August 6, 1980; Clawson Aff. at ¶ 18.)  So the police asked Sergeant Clawson to "get Max to talk about what he knew of the bowling alley incident."  (*Id.*)

Sergeant Clawson understood that the Houston police and D.A.'s office "expected [him] to get Max to talk" and that his task that day was to "hold Max's hand during the course of the interrogation" and keep him talking at any cost.  (4 RR 124, 127; Clawson Aff. at ¶¶ 16, 19.) Sergeant Clawson apparently felt pressure not to impede the investigation, notwithstanding his reservations about whether Mr. Soffar actually knew anything about the Bowling Alley robbery. (4 RR 107, 125-6; 7 RR 96; B. Clawson Aff. at ¶ 19.)  So he agreed to do so.  What that ultimately meant was that Sergeant Clawson would ignore Mr. Soffar's unambiguous request for an attorney and convince Mr. Soffar that, practically speaking, he had no right to legal representation in the course of his interrogation and that he was "on [his] own."

105

Getting Mr. Soffar to talk was perhaps easier to do than Sergeant Clawson thought it would be, because Mr. Soffar was looking for advice from Sergeant Clawson.  Indeed, no sooner had Sergeant Clawson entered the interrogation room than Mr. Soffar asked "what he should do, talk to the detective or get a lawyer."  (*Id.*)

Consistent with the expectation that Sergeant Clawson would get Mr. Soffar to talk, Sergeant Clawson answered Mr. Soffar's questions in a manner intended to "derail[]" his inquiries about the subject of obtaining a lawyer.  (B. Clawson Aff. (June 20, 1989) at ¶6.) Sergeant Clawson told Mr. Soffar, "if you're guilty you should talk to the police and if you're not guilty you should get an attorney."  (4 RR 109; Clawson Aff. at ¶ 21 ("I told Max that if he was involved in the crime he should tell the detective he was in it; otherwise, he should get a lawyer.").)  In response to this (misleading) answer from Sergeant Clawson, Mr. Soffar replied "so how do I get a lawyer?"  (Clawson Aff. at ¶ 22.)  As Sergeant Clawson recognized, this response indicated both that Max had not been involved in the bowling alley murders and that Mr. Soffar wanted a lawyer consistent with the "advice" that Sergeant Clawson had just given him.  (*Id*. at ¶ 22; App. I, Ex. 18:  State Habeas Transcript, Aug. 17, 1994 at 226 (Clawson testifying that "the obvious answer is that he wanted an attorney.").)

But Sergeant Clawson continued his effort to "derail" Mr. Soffar's invocation of his right to an attorney, deflected Mr. Soffar's question by asking him whether "he could afford a lawyer on his own." (Clawson Aff. at ¶ 22.)  Sergeant Clawson similarly deflected Mr. Soffar's inquiry into how long it would take to obtain a court-appointed attorney by telling Mr. Soffar: "I [don't] know, a day or week, *a month*.  I [don't] know." (4 RR 107-08 (emphasis added).)  Of course, he also failed to explain that questioning would have to cease in the interim, and that suspects could not be held for more than seventy-two hours without charge.  (4 RR 108.)

106

The conclusion that Mr. Soffar drew based on this exchange with Sergeant Clawson—whom Mr. Soffar trusted—was that Sergeant Clawson was "telling me I'm on my own," to which Sergeant Clawson replied, "*yes you are*."[10]  (4 RR 110.)  Having thus been denied counsel and told that he was on his own, Mr. Soffar went back into the interrogation room with Detective Schultz, the interrogation culminating with Mr. Soffar signing the confessions on which his conviction is based.  (4 RR 110.)

### 2.      The Applicable Standard.

The Fifth and Fourteenth Amendments to the United States Constitution guarantee suspects the right to counsel.  U.S. CONST. amend. V, XIV; *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).  The right to counsel includes the right to have an attorney present during any custodial interrogation.  *Miranda*, 384 U.S. at 467.  That right is a necessary component of counteracting the "inherently compelling pressures" of such an interrogation.  *Id.; see also Moran v. Burbine*, 475 U.S. 412, 427 (1986).  Prior to questioning, the police must warn a suspect that, among other things, he has the right to the presence of an attorney and if he cannot afford an attorney one will be appointed for him.  *Id.* at 479.  And a suspect may invoke his right to counsel "at any stage" of questioning.  *Miranda*, 384 U.S. at 444-45.

A suspect need not make a formal or absolute demand for an attorney.  It is sufficient for the suspect to indicate "*in any manner* . . . that he wishes to consult with an attorney."  *Id.* at 444-45 (emphasis added).  A suspect has invoked his right to counsel if "a reasonable police officer in the circumstances would understand the [suspect's] statement to be a request for an

---

[10]   While Sergeant Clawson's affidavit—which indicates that Sergeant Clawson did not respond to Mr. Soffar's statement—is inconsistent with this testimony, that inconsistency is irrelevant.  The way in which Mr. Soffar's statement was phrased only required Sergeant Clawson to respond if he disagreed that Mr. Soffar was "on his own."  So the fact that Sergeant Clawson did not disagree—whether he made an affirmative statement or simply remained silent—would have been, and was, interpreted as agreement.

attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994).  But a suspect "need not speak with the discrimination of an Oxford don" so long as he clearly "articulate[s] his desire to have counsel present." *Id.*

Once a suspect invokes his right to an attorney, there can be ***no questioning*** until he has consulted with an attorney.  *Miranda*, 384 U.S. at 436, 444-45; *Edwards v. Arizona*, 451 U.S. 477, 484 (1981).  The only exception to this rule is where the suspect:  (1) subsequently initiates further discussions regarding the offense under investigation ***and*** (2) makes a voluntary, knowing, and intelligent waiver of his right to counsel.  *Edwards*, 451 U.S. at 484-85.  The State has the burden of proving that a suspect waived his right to counsel.  *Brewer v. Williams*, 430 U.S. 387, 404 (1977).  Where the State does not meet its burden, any statements made after the suspect invokes his right to counsel are inadmissible.  *Miranda*, 384 U.S. at 476-79.

### 3.    Habeas Relief Is Warranted.

Mr. Soffar invoked his right to counsel ***at least*** as early as some point between 1 p.m. and 2 p.m. on August 5, 1980 during his conversation with Sergeant Clawson, and well before he signed his first statement.  Mr. Soffar's statements to Sergeant Clawson, when considered "in the circumstances" in which they were made, evidence a clear desire to have counsel present.  *See Davis*, 512 U.S. at 459.  Indeed, that is exactly what Sergeant Clawson took them to be.  For that reason, Mr. Soffar's right to counsel was violated, and the convicting court's contrary conclusion is an unreasonable application of settled federal law.

The minute Sergeant Clawson entered the interrogation room for the express purpose of "getting Max to talk," Mr. Soffar asked him whether he should "talk to the detective or get a lawyer."  (4 RR 107-08; Clawson Aff. at ¶ 19.)  While this question may not, standing alone, constitute an invocation of Mr. Soffar's right to an attorney, it set in motion the next sequence of answers and questions in which Mr. Soffar did clearly invoke his right to counsel.

Sergeant Clawson answered by giving Mr. Soffar two options: "if you're guilty you should talk to the police and if you're not guilty you should get an attorney."  (4 RR 109; Clawson Aff. at ¶ 21 ("I told Max that if he was involved in the crime he should tell the detective he was in it; otherwise, he should get a lawyer.").)  And Mr. Soffar responded "so how do I get a lawyer" (Clawson Aff. at ¶ 22.)  Mr. Soffar's response, particularly his use of the word "so," demonstrates that Mr. Soffar had chosen the latter of the two options—"get an attorney"—and was both communicating that choice to Sergeant Clawson and seeking the information necessary to implement it.

The context of that statement—which came as a response to Clawson's "advice"—and the use of the word "so" differentiates this case from those in which a request for information on how to contact a lawyer has been held not to be a clear invocation of that right.  *See, e.g., Soffar v. Cockrell*, 300 F.3d 588, 595 (5th Cir. 2002) (citing cases in which "procedural questions" were held not to constitute an invocation of the right to counsel).  Indeed, had Sergeant Clawson had simply said "you should get an attorney" and Mr. Soffar had responded "so how do I get an attorney" there could be no doubt that Mr. Soffar had invoked that right.  The fact that Sergeant Clawson gave Mr. Soffar another choice does not change the meaning of Mr. Soffar's statement. For that reason, Mr. Soffar submits that the Fifth Circuit's contrary decision, which did not take into account the circumstances in which Mr. Soffar made his statement, is incorrect.

The court need look no farther than what happened thereafter for confirmation that Mr. Soffar was invoking his right to an attorney.  In response to Mr. Soffar's inquiry—which should have ended any questioning, *see Miranda*, 384 U.S. at 436, 444-45; *Edwards,* 451 U.S. at 484—Sergeant Clawson attempted to distract him with a question about whether he could afford a lawyer, even though he knew Mr. Soffar could not.  (Clawson Aff. ¶ 22.)  But Mr. Soffar was

so determined to obtain a lawyer that he asked how he could obtain a court-appointed attorney and when.  (*Id.* at ¶ 23.)  And it was not until Sergeant Clawson convinced Mr. Soffar that he was "on [his] own"—*i.e.*, that no matter what he said, no attorney would be made available to Mr. Soffar—did Mr. Soffar apparently acquiesce to Sergeant Clawson and agree to speak with the police.

Mr. Soffar's intellectual impairments—which the police were well aware of—lend additional support to the conclusion that he clearly invoked his right to counsel, even if it was not spoken with the "discrimination of an Oxford don."  *Davis*, 512 U.S. at 459.  The results of psychological tests show, for example, that Mr. Soffar's intelligence quotient is in the lower sixteenth percentile, and his verbal comprehension index score is in the lower twelfth percentile.  (Frumkin Aff., Ex. B at 6.)  Sergeant Clawson thought that he had a "fried brain," and regarded him as child-like with the mental capacity of a ten- or eleven-year old.  (29 RR 134; 4 RR 119.)  At the time Mr. Soffar asked Sergeant Clawson his questions about getting an attorney, the effects of his mental impairments were likely more pronounced because he was sleep deprived and intoxicated or recovering from the effects of intoxication.  (4 RR 45-46, 53; 29 RR 42-43; *see also* Frumkin Aff., Ex. B at 8.)  Moreover, Mr. Soffar was under tremendous stress at the time of his conversation with Sergeant Clawson.  Even putting aside the Bowling Alley murders, he was on probation and already facing multiple charges because he had been caught speeding on a stolen motorcycle while intoxicated and in possession of drugs and stolen property.  (29 RR 21-23, 27-28.)

Faced with a stressed, intellectually deficient man who had just invoked his right to silence, there is simply no way that "a reasonable police officer" could have interpreted

Mr. Soffar's questions as anything other than a request for counsel.[11]  *Davis*, 512 U.S. at 459.

Indeed, at Mr. Soffar's first habeas proceeding that is precisely what Sergeant Clawson testified

he concluded.

> Q.    Did you draw any . . . conclusions based on everything you
>        heard and observed from Max and everything you observed
>        with regard to his situation . . . .  [w]hat did you conclude
>        that Max wanted at that point?
>
> A.    What did I conclude?
>
> Q.    Yes?
>
> . . .
>
> A.    ***Well the obvious answer is that he wanted an attorney.***

(App. I, Ex. 18:  State Habeas Transcript, August 17, 1994 at 226 (emphasis added).)  Under the

circumstances, this "obvious answer" is undoubtedly correct and the State court's contrary

conclusion is an unreasonable application of federal law.  *But see Soffar v. Cockrell*, 300 F.3d at

595 (holding that Mr. Soffar did not invoke his right to counsel during his conversation with

Sergeant Clawson).

Once Mr. Soffar had done so, the police interrogation should have ceased until he had

spoken with an attorney unless Mr. Soffar had later (1) initiated further discussions regarding the

offense under investigation ***and*** (2) made a voluntary, knowing, and intelligent waiver of his

right to counsel.  *Edwards*, 451 U.S. at 484-85.  Mr. Soffar did not initiate any further discussion

regarding the bowling alley murders.  To the contrary, it was Sergeant Clawson, after convincing

Mr. Soffar that he was "on [his] own," who brought up the idea that Mr. Soffar continue to speak

with the police officers.  (Clawson Aff. at ¶ 25.)  Accordingly, the continued interrogation of

---

[11]   Had Sergeant Clawson been a car dealer who had just told a client "if you want to go fast buy the sports car but
if you want something safe buy the minivan," a response like "so how do I get the minivan" would have caused
Sergeant Clawson to begin drawing up the sale paperwork and asking about colors and interior.  The dealer
would have interpreted his client's response as an unambiguous request for the minivan, and acted accordingly.

Mr. Soffar after his invocation of his right to counsel cannot be justified on the ground that he initiated further discussion regarding the bowling alley murders.

### 4.    The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar exhausted his claim that his right to counsel was violated both in his direct appeal and in his state habeas proceeding.  During the direct appeal, Mr. Soffar raised the issue in his Tenth Point of Error, subsections (a) and (b).  The Court of Criminal Appeals overruled each point of error.  *See Soffar III*, 2009 WL 3839012 at *25-27.  Mr. Soffar also raised the issue in his state application for writ of habeas corpus at Section II.A.  The convicting court rejected Mr. Soffar's claim that his right to counsel was violated and Court of Criminal Appeals adopted that ruling.  *See Soffar VI*, 2012 WL 4713562, at *1.

**F.    CLAIM FOR RELIEF 7:  THE TEXAS COURT'S CONCLUSION THAT THE POLICE DID NOT VIOLATE MR. SOFFAR'S RIGHT TO REMAIN SILENT IS CONTRARY TO, OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *MIRANDA v. ARIZONA*, 384 U.S. 436 (1966) AND *MICHIGAN v. MOSLEY*, 423 U.S. 96 (1975).**

### 1.    The Relevant Facts.

Mr. Soffar invoked his right to remain silent on August 5, 1980, well before he signed his first statement.  Sometime between one and two o'clock in the afternoon, Detective Schultz "hit a brick wall" because and Mr. Soffar was "refusing to talk." (4 RR 131-32; 29 RR 106; 43 RR Defense Ex. 25.)  That was not the first time that Mr. Soffar refused to talk.  (Clawson Aff. at ¶ 18.)  Mr. Soffar also had previously refused to talk to both Assistant District Attorney Terry Wilson and to Detective James Palmire.  (4 RR 102; 5 RR 28.)

But rather than "scrupulously honor" this clear invocation of Mr. Soffar's right to remain silent, the police asked Sergeant Clawson to "get Max to talk about what he knew of the bowling alley incident." (*Id.)*  It was clear to Sergeant Clawson that the Houston police and D.A.'s office "expected [him] to get Max to talk" and that his task that day was to "hold Max's hand during

the course of the interrogation" and keep him talking at any cost.  (4 RR 124, 127; Clawson Aff. at ¶¶ 16, 19.)  And he agreed to do so.

And no sooner had Sergeant Clawson entered the interrogation room than Mr. Soffar asked "what he should do, talk to the detective or get a lawyer."  (*Id.*)  So consistent with the expectation that Sergeant Clawson would get Mr. Soffar to talk, Sergeant Clawson answered Mr. Soffar's question by encouraging him to talk to the police if he was guilty.  (4 RR 109; Clawson Aff. at ¶ 21 ("I told Max that if he was involved in the crime he should tell the detective he was in it; otherwise, he should get a lawyer.").)  And after convincing Mr. Soffar that he had no practical right to an attorney and that he was "on [his] own," Sergeant Clawson's efforts were successful.  At Sergeant Clawson's further prompting, Mr. Soffar, continue to speak with the police.  (Clawson Aff. at ¶ 25.)

### 2.    The Applicable Standard.

The Fifth and Fourteenth Amendments assure a suspect the right to remain silent in the face of questioning by police officers.  *Miranda*, 384 U.S. at 460-61.  The right to remain silent is an essential part of ensuring that "[a]n individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion" is not forced to give up his privilege against self-incrimination.  *Id.* at 461.  A suspect invokes his right to remain silent by indicating that he does not want to answer questions in a manner that is unambiguous.  *See, e.g., Michigan v. Mosley*, 423 U.S. 96, 101-02 (1975); *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010).  A simple statement that a suspect "d[oes] not want to talk to the police" suffices to invoke the right to remain silent and the related "right to cut off questioning."  *Thompkins*, 130 S. Ct. at 2260.

Once invoked, the police have a duty to "scrupulously honor" a suspect's right to remain silent.  Mosley, 423 U.S. at 104.  Police officers are ***not*** permitted to continue to question a

suspect in an effort to persuade him to rescind that invocation.  *Id.* at 105-06 (police may not "refus[e] to discontinue the interrogation . . . persist[] in repeated efforts to wear down [a suspect's] resistance and make him change his mind").  But that is exactly what Detective Schulz and Sergeant Clawson did here.

### 3.     Habeas Relief Is Warranted.

Mr. Soffar invoked his right to remain silent ***at least*** as early as some point between 1 p.m. and 2 p.m. on August 5, 1980, well before he signed his first statement.  It appears that it was during that one-hour window that Detective Schultz "hit a brick wall" and Mr. Soffar was "refus[ing] to talk."  (4 RR 131-32; 29 RR 106; 43 RR Defense Ex. 25.)  Mr. Soffar's express refusal to talk constituted an invocation of his right to remain silent.  *See, e.g., Mosley*, 423 U.S. at 104-06 (a suspect invokes his right to remain silent merely by indicating that he does not want to answer questions); *Thompkins*, 130 S. Ct. at 2260 (a statement that a suspect "d[oes] not want to talk with the police" is sufficient to invoke his "right to cut off questioning") (citing Mosley, 423 U.S. at 103).  Though the Fifth Circuit, in *Soffar v. Cockrell*, 300 F.3d 588, 594 (5th Cir. 2002), held otherwise, the court there focused only on the statement that Detective Schulz had "hit a brick wall" with Mr. Soffar, and did not discuss the testimony that Mr. Soffar was "refusing to talk."  *See id.*  And the Fifth Circuit's conclusion is, in any event, inconsistent with the Supreme Court's decision in *Thompkins*, in which the Court held that the statement that a suspect "d[oes] not want to talk to the police" suffices to invoke the right to remain silent and the related "right to cut off questioning."  *Thompkins*, 130 S. Ct. at 2260.

Once Mr. Soffar had invoked his right to remain silent, the police were not permitted to "refus[e] to discontinue the interrogation" or "persist[] in repeated efforts to wear down [a suspect's] resistance and make him change his mind."  *Mosley*, 423 U.S. at 105-06.  But that is exactly what they did.  Detective Schulz enlisted Sergeant Clawson to "get Max to talk about

what he knew of the bowling alley incident."   (*Id.*)   It was clear to Sergeant Clawson that the Houston police and D.A.'s office "expected [him] to get Max to talk" and that his task that day was to "hold Max's hand during the course of the interrogation" and keep him talking at any cost.   (4 RR 124, 127; Clawson Aff. at ¶¶ 16, 19.)   That was a violation of Mr. Soffar's constitutional rights. *Mosley*, 423 U.S. at 105-06.

Thus, because Mr. Soffar validly and unambiguously invoked his Fifth and Fourteenth Amendment right to remain silent on August 5, 1980, the statements made by Mr. Soffar after he invoked his right to remain silent—including the August 7, 1980 written statement on which the State's case rests—are inadmissible against him and the convicting court's contrary conclusion is contrary to or an unreasonable application of federal law.

### 4.      The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar exhausted his claim that his right to remain silent was violated both in his direct appeal and in his state habeas proceeding.   During the direct appeal, Mr. Soffar raised the issue in his Tenth Point of Error, subsection (c).   The Court of Criminal Appeals overruled each point of error.   *See Soffar III*, 2009 WL 3839012 at *25-27.   Mr. Soffar also raised the issue in his state application for writ of habeas corpus at Section II.B.   The convicting court rejected Mr. Soffar's claim that his right to counsel was violated and Court of Criminal Appeals adopted that ruling. *See Soffar VI*, 2012 WL 4713562, at *1.

**G.**      **CLAIM FOR RELIEF 8: THE TEXAS COURT'S CONCLUSION THAT TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO INVESTIGATE, DEVELOP, AND PRESENT ALL EVIDENCE REQUIRING THE SUPPRESSION OF MR. SOFFAR'S STATEMENTS IS CONTRARY TO, OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (U.S.)**

Trial counsel's failure to utilize powerful expert testimony to provide an understanding of who Mr. Soffar was, and how he was likely affected by the interrogations, not only impacted on the trial itself. It also had great impact on the outcome of the motions to suppress those

statements.  Counsel performing in reasonable compliance with the prevailing standard of care would have presented testimony at those hearings about Mr. Soffar's mental conditions and, particularly, evidence about how it impacted on his capacity to knowingly waive his rights and to resist police pressure.  Had such evidence been presented, there is a reasonable probability that a reasonable judge would have followed the law and suppressed the statements, thereby terminating the prosecution.

As demonstrated above, there was no reasonable justification for trial counsel not to be armed with a potent arsenal of expert testimony demonstrating just how mentally impaired Mr. Soffar was and just how profoundly this would have impacted his understanding and decision-making in the interrogation room.  There can be no doubt that, had they possessed that evidence, trial counsel would have eagerly presented it to the trial court as part of the motion to suppress.  As will be seen, the evidence went to the core issues that govern the determination of whether a suspect has knowingly waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and whether the police pressure was, in light of the suspect's particular condition, so severe as to render any statements involuntary.  And, as will be seen, there is a reasonable probability that presentation of the absent evidence would have been outcome determinative.

### 1.    The Relevant Facts.

During the pre-trial proceedings, counsel for Mr. Soffar brought a motion to suppress the statements Mr. Soffar made from approximately 1:00p.m. on August 5 onward.  The motion was based on claims that Mr. Soffar's statements were taken in violation of his rights to silence and counsel as set forth in *Miranda,* and they were involuntary under the Due Process Clause of the Fourteenth Amendment.  These claims had been raised before the first trial and during the ensuing appeals and habeas corpus proceedings. Although a panel of the United States Court of Appeals for the Fifth Circuit had initially granted Mr. Soffar relief on the grounds that the

statement had violated his rights under *Miranda*, the *en banc* court reversed that ruling.  The *en banc* court's ruling was, of course, based on the factual record that had then been developed at that time.  It is undisputed that Mr. Soffar had a right to bring a new motion to suppress before the second trial, as he did, and to present any and all evidence in support of relief.  Because the motion would then be decided based on a new factual record, the prior decisions of the Texas Court of Criminal Appeals and the federal courts would not govern whether he was entitled to relief.

During the October 2005 hearings on the Motion to Suppress, Mr. Soffar's trial counsel presented two witnesses (other than a number of witnesses who verified the authenticity of various records and documents).  One of these witnesses was a former police officer, who had interrogated Mr. Soffar on other occasions and had come to believe that Mr. Soffar was quite suggestible.  (6 RR 30-37.)  When trial counsel asked him whether Mr. Soffar was able to read things that were given to him and understand what he was being told, the prosecution objected on the ground that the witness was not an expert on such matters.  The judge sustained the objection and the defense presented no further evidence on that point.  Trial counsel never sought to admit the testimony of the three mental health experts who had testified at the 1994 habeas hearing, and never called those witnesses or any new experts.  The prosecution presented nine witnesses in its opposition to the motion.  The trial judge denied the motion to suppress, stating that Mr. Soffar understood and waived his rights.

On direct appeal, the Texas Court of Criminal Appeals affirmed that ruling.  With regard to Mr. Soffar's right-to-silence claim, the court held, "the material portions of the evidence pertaining to Soffar's current allegation are the same as they were when the Fifth Circuit rejected this claim.  And with regard to the claim that the statements and waivers were involuntary, the

court held that the relevant witnesses all "testified that Soffar appeared to understand the warnings."  The only mention the court made of anything to do with Mr. Soffar's mental capacity and conditions was that "Soffar claims that he had a 'child-like' mentality . . . and that he was intoxicated."

In his Application for Writ of Habeas Corpus filed in the Texas courts, Mr. Soffar's habeas counsel submitted the series of expert affidavits described in detail above.  The Petition asserted that testimony from these or similar experts was critical to a meaningful adjudication of the motion to suppress and that trial counsel were ineffective for not securing and presenting such testimony.  At the vey least, counsel should have called the three experts who testified in 1994, or otherwise secured admission of their testimony.  The Habeas Petition further claimed to that there was a reasonable probability that testimony of this sort would have led to suppression of the evidence.

The Texas court denied this claim.  As described above, the court held that trial counsel's decision not to secure any of this expert testimony was a "considered" one that could not be disturbed on review.  In addition, the Texas court indicated that during the 2005 suppression hearing, the trial court had agreed to take prior proceedings into account in ruling on the motion, and that these proceedings would have included both lay and expert testimony elicited during the 1994 habeas hearing regarding Mr. Soffar's mental health and intellectual deficits.  (33 S.H.R. 8939 at F.F. ¶ 137.) The Texas court found that the evidence that could have been presented by Drs. Frumkin, Gelbort and Pincus was substantially the same as the expert testimony that had been presented in the 1994 habeas and had been before the Fifth Circuit.  (33 S.H.R. 8940 at F.F. ¶ 139.).

## 2. The Applicable Standard.

The governing standard applicable to ineffective assistance of counsel claims is discussed in Claim for Relief 4.  (*See infra* II.C.2 (Claim for Relief 4).)

## 3. Habeas Relief is Warranted.

To this day, no court that has considered any defense motion to suppress Mr. Soffar's statements has heard some of the most vital evidence supporting those motions.  Despite clear law that a defendant's mental impairments and limitations are central to analyzing whether he knowingly waived his right to silence and counsel and to whether statements must otherwise be suppressed, Mr. Soffar's trial counsel made a tragic blunder and never presented compelling psychiatric and neurological evidence that demonstrates his inability to appreciate the nature of the rights he was waiving or the consequences of doing so.  This evidence also speaks directly to the various ways in which Mr. Soffar's impairments magnified the impact of the deceptive and pressure-oriented tactics the police used in persuading him to make a statement—as opposed to keeping silent—and to proceed on his own—as opposed to waiting for a lawyer.

### (1) The "Performance" Prong

In *Colorado v. Spring*, 479 U.S. 564 (1987), the Supreme Court reiterated that the government bears the burden of proving that two distinct requirements are satisfied for a *Miranda* waiver to be deemed valid. First, the "relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. at 573 (*quoting Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  Second, "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id. (quoting Moran*, 475 U.S. at 421).  Put otherwise, a court may only find a valid *Miranda* waiver when the government can prove "both an uncoerced choice and the requisite level of comprehension." *Id.*

(*quoting Moran*, 475 U.S. at 421).  The evidence that trial counsel failed to secure and present at the suppression hearing spoke directly to both of these points.[12]

To begin with, the testimony about all of Mr. Soffar's cognitive impairments went to the core question of whether he made waivers "with the full awareness" of the nature of his rights and the consequences of abandoning them."  Dr. Frumkin spoke most directly to this issue (although all the experts presented with the state habeas petition spoke to it as well).  Dr Frumkin, specializes in assessing whether suspects are competent to waive *Miranda* rights and he evaluated Mr. Soffar with that question as a centerpiece of his inquiry.  Dr. Frunking spent eight and a half hours interviewing Mr. Soffar and administering an array of tests.  He also reviewed medical records, evidence about Mr. Soffar's background, other expert evaluations, and documents pertaining to the interrogation.  Based on all this data, Dr. Frumkin concluded that "it is unlikely that at the time of police questioning, Mr. Soffar would have been able to make a knowing and intelligent waiver of his *Miranda* rights."  (Frumkin Aff. at 8.)  This conclusion was based not only on Mr. Soffar's cognitive limitations, but on his impaired thinking processes (attributable to organic brain damage), sleep deprivation, intoxication and the interrogation atmosphere.  (*Id.*)  All of these themes were also part of the other experts' finding and their testimony, too, would have been central to demonstrating that Mr. Soffar was not capable of knowingly and intelligently waiving his *Miranda* rights.

---

[12] The  inquiry into knowledge and awareness does not require a showing of any police misconduct or coercion— it focuses on the suspect's cognitive capacities. The inquiry into voluntariness, by contrast, does require some showing of police overreaching. See *Colorado v. Connelley*, 479 U.S. 157 (1986). But, as will be seen, the degree of pressure and the nature of the tactics the police use in relation to a particular suspect are evaluated in light of that individual's mental and physical constitution. This is true in relation the voluntariness inquiry regarding a *Miranda* waiver as well as a due process voluntariness challenge to a confession itself.

The testimony of the experts identified in the state habeas proceedings was also highly relevant to the voluntariness inquiry, both as it related to the validity of the *Miranda* waiver and to the broader due process question of whether the confessions were involuntary.  In *Colorado v. Connelley*, 479 U.S. 157 (1986), the Supreme Court held that some degree of coercive behavior by the police is necessary to establish in voluntariness (for both *Miranda* and Due Process purposes), but the Court was also careful to emphasize that "mental condition he sure leave relevant to an individual's susceptibility to police coercion."  *Id.* at 165.

In addressing voluntariness, it was vital for the defense to prove the nature of Mr. Soffar's "special weaknesses," of which his interrogators would have had to be aware.  *See Gomes v.* State, 9 S.W.3d 373, 377 (Tex App. 1999).  Such individual characteristics are part of the inquiry into whether the conduct of law enforcement crossed the line with regard to the particular suspect in a way that rendered any waivers or statements involuntary.  *See Franks v.* State, 90 S.W.3d 771, 785-786 (Tex. App. 2002) ("mental impairment is a factor in ascertaining the voluntariness of a confession"); *United States v. Robles-Ramirez*, 93 F. Supp. 2d 762 (W.D. Tex. 2000) (suspect's subnormal intelligence is relevant to assessing voluntariness).  It was unreasonable to try to make this showing without expert testimony of the sort that, as we have demonstrated, trial counsel could have and should have had.  There was considerable evidence of police overreaching in the case, including prolonged tag-team interrogations, sleep deprivation, deception about the existence of an eyewitness and, most significantly, distorted information about what would happen if Mr. Soffar asked for a lawyer and about his being all on his own.  Whether or not those tactics used on an ordinary person would be sufficient to render a confession involuntary, their impact on a person of Mr. Soffar's mental and emotional capacity and health—of which the police had to have been aware—was such that any ensuing decision to

speak cannot be said to have been an exercise in free will divorced from the pressure and coercion.   It was critical, in order to demonstrate this, for trial counsel to introduce the appropriate expert evidence at the suppression hearing.

In *Withrow v. Williams*, the Supreme Court wrote that factors in assessing voluntariness include, beyond the circumstances of the confession, the "defendant's maturity, education, physical condition, and mental health."   507 U.S. 680, 693 (1993).   The expert testimony that should have been presented at the suppression hearing would have shown that Mr. Soffar was off the charts on each of these dimensions: with regard to maturity, he functioned as a young child in a number of relevant respects; his educational history was dismal; his physical condition at the time was very poor given his withdrawal symptoms from narcotics and alcohol intoxication; and, obviously, his mental health was deeply impaired as a result of organic brain damage and other conditions.   This was not some "Hail Mary" of a voluntariness motion (or at least it should not have been).   This is a case that has kept many judges awake at night and the voluntariness (and *Miranda* waiver) claims go the heart of that distress.

In denying the state habeas petition, the Texas court never suggested that the expert evidence trial counsel failed to present was irrelevant to the central issues of the suppression hearing.   Instead, the Texas court found that the court conducting the suppression hearing had agreed to take prior proceedings into account and those prior proceedings "would have included" expert testimony about Mr. Soffar's mental state.   (33 S.H.R. 8939 at F.F. ¶ 137.)   Therefore, the Texas court concluded, the expert testimony proffered through the habeas petition would have been duplicative of the testimony three mental health experts had offered during the 1994 state habeas proceedings. (33 S.H.R. 8940 at F.F. ¶ 139.)

There are two problems with this finding.  First, and fundamentally, there is no evidence at all that the court conducting the suppression hearing in 2005 ever agreed to review the testimony of every witness from 1994 and to consider it as part of the record.  The pages that the Texas court cited to support that premise (4 R.R .at 5-17) say nothing of the sort.  All they indicate is that the prosecution and defense were both seeking the court's support when it was necessary to produce any prior testimony of unavailable witnesses, or to use prior testimony to show some witness, counsel would be able to use their own copies they had made of the trial record, as opposed to requiring them to secure the original trial record from the clerk's office.  (*Id.* at 17.)  This has nothing to do with incorporation of all 1994 testimony into the 2005 hearing.  What matters here is that at no time did trial counsel ever seek to have the three experts from the 1994 hearing deemed unavailable, or to otherwise seek admission of their testimony.  Nor, of course, did trial counsel ever seek to call any of those witnesses.[13]  The Texas court's finding that the 1994 testimony of those witnesses "would have been part of the record" that the court hearing the suppression motion would have considered is an "unreasonable" finding entitled to no deference.

Even were it the case that the 1994 testimony of the three experts was admitted into the 2005 record and considered by the court deciding the suppression hearing, the Texas court would be still have been wrong—unreasonably so—in denying habeas relief on the ground that the testimony of the newly proffered witnesses would have been duplicative of the 1994 testimony.  Although the three experts who participated in the 1994 habeas proceedings spoke to certain general elements of Mr. Soffar's brain damage and mental capacity, none of them related that

---

[13]   Unlike the trial, where introducing the 1994 experts would have risked letting the jury know that Mr. Soffar was being tried for a second time, no such consideration was relevant to the suppression hearing.  There was no reason, therefore, for counsel to fail to seek admission of that 1994 testimony at the 2005 suppression hearing, or to call those witnesses.  The failure to do so constituted ineffective assistance of counsel.

directly to the question of his capacity to waive *Miranda*, to issues of constitutional voluntariness, and the ways in which these conditions would interact with interrogation techniques. (*See* Merikangas Affidavit; Nelson Affidavit; Modlin Affidavit.)

By contrast, several of the experts the defense could have presented at the 2005 suppression hearing would have done just that. Dr. Frumkin is a prime example of the kind of testimony that could have been provided—testimony very different than anything presented before. As discussed above, Dr. Frumkin's focus of inquiry was on Mr. Soffar's competency to execute a knowing and intelligent waiver, and on the effects of the interrogation on Mr. Soffar's psyche. The difference between this kind of targeted testimomy and the generalized testimony from 1994 is far from trivial. In *Franks*, the court specifically noted that a defect in the defendant's effort to invalidate his *Miranda* waiver was that, although the testifying expert disclosed general information about the defendant's intelligence, "he never testified that Appellant was incapable of understanding his *Miranda* warning or the effect of their waiver." *Franks*, 90 S.W. 3d at 786. The same can be said for the testimony at Mr. Soffar's 1994 habeas hearing. And because trial counsel never secured and presented the readily available evidence, it can also be said of the 2005 suppression hearing.

Dr. Frumkin was not the only expert with information quite different than anything previously presented. Both Dr. Leo and Dr. Meissner were also prepared to relate the evidence of Mr. Soffar's mental defects to the vital issues surrounding how he would have understood and processed issues during the interrogations. And Dr. Pincus (or another qualified neurologist) would have testified to the key finding that Mr. Soffar has bipolar disorder. No expert testified to anything of that sort in the 1994 hearing. Counsel acting competently would have been sure to presents this wide array of testimony at the 2005 suppression hearing.

(2)     The "Prejudice prong"

Even without all the new expert testimony that counsel acting reasonably would have presented at the 2005 suppression hearing, a panel of the Fifth Circuit in 2000, reviewing the proceedings from the first trial and the ensuing habeas, was so concerned with the circumstances of the waivers and interrogations that it ordered the statements suppressed.  When that decision was reversed by the *en banc* court, three judges of the Fifth Circuit dissented, continuing to maintain that Mr. Soffar's rights under *Miranda* were violated.  Obviously, there is great cause for concern about this extraordinary case and, in light of that, the expert testimony that should have been presented had a reasonable probability of persuading a reasonable trial judge to suppress the evidence.  It not only provides vital new information on whether Mr. Soffar was truly capable of understanding what he was waiving and what those waivers meant, it also provides the necessary context to determine whether the devices the police used—including deception about the evidence and prolonged tag-team interrogation—crossed the relevant constitutional line in light of Mr. Soffar's particular abnormalities.  Of course, had the statements been suppressed, there is no doubt that Mr. Soffar could never have been convicted.  The prejudice is manifest and Mr. Soffar is entitled to issuance of the writ.

**4.     The Claim Was Exhausted in the State Court Proceedings**

This issue was raised in Claims VI A, B, C, E.1, and E.2. The Court of Criminal Appeals, as discussed above, reached the merits of the claims and denied them.

III.    ANOTHER MAN, PAUL DENNIS REID, COMMITTED THE CRIME FOR WHICH MR. SOFFAR IS SENTENCED TO DIE.

A.    CLAIM FOR RELIEF 9: THE TEXAS COURT'S CONCLUSION THAT MR. SOFFAR'S CONSTITUTIONAL RIGHTS TO DUE PROCESS, COMPULSORY PROCESS, AND TO PRESENT A DEFENSE WERE NOT VIOLATED BY THE EXCLUSION OF EVIDENCE OF PAUL DENNIS REID'S GUILT IS CONTRARY TO, OR, ALTERNATIVELY AN UNREASONABLE APPLICATION OF, *HOLMES V. SOUTH CAROLINA*, 126 S. CT. 1727 (2006).

While the evidence against Mr. Soffar amounts to a facially implausible statement that he involuntarily signed, there is abundant, concrete evidence against another man, Paul Dennis Reid.   Mr. Reid is currently on death row in Tennessee where he has been convicted of commiting seven murders using a *modus operandi* that is earily similar to that employed by the Bowling Alley killer.   The jury at Mr. Soffar's trial did not even hear Mr. Reid's name let alone the damning evidence against him because the trial court refused to admit it.   That ruling was erroneous and, for the reasons set forth below, habeas relief is warranted.

1.    The Relevant Facts.

As a result of the work of Mr. Soffar's prior state habeas counsel, by the time of the retrial, defense counsel had in their possession significant evidence against Mr. Reid.   Among that evidence was the sworn recollection of one of Mr. Reid's former accomplices—Stewart Cook—who had attested that Mr. Reid confessed to committing the Bowling Alley crime:

> Although Paul sometimes fired his gun during the robberies, during most of the robberies we committed together, he never shot anyone (often because I persuaded him not to).   However, all this changed after one particular robbery, when Paul used his pistol.   I did not understand why Paul had used his gun and asked him why he did it.   Paul brushed it off, telling me he'd done much worse during a robbery he had committed before we started working together.   Specifically, he said that he once had a "problem" while he was robbing a bowling alley out on Route 290, and he shot "four people."

(43 R.R. Def. Ex. 40 at ¶ 12.)

126

Defense counsel sought to introduce evidence of that confession by calling Mr. Cook to testify. Initially, the convicting court ruled the statement admissible. (5 R.R. 234; 10 R.R. 12; 6 C.R. 1671-72). On the first day of trial, however, Mr. Cook told the court that he would attempt to assert his Fifth Amendment rights if asked about his affidavit's contents or his conversation with Mr. Reid. (26 R.R. 91-94.). Mr. Cook nonetheless testified openly about the circumstances under which he signed his affidavit and even swore that it was true, all without pleading the Fifth Amendment. (26 R.R. 91, 93-94.) Althout defense counsel asked the court to compel Mr. Cook to testify on the basis that he had no Fifth Amendment privilege, the court summarily denied the request without ever testing the basis for Mr. Cook's assertion. (30 R.R. 84-85; 32 R.R. 40-44.) The state refused to grant Mr. Cook immunity and the convicting court refused to compel the state to do so (24 R.R. 4-5; 26 R.R. 99.)

Faced with the possibility of being unable to tell the jury that another man had confessed—credibly—to committing the crime, defense counsel proposed to call the attorney to whom Mr. Cook had made the statements contained in his affidavit. As counsel explained, both Mr. Cook's and Mr. Reid's admissions were declarations against interest under Texas Rule of Evidence 803(24). Over trial counsel's objection that the court was denying Mr. Soffar his right to due process, compulsory process, and to present a defense, the court precluded the proffered evidence at the prosecution's urging. (5 R.R. 233-34; 30 R.R. 79, 84; 32 R.R. 37, 44; 5 C.R. 1474-78; 13 C.R. 3796-3801.)

In addition to Mr. Reid's confession, defense counsel also attempted to introduce evidence that the *modus operandi* Mr. Reid employed in committing his Tennessee crimes was consistent with the *modus operandi* that he used to commit the Bowling Alley robbery. As described by Detective Postiglione, who captured Mr. Reid in Tennessee, "Reid displayed a

distinctive *modus operandi* in his crimes in Tennessee." (9 C.R. 2553, 2561). Specifically, "he would gain entry to an establish[ment] at a time when the establishment was closed but employees were still present, by causing employees to let him in." (*Id.*) Mr. Reid would then "steal cash and coins, often having an employee access the register or safe." (*Id.*) Following the robbery, "Reid would then kill or attempt to kill all employees present at the time of the robbery, with a preference for forcing the employees to lie on the floor, face down, and then shooting them execution style, with a gun shot to the head." (*Id.*)

The Bowling Alley crime unfolded in a nearly identical manner. The murders occurred on a Sunday. (26 R.R. 42). The lone perpetrator feigning car trouble to obtain entry to the Bowling Alley after it closed. (32 R.R. 66, 71-74, 75, 79-80, 83, 101, 103-04, 136-38, 144.) The perpetrator wore no mask or disguise. (32 R.R. 89-91, 131-34). He forced one of the victims to remove the contents of the cash register. (32 R.R. 69, 84, 107, 112, 124, 167-27.) And he made each of his victims lie face down and shot them in the head only after completing his robbery. (32 R.R. 69-70, 80, 84-85, 106-07, 112, 124, 126-29.)

The convicting court, however, refused to admit this evidence, apparently ruling that the evidence contained hearsay, notwithstanding trial counsel's offer to call witnesses with direct knowledge of Mr. Reid's Tennessee crimes or the court's ability to take judicial notice of the facts of those crimes and allow an expert to testify. (5 R.R. 234; 6 C.R. 1671-72; 9 R.R. 20; 10 R.R. 11.)

###  2. The Applicable Standard.

The Supreme Court has long held that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 126 S. Ct. 1727, 1731 (2006)

(internal quotation omitted); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (finding violation of right to present defense where the defendant was prevented from introducing evidence to show at trial that his confession was unreliable, and neither the state court nor the prosecution "advanced any rational justification"); *Chambers v. Mississippi*, 410 U.S. 284 (1973) (finding violation of right to present defense, in part, because court precluded statement against penal interest inculpating an alternative perpetrator); *Washington v. Texas*, 388 U.S. 14 (1967) (noting that the "right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies") (emphasis added)). This guarantee limits a court's ability to exclude evidence from criminal trials. *Holmes*, 126 S. Ct. at 1731. Specifically, a court may not exclude evidence if its exclusion "infringe[s] upon a weighty interest of the accused" and is "arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (citation and internal quotation marks omitted).

### 3. Habeas Relief Is Warranted.

(1)    Cook's and Reid's Statements Were Against Penal Interest and Therefore Admissible Under Well-Established Hearsay Exceptions.

Because a defendant's right to present evidence in his defense can be affected by (but not controlled by) state evidence law, it is necessary for the federal habeas court to look at Texas law on this point as a predicate for determiming whether there was some overriding justification for excluding the evidence. Here, it is quite clear that Texas law actually allows the very testimony Mr. Soffar sought to protect, and there is in sense a state policy being served by excluding it. Determining admissibility under Texas Rule of Evidence 803(24) requires a two-step inquiry. *Davis v. State*, 872 S.W.2d 743, 747-48 (Tex. Crim. App. 1994). The first step addresses

"whether the statement tended to expose the declarant to criminal liability." *Id.* at 747. One indication of such exposure is an invocation of the Fifth Amendment claim against self-incrimination. *Id.* Another is a lack of "evidence indicating that [the speaker] would necessarily have been immune from prosecution." *Id.* The second step requires a determination whether corroborating circumstances "'clearly indicate the trustworthiness of the statement.'" *Davis,* 872 S.W.2d at 747-48. Such corroborating circumstances include "when the guilt of [the hearsay declarant] is inconsistent with the guilt of the accused, [and] when the facts show that such party was so situated that he might have committed the crime." *Id.* The very fact that a statement is "genuinely self-inculpatory" is itself an indication of its trustworthiness. *Williamson v. United States,* 512 U.S. 594, 605 (1994). Here, both Mr. Cook's and Mr. Reid's statements clearly satisfy the two-part test.

*First,* Mr. Cook's statement that Mr. Reid admitted to shooting four people in a bowling alley on Route 290 while he and Mr. Cook were committing a Pasadena robbery for which both men were responsible obviously "tended to expose [Mr. Cook] to criminal liability" for the Pasadena robbery. *Davis,* 872 SW.2d at 747. Mr. Cook's statement includes an admission to being a party to an attempted murder, for which there is no statute of limitations. *See* TEX. CODE CRIM. PROC. arts. 12.01 § 1(A), 12.03 (a). And Mr. Cook stated in court that he would invoke his Fifth Amendment right against self-incrimination if asked about this incident. Finally, immunity from prosecution was not forthcoming. (26 R.R. 91-94; 24 R.R. 4-5; 26 R.R. 99.) To the contrary, the state admitted that Mr. Cook "does have liabilities in that situation [that is, the robbery and attempted murder]." (30 RR 85.) Each of these factors demonstrate that Mr. Cook's statement exposed him to criminal liability.

*Second*, Mr. Cook's statement is accompanied by numerous corroborating circumstances clearly demonstrating its trustworthiness.   Most notably, Mr. Cook's affidavit was sworn, exposing him to the threat of perjury charges if the statement was untrue.   And Mr. Cook had nothing to gain by making his statement to Mr. Soffar's post-conviction attorney, who had nothing of benefit to offer him.   Lastly, independent facts corroborate the accuracy Mr. Cook's statement, including the fact that his affidavit is consistent in other respects with the extensive police report setting forth the details of the crime Mr. Cook described.   (6 C.R. 1531-43.)

For its part, Mr. Reid's statement to Mr. Cook that he shot four people in a bowling alley on Route 290 was admissible as a statement against interest.   Indeed, the convicting court ruled that this layer of hearsay could be introduced through Mr. Cook and the appellate prosecutor, who had the last word on the issue, conceded that Mr. Reid's statement was a statement against interest.   (5 R.R. 234; 10 R.R. 12; 6 C.R. 1671-72; 30 R.R. 83-84.)   That is not surprising, as Mr. Reid's admission to a very serious crime certainly "tended to expose him to criminal liability."   *Davis*, 872 SW.2d at 747.   Mr. Reid stood nothing to gain by making the statement and "must have been aware of the possibility that disclosure would lead to criminal prosecution." *Chambers*, 410 U.S. at 299, 301.

Corroborating circumstances clearly demonstrate the trustworthiness of Reid's statement as well.   Mr. Reid's admission was "inconsistent with the guilt of the accused."   *Davis*, 872 S.W.2d at 748. Furthermore, Mr. Reid made the statement in response to a casual inquiry by Mr. Cook, who had no known connection to the Bowling Alley crime. *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999) (finding casual and spontaneous statements to declarant's friend trustworthy). Mr. Reid was not then under suspicion for the crime, was not

131

shifting blame, and certainly had no incentive to curry favor with Mr. Cook.  *Williamson*, 512 U.S. at 603; *Burks*, 876 S.W.2d at 904-05.

In addition, independent corroborating facts showed that Mr. Reid was in a position to have committed the crime. *Davis,* 872 SW.2d at 749. Mr. Reid was in Houston in July 1980, was married there only days after the robbery murders, and his wife could not account for his whereabouts on the night of the crime. (30 R.R. 79; 45 R.R. Def. Ex. 39; 6 C.R. 1648, 1654, 1660-61.)  Witnesses would have established that Mr. Reid's appearance during that time period strongly resembled the composite that Mr. Garner prepared.   (32 R.R. 38-40; 30 R.R. 78.) Finally, the *modus operandi* Mr. Reid employed to commit numerous robberies in Houston and later in Tennessee strongly corroborated his guilt and indelibly marked him as the perpetrator of the Bowling Alley robbery.  These fatcs, independently and together, further support a finding that Mr. Reid committed the crime.  *See Holmes*, 126 S. Ct. at 1731 (revering due to preclusion of evidence of third party guilt where third party's alibi was refuted).

Because the admissions were clearly admissible under well-established state law, exclusion of Mr. Reid's confession violated Mr. Soffar's constitutional right to present a defense. Indeed, even if the statements were arguably inadmissible under state law, their exclusion still violated that right.  As the Supreme Court has held, a trial court may not exclude evidence if its exclusion "infringe[s] upon a weighty interest of the accused" and the exclusionary rules are "arbitrary or disproportionate to the purposes they are designed to serve."  *Id.* (citation and internal quotation marks omitted).  A confession by a third party to the crime for which a defendant is facing death clearly falls within that description and the court's arbitratry application of the hearsay rule—which Federal law regularly puts aside in circumstances such as this pursuant to the residual exception, FED. R. EVID. 807—cannot serve to work an injustice.

*See House v. Bell*, 126 S. Ct. 2064, 2084 (2006) (finding sufficient showing of "actual innocence" based in part on evidence of a third party confession).   Accordingly, Mr. Reid's confession should have been put before the jury, the trial court's refusal to do so was erroneous, and the appellate court's upholding of that ruling was contrary to, and an unreasonable application of, clearly established Federal law.

There is no question that Mr. Soffar was prejudiced by the trial court's refusal to admit evidence of Mr. Reid's confession (and, by extension, the other evidence against Mr. Reid).   The Supreme Court has recognized the power of alternative perpetrator evidence.   *See Holmes*, 126 S. Ct. at 1731 (reversing due to preclusion of evidence of third party guilt where third party's alibi was refuted).   The prosecution made such evidence of particular significance by exploiting the trial court's refusal to admit evidence of Mr. Reid's guilt and improperly arguing that Mr. Soffar "didn't bring you any evidence that someone other than the Defendant committed this crime." (35 R.R. 9.)

### 4.    The Claim was Exhausted in the State Court Proceedings.

Mr. Soffar exhausted his claim that Mr. Soffar's constitutional rights to due process, compulsory process, and to present a defense were violated by the exclusion of Mr. Reid's guilt in his direct appeal.   Mr. Soffar raised the issue in his direct appeal as points of error 1(b), 2(a)-(b) and 3.   The Court of Criminal Appeals overruled each of the points of error.   *Soffar v. State,* No. AP-75363, 2009 WL 3839012, at *13-17 (Tex. Crim. App. Nov. 18, 2009).

A.   **CLAIM FOR RELIEF 10**:   THE TEXAS COURT'S CONCLUSION THAT TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO INVESTIGATE, DEVELOP, AND PRESENT ALL EVIDENCE ESTABLISHING PAUL DENNIS REID'S GUILT IS CONTRARY TO, OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984).

1.   **The Relevant Facts.**

As discussed above, trial counsel sought to introduce evidence that Paul Dennis Reid committed the crime for which Mr. Soffar is now sentenced to die.   (5 C.R. 1485.)   That evidence included Mr. Reid's confession and his distinctive *modus operandi*. (*Id.*)   As a result of the convicting court's erroneous rulings, defense counsel were unable to do so.  (5 R.R. 233-34; 30 R.R. 79; 32 R.R. 37, 44; 5 C.R. 1474-89; 13 C.R. 3796-801).  Although the court did rule that the defense could introduce evidence showing that Mr. Reid was in Houston at the time of the crime and matched Mr. Garner's description of the robber, doing so would have been pointless given that the defense could not present the jury with evidence directly linking Mr. Reid to the crime.   Thus, the court's ruling effectively prevented the defense from presenting alternative perpetrator evidence.  (*Id.*)

Trial counsel could, however, have obtained and presented evidence of such a link if they had conducted the thorough investigation that prevailing professional norms required them to do.

Most obviously, trial counsel could—and should— have interviewed people who were at the Bowling Alley in the weeks leading up to the murders.   Had they done so, they would have identified three witnesses who recall seeing a man matching Mr. Reid's description at the Bowling Alley in the days prior to the robbery.   Thomas Cadena, who bowled at the Bowling Alley three to four times a week in the summer of 1980, has attested that he "recall[s] a person who shared Paul Reid's appearance hanging out at the bowling alley in the weeks prior to the bowling alley murders" and that he had seen him there "three or four times." (14 S.H.R. 3657.) Mr. Cadena recalled that Mr. Reid was then "in his early 20's," was "about 6 feet tall and had an

average build," "wore his hair combed back, parted in the middle, and collar length," and had distinctive eyes. (*Id.*)

Another witness, Danny Cain, who bowled at the Bowling Alley at least two to three times a week, testified that "[s]everal times [in July 1980 he] saw Paul Reid at the bowling alley." (33 S.H.R.3667 at ¶ 7.)  Consistent with Mr. Cadena, Mr. Cain recalled Mr. Reid's distinctive eyes:  "No one could mistake Paul's eyes, even after all of these years." (*Id.*)

But it is the testimony of the third witness Patrick Pye—that is of most importance.  In his affidavid, Mr. Pye recalled an incident in which he threw Mr. Reid out of the Bowling Alley after Mr. Reid refused to pay and that Mr. Reid later telephoned the Bowling Alley threatening to kill Mr. Pye and Mr. Sims:

> I remember telling a member of the Houston Police Department that about a week prior to the event, I was working at the Bowling Alley and recall a verbal altercation involving Steve Sims and a white male customer.  The customer had refused to produce what is called a "play sheet," which was used back then to track the number of bowling games a customer would play so that the Bowling Alley could calculate their bill.  This customer, who was about 22 or 23 years of age, 6'1'' or 6'2'', with a strong build, told Steve Sims that he never received the play sheet and refused to pay.  Steve and I had to remove him from the Bowling Alley.  Later we found the customer's play sheet on top of a trash can. . . .  The customer called and threatened us after we removed him from the bowling alley, saying we should both be looking over our shoulders because he would be getting even. . . . **The man on the phone said that we had better have eyes in the back of our heads because "I am going to blow your heads off**."

(21 S.H.R. 5434 at ¶¶ 4-5.)  Mr. Pye has positively identified that man as Paul Dennis Reid. (*Id.*)

Each of the three witnesses were mentioned in the offense reports that the defense had prior to the trial and all were known to have bowled at the Bowling Alley frequently.  (26 R.R. 84.)  In fact, Mr. Pye's recollection of throwing a man out of the Bowling Alley was recorded in detail in one of those reports. Yet trial counsel inexplicably listed Mr. Pye as a "low priority" in

their investigative plan prepared in June 2005.  Seemingly he was such a low priority that trial counsel never contacted him.  (21 S.H.R 5435 [Pye Aff. at ¶ 8].)

Trial counsel also could have—and should have—sought to present evidence of the similarities between the Bowling Alley murders and the *modus operandi* that Mr. Reid employed in committing his Texas crimes.  The similarities are striking:

- He robbed cash-rich establishments, such as stores or restaurants, near or just after closing time when employees were still on the premises;

- He robbed those establishments on a weekend;

- He entered the store using a pretext such as interest in finding employment or car trouble, (5 C.R. 1483; 8 C.R. 2304;

- He waited outside of the store and forced an employee back into the establishment at gunpoint;.

- He ordered those in the establishment to lie facedown on the floor or herded them into a back room or cooler if it was available;

- He ordered an employee to remove the contents of the cash register;

- He made no attempt to disguise himself.

The Bowling Alley robber used an almost identical approach:

- The Bowling Alley was a cash-rich establishment and was robbed shortly after it closed at a time when employees were still on the premises;

- The robbery took place on a weekend;

- The robber talked his way into the Bowling Alley using a pretext—a claim that he had car trouble;

- The robber persuaded the assistant Bowing Alley manager to go outside with him and then forced the assistant manager back into the establishment at gunpoint;

- The robber ordered the people inside the Bowling Alley to lie face down;

- The robber ordered the assistant manager to remove the contents of the cash register; and

- The robber made no attempt to disguise himself.

(22 R.R. 92; 32 R.R. 69, 72-74, 79-80, 83-84, 89, 101, 103-07, 109-10, 112, 124, 126-29, 136-38, 144-45, 184.)

Conducting this sort of *modus operandi* comparison analysis would have been easy for trial counsel to do.  Trial counsel were aware of Mr. Reid's Texas crimes; indeed, they refer to them in their motion.  Trial counsel had all of the offense reports that would have enabled a *modus operandi* comparison to have been conducted.  (30 R.R. 76-84.)  And trial counsel already had retained an experienced forensic consultant to prepare a *modus operandi* analysis for the Tennessee crimes.  Nothing prevented trial counsel from utilizing that expert except their own ineffectiveness.

*Finally*, trial counsel could have further investigated, obtained, and presented evidence that Mr. Reid owned a pick-up truck very similar to that seen by eyewitnesses who passed the Bowling Alley around the time the robbery was committed.  For example, Donald Putz, who was in the parking lot of the church across the street from the Bowling Alley, recalled seeing a pickup truck parked in front of the Bowling Alley with its hood up—corroborating Mr. Garner's recollection that the Bowling Alley robber tricked his way into the Bowling Alley by claiming to have car trouble.  (*Id.*)  Finding out the make and color of Mr. Reid's pickup truck was a simple matter of interviewing his then-wife, Elizabeth Cortez.  (14 S.H.R. 3714.)

### 2.    The Applicable Standard.

The governing standard applicable to ineffective assistance of counsel claims is discussed in Claim for Relief 4.  (*See infra* II.C.2 (Claim for Relief 4).)

### 3.    Habeas Relief Is Warranted.

Trial counsel's failure to investigate properly their alternative perpetrator theory of defense constituted deficient performance such that Mr. Soffar's Sixth Amendment rights were violated.  With respect to *Strickland*'s competence limb, prevailing professional norms at the

time of Mr. Soffar's trial required defense counsel to "fully investigate" all possible defenses, which necessarily involves searching for all "potential witnesses who might challenge the prosecution's version of events."  ABA GUIDELINES Guideline 1.1 Commentary; ABA STANDARDS Standard 4-4.1 Commentary; NLAD GUIDELINES Guideline 4.1(b)(3); TEXAS GUIDELINES Guideline 11.1(A)(2)(C); DOJ STANDARDS F.2; 21 TEX. JUR. 3D *Criminal Law: Rights of the Accused* § 130 (2012).  Prevailing professional norms also imposed on counsel a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S.at 691; *Wiggins*, 539 U.S. at 510.  And federal courts have repeatedly found that a defendant's Sixth Amendment rights were violated due to his counsel's failure to locate and interview witnesses.  *See, e.g., Moore v. Johnson*, 194 F.3d 586, 608 & 616 (5th Cir. 1999); *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994); *Soffar I*, 368 F.3d at 474-75; *Rummel v. Estelle*, 590 F.2d 103, 104 (5th Cir. 1979), *aff'd*, 445 U.S. 263 (1980); *Bell v. Watkins,* 692 F.2d 999, 1009 (5th Cir. 1982); *Nealy v. Cabana*, 764 F.2d 1173, 1177-78 (5th Cir. 1985); *Anderson v. Johnson*, 338 F.3d 382, 391-92 (5th Cir. 2003); *Davis v. Alabama*, 596 F.2d 1214 (5th Cir. 1979); *Harris v. Estelle,* 487 F.2d 1293 (5th Cir. 1974); *Williams v. Beto*, 354 F.2d 698 (5th Cir. 1965).

Trial counsel failed to comply with those professional norms when they did not interview Messrs. Cadena, Cain, and Pye.  Trial counsel were well aware of those witnesses' existence because each was mentioned in police offense reports.  Indeed, Pye's name was included on a list of witnesses that trial counsel had intended to interview prior to trial.  Trial counsel were also aware that Messrs. Pye and Sims had been involved in an altercation with a customer only days before the murders.  Had trial counsel followed up on that information—as they should have done and as would have been easy to do—they would have discovered that the man was Paul

Dennis Reid and that Mr. Reid had expressly threatened to kill Sims by "blow[ing] [his] head[] off." (21 S.H.R 5434 at ¶ 5.)

Trial counsel also failed to fully investigate Mr. Soffar's alternative perpetrator defense by failing to present evidence of Mr. Reid's Texas crimes and obtain evidence that Mr. Reid owned a pickup truck very similar to that seen by people passing the Bowling Alley at the time the robbery took place.

These failures were not the product of strategy calls, either. Tying Mr. Reid to the Bowling Alley robbery was one of the central pillars of the defense's case. Although trial counsel had some evidence, they could have acquired much more, all with little effort. Given the importance of showing Mr. Reid's connection to the Bowling Alley robbery, no reasonable strategic reason can justify trial counsel's failure.

Trial counsel's failures had a catastrophic effect on Mr. Soffar's defense because without those witnesses' testimony, he was deprived his opportunity to advance an alternative perpetrator defense. The eyewitness testimony from Messrs. Pye, Cadena, and Cain, combined with the additional evidence about Mr. Reid, would have supplied the link between Mr. Reid and the Bowling Alley that was missing from trial counsel's presentation. Therefore, trial counsel's failure to investigate, obtain and present this evidence fell below the "objective standard of reasonableness" upon which trial counsel are judged and the first limb of the *Strickland* test is satisfied. *See Strickland*, 466 U.S. at 688.

The convicting court's contrary conclusion was based on a test that conflicts with that prescribed in *Strickland*. The *Strickland* test is straightforward: *First*, the court identifies the challenged acts or omissions; *second*, the court determines the relevant prevailing professional norms; *third*, the court evaluates whether the acts and omissions complied with those norms;

139

*lastly*, the court decides whether there is a reasonable probability that the result of petitioner's trial would have been different but for counsel's unprofessional conduct.  The convicting court, by contrast, merely asked whether, in the court's sole opinion, counsel's general performance was reasonable.  That test conflicts with *Strickland* in at least three respects.

*First*, the Texas court's analysis failed to evaluate the specific "***identified***" omissions—trial counsel's failures to investigate properly their key defenses.  *Strickland*, 466 U.S. at 690.  Instead, with the approach taken by Texas courts generally, the court in petitioner's case evaluated the "totality of the representation." (33 S.H.R. 8982 at C.L. ¶ 15.)  But *Strickland* requires a court to assess whether the specific identified acts or omissions were objectively unreasonable.  *See Strickland*, 466 U.S. at 686; *United States v. Cronic*, 466 U.S. 648, 659 (1984); *Bell*, 535 U.S. at 697; *Burger*, 483 U.S. at 788; *Darden*, 477 U.S. at 184.  And even one specific, identified omission can render counsel's performance inadequate, regardless of how well counsel performed in other respects.  *Strickland,* 466 U.S. at 686; *Cronic*, 466 U.S. at 659; *Bell,* 535 U.S. at 697; *Burger*, 483 U.S. at 788; *Darden*, 477 U.S. at 184.  The Texas test did not evaluate the objective reasonableness of individual failures and is therefore contrary to settled federal law.

*Second*, the Texas court contradicted federal law by focusing on trial counsel's actions and not the identified "***omissions***."  The Texas court's principal finding of fact on the question of ineffectiveness makes this abundantly clear:

> Trial counsel's representation of the applicant at trial fell within the range of reasonable professional assistance; counsel conducted a thorough investigation of the primary offense, possible defenses, and potential punishment evidence; counsel made reasonable strategy decisions, within the boundaries allowed by evidentiary rules and case law, in the presentation of evidence during the pre-trial, guilt/innocence and punishment phases of trial; and,

> counsel lodged appropriate objections and vigorously questioned
> witnesses . . . .

(33 S.H.R. 8982 at C.L. ¶ 15.)  State courts must, however, do far more than simply evaluate what counsel did.  As the *Strickland* Court explained, in evaluating effectiveness, courts must consider the objective reasonableness of the challenged "acts ***or omissions*.**"  *Strickland*, 466 U.S. at 690; *Burger*, 483 U.S. at 795; *Kimmelman*, 477 U.S. at 386.  Courts are required, therefore, to evaluate objectively not only all acts of commission but also whether counsel's omissions were reasonable.  The convicting court did not do that here and so was contrary to *Strickland*.

Lastly, the Texas court failed to comply with the most fundamental of *Strickland*'s requirements:  that courts must review counsel's acts and omissions ***objectively***.  The objective nature of the *Strickland* test is well recognized.  *Harrington*, 131 S. Ct. at 790; *see also Frye*, 132 S. Ct. at 1410; *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2011); *Sears,* 130 S. Ct. at 3264; *Smith v. Robins*, 528 U.S. 259, 285 (2000).  Objectivity takes two forms.  The first form of objectively prohibits courts from evaluating counsel's performance based on their own sense of what is prudent or reasonable.  *Cullen*, 131 S. Ct. at 1407.  Instead, courts must evaluate whether counsel's acts and omissions complied with "prevailing professional norms."  *Strickland*, 466 U.S. at 688; *see also Porter*, 130 S. Ct. at 452-53; *Wiggins,* 539 U.S. at 522; *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010); *Rompilla*, 545 U.S. at 383; *Nixon*, 543 U.S. at 192; *Williams*, 529 U.S. at 396; *Roe*, 528 U.S. at 480; *Kimmelman*, 477 U.S. at 385; *Cullen*, 131 S. Ct. at 1407.  Although this Court has stressed that "[n]o particular set of detailed rules for counsel's conduct" can be prescribed, *Strickland*, 466 U.S. at 688, the Court has referred to certain sources in identifying applicable norms, many of which are identified above.  *See Cullen*, 131 S. Ct. at 1406 (noting that specific guidelines are not appropriate).

The Texas court did not evaluate the specific claims of ineffectiveness, did not address trial counsel's omissions, and failed to compare the specific acts and omissions identified to the prevailing professional norms.   Instead, the court found, in a conclusory fashion, that trial counsel's performance was generally "reasonable."   Accordingly, the convicting court's conclusion that trial counsel's performance "fell within the range of reasonable professional assistance," (33 S.H.R. 8982 at C.L. ¶ 15), is contrary to, or an unreasonable application of *Strickland*.

Trial counsel's failure to locate the eyewitnesses and other evidence tying Mr. Reid to the Bowling Alley robbery also satisfies the prejudice limb of the *Strickland* test.   The Supreme Court has frequently recognized the power and persuasiveness of alternative perpetrator evidence.   *See Holmes v. South Carolina*, 547 U.S. 319 (2006); *House v. Bell*, 547 U.S. 126 (2006).

The Seventh Circuit's decision in *Stanley v. Bartley,* 465 F.3d 810 (7th Cir. 2006) is directly on point.   In *Stanley*, defense counsel failed to interview a witness, Robert Brock, who had given a statement to police that described a fight between the victim and a third party, James Dean, that took place a few hours before the murder.   *Id.*   Dean was the prosecution's "key witness" and was also a possible alternative perpetrator.   *Id.* at 811-12.   In the course of Stanley's post-conviction proceedings, Brock testified that during the course of the flight the victim had struck Dean with a wine bottle and that, when the altercation was over, Dean had told the victim: "I'll catch your ass later on."   *Id.*   In concluding that defense counsel's failure to interview Brock constituted a "shocking dereliction of professional duty," the Seventh Circuit found that Brock's testimony would have "indicated that Dean had a motive to kill [the victim]" and that "[Dean] had as good an opportunity as [the defendant] to do so."   *Id.*

The same is true here:  Mr. Pye's testimony would have provided petitioner with solid evidence implicating Mr. Reid.  Mr. Pye would have established that Mr. Reid was familiar with the Bowling Alley, had motive and opportunity to kill Mr. Sims, and actually threatened to do so. That testimony would have been corroborated by the testimony of Messrs. Cain and Cadena.  All three of those witnesses' testimony would have been admissible, particularly in light of the convicting court's ruling that petitioner could present evidence of Mr. Reid's presence in Houston and physical similarity to the composite drawing.

In short, trial counsel's failure to interview witnesses who would have established Mr. Soffar's alternative perpetrator defense was objectively unreasonable, and there is a reasonable probability that the jury would not have found Mr. Soffar guilty beyond a reasonable doubt had those witnesses testified at trial.  As a result, the convicting court's conclusion that Mr. Soffar's Sixth Amendment right to effective assistance of counsel was not violated is contrary to or an unreasonable application of established federal law.  As such, habeas relief can, and should, be granted.

### 4.     The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar exhausted his claim that trial counsel was ineffective in failing to investigate, develop, and present all evidence establishing Mr. Reid's guilt in the state habeas proceeding. Mr. Soffar raised the issue in his state application for writ of habeas corpus at Section VI.F.2. The convicting court rejected Mr. Soffar's claim that his right to counsel was violated and Court of Criminal Appeals adopted that ruling.  *See Soffar VI*, 2012 WL 4713562, at *1.

## IV.    MR. SOFFAR SHOULD NOT HAVE BEEN SENTENCED TO DEATH.

### A.    CLAIM FOR RELIEF 11: THE TEXAS COURT'S CONCLUSION THAT TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO INVESTIGATE, DEVELOP, AND PRESENT ALL MITIGATING EVIDENCE IS CONTRARY TO, OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *STRICKLAND v. WASHINGTON*, 466 U.S. 668 (1984).

#### 1.    The Relevant Facts.

Trial counsel's mitigation investigation and presentation was utterly inadequate. Although the Texas court found otherwise, even the most cursory review of the state habeas record shows that trial counsel could—and should—have introduced a wealth of additional evidence supporting a sentence of life and not death.  Rather than address that evidence, the Texas court ignored it and focused solely on what trial counsel did, rather than what they should have done.  As explained below, that approach flies in the face of well-settled federal law.  (*See infra* at IV.A.3.)  Had the Texas court adopted and applied the correct standard, habeas relief would have been granted and Mr. Soffar's death sentence would have been overturned.

(1)    Evidence Presented At Mr. Soffar's Retrial.

Trial counsel had two punishment phase theories:  (a) residual doubt—which is not relevant to the present claim for relief—and (b) that Mr. Soffar had a "broken brain" but nonetheless did well in prison.  (26 S.H.R. 6818, 6829.)  In denying Mr. Soffar's application, the Texas court adopted wholesale the state's proposed findings of fact in which the state claimed that trial counsel "sought" to present the following:

- Testimony from a psychiatrist, Dr. Susan Stone, regarding Mr. Soffar's "background and mental health issues";

- "Information regarding applicant saving a police officer's life";

- "Evidence that [applicant] had not been right since birth [and] had never received effective treatment for his problems";

- Evidence "that the [applicant] was mentally ill";

- Evidence "that the applicant's parents were ill-equipped to deal with his needs during childhood";

- Evidence "that the applicant had a very low I.Q."

33 S.H.R. 8933, 8955.)   The Texas court also adopted the state's assertion that trial counsel "consulted with a psychologist and had retained a mitigation expert."  (33 S.H.R. 8933-34.)

It is self-evident that the state's—and, by extension, the Texas court's—findings of fact are so general as to be next to worthless because they fail to set forth with any specificity what trial counsel did and, more importantly, what Mr. Soffar alleges trial counsel ought to have done. (*See* 33 S.H.R. 8933-34.)   Nor did the state—and, again by extension, the Texas court—make any effort to explain why those omissions were inconsequential.   There is a good reason why neither the state nor the Texas court wanted to discuss the details of trial counsel's omissions:  a fair and complete reading of the record—which is the only reading permitted by law—shows that the evidence does not support those findings.   Instead, the only valid conclusion is that Mr. Soffar's counsel were ineffective.   (*See id*.)   As such, and as explained below, the Texas court's findings are entitled to no deference at all.   (*See id*.)

(2)   Evidence Trial Counsel Could, And Should, Have Developed And Presented.

Trial counsel's investigation and presentation of mitigating evidence was woefully inadequate.   Had trial counsel conducted an adequate investigation, they could have presented a mitigation narrative that would, to a sufficient degree of reasonable probability, have resulted in a life sentence.   (21 S.H.R 5449-52, 5462-70 [O'Brien Aff.].)   The following sets out just one such narrative and the evidence that would have supported it.   In order to show how powerful that narrative would have been, the following blends evidence that was introduced (indicated by references to the reporter's record) with evidence that could have been presented (indicated by

references to the state habeas record).   The new evidence is separately broken out and highlighted in Section IV.A.3.

(3)      Mr. Soffar's Birth And Adoption.

On December 15, 1955, Cecelia Aline Bonardi gave birth to a baby boy.  (23 S.H.R. 5991.)  Ms. Bonardi was thirty-five years old at the time of the boy's birth.  (*Id.*)  The baby boy was her fourth child.  (*Id.*)  One of her previous children had been stillborn and another had died by the time her son was born.  (*Id.*)

Although the birth was apparently normal, there were immediate signs that the boy had brain damage.  Doctors noted that the baby had an abnormal palate and facial asymmetry. (39 R.R. 114-15.)   Although a psychiatrist testified that Mr. Soffar might have had a brain abnormality since birth, the state challenged that supposition on cross-examination.  (*See* 39 R.R. 170-74, 188.)  Trial counsel could, however, have neutralized the state's challenges had they called experts in neurology and neuropsychiatry who would have testified authoritatively on the congenital causes of Mr. Soffar's brain damage.  (*See, e.g.,* 15 S.H.R. 3794-95, 3868-69.)  For example, Dr. James Merikangas, a neurologist and neuropsychiatrist, would have opined that Mr. Soffar suffers from substantial, diffuse, and permanent organic brain damage that was "probably present from birth."  (15 S.H.R. 3794-95.)  Professor Jonathan Pincus, the Professor and Chair Emeritus of Neurology at Georgetown University and Chief of Neurology at the Veterans Administration Medical Center in Washington, D.C., would have testified that Mr. Soffar suffers from frontal lobe brain damage that, he believes, was "sustained at birth or during the prenatal period."  (15 S.H.R. 3868-69.)  Trial counsel could have gone further and called a witness to verify that Mr. Soffar's brain damage is consistent with his mother's prenatal abuse of alcohol and possibly drugs.  (28 S.H.R. 7362 [*see also* 15 S.H.R. 3859 [Pincus].)  All of

146

this evidence readily available to trial counsel but they failed to investigate and present it.  (*See, e.g.,* 15 S.H.R. 3789, 3823.)

Ms. Bonardi never intended to keep the child.  Prior to his birth, she had arranged for a Jewish couple from Friendswood, Texas—George and Zelda Soffar—to adopt the baby.  (36 R.R. 94; 45 R.R. Def. Ex. P-12.)  Mr. Soffar was forty-eight and Mrs. Soffar was forty-three years old.  (45 R.R. Def. Ex. P-12.)  The Soffars took the baby home four days after he was born.  (36 R.R. 42.)

> (4)    Mr. Soffar Is Neglected By His Disinterested And Inadequate Adoptive Parents.

Mr. and Mrs. Soffar were unprepared and seemingly unwilling to care properly for any child, much less a child like Max who had extensive brain damage and demanding special needs.  (39 R.R. 121-22.)  Rather than help him, from the moment they brought him home, the Soffars likely caused further harm to his already damaged brain.  In the early months of his life, Max was a restless, active baby who seemed to have fits or tantrums.  (15 S.H.R. 3907; 15 S.H.R. 3895.)  Instead of consulting a doctor to find out if there was something medically wrong with him, Mrs. Soffar frequently fed baby Max several spoonfuls of Phenobarbital, a powerful, addictive sedative that is designed to suppress the central nervous system.  (39 R.R. 119-20, 124-25; *see also* 15 S.H.R. 3895 [D. Soffar Aff. at ¶ 2]; 23 S.H.R. 6000.)

Mrs. Soffar's decision to drug her child rather than expend the minimal effort involved in taking baby Max to the doctor is indicative of how little time she had for him.  (15 S.H.R. 3917.)  Indeed, throughout Max's youth, his parents paid him little or no attention.  (14 S.H.R. 3670.)  Instead, his parents poured all of their time and energy into their furniture store in Alvin, Texas.  (38 R.R. 16-18; 14 S.H.R. 3670; 15 S.H.R. 3901.)  They worked every day of the week and regularly worked late at night, leaving Max with a babysitter who at best ignored him and at

worst beat him for the most trivial of reasons.  (38 R.R. 124-25, 160; *see also* 14 S.H.R. 3612-13; 15 S.H.R. 3901.)

The Soffars made no attempt to disguise their lack of care nor did they do anything to provide Max with a structured life.  As a child, Max looked physically neglected and exuded a filthy odor.  (*See, e.g.*, 14 S.H.R. 3631; 14 S.H.R. 3675; 15 S.H.R. 3885-86.)  Relatives of Mr. and Mrs. Soffar believed that they had no time for their child.  (*See, e.g.*, 14 S.H.R. 3670; 15 S.H.R. 3901.)  A neighbor reported that she "never saw Mrs. Soffar show any warmth, praise or personal attention towards Max."  (15 S.H.R. 3890.)

Max's father was similarly disinterested.  (14 S.H.R. 3612-13; *see also* 39 R.R. 140, 234-35.)  He was rarely around and, when he was, he preferred to sit and drink beer rather than acknowledge his son.  (*See* 14S.H.R. 3618; *see also* 15 S.H.R. 4017; *see also* 38 R.R. 27-28; 39 R.R. 140.)  When Mr. Soffar did pay attention to Max, it often came in the form of brutal beatings.  (*See, e.g.,* 14 S.H.R. 3643; 15 S.H.R. 3890.)  A neighbor remembered watching Max's father beat Max as his sister and mother held him down.  (15 S.H.R. 3890.)  The many scars that still exist today on his back may be the remnants of the physical abuse that he sustained as a child.  (15  S.H.R. 3867.)

The Soffars' unwillingness to care properly for their child also manifested itself in their failure to provide a clean, well-maintained, and safe home environment.  The house into which the Soffars brought baby Max was no place for a child.  Structurally, it was falling apart.  (15 S.H.R. 3904.)  Cement crumbled around the cinder blocks creating holes that let in shafts of light.  (15 S.H.R. 3904; 14 S.H.R. 3618; 38 R.R. 21-22.)  The roof leaked profusely.  (15 S.H.R. 3904; 38 R.R. 21-22.)  Rather than repair the building, the Soffars simply put out buckets to catch the water.  (15 S.H.R. 3904.)

The inside of the house was equally unsafe and unhealthy.  Mrs. Soffar was an obsessive hoarder and had lined the walls with filing cabinets overflowing with business records.  (15 S.H.R. 3904; 14 S.H.R. 3618.)  She even kept hundreds of old newspapers.  (15 S.H.R. 3904.)  Stacks of them filled the rooms, making it difficult to navigate around the house.  (15 S.H.R. 3904); 14 S.H.R. 3618.)  According to the Chief of Police, "the house was a shabby framed house, unclean, in need of repair and extremely cluttered."  (15 S.H.R. 4017.)  Max's cousin put it more bluntly: "dogs lived better" than the Soffars.  (15 S.H.R. 3904.)

Despite their apparent complete disregard for the welfare of their baby, just eighteen months after adopting Max, the Soffars unwisely decided to adopt a baby girl.  (15 S.H.R. 3907, 3890.)  The Soffars understood that the baby girl and Max shared the same mother— Ms. Bonardi—but was fathered by a different man.  (15 S.H.R. 3907, 3890.)  The Soffars named the baby girl Esther Jacqueline, known to everyone as Jackie.

(5)     Mr. Soffar's Problems Worsen.

As Max grew older, the effects of his impairments became ever more apparent.  He was notably hyperactive, impulsive, and unable to pay attention for even the shortest period of time.  (36 R.R. 96; 14 S.H.R. 3619, 3670; 15 S.H.R. 3895.)  He could not even sit still long enough to watch a television program.  (14 S.H.R. 3636.)  Max's behavior rendered him unable to interact properly with other children and, as a result, parents—including relatives of the Soffars— stopped bringing their children over to play with him.  (14 S.H.R. 3670; 15 S.H.R. 3903; 38 R.R. 43.)  With no friends and grossly inattentive parents, Max became increasingly isolated and starved of attention.  (14 S.H.R. 3670; 15 S.H.R. 3903.)

(6)     Mr. Soffar Fails at School.

Max found himself even more isolated at school.  His hyperactivity meant that he did not have the attention span necessary to complete even basic schoolwork. (14 S.H.R. 3619, 3632; *see*

*also* 39 R.R. 127.)  The problems caused by his hyperactivity were compounded by his innate sub-normal intelligence.  (14 S.H.R. 3619, 3632; 15 S.H.R. 3979-80.)  Max "just wasn't smart enough to figure things out."  (14 S.H.R. 3639; R.R. 119.)  Indeed, his sister had to go so far as to help him pronounce words.  (38 R.R. 120.)  That utter lack of intellectual ability was reflected in the results of mental agility tests administered by various school psychologists.  (*See* 6 S.H.R. 1275.)  As a result, Max became frustrated and began to engage in attention-seeking behavior.

Max's problems caused him difficulties throughout his school years.  He was held back in first and third grades.  (6 S.H.R. 1225; 15 S.H.R. 3911, 3979-80; 39 R.R. 134.)  When he entered fourth grade, his teacher found that he "suffered from severe intellectual, psychological and emotional deficits arising through no fault of his own."  (14 S.H.R. 3674.)  Max only entered fifth grade at the age of thirteen as a result of a "social-promotion."  (15 S.H.R. 3979-80; 39 R.R. 134-35.)  His fifth grade teacher described him as the "most seriously disturbed child [she] had taught at that point in [her] teaching career."  (15 S.H.R. 3979.)  Just as Max had found outside of school, his problems in school led to him being ostracized by other children.  (14 S.H.R. 3631, 3675; 15 S.H.R. 3980.)

(7)     Mr. Soffar Revels in the Attention of Police Officers.

Ostracized by his peers and ignored by his parents, Max turned to the police to get attention.  (14 S.H.R. 3645.)  Even at a young age, the police knew Max well.  Mrs. Soffar would often use them as a quick-fix to make up for her own failings.  For example, Mrs. Soffar sometimes called the police if Max refused to take his medication or if he needed settling down.  (14 S.H.R. 3645; 38 R.R. 125-26.)

Although the police often reprimanded Max for his behavior, the police nonetheless humored him and even paid him positive attention.  Indeed, Max appeared to develop friendships with some of the officers.  (15 S.H.R. 3991; 38 R.R. 126-28.)  Max used to "hang out" at the

police station.  (14 S.H.R. 3645; *see also* 15 S.H.R. 3991.)  Sometimes, police officers would

drive Max around in their patrol cars.  (14 S.H.R. 3645.)  Max was so excited about riding

around with the police officers that he would shower and dress up in his best clothes before

going out.  (14 S.H.R. 3645.)  It appeared to Max's sister that he acted as if the police were his

real parents.  (14 S.H.R. 3645.)  The sensitivity with which the police treated Max may have

been because they were well aware of his impairments.  (15 S.H.R. 3989.)  The card that the

police department kept on Max stated that he was a "mentally dist. minor."  (15 S.H.R. 3989.)

(8)     Mr. Soffar Heavily Abuses Substances and Self-Mutilates.

The attention the police officers gave Max could not make up for the fact that his parents

were simply not interested in him.  Nor could the officers' sensitivity cure his brain damage.

Seemingly in an effort to self-medicate, Max turned to substance abuse at a very young age.  (39

R.R. 127-30.)  When he was four, he began sniffing glue and then quickly progressed to

"huffing" leaded gasoline.  (*Id.* at 127-28; *see also* 14 S.H.R. 3612; 38 R.R. 130-31.)  His family

often found him passed out next to a car with a gas cap beside him.  (14 S.H.R. 3641-42; 38 R.R.

131.)  He repeatedly raided the family medicine cabinet and consumed anything he found.  (39

R.R. 127-28; 14 S.H.R. 3612, 3618-19; 15 S.H.R. 3909; 38 R.R. 129.)  When he was eight, Max

swallowed his father's sleeping pills and was rushed to the hospital to have his stomach pumped.

(14 S.H.R. 3618-19; 15 S.H.R. 3909.)  Of course, far from helping, Max's substance abuse

compounded his problems.  Had he been engaged by trial counsel, Dr. Joseph Rodricks, a world

renowned toxicologist, would have explained to the jury that many of the substances to which

Mr. Soffar was exposed "have established neurotoxic properties."  (28 S.H.R. 7315.)  In

particular, the inhalation of solvents and gasoline and the exposure to Phenobarbital as a child

"are well established causes of brain damage."  (28 S.H.R. 7315.)

Self-mutilation was a further means by which Max sought relief.  He frequently beat his head against objects.  (14 S.H.R. 3621.)  At school he "often would sit in the back of the classroom and jab his hand with a pencil until his hand bled."  (14 S.H.R. 3675, 3640.)  "He would burn himself."  (14 S.H.R. 3640.)  And, on certain occasions, he would cut his wrists.  (39 R.R. 19.)

Max's impairments caused him to suffer injuries in other ways, too.  At an early age, Max's teachers noticed that he was unable to foresee the consequences of his own actions, even in the shortest timeframes.  (14 S.H.R. 3674; *see also* 14 S.H.R. 3632.)  This lack of foresight often led Max to put himself in dangerous situations, apparently without regard for the injury he was undoubtedly going to sustain.  For example, when he was eleven, Max was bitten while attempting to play with a corral or copperhead snake.  (36 R.R. 46; 6 S.H.R. 1355.)  Despite the pain of the bite and the risk of death, Max's fascination with snakes continued and he was bitten at least five times.  (*See* 36 R.R. 46; 39 R.R. 138; 14 S.H.R. 3637; 23 S.H.R.6035; 38 R.R. 117.)  Similarly, Max repeatedly jumped off a bridge near his house onto alligator gars, notwithstanding the fact that each time he did so he sustained painful welts on his back.  (14 S.H.R. 3637.)

(9)      Mr. Soffar's Brain Damage Is Diagnosed.

Eventually, even Max's disinterested parents realized that their obviously ill child needed help.  Max saw his first psychiatrist when he was six.  (36 R.R. 42-43; 38 R.R. 121-23; 152-53; 39 R.R. 107.)  That psychiatrist appears to have diagnosed Max with attention deficit hyperactivity disorder and prescribed Ritalin. (39 R.R. 107, 131.)  For the next ten years, Max was under the care of a procession of psychiatrists, psychologists, and neurologists.  (*See* 36 R.R. 42-45; 39 R.R. 107-10.)  But rather than help Max, much of the treatment he received only made things worse.

In January 1968, Max was admitted to the John Sealy Division of Child Psychiatry in Galveston.  (6 S.H.R.1393.)  Tests performed there showed that Max had "mild weakness of all muscle groups of [Left] side," a condition from which Mr. Soffar still suffers.  (6 S.H.R. 1393; 15 S.H.R. 3865.)  Several of the doctors suspected that he suffered from some form of degenerative brain disorder.  (6 S.H.R. 1393.)  One doctor concluded that he suffered from chronic brain syndrome secondary to toxins.  (*Id.*)

The diagnosis of brain damage was confirmed during Max's second admission to John Sealy in May 1968.  (23 S.H.R. 6078.)  It was found that "marked organicity was present." ((*Id.*)  The neurologist who saw him noted: "the diagnosis is clear."  (*Id.*)  That diagnosis was "[c]hronic organic brain syndrome due to toxins with behavior disorder."  (23 S.H.R. 6078; 39 R.R. 108.)  Chronic organic brain syndrome is a physical, not psychiatric, disorder.  (*See* 39 R.R. 117-18.)  The hospital recommended "long-term institutional care in an educational setting."  (23 S.H.R. 6078.)

Max's parents did not follow the hospital's advice.  (*See* 39 R.R. 131, 138.)  Instead, they stood by and did nothing until August 10, 1968, when Max had a psychotic break.  (*See* 14 S.H.R. 3646-47.)  His parents' response was to ask the police to lock-up twelve-year old Max in Galveston County Jail.  (15 S.H.R. 4023.)  Drs. Henry and Zien-Eldin, county psychiatric consultants, examined Max in jail.  (15 S.H.R. 4023; 21 S.H.R. 5374.)  Dr. Henry concluded that Max suffered from "chronic brain syndrome."  (21 S.H.R. 5374)  Dr. Zien-Eldin's conclusion was similar—he diagnosed Max with "psychotic reaction with organic brain syndrome." (15S.H.R. 4023; 39 R.R. 142.)  As a result of these diagnoses, Max was civilly committed to Austin State Mental Hospital (hereinafter "Austin State").  (36 R.R. 47; 38 R.R. 132; 39 R.R. 109, 141.)

At the time Max was admitted, Austin State was a "warehous[e]" for children with "really severe problems."  (39 R.R. 109; *see also* 38 R.R. 50.)  A "dark, drab, [and] lifeless" institution, it reeked of urine and was infested with cockroaches.  (39 R.R. 9, 109; 38 R.R. 52.) Human excrement was left decomposing in the hallways.  (39 R.R. 9, 109.)  The bed linens were not laundered for weeks at a time.  (39 R.R. 109.)  The children's psychiatric ward had a "quiet room" in which problematic children were placed.  (39 R.R. 111-12, 115; *see also* 6 S.H.R. 1415.)  This "quiet room" was a ten foot by ten foot "solitary confinement cell [with] hard floors, hard walls, [and] high ceilings."  (39 R.R. 11; *see also* 6 S.H.R. 1430; *see also* 39 R.R. 148.) There were no toilet facilities, no showers, and "not a stick of furniture" in the room.  (39 R.R. 12.)  Children, including Max, were locked up naked in this room for days on end.  (39 R.R. 44-47; *see also* 6 S.H.R. 1430.)  The brutal conditions at Austin State Hospital led to a Texas State legislative investigation in 1970.  (6 S.H.R. 1415.)  The Report of that investigation concluded that abuse, which included the handcuffing of a twelve-year-old deaf female patient to a basketball goalpost for more than twenty-four hours, had occurred at Austin State.  (6 S.H.R. 1433)  Max, understandably, became a very frightened young boy.  (38 R.R. 133.)

Max entered this squalid, inhumane institution on August 14, 1968 when he was only twelve-years old.  (45 R.R. Joint Ex. P-1.)  The admitting physician's diagnosis was "Chronic Brain Syndrome, secondary to toxins with Behavioral Reactions and with Situational reactions." (45 R.R. Joint Ex. P-1.)  The admission summary concluded, among other things, that Max's "[i]ntellectual functioning" was "subnormal," his "[i]ntellectual capacity" was "low average," his "[a]ffective depth" was "low average," and that his "[n]eurological integration" was "low average."  (45 R.R. Joint Ex. P-1.)  To the extent Max received treatment during his time at Austin State it was very risky and age-inappropriate.  In addition to powerful psychotropic

medication, such as Thorazine, Max was also subjected to electric-shock treatment.  (39 R.R. 144-47.)  One doctor described the "treatment" Max received as "sadistic."  (15 S.H.R. 4001.)

In the midst of this horror, Max befriended Richard Laminack, a child-care worker at Austin State during Max's institutionalization.  (39 R.R. 13-14.)  Mr. Laminack first met Max when a fellow child-care worker called him to help restrain Max who was banging his head against the "quiet room" wall.  (39 R.R. 10-11.)  Mr. Laminack found Max bruised, red, scratched, scabbed, tense all over, and crying uncontrollably.  (39 R.R. 11.)

Over time, Max formed a bond with Mr. Laminack.  Max thrived on the positive attention Mr. Laminack gave him.  Just as Max had attempted to please the police officers he admired, he did his best to impress Mr. Laminack.  For example, Mr. Laminack saw that Max worked hard on his schoolwork when he was encouraged.  (39 R.R. 25-26.)  But regardless of how hard Max worked or how much help Mr. Laminack gave him, Max's mental deficits meant that he struggled to complete even basic work aimed at children several years younger than him.  (39 R.R. 26-27.)

(10)    Mr. Soffar's Support Ends.

Max was discharged from Austin State in June 1970 at the age of fourteen.  Although he continued to be seen by psychiatrists, (39 R.R. 109-10, 150), the two years he spent in hospital had done him little good.  Max continued to be hyperactive, impulsive, and attention seeking.  (14 S.H.R. 3646-47.)  Not long after leaving Austin State, Max also left school, having only barely completed the seventh grade.  (14 S.H.R. 3640-41.)

By this time, Max was well known to the police.  The Soffars had called them repeatedly when Max threw a fit, refused to take his medicine or to find him when he ran away from home.  (14 S.H.R. 3646.)  But there were also criminal charges—such as theft, burglary, vandalism, and driving without a license—that led to Max being placed under the supervision of probation

155

officers.   (15 S.H.R. 3744.)   The Chief Probation Officer in Galveston noticed what everyone else in Max's life had noticed:  that he was a very hyperactive boy.  (*Id.*)  Based on his years of experience with children, he believed, correctly, that Max had some organic or neurological problems.  (*Id.*)

In 1971, when Max was sixteen, his probation officer arranged for him to be placed in a boot camp called Boy's Country.  (36 R.R. 77.)  Max stayed there for nine months during which time the effects of his organic brain condition continued to cause him problems.  He would engage in impulsive actions without any apparent pre-planning or consideration of the consequences.  (14 S.H.R. 3627.)  And he continued his habit of telling tall-tales even when the person to whom he was telling them had concrete evidence of their falsity.  (*Id.*) Ultimately, Max was expelled from Boy's Country.  (36 R.R. 87-88.)

A few months after his expulsion, his probation officer sent Max to Gulf Coast Trades Center, a vocational school for troubled teenagers.  (36 R.R. 89-90; 38 R.R. 59.)  The executive director of Gulf Coast testified at the punishment phase of Mr. Soffar's retrial.  (*See* 38 R.R. 59-98.)  He remembered Max well and testified that Mr. Soffar met the screening criteria for admission:  his intelligence quotient was low, he was non-violent, he was not a fire-setter and, at that point, was not taking psychotropic medication.  (38 R.R. 62.)  At Gulf Coast, Max succeeded in the shops and did poorly in the classroom. (38 R.R. 67-69, 79.)  He scored only seventy one on an intelligence test, was found to read at a fifth grade level, and had the vocabulary of a fourth-grader.  (6 S.H.R. 1456.)

Despite the level of supervision at Gulf Coast, Max continued to abuse substances; he sniffed paint, paint thinner, and anything else at hand.  (38 R.R. 71.)  Notably, however, he was never violent.  (38 R.R. 71, 73.)  Max left Gulf Coast on May 1, 1973 when he was eighteen and

went to Maryland to join the Merchant Marines.  (6 S.H.R. 1469.)  He quit after only one day and returned to Texas.

(11)     Mr. Soffar Once Again Turns to the Police for Attention.

By the time Mr. Soffar returned to Texas in 1973, the State had effectively washed its hands of him.  Without any psychiatric or social support, Mr. Soffar reverted back to his old habit of courting the attention of police officers.  Often, the attention Mr. Soffar received was negative.  His life of minor crime led to numerous arrests and convictions.  (*See, e.g.,* 45 R.R. State Ex. P-33.)  Many, if not all, of Mr. Soffar's crimes appear to have been drug-fueled or drug-related.  The range of drugs that Mr. Soffar was abusing in the late 1970s was astounding.  Although his drug of choice was methamphetamine, he also abused, among other things, marijuana, downers, heroin, hallucinogens, preludes, LSD, Orange Sunshine, windowpane, purple microdot, Quaaludes, 714's, and alcohol.  (*See, e.g.,* 39 R.R. 157-58.)

Although Mr. Soffar was arrested numerous times, just as he did when he was a child and teenager, the adult Mr. Soffar appeared to enjoy the attention the police gave him.  He was particularly close to Bruce Clawson, a Sergeant in the Galveston County Sheriff's Department's Organized Crime Task Force.  (4 R.R. 123-24.)  In addition to agreeing to act as an informant for Sergeant Clawson, Mr. Soffar also agreed to help him with undercover operations.  (4 R.R. 117.)  His "ragged Ann"-like appearance meant that it was easy for him to blend in with the criminals that Sergeant Clawson was attempting to catch.  (29 R.R. 100, 133.)  But Mr. Soffar's value really became evident when Mr. Soffar saved Sergeant Clawson's life after his cover was blown during an undercover narcotics purchase.  (40 R.R. 5-6.)

Police officers were well aware of his brain damage, mental health problems, intellectual limitations, drug abuse, impulsiveness, and attention-seeking behavior.  (4 R.R. 89, 96, 119; 29 R.R. 134; 7 S.H.R.1475; 38 R.R. 106.)  Officers also knew that he was eager to please,

impulsive, immature, unable to see into even the near future, had a poor grasp on reality, and did not understand what was going on around him on many occasions. (*See, e.g.,* 4 R.R. 80-81, 119; 29 R.R. 134.) He was, in Sergeant Clawson's opinion, someone who had "fried his brain out" and had the intellectual capacity of a ten- or eleven-year-old. (29 R.R. 134; *see also* 4 R.R. 119; 38 R.R. 106.)

### 2. The Applicable Standard.

The governing standard applicable to ineffective assistance of counsel claims is discussed in Claim for Relief 4. (*See infra* II.C.2 (Claim for Relief 4).)

### 3. Habeas Relief Is Warranted.

Habeas relief is warranted for two reasons: *First*, the Texas court's decision is contrary to well-settled federal law because the test the court adopted for evaluating Mr. Soffar's ineffective assistance of counsel claim flies in the face of *Strickland v. Washington*, 466 U.S. 668 (1984). Had the Texas court articulated the correct standard, it would have concluded that Mr. Soffar's trial counsel were constitutionally ineffective. *Second*, even assuming the Texas court correctly articulated the *Strickland* standard—which it did not—the court's holding is an unreasonable application of that standard. Either way, habeas relief can and should be granted.

> (1) The Test Adopted By The Texas Court Is Inconsistent With That Set Forth In *Strickland v. Washington*, 466 U.S. 668 (1984).

The test the Texas court adopted to evaluate trial counsel's performance bears no relationship to the *Strickland* test. In evaluating Mr. Soffar's ineffective assistance of counsel claim, the Texas court's simply asked whether, in the court's sole opinion, trial counsel's general performance was reasonable. That approach conflicts with *Strickland* in at least three respects.

*First*, the Texas court's approach fails to evaluate sufficiently whether the specific "identified" omission—in this case, trial counsel's failure to investigate and present readily

available and compelling mitigating evidence—was objectively unreasonable.  *Strickland*, 466 U.S. at 690.  Instead, the Texas court evaluated the "totality of the representation."  (33 S.H.R. 8935, 8982.)

> The Court finds, based on a review of the trial and habeas proceedings, that the ***totality of the representation*** afforded the applicant at trial was competent under prevailing professional norms; that the applicant fails to demonstrate that trial counsel was deficient in the representation of the applicant at either phase of trial; and, that the applicant fails to establish that the applicant was harmed on the basis of any alleged deficiency in trial counsel's representation. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(for ineffective assistance of counsel claims, a defendant must meet the standard established in Strickland by showing that "counsel's performance was deficient and that the deficiency prejudiced the defense").

(33 S.H.R. 8935 at F.F. ¶119)  But while the totality of the representation might have some general relevance, in considering the question of effectiveness, courts ***must*** assess whether the ***specific*** identified acts or omissions were objectively unreasonable.  *See Strickland*, 466 U.S. at 686; *United States v. Cronic*, 466 U.S. 648, 659 (1984); *Bell*, 535 U.S. at 697; *Burger*, 483 U.S. at 788; *Darden*, 477 U.S. at 184.  The Texas court did not do so.

*Second*, the Texas court's approach is also contrary to *Strickland* because it focused on trial counsel's actions and not the identified "omissions."  (*See* 33 S.H.R. 8935.)  State courts must do far more than simply evaluate what counsel did.  As the *Strickland* Court explained, in evaluating effectiveness, courts must consider the objective reasonableness of the challenged "acts or omissions."  *Strickland*, 466 U.S. at 690; *Burger*, 483 U.S. at 795; *Kimmelman*, 477 U.S. at 386.  Courts are required, therefore, to evaluate objectively not only all acts of commission but also whether trial counsel's omissions were reasonable.  The Texas court, however, only looked at counsel's actions and not their omissions.

*Lastly*, the test adopted by the Texas court failed to comply with the most fundamental of *Strickland's* requirements:  that courts review counsel's acts and omissions **objectively**.  The objective nature of the Strickland test is well recognized.  *Harrington*, 131 S. Ct. at 790; *see also Frye*, 132 S. Ct. at 1410; *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2011); *Sears*, 130 S. Ct. at 3264; *Smith v. Robins*, 528 U.S. 259, 285 (2000).  Objectivity takes two forms.  The first form of objectively prohibits courts from evaluating counsel's performance based on their own sense of what is prudent or reasonable.  *Cullen*, 131 S. Ct. at 1407.  Instead, courts must evaluate whether counsel's acts and omissions complied with "prevailing professional norms."  *Strickland*, 466 U.S. at 688; *see also Porter*, 130 S. Ct. at 452 53; *Wiggins*, 539 U.S. at 522; *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010); *Rompilla*, 545 U.S. at 383; *Nixon*, 543 U.S. at 192; *Williams*, 529 U.S. at 396; *Roe*, 528 U.S. at 480; *Kimmelman*, 477 U.S. at 385; *Cullen*, 131 S. Ct. at 1407.  The second form of objectivity requires courts to assess critically counsel's reasons, if any, for their conduct.  Although counsel's decisions are entitled to some deference, *Strickland*, 466 U.S. at 521 22, counsel may nonetheless still be found ineffective if their acts and omissions were objectively unreasonable.  *Wiggins*, 539 U.S. at 521 22; *Williams*, 529 U.S., at 396; *cf. Cullen*, 131 S. Ct. at 1406; *Primo*, 131 S. Ct. at 741.

The Texas court did not evaluate trial counsel's performance objectively.  *First*, the court paid mere lip service to the concept of "prevailing professional norms."  While using the court did use that phrase, (*see* 33 S.H.R. 8956), the court made no findings of fact as to what the relevant professional norms were.  Instead, the court found, in a conclusory fashion, that trial counsel's performance was generally "reasonable."  (*Id.*)  In other words, the court evaluated trial counsel's performance in light of its own sense of what was prudent rather than objectively.  Such a test is flatly inconsistent with *Strickland*.  *See Cullen*, 131 S. Ct. at 1407.  The Texas

court's failure to articulate, much less apply, properly the test articulated in *Strickland* means that its findings and conclusions were contrary to clearly established federal law.  This Court can, therefore, grant habeas relief.  28 U.S.C. 2254(d)(1).

(2)     Trial Counsel Were Ineffective.

Not only can habeas relief be granted, it should be granted because the undisputed facts establish that trial counsel failed to comply with prevailing professional norms in investigating and presenting their mitigation case.  As a threshold matter, because the Texas court applied the wrong standard, its findings of fact and conclusions of law with respect to the instant claim for relief are entitled to no deference whatsoever.  *See Int'l Broth. of Elec. Workers v. Mississippi Power & Light Co.*, 442 F.3d 313, 316 (5th Cir. 2006).  This Court should, therefore, consider this claim de novo.

Indeed, the Texas court has left this Court with little option but to conduct a de novo review because it made no findings of fact with respect to crucial elements of the *Strickland* inquiry.  As set forth above, the court made no findings as to what the applicable prevailing professional norms are and, therefore, this Court must identify them itself.  The prevailing professional norms at issue are straightforward and universally recognized:  counsel have a constitutionally mandated obligation to conduct a comprehensive investigation of potentially mitigating evidence and present that evidence in the most compelling light possible.  *See Wiggins*, 539 U.S. at 522 (counsel have an "obligation to conduct a thorough investigation of the defendant's background"); *Williams*, 529 U.S. at 396; *Bell v. Cone*, 535 U.S. 685, 716 (2002) ("performing a mitigation investigation, putting on available mitigation evidence, and making a plea for the defendant's life" is one of the "fundamental duties" of capital representation.) (Stevens, J. dissenting); ABA GUIDELINES, Guideline 1.1, Commentary (obligation to conduct and present comprehensive mitigating evidence); ABA GUIDELINES, Guideline 10.7,

161

Commentary ("Counsel's duty to investigate and present mitigating evidence is now well established."); NLAD GUIDELINES, Guideline 8.1 (counsel's obligation includes "ensur[ing] all reasonably available mitigating and favorable information . . . is presented to the court."); TEXAS GUIDELINES ("counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.); *Porter v. McCollum*, 558 U.S. 30, 39, 130 S. Ct. 447, 452-53 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000)); *Sears v. Upton*, 130 S. Ct. 3259, 3261 (2010) (although defense counsel presented some mitigating evidence, they failed to conduct a constitutionally adequate investigation); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (counsel have a duty to investigate mitigating evidence); *Carty v. Thaler*, 583 F.3d 244, 262-63 (5th Cir. 2009) (referencing a duty to investigate mitigating evidence); *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003) (same); *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (same).  The fact that a defendant—such as Mr. Soffar—pursues an innocence defense does not absolve counsel of that obligation.  (*See* 21 S.H.R. 5463; ABA GUIDELINES, Guideline 10.7; TEXAS GUIDELINES, Guideline 11.7.)  To the contrary, counsel should attempt to ensure that a consistent theory of defense is advanced through the guilt/innocence and punishment phases.  ABA GUIDELINES, Guideline 10.11, Commentary ("During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial.").

As a general matter, a thorough mitigation investigation "requires extensive and generally unparalleled investigation into personal and family history."  ABA GUIDELINES, Guideline 10.7.

The importance of conducting such an extensive investigation means that a mitigation expert is an essential member of a capital trial team.  ABA GUIDELINES, Guideline 1.1, Commentary ("Counsel must promptly obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case"); *see also* ABA GUIDELINES, Guideline 4.1, Commentary ("A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings" and it is "part of the existing 'standard of care in capital cases.'"); TEXAS GUIDELINES, Guidelines 3.1, 10.1, 11.7.  The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases provides an example list of areas that a mitigation expert should consider investigating:

- Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, prenatal and birth trauma, malnutrition, developmental delays, and neurological damage);

- Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

- Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

- Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

- Employment and training history (including skills and performance, and barriers to employability);

- Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA GUIDELINES, Guideline 10.7.  In gathering that evidence, family members and "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others" should be interviewed. (ABA GUIDELINES, Guideline 10.7; *see also* 21 S.H.R. 5453.)  Documents, such as school records, social service and welfare records, juvenile dependency or family court records, medical records, military records, employment records, criminal and correctional records, family birth, marriage, and death records, alcohol and drug abuse assessment or treatment records, and INS records should also be collected.  (ABA GUIDELINES, Guideline 10.7.)  Although locating, retaining, and consulting with expert witnesses is critically important, (ABA GUIDELINES, Guideline 10.11), fact witness testimony is preferred because such witnesses can provide first-hand accounts of the poverty and abuse suffered by a capital defendant and can humanize him or her (ABA GUIDELINES, Guideline 10.11).  And where experts are used, counsel should use specific experts in specific fields and ***not*** rely on a multi-purpose expert.  (ABA GUIDELINES, Guideline 10.11.)

The goal of the mitigation investigation is simple:  to gather evidence that will, at a minimum, allow trial counsel to:  (1) portray the defendant as a human being with positive qualities, (2) show that the defendant's crime is understandable in light of his past history such that he is not solely responsible for his actions, and (3) rebut other crimes and circumstances that the prosecutor might introduce.  (21 S.H.R. 5462.)  Presenting positive evidence of a defendant's character and acts is essential to refuting the prosecutor's thoroughly and one-sidely evil portrayal of the defendant.  (21 S.H.R. 5463.)  However, mitigation evidence must be part of a cohesive narrative and not merely a string of events.  (*See, e.g.,* ABA GUIDELINES, Guideline 10.11 (Commentary) ("it is critically important to construct a persuasive narrative, rather than to

simply present a catalog of seemingly unrelated mitigating factors."); 15 S.H.R. 3917.) Explaining how the mitigating factors relate to the crime for which the accused has been convicted is a prevailing professional norm of capital representation. (*See, e.g.,* ABA GUIDELINES, Guideline 1.1 (Commentary) ("Nor will the presentation be persuasive unless it . . . links the client's behavior to the evidence offered in mitigation.")

In Mr. Soffar's case, trial counsel failed to achieve those goals because they disregarded almost all of the basic, prevailing professional norms of capital representation. Indeed, Kathryn Kase, Mr. Soffar's principal trial counsel, has ***admitted*** that the defense team had not prepared adequately a strategy for the punishment phase and were "stunned by the guilty verdict." (26 S.H.R. 6831.) They were so unprepared that they had not even drafted an opening statement or readied their witnesses. (26 S.H.R. 6838.) Their mitigation specialist averaged only sixteen hours of work during the preparation and trial phases, a number that Janet Vogelsang—a clinical social worker with twenty seven years of experience as a mitigation expert—has attested is "exceptionally low." (15 S.H.R. 3817.) And, unbeknownst to Ms. Kase when she agreed to take on Mr. Soffar's case, the defense team's most experienced capital trial attorney—Stanley Schneider—was unable to participate in the majority of the punishment phase due to a personal conflict. (26 S.H.R. 6838.) This comedy of errors meant that Ms. Kase, who had never represented a client in the punishment phase of a capital trial, had two hours to prepare her entire opening statement and a "rudimentary PowerPoint presentation" and then fight for a man's life without a fully refined theory of the case. (*Id.*) Ms. Kase and her co-counsel's conduct flies in the face of their obligation to prepare a mitigation case despite their belief in Mr. Soffar's innocence. (*See* 21 S.H.R. 5463; ABA GUIDELINES, Guideline 10.7; TEXAS GUIDELINES, Guideline 11.7.)

Trial counsel's disregard for their professional obligations began, however, long before the guilty verdict. As Professor Sean O'Brien, a nationally recognized expert in death penalty litigation, has opined, trial counsel's mitigation investigation, and ultimately their presentation, was defective in at least three areas: (1) trial counsel did not uncover and present evidence of maltreatment and neglect during Mr. Soffar's childhood, (2) trial counsel did not adequately develop evidence of Mr. Soffar's developmental disabilities and mental impairments, and (3) trial counsel did not uncover and present evidence of Mr. Soffar's positive, humanizing qualities. (21 S.H.R. 5464-69.) In addition, trial counsel failed to package adequately that evidence into a compelling narrative in favor of life and not death. (15 S.H.R. 3975.) As Professor O'Brien puts it, and as explained more fully below, "there is no good justification for failing to interview these witnesses and present this evidence" and trial counsel's "failure to do so is deficient performance." (21 S.H.R. 5466.)

(3)     Childhood Maltreatment And Neglect

Trial counsel called a handful of witnesses who testified about certain aspects of Mr. Soffar's developmental history, including his hyperactivity, disciplinary problems, and parental inaptitude. (15 S.H.R. 5449-52.) That evidence and its presentation was woefully inadequate. (15 S.H.R. 3962-67.) For the most part, the evidence was introduced through a "multi-purpose" expert, Dr. Susan Stone, who could not answer basic questions about Mr. Soffar's life nor provide concrete, personally experienced examples to illustrate just how abusive and neglectful Mr. Soffar's childhood was. (*See* 39 R.R. 170, 180, 183-86; 15 S.H.R. 3962-63.) Dr. Stone is a classic example of why the use of a multi-purpose expert is contrary to prevailing professional norms. (ABA GUIDELINES, Guideline 10.11.)

What trial counsel could—and should—have done is locate and present evidence from the numerous fact witnesses who were actually present when Mr. Soffar was being neglected and

166

abused and could have recounted specific instances of such maltreatment.  (ABA GUIDELINES, Guideline 10.11 (a proper mitigation presentation involves calling fact witnesses with personal experience of the defendant's childhood mistreatment).  Just by way of a handful of examples, trial counsel could have called the following witnesses:

- **Carl Amdur**:  Carl Amdur is Mr. Soffar's uncle.   (14 S.H.R. 3611.)  Based on personal observations, he was of the view that Mr. Soffar's father "did not seem comfortable with Max or interested in him."  (14 S.H.R. 3613.)  For example, Mr. Soffar's parents could not even put him to bed without the assistance of a neighbor who would physically restrain him.  (14 S.H.R. 3611.)  He also observed Mr. Soffar's developmental problems, including his inability to tie his shoelaces until he was eleven or twelve.  (14 S.H.R.3612.)

- **Reneea Amdur**:  Ms. Amdur is Mr. Soffar's aunt-in-law.  (14 S.H.R. 3617.)  Like her husband, she observed Mr. Soffar's parents' lack of care, including Mr. Soffar's father's willingness to let his son drink beer when he was only one year old.  (14 S.H.R. 3618.)  She would also have told the jury how angry she was about the way Mr. Soffar's caretakers beat and abused him.  (14 S.H.R. 3617-18.)  And she could have described the decrepit state of the Soffars' home including the numerous filing cabinets that lined the walls and the gaps between the concrete blocks that let in shafts of light.  (14 S.H.R. 3618.)

- **William Amdur**:   William Amdur is Mr. Soffar's uncle.   (14 S.H.R. 3621.)  Mr. Amdur could have painted a vivid picture of Mr. Soffar's "horrible physical home environment."  (14 S.H.R. 3622.)  He would have told the jury that everything in the house—including the floor—needed replaced or repaired and that there was no living space because of Mrs. Soffar's filing cabinets.  (*Id.*)  He also witnessed the abuse Mr. Soffar suffered.  For example, he could have recounted just how much Mr. Soffar feared the beatings that his babysitter administered to him.  (14 S.H.R. 3621.)   And he could have provided a concrete example of Mr. Soffar's self-mutilation, having "frequently [seen] Max beat[ing] his head" when he was four to six years old.  (*Id.*)

- **Betty Chappee**:  Ms. Chappee was Mr. Soffar's fourth grade teacher.  (14 S.H.R. 3673.)  In her professional opinion, Mr. Soffar had "severe intellectual, psychological and emotional deficits" that were "compounded by the lack of an adequately structure and nurturing home environment and by the lack of professional medical, psychological and educational attention addressing his special needs."  (14 S.H.R. 3674.)  "Max was the most disturbed child [she] had ever encountered in a school setting."  (14 S.H.R. 3674.)  Mr. Soffar would stab his hand with a pencil and his inability to interact properly with other children such that he "had no friends."  (14 S.H.R. 3675.)  Although Ms. Chappee was aware that Mr. Soffar's parents had been told about his special needs, they did nothing to get him help.  (14 S.H.R. 3675.)

- **Joy Senter**: Ms. Senter was Mr. Soffar's teacher when he was fifteen years old. (15 S.H.R. 3883.) Based on her experience as a teacher, Ms. Senter believed that Mr. Soffar's emotional, psychological, and intellectual deficits had been compounded by the lack of structure at home and appropriate attention at school. (15 S.H.R. 3883.) From her personal observations, Mr. Soffar's "parents could not and did not care for [Max]." (15 S.H.R.3885.)

- **Jessie Silber**: Ms. Silber was a neighbor of the Soffars when Mr. Soffar was approximately twelve years old. (15 S.H.R. 3889.) She could have recounted how Mr. Soffar told her that he had ran away from Austin State Hospital because he was being raped. (15 S.H.R. 3891.) Austin State was not the only thing of which Mr. Soffar was afraid; Ms. Silber recalled that Mr. Soffar would sleep in her treehouse to get away from his father. (15 S.H.R. 3890.) On one occasion, she observed Mr. Soffar being restrained by his mother and sister while his father beat him. (15 S.H.R. 3890.) In addition to being exposed to violence, the Soffars did not care properly for Mr. Soffar. (15 S.H.R. 3890.) That lack of care included failing to provide proper food for Mr. Soffar and the "pig-sty" nature of the Soffars' house. (15 S.H.R. 3890.) Based on her personal observations, Ms. Silber felt that Mr. Soffar's mother was not a loving person and treated Mr. Soffar as though he were a disgrace. (15 S.H.R. 3890.) By contrast, when Ms. Silber praised him, Mr. Soffar was "elated" and "beamed like no one had ever told him they liked him." (15 S.H.R. 3891.) Mr. Soffar was not, in Ms. Silber's experience, violent; to the contrary, he had a "good sense of humor" and would take an interest in what was happening in the world. (15 S.H.R. 3891.)

- **Dora Soffar**: Dora Soffar is Mr. Soffar's aunt. (15 S.H.R. 3895.) She regularly visited the Soffars when Mr. Soffar was a child. (15 S.H.R. 3895.) She could have corroborated the fact that Mrs. Soffar fed Mr. Soffar Phenobarbital when he was a baby and did so as many as three to four times a night. (15 S.H.R. 3895.) She could also have told the jury about how, while Mr. Soffar found it hard to relate to other children, he found enjoyment in outdoor activities such as fishing. (15 S.H.R. 3896.) Based on her personal observations, Dora Soffar could also have told the jury about how Mr. Soffar's innate problems were aggravated by his parent's neglect, their complete lack of discipline, and their inability to properly care for a special-needs child. (15 S.H.R. 3896.) Reflecting that lack of care, Dora Soffar saw that Mr. Soffar's parents "never cleaned" their house. (15 S.H.R. 3897.) She also knew that when Mr. Soffar was disciplined, that discipline was abusive. (15 S.H.R. 3898.) By way of just one example, Dora Soffar recalled that Mr. Soffar was "terrified" of a man named "Junior" who lived behind the Soffars' house. (15 S.H.R. 3898.) When Mr. Soffar misbehaved, his father would call out Junior's name and Mr. Soffar would hide in a corner deathly scared, a reaction that George Soffar found funny. (15 S.H.R. 3898.)

- **Jackie Soffar**: Jackie Soffar is Mr. Soffar's sister. (14 S.H.R. 3635.) Although she was called to testify, trial counsel inexplicably failed to ask her details about the brutal beatings Mr. Soffar sustained at the hands of their father. (14 S.H.R. 3643.) Indeed, Jackie Soffar described her father beating Max "as if to kill him." (14 S.H.R.

3643.)  Nor did trial counsel ask Jackie Soffar about Mr. Soffar's self-harming.  (14 S.H.R. 3651.)  Had she been asked, she would have testified that Mr. Soffar would "mak[e] his hands bleed by jabbing himself with a pencil" and that he would "burn[] himself."  (14 S.H.R. 3640.)

- **Mary Ward**:  Ms. Ward was Mr. Soffar's fifth grade teacher.  (15 S.H.R. 3979.)  She observed how Mr. Soffar was isolated and alienated himself because of his disturbed behavior.  (15 S.H.R. 3980.)  Just like Ms. Senter, Ms. Ward also believed that the school system failed Mr. Soffar.  (15 S.H.R. 3980.)

- **Mitch Wright:**  Mr. Wright was the Chief of Police in Friendswood when Mr. Soffar was eight or nine years old.  (15 S.H.R. 3988.)  Although Mr. Wright would have testified about some of Mr. Soffar's childhood misconduct, he would also have testified that in his professional opinion, Mr. Soffar's misbehavior was a product of his "serious[] mentally ill[ness]."  (15 S.H.R. 3989-98.)  His disabilities were compounded by his parents neglect and inability to properly discipline him.  (15 S.H.R. 4003.)  Although Mr. Wright urged Mr. Soffar's parents to get help, they ignored that advice.  (15 S.H.R. 4002.)

Trial counsel had affidavits from each of these witnesses in their possession prior to the commencement of Mr. Soffar's retrial but inexplicably failed to call the witnesses or, in the case of Jackie Soffar elicit the helpful testimony in it.  (14 S.H.R. 3617.)

Similarly inexplicable is trial counsel's failure to call relevant expert witnesses. Although fact witnesses are critical to a proper mitigation presentation, ABA GUIDELINES, Guideline 10.11, expert witnesses could—and would—have provided additional evidence of childhood neglect and abuse.   For example, when Professor Jonathan Pincus examined Mr. Soffar in connection with these proceedings he found scares all over his body that "bespeak a violent past and abuse."  (15 S.H.R. 3867.)  When Dr. I. Bruce Frumkin met with Mr. Soffar, he noted that Mr. Soffar reported a history of sexual abuse in Austin State Hospital including Mr. Soffar's recollection of having to perform oral sex on staff members more than forty times. (15 S.H.R. 3749.)  Experts with similar—if not identical—qualifications to those of Professor Pincus and Dr. Frumkin were obviously available at the time of Mr. Soffar's retrial.

(4)     Evidence Of Developmental Disabilities And Mental Impairments.

Trial counsel also failed to develop adequately evidence of Mr. Soffar's developmental disabilities and mental impairments.  (21 S.H.R. 5462-67.)  The investigation and presentation of such evidence is an integral part of a proper mitigation case.  *Sears v. Upton*, 130 S. Ct. 3259, 3267 (2010) (counsel were ineffective in failing to investigate and present mental health evidence); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (same); *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (same); *see also* 21 S.H.R.5462-67; ABA GUIDELINES, Guideline 4.1 (Commentary) ("mental health experts are essential to defending capital cases."); TEXAS GUIDELINES, Guideline 11.1 (preparation for punishment phase involves "[d]evelopment of expert witnesses on mental health issues, if any."), Guideline 11.7 (need for expert and lay witnesses to testify regarding "the client's mental and/or emotional state and life history that may explain or lessen the client's culpability".)  Here, trial counsel failed to satisfy those professional standards.   They did not even have Mr. Soffar evaluated by ***any*** psychiatrist, neurologist, psychologist, or other medical or mental health care professional.   (26 S.H.R. 6824, 6832.) Although trial counsel have sought to explain away that failure by claiming that a consulting expert examination exposes the defendant to a state sponsored examination.   (26 S.H.R. 6832-33.)  That, however, is flat wrong as a matter of law.  *See Lagrone v. State*, 942 S.W.2d 602 (1997) (consulting expert's examination of defendant permits a state sponsored examination but results ***only*** provided to the state if defense proffers its own expert report). Because a misreading of the law can never be strategic, trial counsel had no valid strategic reason for their failure to engage appropriate expert assistance.

The approach that trial counsel did take was, at best, anemic and, at worst, counter-productive.  (21 S.H.R. 5470.)  As the Supreme Court has recognized, there is a risk that jurors treat some mitigating developmental disabilities and mental impairments as aggravating

factors (particularly with respect to the issue of future dangerousness). *See, e.g., Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (jurors can perceive mental retardation as aggravating). It is self-evident that the risk of such confusion is heightened where, as here, the prosecution alleges that the defendant himself was the cause of his impairments. Indeed, in the instant case, the prosecution used ***defense*** witnesses to paint Mr. Soffar as a bad person whose impairments were caused by his own substance abuse rather than factors beyond his control, such as his mother's abuse of alcohol and drugs or other congenital causes. (*See, e.g.,* 38 R.R. 111; 39 R.R. 117, 183-84, 188, 191, 196; 21 S.H.R. 5449-52.)

A proper investigation of Mr. Soffar's mental impairments would not have been difficult or costly because much of the evidence was already in trial counsel's hands having been gathered in connection with Mr. Soffar's prior habeas proceedings. (15 S.H.R. 3789, 3823.) Additional expert assistance would have been easy to obtain. (28 S.H.R. 7362.) For example, trial counsel could have called the following experts:

- **Dr. James Merikangas**: Dr. Merikangas submitted an affidavit in connection with Mr. Soffar's prior habeas proceedings and testified at an evidentiary hearing held in connection with them. (15 S.H.R. 3789.) Trial counsel had access to, and read, that affidavit and testimony. (26 S.H.R. 6830.)

  - Qualifications: Dr. Merikangas is a neurologist, neuropsychiatrist, and psychiatrist in private practice. (15 S.H.R. 3789.)

  - Opinion: If he had been called to testify at Mr. Soffar's trial, he would have testified that (a) Mr. Soffar's brain is "distinctly abnormal," (b) the damage to his brain is "global and diffuse," (c) there are indicators of congenital organic brain damage and subsequent brain damage caused by toxins, (d) the brain abnormalities are not consistent with someone who is only a chronic drug or alcohol abuser, and (e) "all of his mental functions are affected to one degree or another by the damage. (15 S.H.R. 3791-96 [Merikangas Aff.].)

  - Basis for Opinion: His opinions are based on his personal examination of Mr. Soffar, the results of tests conducted at his direction (including a SPECT scan), the results of tests performed by other experts, and his review of relevant documents. (15 S.H.R. 3789-94 [Merikangas Trans. at 111-27, 136-38].)

- **Dr. David Nelson**: Dr. Nelson submitted an affidavit in connection with Mr. Soffar's prior habeas proceedings and testified at an evidentiary hearing held in connection with them. (15 S.H.R. 3823.) Trial counsel had access to, and read, that affidavit and testimony. (26 S.H.R. 6830 [Kase Aff.].)

  - Qualifications: Dr. Nelson is a neuropsychologist. (15 S.H.R. 3823, 3834 [Nelson Aff.].)

  - Opinion: If he had been called at Mr. Soffar's trial, he would have testified that (a) Mr. Soffar suffers from "substantial permanent organic brain damage, (b) his brain damage is reflected in a "diffuse, general decline in functioning and in multiple focal areas, (c) the results of an I.Q. test show that Mr. Soffar is "in the borderline intellectually deficient range," and (d) that the brain damage is consistent with having between sustained at birth. (15 S.H.R. 3823-24 [Nelson Aff.]; Nelson Tr. at 158, 162-63].)

  - Basis for Opinion: His opinions are based on his personal examination of Mr. Soffar, the results of tests performed by him, and his review of relevant records. (15 S.H.R. 3823 [Nelson Aff.]; [Nelson Tr. at 150, 152-53, 156-58.)

- **Dr. Herbert Modlin**: Dr. Modlin submitted an affidavit in connection with Mr. Soffar's prior habeas proceedings and testified at an evidentiary hearing held in connection with them. Trial counsel had access to, and read, that affidavit and testimony. (26 S.H.R. 6830.)

  - Qualifications: Dr. Modlin is a forensic psychiatrist. [Modlin Tr. at 155].)

  - Opinion: If he had been called to testify at Mr. Soffar's trial, he would have testified that (a) Mr. Soffar was a disabled child since birth with a physical disorder of the brain, (b) he had something wrong with him ever since he was a child, (c) his toxin intake was an attempt to self-medicate, and (d) Mr. Soffar likely had attention deficit hyperactivity disorder.

  - Basis for Opinion: His opinions are based on his personal examination of Mr. Soffar, a review of relevant documents, and other expert reports. [Modlin Tr. at 164-71.].)

- **Professor Jonathan Pincus**: Professor Pincus submitted an affidavit in connection with Mr. Soffar's most recent state habeas proceedings. (15 S.H.R.3859.) Professor Pincus would have testified in connection with those proceedings but the court repeatedly denied Mr. Soffar's request for an evidentiary hearing. (*See* 30 S.H.R. 7987 [denial orders].) Although trial counsel did not have the benefit of Professor Pincus's opinions they could easily have retained him or an expert with similar qualifications.

  - Qualifications: Professor Pincus is a neurologist. (15 S.H.R. 3859 [Pincus Aff.].) He is Chairman Emeritus of Neurology at Georgetown University and

Chief of Neurology at the Veterans Administration Medical Center, both in D.C.

- <u>Opinion</u>:  If he had been called to testify at Mr. Soffar's trial, he would have testified that (a) Mr. Soffar suffers from, among other things, brain damage and bipolar disorder, and (b) his brain damage involves, at least, frontal lobe damage that was likely sustained at birth or during the prenatal period and caused by material alcohol or drug use.  (15 S.H.R. 3868-69 [Pincus Aff.].)

- <u>Basis for Opinion</u>:  His opinions are based on his personal examination or Mr. Soffar, the results of testing performed by him, and a review of relevant documents. (15 S.H.R. 3860, 3864 [Pincus Aff.].)

- **Dr. Michael Gelbort**:   Dr. Gelbort submitted an affidavit in connection with Mr. Soffar's most recent state habeas proceedings.  (15 S.H.R. 3775.)  Dr. Gelbort would have testified in connection with those proceedings but the court repeatedly denied Mr. Soffar's request for an evidentiary hearing.  Although trial counsel did not have the benefit of Dr. Gelbort's opinions they could easily have retained him or an expert with similar qualifications.

  - <u>Qualifications</u>:  Dr. Gelbort is a neuropsychologist.  (15 S.H.R. 3775.)

  - <u>Opinion</u>:  If he had been called to testify at Mr. Soffar's trial, he would have testified that (a) Mr. Soffar has low average intellectual abilities, and (b) he has neurocognitive impairments and dysfunction attributable to anteriorly located areas of the brain (15 S.H.R. 3776-79 [Gelbort Aff.].)

  - <u>Basis for Opinion</u>:  His opinions are based on his review of relevant records and his personal examination of Mr. Soffar. (15 S.H.R. 3776 [Gelbort Aff.].)

- **Dr. Paul Connor**:  Dr. Connor submitted an affidavit in connection with Mr. Soffar's most recent state habeas proceedings.  (28 S.H.R. 7362.)  Dr. Connor would have testified in connection with those proceedings but the court repeatedly denied Mr. Soffar's request for an evidentiary hearing.  (*See* 30 S.H.R. 7987 [denial orders].)  Although trial counsel did not have the benefit of Dr. Connor's opinions they could easily have retained him or an expert with similar qualifications.

  - <u>Qualifications</u>:  Dr. Connor is a psychologist and a member of the Department of Psychiatry and Behavioral Sciences' Fetal Alcohol and Drug Unit at the University of Washington.  (28 S.H.R. 7362.)

  - <u>Opinion</u>:  If he had been called to testify at Mr. Soffar's trial, he would have testified that Mr. Soffar "evidences a complex pattern of behavior and cognitive abnormalities that is consistent with guidelines for the diagnosis of Fetal Alcohol Spectrum Disorders."  (28 S.H.R. 7380.)

- Basis for Opinion:  His opinions are based on his review of other expert reports, relevant documents, and his personal examination of Mr. Soffar. (28 S.H.R. 7369-72.)

Those expert's opinions would have been bolstered by evidence from fact witnesses.  For example, trial counsel could have called the following:

- **Carl Amdur**:  Mr. Amdur would have testified that Mr. Soffar "was not a normal child and this was clear from the beginning."  (14 S.H.R. 3611.)  He was "physically uncoordinated, abdnormally so" and "could not tie his shoelaces until he was about eleven or twelve."  (14 S.H.R. 3612.)

- **Renee Amdur**:  Ms. Amdur would have testified that Mr. Soffar's grandmother always said "something's wrong with that child."  (14 S.H.R. 3617.)  She would also have testified that, based on her personal observations, "Max was learning disabled."  (14 S.H.R. 3619.)

- **Betty Chappee**:  Ms. Chappee would have testified that, based on her experience working with children, Mr. Soffar had "innate difficulties" that included "[s]evere intellectual, psychological and emotional-deficits."  (14 S.H.R. 3674.)

- **Jessie Silber**:  Ms. Silber would have testified that, based on her observations, "Max came into this world with built-in defects due to a chemical imbalance of some sort." (15 S.H.R. 3889.)

Trial counsel's failure to develop and present this evidence is inexplicable because they were on clear notice that Mr. Soffar suffers from significant cognitive impairments.  (*See* 26 S.H.R. 6831-32.)   Being aware of relevant and helpful lines of inquiry but simply ignoring them is classic ineffectiveness.  *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 531 (2003) (counsel were ineffective in limiting their mitigation investigation where relevant lines of inquiry were obvious).

(5)     Positive Humanizing Qualities.

It is universally acknowledged that a central goal of an effective mitigation case is to show that the defendant is not inherently evil and, instead, is a human being with positive qualities.  *See, e.g., Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).  To do so, competent capital counsel use family and friends to testify anecdotally about positive incidents in a defendant's

life.  (21 S.H.R. 5467.)  Although Mr. Soffar's trial counsel attempted to do so, they failed to put

on powerful humanizing evidence that was already in their possession.  For example, trial

counsel could have called the following witnesses:

- **Reneea Amdur**:  Ms. Amdur would have told the jury about Mr. Soffar's reaction to learning that his mother had fallen ill while he was in prison and how concerned he was for her.  (14 S.H.R. 3619.)

- **Betty Chappee**:  Ms. Chappee would have testified that, although Mr. Soffar was a problem at school, he would pay attention and focus when he worked with her directly and would try to overcome his inate problems but simply could not do so.  (14 S.H.R. 3676.)

- **Joy Senter**:  Ms. Senter would have testified that Mr. Soffar responded well to attention in her class room so much so that he was "less disruptive than other kids" and "not a discipline problem."  (15 S.H.R. 3884.)  In her view, he did so because she "liked him and did not judge him."  (15 S.H.R. 3884.)  She felt that Mr. Soffar was vulnerable and that she connected with him.  (15 S.H.R. 3886.)

- **Jessie Silber**:  Ms. Silber knew Mr. Soffar "very well" when he was a child.  (15 S.H.R.3889.)  She would have told the jury that Mr. Soffar—despite his very deprived and abusive upbringing—had an inner desire to please and conform.  (15 S.H.R. 3890-91.)  He tried as a child to be social in his own way by participating in neighbourhood activities.  (15 S.H.R. 3890.)  He "had a way of trying to relate to people and trying to get people to like him."  (15 S.H.R. 3890.)  Indeed, she "always liked Max in spite of being disturbed and mentally deficient."  (15 S.H.R. 3890.)  He would help her with chores.  (15 S.H.R. 3891.)  By way of one example, she could have told the jury about a time in which she expressly told Mr. Soffar that she "already liked him" and how Mr. Soffar was "elated" and "beemed like no one had ever told him they liked him."  (15 S.H.R. 3891.)  She could also have told the jury about a time in which Mr. Soffar was taken to a party by another neighbour and how he was so proud having gotten cleaned and dressed up.  (15 S.H.R. 3891.)  In her view, Mr. Soffar had a "good sence of humor" and was "interested in what was happening in the world."  (15 S.H.R. 3891.)

- **Dora Soffar**:  Dora Soffar would have told the jury that, as a child, Mr. Soffar loved the outdoors and fishing.  (15 S.H.R. 3896.)  She would also have explained how Mr. Soffar would respond to specific rules and commands and that she never had any problems dealing with him when his parents were not present.  (15 S.H.R. 3897.)

Taken together, this expert and fact evidence would have presented a compelling,

humanizing narrative.  (21 S.H.R. 5467-69 [O'Brien Aff.].)

175

(6)      Mr. Soffar Was Prejudiced By His Trial Counsel's Ineffectiveness.

Given the power of the mitigating evidence that was not presented at trial, there is clearly a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694. A verdict only weakly supported by the record is more likely to have been affected by the errors. *Strickland*, 466 U.S. at 694.

Here, although the convicting court entered findings of fact and conclusions of law, it did **not** enter any adequate findings with respect to prejudice.  (*See* 33 S.H.R. 8903.)   Indeed, with the exception of Mr. Soffar's inadmissible statement about a rape, the Texas court did not describe one shred of evidence to contradict the mitigating evidence.  (*Id.*)  Instead, the court made the vague finding that "trial counsel presented testimony and evidence from sixteen witnesses at punishment, including family members, a mental health expert, and individuals who had contact with the applicant throughout all phases of his life."  And the court backed up that finding with the conclusory statement "that the applicant fails to establish that the presentation of the mitigating evidence proposed in the instant habeas proceeding would have been any more effective than that elected by counsel at trial."  (*Id.*)  That is not sufficient under *Strickland*.

The fact that the State did not propose findings of fact detailing the supposed aggravating factors is unsurprising since the evidence is pitifully weak.  As a threshold matter, the evidence concerning a rape and the "victim impact" testimony of Ms. Moebius should not have been admitted and, therefore, should not be considered in evaluating whether Mr. Soffar was prejudiced by his trial counsel's failure to present mitigating evidence.  (*See infra* at IV.B, IV.D.) Excluding that evidence, the following constituted the state's entire punishment phase case: *First*, the state introduced evidence of past misconduct.  (*See infra* at IV.B.)   But of that

176

misconduct, the state's evidence of historic violence amounted to four events that occurred when Mr. Soffar was a child, four adult misdemeanor convictions, and five violations of prison rules for which he was never prosecuted and which occurred approximately a decade before his retrial. (*Id*.)   Although the state questioned witnesses about other acts of supposed violence—such as Mr. Soffar supposedly breaking his sister's arm—no evidence was introduced that those acts occurred or, if they did, that they were motivated by malice.  (36 R.R. 47.)  Although a jury may believe otherwise, a prosecutor's question is not evidence.  *See U.S. v. Carter*, 953 F.2d 1449, 1457 (5th Cir. 1992) (approving a curative instruction that the prosecutor's questions were not evidence).

*Second*, the state did, however, manage to elicit certain evidence regarding negative aspects of Mr. Soffar's character.  For example, the state introduced testimony from Mr. Soffar's mother to the effect that she saw him inflicting pain on animals, mistreated people in a fit of temper, struck his father once, and would throw bottles at the wall or inanimate objects.  (36 R.R. 48-49, 53; *see also* 37 R.R. 145-46.)   At the same time, however, she also testified that Mr. Soffar could control his violence and that he never threw objects at people.  Mr. Soffar's sister concurred, rejecting the idea that Mr. Soffar was aggressive towards his parents, other children, or animals.  (38 R.R. 147-49.)

*Third*, other aspects of Mr. Soffar's character and background that the state claimed were aggravating are, in fact, inherently mitigating.  Those characteristics include his drug abuse, his psychiatric treatment, his adoption, his problems at and expulsion from school and his placement in residential programs.  *See United States v. Caro*, 597 F.3d 608, 644 (4th Cir. 2010) ("[a] defendant's history of drug abuse is classic mitigating evidence, which the Supreme Court has held a jury must be able to consider and give effect to when sentencing a defendant.") (citing

*Cone v. Bell*, 129 S. Ct. 1769 (2009)); *Smith v. Mahoney*, 611 F.3d 978, 987 88 (9th Cir. 2010) (finding trial counsel ineffective for failing to investigate a defendant's history of drug abuse); *Tennard v. Dretke*, 542 U.S. 274 (2004) (granting habeas relief where counsel failed to present evidence of the defendant's mental impairments) (citing *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)); *Winston v. Kelly*, 592 F.3d 535, 565 (4th Cir. 2010) (noting that "evidence of mental deficiencies is certainly mitigating"); *Gardner v. Galetka*, 2:95-CV-846TC, 2003 WL 25513130 (D. Utah Aug. 3, 2003) ("the startling lack of supervision and appropriate discipline he received from his parents" was a mitigating factor), *adopted as modified*, 2:95-CV-846-TC, 2007 WL 1071400 (D. Utah Apr. 5, 2007), *aff'd*, 568 F.3d 862 (10th Cir. 2009); *Merck v. State*, SC10-1830, 2013 WL 264437 (Fla. Jan. 24, 2013) (lack of parental role model was a mitigating factor); *Seibert v. State*, 923 So. 2d 460, 466 n.3 (Fla. 2006) (adoption is a nonstatutory mitigating factor); *State v. Banks*, 271 S.W.3d 90, 162 (Tenn. 2008) (parents' failure to provide adequate support was mitigating); *Williams v. Cain*, 125 F.3d 269, 279 (5th Cir. 1997); *United States v. Basham*, 561 F.3d 302, 315 (4th Cir. 2009) (placement "into youth homes following his expulsion from school" was mitigating); *State v. Bies*, 658 N.E.2d 754, 761 (1996) (expulsion from school due to disruptive behavior was mitigating).  Similarly, evidence of Mr. Soffar's non-criminal juvenile misconduct such as running away from home and his adjudication as a delinquent, (*see, e.g.,* 36 R.R. 71-72, 74, 76), cannot be aggravating given the Supreme Court's repeated holding that "[e]vidence of youth . . . has special relevance to the question of future dangerousness" because it is inherently ***mitigating***.  *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261 (2007); *see also Brewer v. Quarterman*, 550 U.S. 286, 127 S. Ct. 1706, 1724 (2007) (referencing "the mitigating factor of youth") (Scalia, J., dissenting); *Graham v. Collins*, 506 U.S. 461, 478 (1993) (youth is a mitigating factor); *Eddings v. Oklahoma*, 455 U.S. 104, 115-16

(1982) (same); *Pierce v. Thaler*, 604 F.3d 197, 207 (5th Cir. 2010) ("[U]nder clearly established Federal law, the future dangerousness special issue provided a meaningful basis for the jury to consider and give effect to [the defendant's] youth"); *Ex Parte Davis*, 866 S.W.2d 234, 238 (Tex. Crim. App. 1993) ("[J]urors must be empowered to consider the mitigating impact of youth as it bears upon the special issues, especially future dangerousness."). As such, this evidence does not strengthen the state's case; it weakens it as a matter of law.

*Lastly*, the state introduced victim impact testimony from Ms. Felsher's sister, Jackie Bryant. (40 R.R. 47-58.) She explained that Ms. Flesher was the youngest of five sisters and was seventeen when she died. (40 R.R. 47-48.) The state introduced a picture depicting her sisters, her mother, and her grandmother. (40 R.R. 48:14-22.) Ms. Bryant described Ms. Felshers beautiful brown eyes and their strong Christian family. (40 R.R. 52-54.) She told the jury that Ms. Felsher decided to switch high schools to get away from violence and drug use and how she "blossomed" at her new schol, making friends and joining a church group. (40 R.R. 51-52.) The last time Ms. Bryant saw her sister prior to her death was on July 12, 1980 when she gave Ms. Flesher a T-shirt. (40 R.R. 54-55.) The death of her sister had a traumatic effect on her family as her mother went to her grave wishing that she could have told Ms. Felsher that she loved her and that her sisters realized that Ms. Felsher would not have the opportunity to marry and have children. (40 R.R. 55-56.)

On the other side of the equation, some mitigating evidence was presented. *First*, the defense presented some limited evidence of Mr. Soffar's brain damage and psychiatric treatment, including evidence that he began receiving treatment in early childhood. (*See, e.g.,* 36 R.R. 41-42; 38 104-106, 111, 121-22, 133, 153, 160-61.) That evidence included a general description of the conditions at Austin State Hospital—including the presence of cockroaches,

the use of a "quiet room", and inhumane treatment of children—and Mr. Soffar's bond with certain staff members.  (*See, e.g.,* 36 R.R. 42; 38 R.R. 48-58; 39 R.R. 4-57; *see also* 38 R.R. 132-33.)   It also included evidence that Mr. Soffar had seen a plethora of psychiatrists throughout his formative years.  (*See, e.g.,* 35 R.R. 43-46.)

*Second*, trial counsel elicited testimony regarding Mr. Soffar's extensive substance abuse and, in particular, the fact that it began in very early childhood.  (*See, e.g.,* 36 R.R. 46, 70-74, 76, 93; 38 R.R. 106, 129-31.)  Substance abuse is a constitutionally mitigating factor.  *See Caro*, 597 F.3d at 644 (citing *Cone v. Bell*, 129 S. Ct. 1769 (2009)).   But rather than present it in a mitigating light, the state was able to effectively recast that evidence as aggravating.

*Third*, the jury heard a limited amount of evidence of Mr. Soffar's parental ineptitude, neglect, and abuse.  (*See, e.g.,*  38 R.R. 16-18.)  For example, Mr. Soffar's cousin testified that he saw no discipline in the house.  (38 R.R. 20:6-24.)  But the value of that testimony was neutered by the fact Mr. Soffar's cousin did not visit Mr. Soffar's family very often.  (38 R.R. 29.)  Two witnesses described the poor physical living conditions.  (38 R.R. 21-23.)  And Mr. Soffar's sister testified concerning the violence that was inflicted on Mr. Soffar by his father and their babysitter.  (*See, e.g.,* 38 R.R. 160.)

*Fourth*, some witnesses generally described their impression of Mr. Soffar as a child and young adult.  For example, Mr. Soffar's cousin described him as a very nice child with no problems.  (38 R.R. 19-20.)  But he conceded that he had not seen Mr. Soffar since he was eleven years old.  (38 R.R. 31.)  Other witnesses testified that Mr. Soffar was not violent.  (*See, e.g.,* 37 R.R. 70-74, 76, 93; 39 R.R. 28.)  And Mr. Soffar's sister described him as very outgoing and inquisitive.  (38 R.R. 116-17.)  Richard Laminack, a former Austin State Hospital employee, testified that Mr. Soffar responded well to positive attention and assisted in the staff in

preventing patients from running away or hording pills.  (39 R.R. 37-38; *see also* 39 R.R. 17-19.)  Even as a grown man, Mr. Soffar still exhibited a desire to help, going so far as to save a police officer's life during an undercover drug bust.  (40 R.R. 5-6.)

*Fifth*, numerous witnesses testified about their contact with Mr. Soffar since he had been imprisoned.  (*See, e.g.,* 38 R.R. 42.)  Ms. Kaplan, for example, testified that Mr. Soffar had become quiet unemotional, cooperative, and mature.  (38 R.R. 42-43.)  Katherine Cox, a Salvation Army minister, Sister Isabella Scotta, and Kinkey Friedman, all had similar experiences.  (*See* 39 R.R. 67-95; 40 R.R. 16-24.)  But that contact was sporadic and often through telephone calls and correspondence rather than personal visits.  (*See, e.g.,* 38 R.R. 42-43.)  A former inmate, Clarence Brantley testified that Mr. Soffar never had any problems with corrections officers or other prisoners and was trusted to handled sharp implements in the garment factory.  (40 R.R. 7-16.)  And, most importantly, Mr. Soffar's wife, Sandra, testified about how she came to know, love, and marry Mr. Soffar while he was imprisoned.  (40 R.R. 24-35.)

*Sixth*, a limited amount of evidence was presented regarding Mr. Soffar's educational history.  (*See, e.g.,* 38 R.R. 58-98.)  Mr. Soffar's sister testified that Mr. Soffar tried hard but "just didn't get it."  (38 R.R. 118-20.)  When he was fourteen and at Austin State Hospital, he was performing at a third grade level.  (39 R.R. 26-28.)  The director of Gulf Coast Trade Center testified that Mr. Soffar was admitted to the program because he was not a violent offender and had a low I.Q.  (38 R.R. 61-63.)  At the time, he was sixteen years-old but performed only at a fifth or sixth grade level.  (38 R.R. 62, 79, 91.)  Although academically challenged, Mr. Soffar performed well in vocational courses.  (*See* 38 R.R. 67-69, 71-72, 85, 97.)

As noted above, in addition to this fact evidence, trial counsel called Dr. Susan Stone as a multi-purpose expert.  (*See* 39 R.R. 95-243.)  Dr. Stone's testimony was limited to summarizing the contents of documents and offering a handful of opinions based on their content.  (*Id.*)  For example, she tentatively opined that Mr. Soffar had physical manifestations of congenital brain damage.  (39 R.R. 114-117.)  And, based solely on her review of documents, she told the jury that she believes that Mr. Soffar suffers from organic brain syndrome, an incurable but treatable condition.  (39 R.R. 117-19, 167, 191, 199-201, 239.)  She also felt able, based on her review of documents, to suggest that Mr. Soffar's adoptive mother may have had a mental illness, that Mr. Soffar's father had an alcohol problem, and that Mr. Soffar's substance abuse may have been an attempt to self-medicate.  (39 R.R. 128-30, 137, 140.)  Admittedly without a complete set of records, Dr. Stone nonetheless opined that the treatment Mr. Soffar received—psychotropic medication, electro convulsive therapy, and being placed in a "quiet room" was medically inappropriate.  (39 R.R. 144-48, 197.)  Finally, while not necessarily meeting the strict criteria for mental retardation, Dr. Stone testified that Mr. Soffar has some characterisatics that are similar to people who do have mental retardation, such as his level of adaptive functioning, appreciation of social cues, and understanding cause and effect consequences.  (39 R.R. 165-168, 216.)  As explained above, however, Dr. Stone's testimony was fatally flawed and inadequate. (*See supra* at IV.A.3.)

When the mitigation evidence that was presented is combined with the mitigation evidence that should have been presented (as described in the narrative above (*see supra* at IV.A.3)), "there is a reasonable probability that, but for counsel's [failure to investigate and present mitigating evidence], the result of the [punishment phase] would have been different." *Strickland*, 466 U.S. at 694.  That conclusion is supported by the opinion of Professor O'Brien,

who explains that the type of evidence that was not presented, is "precisely "the kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 522. Indeed, the positive characteristics about which the jury never heard themselves give rise to a reasonable probability that one juror would have voted for life, rather than death. (21 S.H.R. 5468-69.) Accordingly, for the foregoing reasons, habeas relief is warranted. 28 U.S.C. 2254(d)(1).

> (7)   The Texas Court's Holding Is An Unreasonable Application of *Strickland v. Washington*, 466 U.S. 668 (1984)

Even assuming that the Texas court applied the correct standard—which it did not—its denial of Mr. Soffar's ineffective assistance of counsel claim was based on an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984) because the undisputed facts establish that trial counsel failed to comply with prevailing professional norms in investigating and presenting their mitigation case. (*See supra* at IV.A.) And, as explained above, there is no doubt that Mr. Soffar was prejudiced by that failure. (*See supra* at IV.A.3.) Accordingly, Mr. Soffar's constitutional rights were violated and he is entitled to habeas relief. 28 U.S.C. 2254(d)(2).

## 4.   The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar raised the issue in his state application for writ of habeas corpus at Section VI.G.4. The convicting court rejected Mr. Soffar's claim that his right to counsel was violated and Court of Criminal Appeals adopted that ruling. *See Soffar VI*, 2012 WL 4713562, at *1.

**B.**     **CLAIM FOR RELIEF 12:  RELIEF IS WARRANTED BECAUSE THE WRONGFUL ADMISSION OF A STATEMENT MR. SOFFAR SIGNED REGARDING A RAPE HAD A SUBSTANTIAL AND INJURIOUS EFFECT OR INFLUENCE IN DETERMINING THE JURY'S VERDICT OF DEATH.**

**1.     The Relevant Facts.**

Mr. Soffar requested and was appointed counsel on August 8, 1980, the day after he signed the third statement and three days after his arrest.  *Soffar III*, 2009 WL 3839012 at *5, *7, *43.  Despite that appointment, Houston homicide detectives continued to spend many hours interrogating him over the course of the next few days.  (*See* 7 R.R. 44-48, 108-09; 37 R.R. 45.) Mr. Soffar's attorneys were not present during any of those interrogations.  (*See* 7 R.R. 44, 74.)

Clearly, the detectives' objective in continuing their interrogations was to obtain information about extraneous offenses that Mr. Soffar might claim to have committed.  (*See* Supp. R.R. State Exs. 166, 167; 7 R.R. 47.)   They were not disappointed; during their questioning, Mr. Soffar claimed to have committed numerous robberies and other crimes, including the rape and murder of a woman.  (*See* Supp. R.R. State Ex. 167; 7 R.R. 47.)  The police never recovered a body despite conducting an extensive two-day search in a field in which Mr. Soffar maintained he buried her.  (4 R.R. 177.)

Unable to confirm, much less corroborate, Mr. Soffar's murder claim, the detectives decided to canvass local law enforcement agencies in an effort to identify unsolved sexual assaults.  (37 R.R. 45.)  After conducting some research, Detective Earl Bockel of the Harris County Sheriff's Department found the unsolved rape of Carolyn Knight that had occurred in Friendswood, Texas in 1979.  (37 R.R. 45.)  Detective Bockel decided to focus his investigative efforts on Mr. Soffar.  (7 R.R. 108.)

On August 19, 1980, Detective Bockel interrogated Mr. Soffar in the Harris County Rehabilitation Center.  (7 R.R. 119.)  Detective Bockel was aware that the court had appointed

Mr. Soffar counsel.  (7 R.R. 112, 116, 122.)  He nonetheless decided to interrogate Mr. Soffar

outside their presence.  (7 R.R. 116, 123.)  None of this interrogation was recorded.  (7 R.R. 116,

123.)

The product of Detective Bockel's interrogation was a one-page statement that he wrote

out long-hand and then typed-up for Mr. Soffar's signature.  (7 R.R. 114.)  The statement read:

> My full name is Max Alexander Soffar and I am a white male 24 years of age.  My date of birth is 12-15-55.  My home address is 200 Wispering Pines and I live there with my parents, George and Zelda Soffa.  My home phone number is 482-7291.  I am presently unemployed

> I have been given my legal, and oral warning by Detective E. Bockel and have also read them at the top of this page and I do understand them and I make this statement of my own free will, without promis or threat.

> Around December of last year I picked up a white female in the Town Plaza in Alvin Texas.  She was about 25 years old, medium build, brown hair and I think she was wearing blue jeans and a tee shirt.  I think she was driving a small blue car but I cant remember the color for sure.  I asked her for a ride to Friendswood which is in South West Harris County.  I asked her to take me to my house and showed her a house and told her that it was mine and that I lived there.  Before we got there I told her to stop and get out and then made her walk over to some bushes.  I had a pocket knife and told her to take off her clothes.  She took all of them off, then I raped her. I told her that if she didn't cooperate I would cut her. After I got thru I told her to get into her car and leave.  Then I went to my parents house which is about a mile away.

> The girl had a guitar in the bask seat of her car and I took it out of the car while it was at the shopping center and hid it in some bushes across the road from the shopping center.  The guitar was a plain type without an amplifier and in a black case I dont know the brand name of it but it was a good one.  The next day I went back and got it and about 2 weeks later I sold it to a guy in Alvin, who I met in the pool hall on South Street.  He was a white male about 17 years old, 6'tall, and weighs about 150 lbs. he has long hair like mine but it is black.  He drives a red Mustang with wide tires, I think it is a 65 or 66 modle, fast back and it has a Schlitz beer shifter knob.  He goes to Alvin High School but I dont know his name.  He paid me $100.00 for it because it was a good brand.

> I can read and write the English Language and have read this statement which I have made consisting of one page, and find it to be true and correct to the best of my knowledge.

(43 R.R. State Ex. 144 (corrections omitted, errors in the original); 37 R.R. 52.)  Despite that statement, Mr. Soffar was not—and never has been—charged with or indicted for rape.  (*See* 4 C.R. 1194.)

Over defense objections, the statement Mr. Soffar signed on August 19, 1980 (the "August 19 Statement") was admitted during the punishment phase of Mr. Soffar's retrial.  (37 R.R. 52.)  The Texas Court of Criminal Appeals held that the convicting court erred in admitting the August 19 Statement because it was extracted in violation of Mr. Soffar's Sixth Amendment right to counsel.  *Soffar III*, 2009 WL 3839012, at *44.  The appellate court nonetheless concluded that the error was "harmless beyond a reasonable doubt."  *Id.*.  In doing so, the court held that the statement "did not influence" the jury's answer to Special Issue Three.  *Id.*.  Special Issue Three asked the jury whether there is, beyond a reasonable doubt, "a probability that the defendant, Max Alexander Soffar, would commit criminal acts of violence that would constitute a continuing threat to society," a question commonly known as the "future dangerousness" question.  (1 S.H.R. 268).  The court gave two reasons for its holding:

*First*, the court listed what it characterized as "other convincing evidence establishing Soffar as Knight's assailant."  *Id.*  The court cited the following evidence:  (a) Ms. Knight made an in-court identification of Mr. Soffar at his original trial in 1981, (b) Ms. Knight described the rape during her testimony at Mr. Soffar's original trial and retrial, and (c) at some point after the crime occurred, Mr. Soffar sold a guitar that had been stolen from the rear of Ms. Knight's car.  *Id.*  As an initial matter, the Texas Court of Criminal Appeals ignored clearly established Supreme Court precedent when it ruled that the unconstitutional introduction of Mr. Soffar's statement about the rape was rendered harmless by "other convincing evidence" that was

introduced about the rape. This is flatly wrong. Every single piece of evidence the prosecution introduced about the rape came about because of the Sixth Amendment violation the police committed in interrogating Mr. Soffar once he had counsel. Every piece of that evidence was, therefore, barred under the "fruit of the poisonous tree" doctrine, which applies in full rigor to Sixth Amendment violations. See *Nix v. Williams*, 467 U.S. 431 (1984) ("fruit of the poisonous tree doctrine" bars admission of evidence discovered as a result of a Sixth Amendment violation unless the state has proved that the evidence would have been discovered inevitably regardless of the defendants' statement); *Fellers v. United States*, 540 U.S. 522 (2004) (recognizing that "fruit of the poisonous treetop doctrine applies in Sixth Amendment contexts and remanding case for determination of whether evidence was barred). That is decidedly not the case here—no one was trying to connect Mr. Soffar to Carolyn Knight's rape until he mentioned a rape in the unconstitutional interrogation.  Thus, all evidence regarding the rape was barred. It was part of the problem, not part of the solution. The Court of Criminal Appeals' ruling relying on this very evidence cannot be upheld, and because the court's conclusion that the Sixth Amendment error was harmless was based in part on this unsustainable (based, in large part, apparently, given that the court put this forth as its first reason for finding the error harmless), that conclusion cannot stand.

*Second,* the Texas court concluded that "the remaining evidence of future dangerousness was strong." *Id.*, at *45.  In support of that conclusion, the court relied heavily on events that occurred during Mr. Soffar's ***childhood***, many of which did not even involve misbehavior. *See Id.*, at *45-*47.  The court began by citing Mr. Soffar's adoption, his parental neglect, and unspecified "behavioral problems" that manifested themselves when he was ***six years old***. *Id.*, at *45.  The court next referred to Mr. Soffar's childhood psychiatric problems, the psychiatric

treatment he received throughout his childhood—including three years of in-patient psychiatric treatment in Austin State Hospital—and his adverse reaction to psychiatric medication.  *Id.*, at *45.  Mr. Soffar's difficulties in school, culminating in his removal, were also cited by the court as evidence of future dangerousness, as was the fact he entered the juvenile probation system because he ran away from home and later reentered that system because he committed some "minor offenses."  *Id.*, at *45.  Although the court stated that there were "numerous occasions" in which he acted "violently toward family . . . and animals," the court could only point to ***three*** specific acts of childhood violence towards his family and ***one*** act of childhood violence towards an animal. *Id.*, at *45.

With respect to Mr. Soffar's adult behavior, the court relied primarily on offenses for which Mr. Soffar had been arrested, although not necessarily convicted.  *Id.*, at *46.  The court listed Mr. Soffar's arrests for aggravated assault, terroristic threats, resisting arrest, reckless conduct, possession of marijuana, enticing a child, theft, and burglary.  *Id.*, at *46.  In addition, the court noted that his mother had called the police on one occasion because Mr. Soffar was "tearing up the house."  *Id.*  Of the offenses for which Mr. Soffar was arrested, only ***six*** involved violent behavior, only ***four*** resulted in a conviction, and only ***one*** resulted in injury to another person.  *Id.*.  Similarly, although the court found that Mr. Soffar had violated certain prison rules during his twenty-five years in prison, only ***five*** violations can even remotely be described as involving violence and only ***one*** resulted in slight injury to a corrections officer.  *Id.*.  Finally, the court found that "[Mr.] Soffar showed no remorse when confessing to Bryant and Cass."  *Id.*, at *47.  Based on this evidence, the Texas court held that the erroneous admission of the August 19 Statement was harmless.  *Id.*, at *44.

2.      **The Applicable Standard.**

The Texas Court of Criminal Appeals correctly held that Mr. Soffar's Sixth Amendment right to counsel was violated by the admission of his August 19 Statement. *Soffar III*, 2009 WL 3839012, at *44. Accordingly, the only issue before this Court is the propriety of the convicting court's finding of harmless error. *See Westbrook v. Thaler*, 585 F.3d 245, 256 (5th Cir. 2009) (reviewing state court's finding of harmless error without reconsidering state court's finding of a constitutional violation); *Knotts v. Quarterman*, 253 F. App'x 376, 382 (5th Cir. 2007) (same).

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993) the Supreme Court held that where, as here, an error comprised a constitutional violation, the harmless-error standard in federal habeas is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623 (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). If the reviewing judge is "uncertain" as to whether an error satisfies that standard, the judge must treat it as having had a "substantial and injurious effect or influence . . . ." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). In the words of the Fifth Circuit, "if our minds are in virtual equipoise as to the harmlessness under the *Brecht* standard, of the error, then we must conclude that it was harmful." *Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir. 1996) (quoting *O'Neal*, 513 U.S. at 435); *see also Horn v. Quarterman*, 508 F.3d 306, 322 (5th Cir. 2007) (same); *Robertson v. Cain*, 324 F.3d 297, 304-05 (5th Cir. 2003) (same). The *Brecht* standard is different from that applicable to cases brought on direct review, which remain subject to the "beyond a reasonable doubt" test articulated in *Chapman v. California*, 386 U.S. 18 (1967). *See Brecht*, 507 U.S. at 637. Moreover, the Supreme Court clarified in *Fry v. Piller*, 551 U.S. 112 (2007) that the applicability of the *Brecht* standard was not affected by the passage of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2241, *et seq.* ("ADEPA"). Although Section 2254(d)(1) prohibits a grant of habeas relief absent a showing that the state court's ruling was

189

"contrary to, or involved an unreasonable application of, clearly established Federal law," federal courts do not have to engage in a "formal" inquiry into whether the state court "unreasonably applied" *Chapman* because the *Brecht* standard "subsumes" the *Chapman* standard.  *Fry*, 551 U.S. at 120.  In this case, therefore, the relevant inquiry is not whether the Texas court's finding of harmless error was unreasonable; the inquiry is whether, in ***this Court's opinion***, the admission of the August 19 Statement "had [a] substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.

### 3.  Habeas Relief Is Warranted.

The admission of the August 19 Statement clearly had a "substantial and injurious effect or influence in determining the jury's" finding of future dangerousness.  *Brecht*, 507 U.S. at 623. As a threshold matter, "[u]nder the Texas scheme, a defendant will be eligible for the death penalty only upon a ***unanimous jury finding*** that 'there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.'"  *Sonnier v. Quarterman*, 476 F.3d 349, 366 (5th Cir. 2007) (emphasis added) (citing TEX. CODE CRIM. PROC. ANN. art. 37.071 (1991)).  Relief is warranted, therefore, if this Court concludes—as it should—that the erroneous admission of the August 19 Statement had a "substantial and injurious effect or influence" on even a single juror's vote.  *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir. 1995) ("[E]ven a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict."); *Dickson v. Sullivan*, 849 F.2d 403, 408 (9th Cir. 1988) (same); *United States v. Delaney*, 732 F.2d 639, 643 (8th Cir. 1984) (same); *In re Beverly Hills Fire Litig.,* 695 F.2d 207, 215 (6th Cir. 1982) (same).  Even the most cursory examination of the record shows that it did.

*First*, the unadjudicated rape and August 19 Statement formed the centerpiece of the prosecution's punishment-phase case.  Courts routinely consider the emphasis the prosecution

placed on inadmissible evidence in evaluating its effect on the jury.   *See, e.g., Fratta v. Quarterman*, 536 F.3d 485, 511 (5th Cir. 2008) (*Brecht* standard met where, among other things, prosecutor placed emphasis on inadmissible confession); *Goodwin v. Johnson*, 132 F.3d 162, 182 (5th Cir. 1997) (same); *cf. Brecht*, 507 U.S. at 638-39 (no harm where prosecutor's references to inadmissible evidence were infrequent and other overwhelming evidence of guilt existed); *Tucker v. Johnson*, 242 F.3d 617, 628 (5th Cir. 2001) (same); *Hogue v. Johnson*, 131 F.3d 466, 502 (5th Cir. 1997) (erroneous admission of confession harmless where it did not play a significant role in the case).   Here, the prosecutors made clear how important the August 19 Statement was to their case even before the trial started by just how hard they fought to secure its admission.   (*See, e.g.,* 7 R.R. 109-126.)   On the first day of the actual punishment phase—which began less than two hours after the jury had rejected Mr. Soffar's false confession defense (15 C.R. 4672)—the prosecutor told the jury that Mr. Soffar "actually admitted to the officers that he was the one who raped Carolyn Knight back in 1978."   (36 R.R. (Amend.) 27.)   To ensure maximum effect, the prosecutor waited to tell the jury about the August 19 Statement until after she had finished a detailed depiction of the rape:

> The evidence will also show that there was another victim that the Defendant terrorized before he went and killed those 3 kids at the bowling alley and her name is Carolyn Knight.  And what Carolyn Knight will tell you is that in 1978 she was doing her laundry at laundromat in Alvin, Texas.
>
> She will tell you as she walked out she was approached by the Defendant and he asked her for a ride and Carolyn Knight will testify to you she gave him a ride and he wanted to go not a far distance and after she offered him a ride he took a knife and he threatened her with it and he forced her into a vacant lot where he forced her from her car and in that vacant lot Carolyn Knight will tell you how the Defendant raped her and terrorized her.
>
> She'll tell you how the Defendant forced her to have sex with him, how as he was threatening, her with that knife he began stabbing it

191

around her head telling her that he killed her women and he could
kill her.

(36 R.R. (Amend.) 26-27.)  That same prosecutor read the entire August 19 Statement to the jury

on the second day of the punishment phase during the testimony of Detective Bockel.  (37 R.R.

48-55; R.R. 45 State Ex. P-13.)  Introducing the statement during Detective Bockel's testimony

"undoubtedly enhanced" its effect on the jury.  *Fratta v. Quarterman*, 536 F.3d 485, 511 (5th

Cir. 2008) ("[T]he effect of the custodial confessions on the jury was undoubtedly enhanced by

the fact that they were related through the testimony of . . . a law enforcement officer who could

command the jury's respect.").  Shortly after the Statement was read, Ms. Knight told the jury

about her recollection of the attack and the effect it had upon her.  (36 R.R. (Amend.) 102-123.)

In total, testimony about the rape and the August 19 Statement took up almost half a day of the

approximately three-and-a-half days of punishment phase evidence.  (*See* 37 R.R. 44-133; 15

C.R. 4672-76.)  Finally, on the sixth and final day of the punishment phase, the prosecution once

again emphasized the significance and brutality of Ms. Knight's rape, telling the jury that

Mr. Soffar did not "just . . . rape her" but he had "to terrorize her" as well.  (41 R.R. 36.)  In

doing so, the prosecutor invited the jury to put themselves in Ms. Knight's position and see the

rape through her eyes:

> And think about that because what Caroline Knight saw in his
> eyes, what she saw in his eyes was just a preview of what was to
> come 'cause what Caroline Knight saw in his eyes was danger.
> What he saw in her eyes was fear.  And what he did with that fear
> absolutely tells you everything that you need to know about him
> because he wasn't satisfied just raping her.  No, he put the knife to
> her throat, told her how he could cut her throat out if she screamed,
> told her as he's raping her that he killed other women and buried
> them; stabs the knife around her head and at that point what does
> Caroline Knight tell you she's thinking.  She's looking into his
> eyes and based on what she sees she thinks she's going to die.  She
> thinks she's going to die.  That's what she sees when she looks into
> the Defendant's eyes.  That's what she sees.  And he liked it.  I
> mean stabbing the knife around her head as he's raping her putting

> the knife to her throat.  That tells you the kind of person the
> Defendant is.  That tells you the kind of person that he is.

(41 R.R. 36; *see also* 44 R.R. 44.)   The prosecution's extensive reliance on the rape and

August 19 Statement in itself justifies a finding that the Statement had a "substantial and

injurious effect or influence" on at least one juror's vote.  *Fratta*, 536 F.3d at 511; *Goodwin*, 132

F.3d at 182.

  *Second*, even if the prosecution had not placed such emphasis on the rape and the

August 19 Statement, the introduction of such a Statement was inherently prejudicial in itself.

As Justice Brennan recognized in *Colorado v. Connelly*, 479 U.S. 157 (1986), confessions are

"profoundly prejudicial" because juries "accord confessions such heavy weight in their

determinations that the introduction of a confession makes the other aspects of a trial in court

superfluous."  *Id.* at 182 (Brennan, J., dissenting)*; see also Arizona v. Fulminante*, 499 U.S. 279,

296 (1991) ("[C]onfessions have [a] profound impact on the jury, so much so that we may

justifiably doubt its ability to put them out of mind even if told to do so.") (quoting *Burton v.*

*United States*, 391 U.S. 123, 139-40 (1968) (White, J., dissenting)); *Miranda v. Arizona*, 384

U.S. 436, 466 (1966) (a confession is "the most compelling possible evidence of guilt") (citing

*Mapp v. Ohio*, 367 U.S. 643, 685 (1961) (Harlan, J., dissenting)); *Pyles v. Johnson*, 136 F.3d

986, 996 (5th Cir. 1998) (a confession is "probably the most probative and damaging evidence"

against a defendant).  For that reason, the "admission or exclusion of [a confession] . . . would be

***highly likely*** to affect the outcome of [a] trial."  *United States v. Avants*, 278 F.3d 510, 522 (5th

Cir. 2002) (emphasis added); *Goodwin v. Johnson*, 132 F.3d 162, 182 (5th Cir. 1997) (discussing

power of improperly admitted confession in evaluating harmlessness).   Courts routinely find,

therefore, that the erroneous admission of a confession during the punishment phase of a capital

murder trial is not harmless error.  *See, e.g., King v. State*, 657 S.W.2d 109, 112 (Tex Crim. App.

1983) (en banc) (admission of oral statement at punishment phase was not harmless); *see also State v. Hobley*, 752 So. 2d 771, 781-82 (La. 1999) (same); *State v. Brooks*, 648 So. 2d 366, 376 (La. 1995) (same).   Indeed, the Supreme Court has held that the erroneous admission of a coerced confession ***requires*** reversal of a death sentence.   *See Johnson v. Mississippi*, 486 U.S. 578, 590 (1988); *Payne v. Arkansas*, 356 U.S. 560, 568 (1958) (citing *Chambers v. Florida*, 309 U.S. 227, 241 (1940)).

In this case, the August 19 Statement was particularly prejudicial because it was a confession to a violent, stranger rape.   Given the nature of the crime, courts routinely hold that the erroneous admission of an unadjudicated rape is not harmless error.   *See, e.g., Grunsfeld v. State*, 813 S.W.2d 158, 172 (Tex. App. – Dall. 1991) ("The extraneous, unadjudicated offenses could only persuade the jury that Grunsfeld stood before them as a vicious serial rapist who must be given the maximum punishment."); *Tyrone v. State*, 854 S.W.2d 153, 160 (Tex. App. – Forth Worth 1993) (wrongful admission of extraneous rape at punishment phase not harmless); *see also People v. Frank*, 38 Cal. 3d 711, 735-36 (Cal. 1985) (wrongful admission of notebooks detailing sexual thoughts and actions not harmless).   That courts view the erroneous admission of rape as severely prejudicial is unsurprising since rape is a crime often viewed as second only to murder in terms of its severity and abhorrence.   BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, BULLETIN: THE SEVERITY OF CRIME 2 (1984) (a survey of 60,000 people placed rape and child abuse second only to murder in terms of its severity); *see also Coker v. Georgia*, 433 U.S. 584, 597 (1977) (rape is "a violent crime" and, "[s]hort of homicide, it is the 'ultimate violation of self.'"); *United States v. Quiver*, 241 U.S. 602, 605 (1916) (rape is "generally regarded as among the most heinous [crimes], so much so that death is often prescribed as the punishment."); *United States v. Gibson*, 820 F.2d 692, 698 (5th Cir. 1987) (describing rape as an

evil); *Hoffman v. Cain*, No. 09-3041, 2012 WL 1088832, at *24 (E.D. La. Mar. 30, 2012) (referring to rape and murder as "the most heinous crimes."); *Rivera v. Ryan*, No. CIV 08-659, 2009 WL 1531863, at *3 (D. Ariz. June 2, 2009) (rape "is perhaps second only to murder in its potential for harm to the victim and society."); *People v. M.D.*, 595 N.E.2d 702, 711 (Ill. 1992) ("Sexual assaults are generally violent, degrading acts which cause severe physical and emotional damage to the victims."); *Hemphill v. State*, 165 S.W. 462, 465 (Tex. Crim. App. 1913) (rape "excite[s] our people sometimes beyond the bounds of reason, eventuating in the fury of mob violence even to burning at the stake."); *Wilson v. State*, 17 Tex. App. 525, 538 (Tex. App. 1885) (rape is "one of the most heinous of the crimes known to the law"); Susan Estrich, *Rape*, 95 Yale L.J. 1087, 1090-91 (1986) (discussing treatment of rape in comparison to other crimes). Violent stranger rapes—such as the one of which Mr. Soffar was accused—are viewed, by some, as especially abhorrent. *See Lent v. Wells*, 861 F.2d 972, 979 (6th Cir. 1988) (Boggs, J., dissenting) ("stranger rape" is more "lurid" than "acquaintance rape".); *Brzonkala v. Virginia Polytechnic & State Univ.*, 935 F. Supp. 779, 784-85 (W.D. Va. 1996) ("while any rape is egregious, stranger rape and rapes such as the one in question generally are more egregious than date rape."), *aff'd sub nom.*, *Brzonkala v. Virginia Polytechnic Inst. & State Univ.*, 169 F.3d 820 (4th Cir. 1999), *aff'd sub nom. United States v. Morrison*, 529 U.S. 598 (2000); Susan Estrich, Real Rape 25 (1987) (stranger rape is generally considered to be the most heinous type of rape). Indeed, it was not long ago that rape itself was punishable by death, a punishment that the Texas Republican Party proposed reinstating in 2004 and 2006. *Coker*, 433 U.S. at 597; State Republican Party Platform at P-22 (2006) ("[R]ape is a heinous crime for which punishment options should include death."); State Republican Party Platform at P-9 (2004) ("[F]orcible rape is a heinous crime for which the punishment options should include the death

penalty."); GARY D. LAFREE, RAPE AND CRIMINAL JUSTICE: THE SOCIAL CONSTRUCTION OF SEXUAL ASSAULT 62 (1989) ("[P]eople regard rape as a heinous offense worthy of the most serious punishment."); Donald Dripps, *Beyond Rape: An Essay on the Difference Between the Presence of Force and the Absence of Consent,* 92 COLUM. L. REV. 1780, 1781-82 (1992) (discussing the historical punishments for rape). Echoing that sentiment, several potential jurors—including one who served as an alternate—told the court during *voir dire* that they believed that rape merited the death penalty. (12 R.R. 9; 18 R.R. 5; 20 R.R. 29; 21 R.R. 47; 23 R.R. 9.) With such prevailing attitudes, the prejudicial effect of the August 19 Statement is self-evident.

*Third*, although the Texas court believed otherwise, there is no other admissible "convincing evidence establishing [Mr.] Soffar as [Ms.] Knight's assailant." *Soffar III*, 2009 WL 3839012, at *44. As noted above, every piece of that evidence was barred under the "fruit of the poisonous tree" doctrine, which applies to Sixth Amendment violations. See *Nix v. Williams*, 467 U.S. 431 (1984). The absence of such evidence underscores the importance of the August 19 Statement. *See Wilkerson v. Cain*, 233 F.3d 886, 892 (5th Cir. 2000) (finding *Brecht* test satisfied where absence of other evidence). The prosecution introduced no fingerprint, DNA, hair, fiber, or any other forensic evidence implicating Mr. Soffar. (*See* 37 R.R. 101, 181.) Nor did the prosecutor introduce the knife that Mr. Soffar supposedly used. (*See* 37 R.R. 44-143, 166-69, 176-81.) Indeed, the only evidence the Texas court claimed "established" Mr. Soffar as the rapist was: (a) testimony that Mr. Soffar sold a guitar that had been stolen from Ms. Knight's car, (b) Ms. Knight's description of the attack, and (c) her in-court identification of Mr. Soffar. *Soffar III*, 2009 WL 3839012, at *44. But even if Mr. Soffar did sell the guitar, there is no evidence that was the thief much less that he was the rapist. *See Flores v. State*, 551

S.W.2d 364, 369 (Tex. Crim. App. 1977) (possession of victim's property not sufficient to support a murder conviction but might support theft conviction).   While Ms. Knight's description of the attack might establish that a rape took place, a description of what the attacker did says nothing about who the attacker's was.   *See, e.g., People v. Brewer*, B232351, 2012 WL 1899175, at *1 n.1 (Cal. Ct. App. May 25, 2012) (conviction was reversed where victim only described the attack).   In truth, the only evidence that purports to identify Mr. Soffar as the attacker is Ms. Knight's in-court identification.   That identification is hopelessly unreliable.   Ms. Knight only identified Mr. Soffar two years after the attack when she saw a guard bringing him into the courtroom during the punishment phase of his first capital murder trial.   (37 R.R. 68-72.)   Shortly before she testified, the prosecutor told Ms. Knight that he believed the defendant was her rapist and that the purpose of the hearing was to decide whether he should live or die.   (37 R.R. 79-81.) The prosecutor expressed that belief despite knowing that Ms. Knight had failed to positively identify Mr. Soffar on two prior occasions:   once when shown a photospread and later when shown an in-person lineup.   (37 R.R. 70, 74-75.)   And just a few hours after the attack, Ms. Knight gave the police a description of her attacker that did not match Mr. Soffar in several critical respects including his age, weight, height, and dental condition (Mr. Soffar was missing his front teeth).   (*Compare* 37 R.R. 72-74 *with* 37 R.R. 63, 98-99; 43 R.R. State Ex. 107.)   Given these circumstances, Ms. Knight's identification cannot possibly be characterized as reliable much less strong.   *See Moore v. Illinois*, 434 U.S. 200, 229 (1977) ("one-on-one" identifications "present greater risks of mistaken identification than a lineup."); *Kennaugh v. Miller*, 289 F.3d 36, 46 (2d Cir. 2002) (in-court identification impermissibly suggestive when witness failed to identify defendant in repeated pretrial confrontations and saw defendant being led out of courtroom by court officers); *United States v. Emanuele*, 51 F.3d 1123, 1131 (3d Cir. 1995) (it

was an abuse of discretion for trial court to permit in-court identification when witness had failed to positively identify the defendant when shown a photospread and only identified the accused when he entered the courtroom "in conditions reeking of criminality.").  The absence of other evidence implicating Mr. Soffar in the rape supports a finding that the erroneous admission of the August 19 Statement had a "substantial and injurious effect or influence" on the jury's verdict.  *See Wilkerson v. Cain*, 233 F.3d 886, 892 (5th Cir. 2000) (finding *Brecht* test satisfied where absence of other evidence).

*Fourth*, the other evidence of future dangerousness was not—as the Texas court believed—strong.  *Soffar III*, 2009 WL 3839012, at *45.  As a matter of law, the strength of that other evidence has little bearing on whether the *Brecht* test is satisfied.  The Fifth Circuit has held that even if "the evidence *exclusive* of the custodial confession[] may have been sufficient to sustain [the jury's] verdict [that] does not alone suffice to establish that the error in admitting the confessions was harmless under *Brecht*."  *Fratta v. Quarterman*, 536 F.3d 485, 510 (2008) (emphasis in the original).  The inquiry remains "whether the error itself had substantial influence" or the court at least had a "grave doubt" that it did.  *Id.* (quoting *Kotteakos*, 328 U.S. at 765).  But even the strength of the other supposed evidence of future dangerousness were relevant, it does not outweigh the prejudicial effect of the August 19 Statement.  All of the behavior that the Texas court cited in support of the jury's verdict occurred nearly a decade before his retrial.  *See Soffar III*, 2009 WL 3839012, at *45.  Indeed, in an effort to find some basis for Mr. Soffar's death sentence, the Texas court was forced to go back to Mr. Soffar's behavior as a ***six year old***.  *See Id.*  As the Supreme Court has recognized, however, children are simply not as culpable as adults.  *See Roper v. Simmons*, 543 U.S. 551, 571 (2005); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 2026 (2011); *Miller v. Alabama*, 132 S. Ct. 2455, 2465

(2012).   "[T]he impetuousness and recklessness that may dominate in younger years can subside."   *Johnson v. Texas*, 509 U.S. 350, 368 (1993).   Accordingly, "[e]vidence of youth . . . has special relevance to the question of future dangerousness" because it is inherently ***mitigating***.   *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261 (2007); *see also Brewer v. Quarterman*, 550 U.S. 286, 127 S. Ct. 1706, 1724 (2007) (referencing "the mitigating factor of youth") (Scalia, J., dissenting); *Graham v. Collins*, 506 U.S. 461, 478 (1993) (youth is a mitigating factor); *Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982) (same); *Pierce v. Thaler*, 604 F.3d 197, 207 (5th Cir. 2010) ("[U]nder clearly established federal law, the future dangerousness special issue provided a meaningful basis for the jury to consider and give effect to [the defendant's] youth"); *Ex Parte Davis*, 866 S.W.2d 234, 238 (Tex. Crim. App. 1993) ("[J]urors must be empowered to consider the mitigating impact of youth as it bears upon the special issues, especially future dangerousness.").

More fundamentally, however, while juries can take into account juvenile ***offenses*** when assessing future dangerousness, *Conner v. State*, 67 S.W.3d 192, 199 (Tex. Crim. App. 2001), the Texas court relied on Mr. Soffar's childhood behavior generally.   *See Soffar III*, 2009 WL 3839012, at *45.   And rather than supporting a death sentence, much of that behavior is constitutionally ***mitigating***.   For example, the court highlighted the fact Mr. Soffar received psychiatric treatment—including spending three years in Austin State psychiatric hospital—as a child, that he was bitten by a venomous coral snake, and that he once had an adverse reaction to medication.   *See Soffar III*, 2009 WL 3839012, at *45.   But the Supreme Court recognized in *Tennard v. Dretke*, 542 U.S. 274 (2004) that mental conditions are an inherently mitigating factor.   *Id*. at 285 (granting habeas relief where counsel failed to present evidence of the defendant's mental impairments) (citing *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)); *see*

*also Winston v. Kelly*, 592 F.3d 535, 565 (4th Cir. 2010) (noting that "evidence of mental deficiencies is certainly mitigating").  And how the Texas court believed a snake bite and the side-effects of medication were relevant to the question of future dangerousness is completely inexplicable.

Mr. Soffar's adoption and the failings of his parents, which were also relied upon by the Texas court, are likewise *prima facie* mitigating.  *See Gardner v. Galetka*, 2:95-CV-846TC, 2003 WL 25513130 (D. Utah Aug. 3, 2003) ("the startling lack of supervision and appropriate discipline he received from his parents" was a mitigating factor), *adopted as modified*, 2:95-CV-846-TC, 2007 WL 1071400 (D. Utah Apr. 5, 2007), *aff'd*, 568 F.3d 862 (10th Cir. 2009); *Merck v. State*, SC10-1830, 2013 WL 264437 (Fla. Jan. 24, 2013) (lack of parental role model was a mitigating factor); *Seibert v. State*, 923 So. 2d 460, 466 n.3 (Fla. 2006) (adoption is a nonstatutory mitigating factor); *State v. Banks*, 271 S.W.3d 90, 162 (Tenn. 2008) (parents' failure to provide adequate support was mitigating).  Expulsion from school and placement in youth homes have similarly been found to have some—even if modest—mitigating value. *Williams v. Cain,* 125 F.3d 269, 279 (5th Cir. 1997); *see also United States v. Basham*, 561 F.3d 302, 315 (4th Cir. 2009) (placement "into youth homes following his expulsion from school" was mitigating); *State v. Bies*, 658 N.E.2d 754, 761 (1996) (expulsion from school due to disruptive behavior was mitigating).  Ultimately, the Texas court was only able to point to ***four*** specific examples of aggressive childhood misconduct, none of which appear to have resulted in an arrest or conviction.  *Soffar III*, 2009 WL 3839012, at *45.  And with respect to juvenile crimes, the court merely noted that Mr. Soffar was adjudicated a delinquent when he was sixteen due to "'minor' offenses." *Id.*

Mr. Soffar's adult record is similarly bereft of any significant violent offenses.  Of the twelve pre-imprisonment convictions that the Texas court listed, only *four* involved conduct that might possibly be characterized as violent.  *Soffar III*, 2009 WL 3839012, at *46.  Each of the offenses were ***misdemeanors*** and only one resulted in physical injury (a minor cigarette burn).  (45 R.R. State Exs. P-7, P-11, P-17; 37 R.R. 41, 171.)  The *only* felony conviction to which the court referred appears to have been a conviction for burglary.  (45 R.R. State Ex. P-12; 37 R.R. 41.)  While Mr. Soffar may have been arrested for two offenses that arguably involved an element of violence, no evidence of a conviction was introduced.  (*See* 37 R.R. 16, 25.)  And with respect to his two drug convictions, it is well-settled that drug abuse is a mitigating, not aggravating.  *See United States v. Caro*, 597 F.3d 608, 644 (4th Cir. 2010) ("[a] defendant's history of drug abuse is classic mitigating evidence, which the Supreme Court has held a jury must be able to consider and give effect to when sentencing a defendant.") (citing *Cone v. Bell*, 129 S. Ct. 1769 (2009)); *see also Smith v. Mahoney*, 611 F.3d 978, 987 88 (9th Cir. 2010) (finding trial counsel ineffective for failing to investigate a defendant's history of drug abuse).

The Texas court fared no better in relying on Mr. Soffar's disciplinary record while in prison.  *Soffar III*, 2009 WL 3839012, at *46.  Despite being in prison for nearly twenty-five years by the time of his retrial, the court cited only *five* even arguably violent incidents, the most recent of which occurred a decade before the retrial began.  *Id.*  Of those incidents, four involved only the threat of injury; the fifth, which occurred twenty years before his retrial, involved Mr. Soffar throwing urine on a corrections officer.  (37 R.R. 183.)  And while Mr. Soffar has twice been cited for possession of a weapon, *Soffar III*, 2009 WL 3839012, at *46, there is no evidence as to what the weapon was or that he ever used those—or any other—weapon during his time in prison.  Indeed, Mr. Soffar has ***never*** been prosecuted for a violating a prison rule that

was also a crime.  (37 R.R. 269.)  In total, therefore, the only evidence of historic violence upon which the Texas court relied amounted to four events that occurred when Mr. Soffar was a child, four adult misdemeanor convictions, and five violations of prison rules for which he was never prosecuted and which occurred approximately a decade before his retrial.  *Soffar III*, 2009 WL 3839012, at *45-46.  This paltry evidence can hardly be described as "strong."  *Soffar III*, 2009 WL 3839012, at *45.  The absence of any other significant act of violence could only have served to inflame further the jury's emotions when they heard about the August 19 Statement and the brutal rape it described.

*Lastly*, if the strength—or lack thereof—of the prosecution's future dangerousness case is to be taken account, the evidence negating a finding of future dangerousness must also be considered.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, ***on the whole record***, that the constitutional error was harmless beyond a reasonable doubt.") (emphasis added); *Scott v. State*, 227 S.W.3d 670, 690-91 (Tex. Crim. App. 2007) (courts should consider, among other things, the whole record in performing a harmless error analysis).  While not presenting all of the evidence they should have presented, (*see supra* at IV.A; *infra* IV.C), trial counsel tried to counter the minimal evidence of historic violence by presenting testimony from a former Austin State Hospital staff member who recalled that Mr. Soffar "wasn't a really major behavioral problem."  (38 R.R. (Amend.) 55.)  Another former staff member recalled that, apart from picking fights with bigger kids, he "never saw Max ever do anything that would endanger another person."  (39 R.R. (Amend.) 28).  The Director of Gulf Coast Trade School testified that Mr. Soffar did not have any "violent problems" during his nine-month stay at that institution and would not have been admitted had he been a "violent offender."  (38 R.R. (Amend.) 59, 62, 71,

89-90.)   Regarding Mr. Soffar's behavior in prison, a former prisoner who worked with Mr. Soffar in a garment factory testified that he never saw Mr. Soffar having so much as an argument with a corrections officer or inmate while in the factory or in the recreation yard.  (40 R.R. 10-13.)  Indeed, Mr. Soffar was trusted to handle sharp scissors in the presence of officers and other inmates.  (40 R.R. 9-10.)  Investigator Michael Clawson, who dealt with Mr. Soffar in the late 1970s, similarly testified that Mr. Soffar never had any problems when incarcerated in Alvin jail.  (38 R.R. (Amend.) 107.)  He, along with other witnesses, was able to tell the jury about how well Mr. Soffar responded to authority.  (38 R.R. (Amend.) 20, 206, 72, 107.)  Trial counsel also led evidence from Mr. Soffar's spiritual counselors and relatives about his personal development while in prison.   His cousin testified that Mr. Soffar has become "very unemotional," "cooperative," and speaks "very maturely."  (38 R.R. (Amend.) 42-43.)  Sister Isabella Scotta, a nun affiliated with the Blessed Word of Sacrament explained how Mr. Soffar has become a "very spiritual" person and is "a lot closer to the Lord."  (39 R.R. (Amend.) 89, 94-95.)  Kinky Friedman, the musician, author, and politician, testified about the "humanity" and "kindness" that he observed when he met Mr. Soffar.  (40 R.R. 17-24.)  And ordained minister and Salvation Army Major Kathryn Cox testified about Mr. Soffar's politeness, his eagerness to learn, his "hunger for something better," his love for his family, his growing responsibility for his actions, his concern about becoming a good person, and his courtesy attitude towards corrections officers.  (39 R.R. (Amend.) 80-82, 86-87.)  Finally, the former Chairman of the Texas Department of Criminal Justice Classifications Committee spoke about the maximum-security conditions under which Mr. Soffar would be confined if sentenced to life imprisonment and the low instance of escape and prisoner-on-staff violence in Texas prisons.  (*See* 39 R.R. (Amend.) 244-291.)  The evidence trial counsel presented—albeit incomplete—is

the type of evidence that courts cite as weighing against a finding of future dangerousness. *Franklin v. Lynaugh*, 487 U.S. 164, 185 (1988) (O'Connor, J., concurring) (prison violations); *Jasper v. Thaler*, 765 F. Supp. 2d 783, 831 (W.D. Tex. 2011) (religious conversion, growth, and increasing maturity); *Renteria v. State*, No. AP-74829, 2011 WL 1734067, at *39 (Tex. Crim. App. 2011) (classification expert testimony); *Smith v. State*, 779 S.W.2d 417, 421 (Tex. Crim. App. 1989) (en banc) (history of violence).

The *Brecht* standard is easily satisfied in light of this record. The Fifth Circuit's decision in *Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1997) is on point. There, like here, the trial court improperly admitted a written confession to a violent crime (a robbery-murder). *Id.* at 181. In explaining why they were "convinced" that the admission of that confession had a "substantial and injurious effect or influence" on the jury's verdict, the Fifth Circuit cited the fact that a confession is "the most probative and damaging evidence that can be admitted against [a criminal defendant]," that the confession at issue was detailed and concerned a vicious crime, and that the prosecutor had referred to the confession during his closing statement. *Id.* at 181-82. The facts in this case are even more "convincing." The August 19 Statement purported to be a confession to a heinous and reviled crime and the prosecution placed great emphasis on the Statement and rape throughout the punishment phase. (*See supra* at IV.B.3.) Moreover, while in *Goodwin* "the state presented a substantial amount of other evidence" against the defendant (something that did not alter the court's finding of prejudice), *Johnson*, 132 F.3d at 181, the other evidence linking Mr. Soffar to the rape was utterly unreliable and the other evidence of future dangerousness was scant and contested. (*See supra* at IV.B.1.) If *Brecht* was satisfied in *Goodwin*, it is undoubtedly satisfied here. *See also Fratta v. Quarterman*, 536 F.3d 485, 510-11 (5th Cir. 2008) (granting relief where erroneously admitted custodial confession contained a

detailed, comprehensive, and graphic account of a brutal murder and was referred to by the prosecutor during his closing statement); *Taylor v. Cain*, 545 F.3d 327, 336-37 (5th Cir. 2008) (granting relief were no physical evidence linked the accused to the attack and that the only eyewitness's identification was "markedly indefinite."); *Bennett v. Collins*, 852 F. Supp. 570, 574 (E.D. Tex. 1994) (erroneous admission of expert evidence regarding defendant's propensity for future violence not harmless where evidence was the centerpiece of the prosecution case). Accordingly, Mr. Soffar respectfully submits that, for the same reasons the Fifth Circuit in *Goodwin* granted habeas relief, this Court should grant relief as well.

### 4.       The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar raised this claim in his direct appeal to the Texas Court of Criminal Appeals—the highest state court for purposes of capital appeals, TEX. CODE CRIM. APP. art. 4.04(2) (1991)—as sub-point (a) of his Twenty-Seventh Point of Error.  (4 S.H.R. 1344-47.)  The sub-point was entitled:  "The trial court erred in admitting Appellant's alleged statement confessing to a rape elicited in violation of his Sixth Amendment and Texas constitutional right to counsel."  (*Id.* at 1344-45.)  The Texas appellate court concluded that Mr. Soffar's constitutional right to counsel had been violated by the admission of the August 19 Statement but nonetheless overruled the Point of Error because "the error was harmless."  *Soffar III*, 2009 WL 3839012, at *44.

**C.**     **CLAIM FOR RELIEF 13**:  THE TEXAS COURT'S CONCLUSION THAT TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO INVESTIGATE, DEVELOP, AND PRESENT ALL EVIDENCE NEGATING A FINDING OF FUTURE DANGEROUSNESS IS CONTRARY TO, OR ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984).

### 1.       The Relevant Facts.

At the heart of the state's punishment phase evidence was testimony and documents supposedly showing that Mr. Soffar poses a future threat to society.  But despite being on notice

of that evidence—much of which was presented during Mr. Soffar's first trial—trial counsel failed to investigate, develop, and present overwhelming and readily available evidence to the contrary.   In fact, trial counsel simply overlooked or, even worse, chose to ignore critical evidence that was already in their possession.   The Texas court likewise ignored that evidence when Mr. Soffar presented it in the course of his state habeas proceedings.   Just as it did in considering Mr. Soffar's mitigation claim, the Texas court focused only on what trial counsel did and not on what they should have done.   As explained above, that approach flies in the face of well-settled federal law.   (*See supra* at IV.A.)   Had the Texas court adopted and applied the correct standard for evaluating trial counsel's effectiveness, habeas relief would have been granted and Mr. Soffar's death sentence would have been vacated.   (*See infra* at IV.C.3.)

(1) Evidence Presented At Mr. Soffar's Retrial

Accordingly to the Texas court's findings of fact—which were drafted by the state and are, therefore, hopelessly one-sided—trial counsel present the following evidence:

- Mr. Soffar's "prison records reflected that he was not a disciplinary problem or future danger";

- Testimony from three lay witnesses that Mr. Soffar "was not violent at various stages of his life";

- Testimony from a police officer that Mr. Soffar followed rules while incarcerated in Alvin Jail;

- Testimony that Mr. Soffar saved a police officer's life (a fact that is, at most, only tangentially relevant to future dangerousness);

- Testimony from three lay witnesses regarding their impression of Mr. Soffar's character since incarcerated;

- Testimony from a former prison inmate regarding Mr. Soffar's interactions with other inmates and corrections officers while incarcerated;

- Testimony from Dr. Stone regarding Mr. Soffar's favorable response to a structured environment; and

- Testimony from a former prison system employee who described the prison environment of a capital prisoner and Mr. Soffar's disciplinary history.

(33 S.H.R. 8957-59.)  Notably, although Mr. Soffar alerted the Texas court to numerous failings in trial counsel's future dangerousness case, (33 S.H.R. 8957-59.), the Texas court did not even acknowledge those alleged failures much less explain why they were not failures at all or, if they were, why they did not affect the outcome of Mr. Soffar's trial.  (*See* 33 S.H.R. 8957-59.)  By neglecting to address those issues, the Texas court's decision is utterly inadequate and deserves no deference whatsoever.  *Salazar v. Dretke*, 419 F.3d 384, 395 n.19 (5th Cir. 2005) ("[I]f the federal claim was not adjudicated on the merits in the state courts, we would review the claim de novo rather than under the deferential standard set forth in § 2254(d)(1).").

> (2)   Evidence Trial Counsel Could, And Should, Have Developed And Presented.

Trial counsel should, and could, have presented a compelling case negating a finding of future dangerousness.  Consistent with prevailing professional norms, that case would have involved presenting both fact and expert testimony, a wealth of which was readily available to trial counsel.  With respect to fact evidence, trial counsel could have called at least the following witnesses:

- **Betty Chappee**:  Betty Chappee was Mr. Soffar's fourth grade teacher.  (14 S.H.R. 3673.)  She recalled Mr. Soffar performing well in a structured setting with clear rules.  (14 S.H.R. 3676.)

- **Dora Soffar**:  Dora Soffar is Mr. Soffar's aunt-in-law.  She would have testified, from her own personal experience, that Mr. Soffar was capable of responding to rules and direction.  She observed that Mr. Soffar was not a disciplinary problem when he was at her house.

- **Jessie Silber**:  Ms. Silber was a neighbor of the Soffars when Mr. Soffar was a child. (15 S.H.R. 3889.)  She liked Mr. Soffar and thought that he had an inherent need to please and connect with people.  (15 S.H.R. 3890.)  For that reason, Mr. Soffar responded positively to attention.  (15 S.H.R. 3891.)  She never saw Mr. Soffar mad or violent.  (15 S.H.R. 3891.)  Having visited Mr. Soffar while in prison, she believes that he would be a "model prisoner" and that he has become happier and found

himself in an environment with no drugs or alcohol and clear, simple rules.  (15 S.H.R. 3892.)

- **Jackie Soffar Butler**:  Ms. Butler is Mr. Soffar's sister.  (14 S.H.R. 3635.)  Although she testified during the punishment phase of Mr. Soffar's retrial, trial counsel inexplicably failed to ask her about her observations of how Mr. Soffar responded to structure and discipline.  Had trial counsel done so, Ms. Butler would have testified that Mr. Soffar would respond well to the attention paid to him by Ms. Silber such that he helped her around the house.  (14 S.H.R. 3644.)  Mr. Soffar would similarly respond well when his aunt Dora and uncle Danny make clear that they liked him and what they expected of him.  (14 S.H.R. 3644.)

- **Joy Senter**:  Ms. Senter was Mr. Soffar's teacher when he was fifteen years old.  (15 S.H.R. 3883.)  Although hyperactive, Mr. Soffar was not a discipline problem in her class because she paid him positive attention and did not judge him.  (15 S.H.R. 3884.)

- **Ken Tarpey**:  Mr. Tarpey was a recreational aid at Gulf Coast Trade School when Mr. Soffar was seventeen years old.  (15 S.H.R. 5395.)  If called to testify, he would have told the jury that Mr. Soffar was neither cruel nor violent.  (15 S.H.R. 5395.)

- **Mary Ward**:  Ms. Ward was Mr. Soffar's fifth grade teacher.  (15 S.H.R. 3979.)  Like Ms. Silber, Mr. Soffar was not a disciplinary problem in Ms. Ward's class.  (15 S.H.R. 3980.)  Although he was frustrating to teach, he was not the most difficult student with whom Ms. Ward dealt.  (15 S.H.R. 3980.)

As with their mitigation case, trial counsel could—and should—have presented evidence from an expert who could explain the significance of the fact evidence and how it relates to the special issues.  In the course of his state habeas proceedings, Mr. Soffar submitted an affidavit from one such expert, Dr. Mark D. Cunningham.  (*See* 14 S.H.R. 3718.)  Dr. Cunningham is a forensic psychologist who specializes in sentencing determinations, including violence risk assessment.  (14 S.H.R. 3719.)  Having reviewed the evidence that was presented and that could have been presented, Dr. Cunningham has concluded that "[i]n light of Mr. Soffar's prison adjustment history, age, and continuing community relationships, his likelihood of future violence in prison is well below the low base rates of prison violence committed by capital offenders and convicted murderers."  (*See* 14 S.H.R. 3739.)

In arriving at his opinion, Dr. Cunningham reviewed a wealth of information about Mr. Soffar and, just as importantly, explained the significance of that information to the future dangerousness inquiry.  (*See* 14 S.H.R. 3724-25.)  From his perspective, a proper risk assessment requires interpreting the defendant's past behavior in light of group statistical data, such as rates of homicide per inmate in the Texas prison system.  (14 S.H.R. 3725-37.)  The ultimate goal is to determine not whether there is a ***possibility*** that any defendant will commit future acts of violence but whether there is a ***probability*** that this specific defendant will do so.  (14 S.H.R. 3725.)  In this case, Dr. Cunningham could have told the jury at least the following:

- As a general matter, the occurrence of inmate violence in Texas prisons is very low.  (14 S.H.R. 3727.)  The rate of violence decreases as the severity of the violence increases.  In 2005, there was only one inmate assault on a staff member per 2,941 inmates and 1.91 inmate homicides per 100,000 inmates.  (14 S.H.R. 3727.)  The rate of homicide is dramatically lower than the homicide rate in major American cities.  (14 S.H.R. 3727.)  And with respect to escapes, in 2005 there was only one inmate escape per 78,310 inmates.  Clearly, while it might be possible for an inmate to murder someone or escape, it can hardly be said to be probable that he will do so.

- Violence in the community is not predictive of violence in prison.  (14 S.H.R. 3731.)  At least one study has shown that offenders incarcerated because they committed a property crime are just as likely to commit acts of violence in prison as murderers are.  (14 S.H.R. 3728.)  In a later study, researchers found that capital murders whose sentences were later commuted to life imprisonment had significantly lower rates of violence than other inmates even though a jury had concluded that those murderers would posed a future danger to society.  (14 S.H.R. 3732.)

- Mr. Soffar's relatively late age makes it very unlikely that he will engage in future acts of violence.  The link between age and risk of violence is well established in the academic literature.

- Although Mr. Soffar had a number of disciplinary violations when he was first confined, he has not been involved in an assault (other than throwing urine at an officer) in the past 20 years.  (14 S.H.R. 3738.)  Research has shown that there is almost zero chance that an offender who goes over ten years without an assault will commit another assault.  (14 S.H.R. 3728.)

- Mr. Soffar's links with the outside community further reduces the chance that he will commit any future acts of violence.  (14 S.H.R. 3739.)

- The sharp decline in Mr. Soffar's disciplinary offenses is not simply a function of tighter security.  (14 S.H.R. 3736.)  Indeed, tighter security often leads to an increase in disciplinary violations.  (14 S.H.R. 3736-37.)  Here, by contrast, Mr. Soffar's disciplinary violations fall suggesting that his behavior improved despite the pressures of super-maximum confinement.  (14 S.H.R. 3739.)

- Mr. Soffar's past diagnosis of anti-social personality disorder does not make it probable that he will commit future acts of violence.  (14 S.H.R. 3739.)  As he explains, there is "no known research demonstrating that [anti-social personality disorder] is reliably associated with serious violence in American prisons."  (14 S.H.R. 3728 [Cunningham].)

Clearly, Dr. Cunningham's opinions—which are supported by ample factual evidence and academic studies—would have been very persuasive and provided precisely the type of coherent narrative that was lacking in trial counsel's presentation.

### 2.    The Applicable Standard.

The governing standard applicable to ineffective assistance of counsel claims is discussed in Claim for Relief 4.  (*See infra* II.C.2 (Claim for Relief 4).)

### 3.    Habeas Relief Is Warranted.

Habeas relief is warranted for two reasons:  *First*, the Texas court's decision is contrary to well-settled federal law because the test it adopted for evaluating Mr. Soffar's ineffective assistance of counsel claim flies in the face of that set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  Had the Texas court articulated the correct standard, it would have concluded that Mr. Soffar's counsel were constitutionally ineffective.  *Second*, even assuming the Texas court correctly articulated the *Strickland* standard—which it did not—its holding is an unreasonable application of that standard.  Either way, habeas relief is warranted.

(1)    The Test Adopted By The Texas Court Is Inconsistent With That Set Forth In *Strickland v. Washington*, 466 U.S. 668 (1984).

As discussed above, the test the Texas court adopted to evaluate counsel's performance bears no relationship to the test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984).

(*See supra* at II.D.)  That is just as true with respect to its evaluation of trial counsel's future dangerousness case as it is with respect to the court's evaluation of trial counsel's mitigation case:  the court failed to consider the specific acts of ineffectiveness, considered only trial counsel's actions and not their omissions, and failed to judge trial counsel's performance objectively.  (*See supra* at II.D, IV.A.)  The Texas court's failure to articulate, much less apply, properly the test set forth in *Strickland* means that its findings and conclusions were contrary to clearly established federal law.  This Court can, therefore, grant habeas relief.  28 U.S.C. 2254(d)(1).

(2)    Trial Counsel Were Ineffective.

Had the Texas court adopted the correct standard, it would have been compelled to grant habeas relief because trial counsel indisputably failed to comply with prevailing professional norms in investigating and presenting their future dangerousness case.  Prevailing professional norms require "counsel [to] make every effort to present information on [future dangerousness]" because that topic is on the mind of every capital juror.  (ABA GUIDELINES, Guideline 10.11 (Commentary); TEXAS GUIDELINES ("counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.); 14 S.H.R. 3718.)  In doing so, counsel should consider putting on evidence regarding the defendant's eligibility for parole and the conditions under which the defendant would be confined.  (ABA GUIDELINES, Guideline 10.11 (Commentary); 14 S.H.R. 3718.)  Beyond those specific norms, the professional norms relevant to the investigation and presentation of punishment phase evidence are also applicable.  *Diaz v. Quarterman*, 239 Fed. App'x 886, 889 (5th Cir. 2007).  Those norms are set forth in detail above but, in general, they require counsel to conduct a comprehensive investigation for evidence supporting a sentence of life rather than death.  *See Bell v. Cone*, 535 U.S. 685, 716 (2002) ("making a plea

211

for the defendant's life" is one of the "fundamental duties" of capital representation.)  (Stevens, J. dissenting).  .

As noted above, trial counsel have admitted their failure to properly prepare for the punishment phase of Mr. Soffar's trial.  (26 S.H.R. 6837-38.)  That was evident from their punishment phase presentation.  Contrary to prevailing professional norms, trial counsel failed to call several fact witnesses who could have told simple, clear stories about their personal experiences with Mr. Soffar and why there is no probability that he will commit future acts of violence.  (*See supra* at IV.A, IV.C.)  Jessie Silber, in particular, has known Mr. Soffar throughout his life and could have told the jury about how, as a child, he responded well to positive attention, was not mad or violent, and how, as an adult, he has found himself in an environment clear of drugs and alcohol.  (15 S.H.R. 3883.)  Ms. Silber's testimony would have been a textbook example of the type of mitigating evidence that trial counsel should present.

Similarly, trial counsel could have presented effective expert witness testimony, such as that outlined by Dr. Cunningham in his affidavit.  (*See supra* at IV.A, IV.C; *see also* 14 S.H.R. 3718.)  Such testimony would have brought together the fact witness testimony in a coherent form and would have explained why that testimony negates any finding of future dangerousness.  (*See id.*; *see also* 14 S.H.R. 3718.)  Instead, however, trial counsel relied on an expert witness who provided a generic description of prison conditions and statistics regarding the occurrence of violence in Texas prisons.  To the extent the expert said anything about Mr. Soffar specifically, it was merely to recite his disciplinary violations.  Such testimony is not a substitute for the type of thoughtful, analytical opinions offered by Dr. Cunningham.  (*See* 14 S.H.R. 3718.)

(3)     Mr. Soffar Suffered Prejudice As A Result Of Trial Counsel's
Ineffectiveness.

Mr. Soffar was prejudiced by trial counsel's failure to properly investigate, develop, and present evidence negating a finding of future dangerousness.  As discussed above in claim for relief 12, the state's future dangerousness case was weak at best.  The centerpiece of the state's case was evidence concerning the alleged sexual assault.  (*See supra* at IV.B.)  That evidence was inadmissible.  (*Id*.)  Without that evidence, all the state had was behavior that occurred nearly a decade before his retrial.  *See Soffar III*, 2009 WL 3839012, at *45.  Indeed, in an effort to find some basis for Mr. Soffar's death sentence, the Texas court was forced to go back to Mr. Soffar's behavior as a **six year old**.  *See Soffar III*, 2009 WL 3839012, at *45.

And the court could not even find evidenve of juvenile **offenses** in support of its future dangerousness analysis.  Instead, the Texas court relied on Mr. Soffar's childhood behavior generally, *see Soffar III*, 2009 WL 3839012, at *45, much of which is constitutionally **mitigating**.

Ultimately, the Texas court was only able to point to **four** specific examples of aggressive childhood misconduct, none of which appear to have resulted in an arrest or conviction.  *Soffar III*, 2009 WL 3839012, at *45.  And with respect to juvenile crimes, the court merely noted that Mr. Soffar was adjudicated a delinquent when he was sixteen due to "'minor' offenses."  *Soffar III*, 2009 WL 3839012, at *45.

Mr. Soffar's adult record is similarly bereft of any significant violent offenses, as is his disciplinary record while in prison.  *Soffar III*, 2009 WL 3839012, at *46.  And if the strength— or lack thereof—of the prosecution's future dangerousness case is to be taken account, the evidence negating a finding of future dangerousness must also be considered.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("[A]n otherwise valid conviction should not be set aside

213

if the reviewing court may confidently say, ***on the whole record***, that the constitutional error was harmless beyond a reasonable doubt.") (emphasis added); *Scott v. State*, 227 S.W.3d 670, 690-91 (Tex. Crim. App. 2007) (courts should consider, among other things, the whole record in performing a harmless error analysis).   The evidence trial counsel presented—albeit incomplete—is the type of evidence that courts cite as weighing against a finding of future dangerousness.  *Franklin v. Lynaugh*, 487 U.S. 164, 185 (1988) (O'Connor, J., concurring) (prison violations); *Jasper v. Thaler*, 765 F. Supp. 2d 783, 831 (W.D. Tex. 2011) (religious conversion, growth, and increasing maturity); *Renteria v. State*, No. AP-74829, 2011 WL 1734067, at *39 (Tex. Crim. App. 2011) (classification expert testimony); *Smith v. State*, 779 S.W.2d 417, 421 (Tex. Crim. App. 1989) (en banc) (history of violence).  In light of the above, there is clearly a reasonable probability that, but for trial counsel's failure to investigate, develop, and present additional evidence negating a finding of future dangerousness, the result of the proceeding would have been different.  Accordingly, Mr. Soffar respectfully requests that habeas relief be granted.  28 U.S.C. 2254(d)(1).

> **(4)    The Texas Court's Holding Is An Unreasonable Application of *Strickland v. Washington*, 466 U.S. 668 (1984)**

Even assuming that the Texas court applied the correct standard—which it did not—its denial of Mr. Soffar's ineffective assistance of counsel claim was based on an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984) because the undisputed facts establish that trial counsel failed to comply with prevailing professional norms in investigating and presenting their future dangerousness case.  (*See supra* at IV.C.3(2).)  And, as explained above, there is no doubt that Mr. Soffar was prejudiced by that failure.  (*See supra* at IV.C.3(3).)  Accordingly, Mr. Soffar's constitutional rights were violated and he is entitled to habeas relief.  28 U.S.C. 2254(d)(2).

4.        **The Claim Was Exhausted In The State Court Proceedings.**

Mr. Soffar raised the issue in his state application for writ of habeas corpus at Section

VI.G.2.  The convicting court rejected Mr. Soffar's claim that his right to counsel was violated

and Court of Criminal Appeals adopted that ruling.  *See Soffar VI*, 2012 WL 4713562, at *1.

D.        CLAIM FOR RELIEF 14:  THE TEXAS COURT'S CONCLUSION THAT TRIAL
          COUNSEL WERE NOT INEFFECTIVE IN FAILING TO OBJECT TO THE
          INTRODUCTION OF INADMISSIBLE VICTIM IMPACT TESTIMONY RELATING TO
          A VICTIM NOT NAMED IN THE INDICTMENT IS CONTRARY TO, OR,
          ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *STRICKLAND v.
          WASHINGTON*, 466 U.S. 668 (1984).

1.        **The Relevant Facts**

At trial, the prosecution called Ms. Brenda Moebius, the widow of Mr. Sims, to give

evidence regarding the impact that Mr. Sims's death had on his family.  (40 R.R. 37-44.)  But

Mr. Soffar had not been indicted for the murder of Mr. Sims; which makes it inadmissible as a

matter of settled Texas law.   Just before Ms. Moebious testified, defense counsel made an oral

motion in limine:

> Judge, we would move in limine to prevent an improper victim
> impact testimony from any of the—I assume it's victim impact
> witnesses coming.  We want to make sure that there is no victim
> worth testimony comparison to [the] life of one person over
> another or asking for a particular sentence from any of these.

(40 R.R. at 36.)  The judge simply responded "okay.  (*Id.*)  Significantly, trial counsel did not

object to Ms. Moebius's testimony on the ground that it related to a victim not named in the

indictment.  (*Id*.)

Ms. Moebius provided powerful victim impact testimony.  The prosecutor walked her

through the history of her relationship with Mr. Sims, the birth of their son the year before his

death, the funeral arrangements that she was forced to make, how their son coped growing up

without a father, and Mr. Sims's character and hobbies.  (*Id.* at 37-43.)  In addition to this

lengthy testimony, the prosecution introduced a photograph showing Mr. Sims with his wife and one year old baby.  (40 R.R. at 42-43; 45 R.R. State Ex. P 35.)

It was only after all the damage had been done that defense counsel finally objected on the grounds that the testimony related to a victim not named in the indictment.  (40 R.R. at 42-43.)  Defense counsel had finally realized thatthere was a legal basis to prevent the jury from hearing this inadmissible and prejudicial evidence but it was far too late.  The objection was overruled.  (*Id.*)

**2.      The Applicable Standard.**

The governing standard applicable to ineffective assistance of counsel claims is discussed in Claim for Relief 4.  (*See infra* II.C.2 (Claim for Relief 4).)

**3.      Habeas Relief Is Warranted.**

Habeas relief is warranted because defense counsel's failure to object was objectively unreasonable and prejudicial.  Texas law permits some "victim impact" evidence to be admitted during the punishment phase of capital cases.  *See, e.g. Ford v. State,* 919 S.W.2d 107 (Tex. Ct. Crim. App. 1996).  But Texas courts have made it clear that "victim impact" testimony is only admissible to the extent it relates to victims named in the indictment.  *See, e.g., Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. Ct. App. 1997).  As the court explained in *Cantu*, evidence of the "good character, activities . . . and the impact . . . on [a non-named victim's] family *is not relevant as appellant was not on trial for her murder and such evidence serves no purpose other than to inflame the jury*."  *Id.* at 637.  Put differently, a victim not named in the indictment is "not the 'victim' for whose death appellant has been indicted and tried, and [Texas law] does not contemplate admission of such evidence as permissible under the Eighth Amendment."  *Id.*

In its state habeas findings of fact and conclusions of law, the Texas court—and ultimately the Texas appellate court that adopted those findings—tried to justify the admission of

216

Ms. Moebius's improper testimony by relying on *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007).  According to the Texas court *Roberts* permits "evidence of the effect of *a different offense* on the victim (of the [different] offense)."  *Id.* at 531 (emphasis added).  The court distinguished *Cantu* on the grounds that the evidence at issue in *Roberts* was "evidence of the **effect . . . on the victim**" rather than evidence regarding the effect of an offense on people **other** than the victim.  *Id.*  Here, Ms. Moebius's testimony related to the effect Mr. Sims's death had upon her and her family and *Cantu*, not *Roberts*, governs.  Accordingly her testimony was plainly inadmissible as a matter of Texas law.  *Compare Leffew v. State*, No. 08-06-00105-CR, 2008 WL 162809 (Tex. App. – El Paso Jan 17, 2008) (not designated for publication) (precluding a murder victim's relative from offering victim impact testimony where the victim was not named in the indictment) *with Thompson v. State*, No. 01-08-00156-CR, 2010 WL 457455 (Tex. App. – Houston Feb. 11, 2010) (not designated for publication) (permitting evidence from the victim of a burglary even though the defendant had not been charged with that burglary).

Had the defense counsel properly objected to Ms. Moebius's testimony, the convicting court should have applied *Cantu*, sustained the objection, and precluded her from testifying.  If the court failed to do so, its ruling would have faced reversal on appeal.  There is no excuse for trial counsel's failure to object.  All three members of the defense team knew that Mr. Soffar had not been indicted for murdering Mr. Sims and the powerful nature of Ms. Moebius's testimony was obvious even before she took the witness stand.  No reason—let alone a strategic one—can justify trial court's failure to object in the face of evidence that was barred by unambiguous and well-settled Texas law and their performance clearly fell below an "objective standard of reasonableness."  *Strickland*, 466 U.S. at 688; *Lyons v. McCotter*, 770 F.2d 529, 533-34 (5th Cir.

1985) *cert.* denied, 474 U.S. 1013 (1986) (District Court and the Fifth Circuit found that the defense attorney's "failure to object at the proper time to the introduction of Lyons' prior conviction, or to seek to limit the use of such evidence, constituted constitutionally deficient assistance of counsel" because "[t]o pass over the admission of prejudicial and arguably inadmissible evidence may be strategic; to pass over the admission of prejudicial and clearly inadmissible evidence, as here, has no strategic value.").

Mr. Soffar was prejudiced by his trial counsel's defective performance. The Texas Court of Criminal Appeals has acknowledged that "[t]he danger of unfair prejudice to a defendant inherent in the introduction of 'victim impact' evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high." *See Cantu*, 939 S.W.2d at 637. Here, the victim impact testimony that the prosecution elicited from Ms. Moebius was of the most powerful and prejudicial sort. Further, unlike in *Cantu*, where, "the State did not even mention [the victim impact testimony], much less emphasize it," [939 S.W.2d at 637], the prosecution emphasized the Sims victim impact evidence in summation. (*See* 41 R.R. 47, 57 ("Steve Sims never got to see his son graduate, marry and [sic] him Steve become a [g]randfather.").) In short, it is clear that trial counsel was ineffective in failing to object to the testimony discussed in this issue, and equally clear that the failure was prejudicial. And the obviousness of the constitutional violation is such that the Texas court's finding to the contrary was contrary to, or, at the very least, an unreasonable application of clearly established federal law. Accordingly, Mr. Soffar respectfully requests that the Court grant a writ of habeas corpus.

### 4.    The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar exhausted his claim that trial counsel was ineffective in failing to object to victim impact evidence relating to a victim not named in the indictment in his state habeas petition. Mr. Soffar raised the issue at Claim for Relief VI.G.5. The convicting court rejected

Mr. Soffar's claim and the Court of Criminal Appeals adopted that ruling.  2012 WL 4713562, at *1.

On direct appeal, Mr. Soffar argued that this evidence should not have been admitted, but, based on defense counsel's failure to timely object, the Court of Criminal Appeals overruled the point of error, holding that Mr. Soffar "failed to preserve this argument for appellate review." *Soffar v. State*, AP-75,363, 2009 WL 3839012 at 34 (Tex. Crim. App. 2009).

## V.  THE PROSECUTORS ENGAGED IN MISCONDUCT THAT RENDERED MR. SOFFAR'S RETRIAL FUNDAMENTALLY UNFAIR.

### A.  CLAIM FOR RELIEF 15:  THE TEXAS COURT'S CONCLUSION THAT THE PROSECUTION'S FACTUALLY INACCURATE AND MISLEADING ARGUMENTS TO THE JURY DID NOT DEPRIVE MR. SOFFAR OF A FAIR TRIAL IS CONTRARY TO OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF *NAPUE v. ILLINOIS*, 360 U.S. 264 (1959), *SULLIVAN v. LOUISIANA*, 508 U.S. 275 (1993), AND *GRIFFIN v. CALIFORNIA*, 380 U.S. 609 (1965).

#### 1.  The Relevant Facts.

The prosecutors engaged in serious summation misconduct.  The State's improper arguments touched on every core issue in the case.  *First*, the State claimed that Mr. Soffar "didn't bring you any evidence that he didn't commit this crime."  (35 RR 9.)  *Second*, the State argued that Mr. Soffar "didn't bring you any evidence that the Defendant falsely confessed to this [crime]."  (35 RR 9.)  *Third*, the State improperly argued that Mr. Soffar's statements were credible because they contained facts that only the true perpetrator of the crime could have known.  (35 RR 11, 22-23.)  *Fourth*, the State argued that Mr. Soffar "didn't bring you any evidence that someone other than the Defendant committed this crime."  *Fifth*, in attempting to neutralize the powerful evidence regarding Mr. Soffar's mental deficits, the State argued that he had "been looking around and [he] just can't find the mental health records of [Mr. Soffar]. . . . and don't you know with his well prepared defense that if they're there we would have them."

(35 RR 82.)  *Sixth*, the State incorrectly characterized Mr. Soffar's confinement to Austin State Hospital as a "criminal commitment."  (35 RR 82.)  *Lastly*, the State claimed that Mr. Soffar did not mention the $15,000 reward for information leading to the capture of the Bowling Alley robber to "anybody anywhere anytime other than his sister."  (35 RR 79.)

Each of these statements was untrue.  For example, trial counsel presented alibi evidence through the first-trial testimony of Mr. Soffar's mother, Zelda Soffar.  Alibi evidence is clearly some "evidence that [Mr. Soffar] didn't commit this crime." (35 RR 9.)  Trial counsel also introduced evidence of the numerous inconsistencies between Mr. Soffar's statements and the eyewitness testimony and available forensic evidence, which is certainly evidence that Mr. Soffar "falsely confessed to this crime."  In addition, the State itself introduced Mr. Soffar's Austin State mental health records during Mr. Soffar's first state habeas proceedings.  In fact, stacks of mental health records were introduced during those proceedings by both the defense and the State.  The State made reference to those very records in their pretrial submissions at Soffar's retrial.  (8 CR 2205, 2394.)  And days after the State's summation, it cross-examined a punishment phase defense witness about those very same records and agreed to admit those records as a joint exhibit. (See, e.g., 39 RR 171, 183, 190; 45 RR Joint Ex. P-1.)  The Austin State Medical Records that the state had in its possession also showed, contrary to the state's argument, that the confinement was civil.  (45 RR Joint Ex. No.P-1).  Moreover, as discussed above, each of the correct facts in Soffar's statements had been widely broadcast in the media.  (30 RR 96-100; 43 RR Defense Exs. 59, 60.)  The only reason that Soffar did not present that evidence was because the trial court incorrectly upheld the State's objection to the introduction of media reports. (30 RR 101-06.)  The same is true for the considerable evidence showing that Mr. Reid committed the crime for which Mr. Soffar is sentence to die.  As for the reward,

Sergeant Clawson testified that he *did* recall Mr. Soffar, "asking a question about a reward.  Is there a reward?"  (29 RR 186; *see also* 30 RR 94-95.)

### 2.      The Applicable Standard.

The United States Constitution entitles a defendant to due process of law in all criminal trials.  A number of different components make up what constitutes due process of law.  Among those are the right not to be convicted with false evidence, *Napue v. Illinois*, 360 U.S. 264 (1959), *Miller v. Pate*, 386 U.S. 1 (1967); the right not to testify in one's own defense (and correspondingly, the right not to have the state comment on a defendant's failure to testify), *Griffin v. California*, 380 U.S. 609 (1965); and the right to a trial in which the state, not the defense, bears the burden of proving the elements of the offense beyond a reasonable doubt, *Sullivan v. Louisiana*, 508 U.S. 275 (1993).

### 3.      Habeas Relief Is Warranted.

The state's arguments were improper because, among other things, the arguments (1) were untrue for the reasons described above, *Napue v. Illinois*, 360 U.S. 264, 269-72 (1959); (2) impermissibly shifted the burden of proof onto the defense, *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993); (3) were impermissible comment on Mr. Soffar's constitutionally guaranteed right not to testify, *Griffin v. California*, 380 U.S. 609, 613-14 (1965); and (4) improperly suggested that the jury should draw an adverse inference from the absence of evidence where the evidence was precluded by virtue of the State's own objections, *See, e.g., Paxton v. Ward*, 199 F.3d 1197, 1213-14 (10th Cir. 1999) (granting habeas corpus relief where the prosecutor's "objections had prevented" the defendant from presenting evidence that the prosecutor later argued in summation the defendant should have offered if his defense were credible).  These statements and improper arguments violated Mr. Soffar's right to due process of law.  Moreover, the errors severely prejudiced Mr. Soffar's defense.  The issues of the

reliability of the confession and identity of the perpetrator were central to the case, so any suggestion that Mr. Soffar bore the burden of proving that his confession was false or that he was not the perpetrator went directly to the key issue. Whether or not trial counsel objected to them, the statements were so improper and so prejudicial that they violated Mr. Soffar's right to due process. The court's error was not harmless under any standard.

### 4. The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar exhausted his claim that the prosecution's factually inaccurate and misleading arguments to the jury deprived Mr. Soffar of a fair trial in his direct appeal. During the direct appeal, Mr. Soffar raised the issue in his Twelfth Point of Error. The Court of Criminal Appeals overruled that point of error, finding that Mr. Soffar's counsel had failed to preserve the objections. 2009 WL 3839012, at *29-30.

**B.** **CLAIM FOR RELIEF 16: THE TEXAS COURT'S FINDING THAT TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO OBJECT TO THE PROSECUTORS' IMPROPER SUMMATION ARGUMENTS IS CONTRARY TO, OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF, *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984).**

### 1. The Relevant Facts.

The prosecutors engaged in serious summation misconduct and trial counsel was ineffective for failing to object to it. The State's improper arguments touched on every core issue in the case. *First*, the State claimed that Mr. Soffar "didn't bring you any evidence that he didn't commit this crime." (35 RR 9.) *Second*, the State argued that Mr. Soffar "didn't bring you any evidence that the Defendant falsely confessed to this [crime]." (35 RR 9.) *Third*, the State improperly argued that Mr. Soffar's statements were credible because they contained facts that only the true perpetrator of the crime could have known. (35 RR 11, 22-23.) *Fourth*, the State's argued that Mr. Soffar "didn't bring you any evidence that someone other than the Defendant committed this crime." *Fifth*, in attempting to neutralize the powerful evidence

222

regarding Mr. Soffar's mental deficits, the State argued that he had "been looking around and [he] just can't find the mental health records of [Mr. Soffar]. . . . and don't you know with his well prepared defense that if they're there we would have them."  (35 RR 82.)[14]  *Sixth*, the State incorrectly characterized Mr. Soffar's confinement to Austin State Hospital as a "criminal commitment."  (35 RR 82.)  *Lastly*, the State claimed that Mr. Soffar did not mention the $15,000 reward for information leading to the capture of the Bowling Alley robber to "anybody anywhere anytime other than his sister."  (35 RR 79.)

Each of these statements was untrue and, in any event, improper.  For example, trial counsel presented alibi evidence through the first-trial testimony of Mr. Soffar's mother, Zelda Soffar.  Alibi evidence is clearly some "evidence that [Mr. Soffar] didn't commit this crime." (35 RR 9.)  Trial counsel also introduced evidence of the numerous inconsistencies between Mr. Soffar's statements and the eyewitness testimony and available forensic evidence, which is certainly evidence that Mr. Soffar "falsely confessed to this crime."  In addition, the State itself introduced Mr. Soffar's Austin State mental health records during Mr. Soffar's first state habeas proceedings.  In fact, stacks of mental health records were introduced during those proceedings by both the defense and the State.  The State made reference to those very records in their pretrial submissions at Soffar's retrial.  (8 CR 2205, 2394.)  And days after the State's summation, it cross-examined a punishment phase defense witness about those very same records and agreed to admit those records as a joint exhibit. (*See, e.g.*, 39 RR 171, 183, 190; 45 RR Joint Ex. P-1.)  The Austin State Medical Records that the state had in its possession also showed, contrary to the state's argument, that the confinement was civil.  (45 RR Joint Ex. No.P-1.)

---

[14]   Trial counsel did object to this argument on the basis of burden shifting.  (35 RR 82.)  She did not, however, articulate all available grounds for her objection.

Moreover, as discussed above, each of the correct facts in Mr. Soffar's statements had been widely broadcast in the media.  (30 RR 96-100; 43 RR Defense Exs. 59, 60.)  The only reason that Mr. Soffar did not present that evidence was because the convicting court incorrectly upheld the State's objection to the introduction of media reports. (30 RR 101-06.)  The same is true for the considerable evidence showing that Mr. Reid committed the crime for which Mr. Soffar is sentenced to die.  As for the reward, Sergeant Clawson testified that he *did* recall Mr. Soffar, "asking a question about a reward.  Is there a reward?"  (29 RR 186; *see also* 30 RR 94-95.)

The State's arguments were also improper because, among other things, the arguments (1) impermissibly shifted the burden of proof onto the defense, *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993); (2) were impermissible comment on Mr. Soffar's constitutionally guaranteed right not to testify, *Griffin v. California*, 380 U.S. 609, 613-14 (1965); and (3) improperly suggested that the jury should draw an adverse inference from the absence of evidence where the evidence was precluded by virtue of the State's own objections, *see, e.g., Paxton v. Ward*, 199 F.3d 1197, 1213-14 (10th Cir. 1999) (granting habeas corpus relief where the prosecutor's "objections had prevented" the defendant from presenting evidence that the prosecutor later argued in summation the defendant should have offered if his defense were credible).  Yet trial counsel failed to object to each of these improper statements.

### 2.    The Applicable Standard.

The governing standard applicable to ineffective assistance of counsel claims is discussed in Claim for Relief 4.  (*See infra* II.C.2 (Claim for Relief 4).)

### 3.    Habeas Relief Is Warranted.

Given the well-recognize "significant persuasive force" of a prosecutor's arguments and the "possibility that the jury will give special weight" to them (*see* AMERICAN BAR ASSOCIATION

PROSECUTION FUNCTION STANDARD 3-5.8 (commentary)), no reasonable defense attorney would have sat by while the State time and time again misrepresented the facts, cast false doubt on core elements of Mr. Soffar's defense, improperly capitalized on the fact that the convicting court had (wrongly) excluded relevant evidence, asked the jury to draw an adverse inference from Mr. Soffar's failure to testify, suggested that trial counsel had lied to the jury, and, perhaps most disturbingly, attempted to shift the burden of proof onto the defendant.  Nor could any strategic rationale justify that failure.  And it is equally clear that the convicting court would have, or should have, sustained objections to each of the State's improper arguments.  Accordingly, trial counsel's conduct fell below an objective standard of reasonableness.

The State's conduct "so poisoned the well" that the trial's outcome undoubtedly was affected.  *Arrieta-Agressot v. United States*, 3 F.3d 525, 528 (1st Cir. 1993); *see also Berger v. United States*, 295 U.S. 78, 85 (1935).  Thus, there is a reasonable probability that Mr. Soffar would not have been convicted had the jury never heard these arguments.   Accordingly, Mr. Soffar was denied his right to effective assistance of counsel and the Texas court's contrary conclusion was contrary to, or an unreasonable application of *Strickland*.  28 U.S.C. 2254..

### 4.    The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar exhausted his claim that counsel was ineffective in failing to object to the state's improper arguments in his state application for writ of habeas corpus at Section VI.F.3. The convicting court rejected Mr. Soffar's claim that his counsel was ineffective violated and Court of Criminal Appeals adopted that ruling.

## VI.    CUMULATIVE ERROR.

A.    CLAIM FOR RELIEF 17:    THE TEXAS COURT'S CONCLUSION THAT THE NUMEROUS DEFECTS IN MR. SOFFAR'S RETRIAL WERE HARMLESS IS CONTRARY TO OR, ALTERNATIVELY, AN UNREASONABLE APPLICATION OF *CHAMBERS v. MISSISSIPPI*, 410 U.S. 284 (1973), *TAYLOR v. KENTUCKY*, 436 U.S. 487 (1978).

### 1.    The Relevant Facts.

For purposes of the cumulative error analysis, the relevant facts are those described in each of the preceding Claims for Relief.  Accordingly, Mr. Soffar adopts and incorporates those facts herein.

### 2.    The Applicable Standard.

The cumulative error doctrine "provides that an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal."  *United States v. Delgado*, 672 F.3d 320, 343-44 (5th Cir.). *cert. denied*, 133 S. Ct. 525 (2012) (citing *United States v. Munoz,* 150 F.3d 401, 418 (5th Cir. 1998).  Cumulative error can require the grant of Federal habeas relief where "(1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir.1992) (en banc); *see also* Rachel A. Van Cleave, *When Is an Error Not an "Error"? Habeas Corpus and Cumulative Error Analysis*, 46 BAYLOR L. REV. 59 (1994).  Put differently, the cumulative error doctrine applies when "synergistic or repetitive error violates the defendant's constitutional right to a fair trial." *United States v Delgado*, 672 F.3d 320, 344 (5th Cir. 2012).

The Supreme Court has consistently acknowledged that the cumulative effect of a trial court's errors, even if they are harmless when considered individually, may amount to a violation

of due process. *See, e.g. Chambers v. Mississippi*, 410 U.S. 284, 298, 302-03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (holding that the combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" which "deprived [him] of a fair trial"); *Taylor v. Kentucky*, 436 U.S. 478, 487 n. 15, 98 S.Ct. 1930, 56 L.Ed. 468 (1978) (concluding that "the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness").   Likewise, the Fifth Circuit recognized that cumulative error analysis applies in federal habeas petitions in the case of. There, the court held that federal habeas corpus relief may be granted for cumulative errors

### 3.    Habeas Relief Is Warranted.

As the seventeen Claims for Relief addressed above demonstrate, Mr. Soffar's trial was riddled with constitutional errors including erroneous rulings by the trial court, prosecutorial misconduct, and woefully ineffective assistance of trial counsel.   Although each of those violations warrant the grant of habeas relief, taken together these "synergistic and repetitive errors" unquestionably deprived Mr. Soffar of his fundamental constitutional right to a fair trial. That is particularly true given the weakness of the prosecution case, which both Judge DeMoss of the Fifth Circuit and Justice Cochran have identified.  *Soffar v. Dretke*, ("*Soffar I*") 368 F.3d 441, 478-79 (5th Cir. 2004); *Soffar VI*, 2012 WL 4713562, at *12.

 In short, given the number and focus of the errors described above, no reasonable jurist could find that Mr. Soffar's constitutional right to a fair trial was not violated.   Accordingly, Mr. Soffar respectfully requests that the Court grant a writ of habeas corpus.

### 4.    The Claim Was Exhausted In The State Court Proceedings.

Mr. Soffar exhausted his claim that the cumulative effect of the errors rises to the level of a constitutional violation by raising the issue in both his direct appeal and state habeas proceeding.  Mr. Soffar raised the issue as point of error 21 in his direct appeal.  The Texas Court

of Criminal Appeals overruled that point of error.  Mr. Soffar also raised the issue as claim for relief VIII of his state habeas petition.  The convicting court rejected Mr. Soffar's cumulative error claim and the Court of Criminal Appeals adopted that ruling.  2012 WL 4713562, at *1.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Soffar prays that this Court:

1. Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2. Grant him discovery, and allow him a reasonable amount of time to conduct such discovery, to permit him to develop evidence in support of his claims for relief and allow him a reasonable period of time to amend or supplement this petition to incorporate facts developed during discovery.

3. Grant him an evidentiary hearing at which he may present evidence in support of the foregoing claims, and allow him a reasonable period of time subsequent to any hearing this court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing.

4. Grant such other relief as law and justice require

*/s/ Andrew. G. Horne*

Andrew G. Horne
Matthew F. Dexter
Kristin Sheffield-Whitehead
Beverly M. Baker
Lauren Sabol
        (all admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue,
New York, New York  10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-6460
Email:          andrew.horne@kirkland.com
                matthew.dexter@kirkland.com
                kwhitehead@kirkland.com
                beverly.baker@kirkland.com
                lauren.sabol@kirkland.com

Lawrence C. Marshall (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          lawrence.marshall@kirkland.com

Seth Kretzer (State Bar No. 24043764)
LAW OFFICES OF SETH KRETZER
Lyric Center
440 Louisiana Street, Suite 200
Houston, Texas  77002
Telephone:      (832) 460-1714
Facsimile:      (713) 224-2815
Email:          seth@kretzerfirm.com

Jonathan Landers (State Bar No. 24070101)
2813 W. T.C. Jester
Houston, Texas  77018
Telephone:      (713) 301-3153
Facsimile:      (713) 685-5020
E-mail:         jlanders.law@gmail.com

## **VERIFICATION**

        I, Andrew G. Horne, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Petition for a Writ of Habeas Corpus of a Person in State Custody are true.

        I declare under penalty of perjury that the foregoing is true and correct.


Date:  October 2, 2013                        /s/ *Andrew. G. Horne*
                                            Andrew G. Horne