IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| MAX ALEXANDER SOFFAR, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-3783 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

On July 13, 1980, a gunman shot four people in a bowling alley during a robbery. One of the victims survived. A few weeks later, Max Alexander Soffar gave the police various statements admitting to different degrees of involvement in the crime. In the past thirty-four years Soffar has twice been convicted of capital murder, has twice been sentenced to death, and has availed himself of state and federal review. Soffar has now filed a federal petition for a writ of habeas corpus.

Both parties seek summary judgment. (Docket Entry Nos. 34, 47) Other motions are pending, including Soffar's motion to expedite federal proceedings because of a terminal illness. Having reviewed the extensive record, lengthy pleadings, and the applicable law -- giving special consideration to the Anti-Terrorism and Effective Death Penalty Act's (AEDPA) deferential standards -- the court will grant Respondent's summary judgment motion.

## I. **Factual Background**

Throughout the past three decades various courts have discussed the facts surrounding the bowling alley murders, which have remained remarkably consistent throughout the two separate prosecutions. On direct appeal from Soffar's second conviction the Texas Court of Criminal Appeals outlined the underlying crime for which he stands convicted:

Soffar was convicted of capital murder and sentenced to death for participating in the robbery and execution-style killing of three people at the Fairlanes Bowling Alley in Houston on the night of July 13, 1980. The Fairlanes Bowling Alley was located near the intersection of Windfern Road and Northwest Freeway (U.S. Highway 290). Tommy Temple, Steve Sims, and Greg Garner, employees at the bowling alley, and Arden Alane Felsher, Temple's girlfriend, were shot by Soffar and Latt Bloomfield. Garner survived, despite being shot in the head.

Two unidentified individuals broke into the bowling alley on July 13th shortly after it closed. They gained entry by breaking a glass door on the side of the building and stole several items from the vending machines. Because the door could not be repaired on the 13th, Jim Peters, the general manager, asked Temple, Sims, and Garner to stay at the bowling alley until the cleaning crew was scheduled to arrive at 4:00 a.m. the next morning.

Garner called his mother, Nellie, at 12:08 a.m. on July 14th. He told her, "[S]omeone is here and I need help." She asked him what was wrong, and he said, "[T]hey just left." He said something in a "garbled" voice that sounded like, "[S]omebody hit me with a fish." Nellie heard a phone ringing in the background, and Garner put her on hold. When Garner got back on the line, Nellie asked him if he was bleeding. He responded, "[Y]es mom the side of my face and I'm holding my eyeball." Nellie then sent her husband, Ira, to the bowling alley, and she followed shortly thereafter.

Peters called the bowling alley at approximately 12:15 a.m. Garner answered the phone after a few rings.

-2-

According to Peters, Garner's voice was garbled, and it was hard to understand him. Peters asked Garner if everything was all right, and Garner said, "either, "'[H]e" or "'[T]hey made me lay down' or 'made us lay down.'" Peters called the police and immediately drove to the bowling alley.

Ira arrived at the bowling alley first. He parked directly in front of the entrance doors and brightened his headlights. He saw Garner raise his head, and he observed someone else lying on the floor next to him. Ira went inside and saw Garner, a female, and two males lying on their stomachs. They were positioned parallel to the front door, with their heads toward the snack bar, and their feet toward the control booth. Garner was closest to the door, followed by Felsher, Sims, and Temple. All had been shot in the head. Felsher was "gasping for breath," and Sims and Temple were dead. Ira tried to use the phone at the bowling alley but he "couldn't get an outside line," so he went to a church across the street and asked someone there to call the police. He went back to the bowling alley and asked Garner if the people that shot him were white or black. Garner replied, "White."

Nellie and Peters arrived at the bowling alley, followed by the police and the paramedics. The paramedics unsuccessfully tried to save Felsher's life and sent Garner to Hermann Hospital via Life Flight. A police officer found Sims's wallet in the parking lot. Felsher's purse was on the counter of the control booth, along with a white plastic jug. Peters discovered that approximately $1,000 in cash had been taken from the control center register. He observed that the "folding bills" were taken, but not the coins. He further observed that the cash drawers for the snack bar and the alcohol bar were in the office, and the office door was closed and locked.

None of the latent fingerprints lifted from the front door and counter area led to a suspect. Latent-print examiner Leonard Cooper testified that he did not dust the white plastic jug for prints because it had a rough surface, and he "didn't feel that it would develop a print." Peters testified that, by 3:00 or 3:30 a.m., the police had left and the victims had been removed from the scene. The cleaning crew arrived at 4:00 a.m. and cleaned the entire bowling alley. When police asked

-3-

Peters about the white plastic jug, he told them that he did not know what had happened to it. Detective M.F. Kardatzke testified that he determined that the white plastic jug had been emptied and washed.

Each of the victims suffered one gunshot wound to the head. Felsher had an entry wound on her right cheek and an exit wound on the back of her head. Sims had an entry wound on the back left portion of his head and an exit wound on his left cheek. Sims also had several shallow abrasions on his chest, and a small bullet fragment was recovered just beneath his skin in that area. Temple was shot in his left temple, and the bullet lodged in his right ear canal. Felsher, Sims, and Temple died from their gunshot wounds. Garner had an entry wound above his left ear and an exit wound below his left eye. He lost his eye and suffered severe brain trauma.

When crime-scene investigator D.M. Rushing processed the scene on July 14th, he found one fired bullet under Felsher, a second fired bullet under Sims or close to him, and several bullet fragments under or around Sims. When Officer Ted Thomas later went to the bowling alley on July 23rd, he discovered four bullet holes in the carpet, a third fired bullet in the padding of the carpeting, and a "divot" in the concrete floor beneath the carpet pad. Thomas also found a bullet fragment in the "divot" and another bullet fragment "right at the same location . . . on the back of the carpet, as the carpet was rolled back." Firearms examiner Charlie Anderson determined that the bullets were lead and that they were .38 or .357 caliber, but he was unable to determine "the exact manufacturer and exact configuration of them."

On July 15th, truck driver Andrew Davis found two wallets on the inbound side of Northwest Freeway near the bowling alley. He gave them to Houston police officer R.O. Olive and showed him the location where he found them. Olive searched the area and found two credit cards that belonged to Ira Garner.

Soffar v. State, 2009 WL 3839012, at *1-3 (Tex. Crim. App. 2009).

The police had little information that would suggest who committed the murders. No eyewitnesses saw men enter the bowling alley around the time of the crime. The police could not find

-4-

fingerprints or other conclusive forensic evidence pointing them toward a suspect. Only the people who had been inside the bowling alley could provide information about the crime and the identity of the assailants. Three of those people were dead. While his injuries at least initially impaired his memory, Mr. Garner would eventually provide the police with detailed, but differing, descriptions of the crime and his assailant. Eventually, Soffar identified himself as a suspect in the case.

## A. Mr. Garner's Recollection

The assailant's bullet left Mr. Garner with "sustained severe trauma to his brain from the gunshot wound." State Habeas Record at 8907. Mr. Garner "lost his eye and suffered mental damage, including large gaps or deficits in his memory[.]" State Habeas Record at 8907. Mr. Garner remained hospitalized for several weeks following the crime, enduring "three initial surgeries and a total of twenty-five surgeries to rebuild his facial structure." State Habeas Record at 8908. During that time, he was "still having problems with thinking and with memory[.]" Soffar, 2009 WL 3839012, at *3.

The police repeatedly spoke with Mr. Garner. Mr. Garner provided the police with four statements and later submitted to an interview while under hypnosis. Three days after the crime, Mr. Garner told the police that his assailant was a "20 foot" tall black man. Soffar, 2009 WL 3839012, at *3. He described how the

-5-

killer knocked on the door of the closed bowling alley while carrying a white milk jug. After saying he needed water, the man left but soon returned with a gun. He said he wanted money, forced the victims to the floor, and shot them.

Over time, Mr. Garner recalled new details, some of which conflicted with other accounts. As time progressed and he healed, Mr. Garner gave the police varying descriptions of the shooter, the last of which served as the basis for a composite sketch that they released to the public with the offer of a reward.[1]  Importantly, Mr. Garner's police interviews also resulted in a fuller explanation of the circumstances surrounding the murder.

## B.   Soffar Identifies Himself as a Suspect

On August 5, 1980, a police officer stopped Soffar for speeding on a motorcycle in League City, Texas. Soffar initially gave the police a false name. When the police officer ascertained that the motorcycle was stolen, he arrested Soffar and read him the Miranda rights. Soffar had some jewelry in his possession, which he admitted he had taken in a burglary. When another police

---

[1] With time, Mr. Garner's description of the shooter varied from (1) a twenty-five year old white man with "weird" hair; (2) a twenty-five-to-thirty-year-old, clean-shaven white man who was a little over six feet tall with combed-back hair that was slightly darker than blonde; (3) a twenty-five-to-thirty-year-old white man without facial hair who weighed 175 to 185 pounds who had long brown or dark brown hair combed back over his ears. The police created the composite sketch using the last description. The arresting police officer described Soffar as being a white male, 6'1", 160 pounds, with brown hair, a moustache, and a beard.

-6-

officer arrived at the scene a few minutes later, Soffar said that "he wasn't going to no penitentiary over a stolen motorcycle" and "[t]o check Houston for bigger things." Soffar did not respond when asked what he was talking about.

During transport to the League City Police Department, Soffar said that "if he was going to go to prison it would not be for a motorcycle theft it would be for something bigger." Soffar volunteered that "he had information about the bowling alley murders that had occurred in Houston a few weeks before." Soffar told the police that he wanted to talk with Sergeant Bruce Clawson from the Galveston County Sheriff's Department.

Soffar continued talking to the police when they arrived at the police station. Over the next three days, Soffar provided statements that served as the strongest evidence for his two convictions.

## C. Soffar's Police Statements

With encouragement from Sergeant Clawson on August 5, Soffar agreed to speak to the police. A state magistrate informed Soffar of his constitutional rights and he waived them. An assistant district attorney arrived two hours later to speak with Soffar. The assistant district attorney again read Soffar his rights and recorded their subsequent conversation on a tape recorder he kept inside his pocket.

Soffar said that on the night before the murders he broke into the bowling alley with his friend Latt Bloomfield by kicking in a

-7-

window. The men returned the next night because Bloomfield wanted to rob the bowling alley. Soffar said that he never went inside the bowling alley. He said, however, that he could see Bloomfield go inside with a blue ".38" or ".357" gun and saw the people inside lie down. After hearing two or three shots, Bloomfield ran outside and they drove away. Bloomfield obtained between $500 and $700 from the robbery, which they used to buy drugs.

Detective Gil Schultz then interrogated Soffar for two more hours and eventually prepared a written statement for Soffar's signature. Soffar repeated much of the same story as in his audio taped interrogation, but clarified that he heard about five shots inside the bowling alley. When he had finished, the police transported Soffar to the Houston Police Department.

On the morning of August 6 Detective Kenny Williamson performed a fifty-minute, tape-recorded interrogation of Soffar. Soffar still claimed that Bloomfield committed the robbery while he waited outside in the car.

Afterwards, the police put both Soffar and Bloomfield in separate lineups. While Mr. Garner thought Soffar might have been one of two men who was involved, he could not positively identify the shooter.

After Soffar received the warnings again, Detective Williamson and another detective, J.W. Ladd, interrogated Soffar for approximately one hour and fifteen minutes. Soffar then gave his written second statement. Soffar still claimed that Bloomfield

-8-

committed the robbery while he waited outside in the car, though he added new details. For instance, Soffar said that the men subsequently bought drugs from someone called "Pops" or "Pop." Soffar stated: "I was back over at Pops a few weeks ago and told him about this deal at the bowling alley. I asked him if he had heard about it and that Latt and I had done it. He thought that we were just kidding."

After signing his second statement, Soffar met privately with his mother, uncle, and aunt. Officers Ladd and Williamson then left the police department with Soffar so that he could "point out some of the locations that he had been talking about." After driving to a bowling alley that Soffar said was not the right place, they drove to the site of the crime. Soffar said that it "looked right." Soffar also showed them where he bought drugs from Lawrence Bryant, whose nickname was "Papa."[2] The officers returned Soffar to jail around 11:00 p.m.

The next morning Officers Ladd and Ted Thomas interrogated Soffar for approximately two and a half hours. Detective Williamson also briefly participated in the interrogation. The State of Texas filed a complaint against Soffar that afternoon charging him with the capital murder of Ms. Felsher during the course of robbing Mr. Sims.

---

[2]Soffar also showed officers where he claimed to have committed another robbery with Bloomfield, though the police later determined that Bloomfield had not been involved.

That afternoon Soffar learned that the police had released Bloomfield from custody because he had not been identified in the lineup. Soffar asked a family member to contact police officers so he could speak with them again. That evening Officers Ladd and Williamson again interrogated Soffar. When he asked about Bloomfield, the officers told Soffar that they lacked sufficient evidence to detain him. After more discussion, Soffar gave a final written statement.

Soffar's third written police statement was the lynchpin of the State's case against him. In his third statement Soffar confessed:

My name is Max Soffar. I have been in jail since Tuesday morning for this bowling alley deal. I gave two previous statements, one to detective Schultz and one to detective Ladd. I didn't tell the whole truth in those statements and want to now so that I don't take this whole thing by myself.

One thing that I didn't tell the truth [about] was that Lat[t] Bloomfield and I did this thing when we first got to the bowling alley, not like I said about being there in the parking lot for awhile. [Bloomfield] drove in and we were in his brown thunderbird. [Bloomfield] pulled right to the front door so that the passenger side was next to the bowling alley. I think that there was a couple of cars in the parking lot when [Bloomfield] pulled to the door. [Bloomfield] pulled a stocking over his hair so that his hair would be pulled back. I pulled up my t-shirt over my nose and mouth. [Bloomfield] had his 357 revolver which I think is an R-G model. This gun had about a three inch barrel. He had the gun under his shirt when we walked in a guy asked what we were doing. [Bloomfield] pulled the revolver and stuck [it] in this guy['] s face and said, 'This is a robbery.' [Bloomfield] pulled this guy by the hair and made him get down on his knees. Three other people were over by the snack bar and they saw the man on his knees and walked up. This was [sic] two dudes and a girl. [Bloomfield] told them to

-10-

get on the floor and if they didn't do what he told them that he would shoot this first guy who was already on the floor. They got down on their knees away from the counter and [Bloomfield] made them come closer to the control counter and they did. They were laying down from the door so that there was a dude and then a girl and then another dude and then the last dude. The second dude was trying to look up and [Bloomfield] told him not to be looking and to turn around and lay facing the way all the others were. He then turned around so that they were all facing back towards the snack bar. The second dude kept looking around so [Bloomfield] fired a warning shot into the floor. The girl screamed and then [Bloomfield] told her to shut up and she kept screaming. [Bloomfield] kicked the girl in the back and the second dude who was the one who kept looking up started to raise up. He was about half way up when Lat[t] shot him in the back of the head. Then [Bloomfield] just turned around and shot the third dude. This third dude was the first one [Bloomfield] grabbed and made get on the floor. He shot him the same way as the first one that he shot. [Bloomfield] threw me the gun and told me to shoot the other two. I hesitated and then he said, 'Shoot them now.' I aimed the gun at the other guy who was still left who was closest to the door and fired one time. I hit him in the back of the head behind the ear. I walked around the other side of them and hesitated and [Bloomfield] said, 'Shoot her.' She had her face down and she just looked up at me and I aimed and turned my head and shot her. I think I hit her in the cheek. I had the gun and ran around and looked in the cash register over by where you get the shoes. I got all the bills and a little of the change and then went to the office but the door was locked. I went over to the cash register by the snack bar and took bills out of it too. I put the money in my pockets. I went back by the office and tried to force the door open but I couldn't get it opened. [Bloomfield] was looking under the counter for a money bag and I think he got 50 or 60 dollars. He walked over by the office and I told him I thought I saw some headlights. I went outside but I didn't see anyone so when I came back in [Bloomfield] was rumageing [sic] through their pockets and took the wallets out of their pockets. He took the money and I think that he kept the wallets. We looked around to make sure that nobody was looking and we didn't see anybody. I asked him if he wanted to check in the back and he said no. So, we looked in the bathrooms making sure no body [sic] was in there. Then we left. I still had the gun. [Bloomfield]

drove and we had the windows down to his car. He made a
right on the highway and drove down for a little bit and
then turned around and came back past the bowling alley.
I asked him why he shot the dudes and he said he shot the
dude for raising up and playing hero. He said he made me
shoot the other two so that I would be as guilty as him
if we got caught. I put the gun under the front seat
after I reloaded it and it only had one live bullet in it
before reloading. I don't know where the gun is now.
The last time I saw the gun was I believe last Saturday
night and [Bloomfield] had it at that time. We went to
score some pills and got 24 pills over at the dope house.
These were preludins. After the gas and pills I got 95
dollars out of the deal and I think [Bloomfield] got a
lot more. We went over to my house and did some preludin
and [Bloomfield] said he was afraid someone had seen his
car so he went and took it home. He walked back over to
my house that night and we did the rest of the pills. We
stayed up all day and went out to the park the next day.
I was scared and that is the reason that I did not tell
the whole truth before and I feel like shit and feel bad
about what happened and ought to take my punishment for
it. I think [Bloomfield] and me both ought to pay for
what we did.

Tr. Vol. 43, State's Exhibit 110. Soffar also prepared a diagram
of each victim's position in the shootings.

## D.    **The First Trial**

The State did not call Mr. Garner as a witness at Soffar's
initial trial, possibly because of concerns about his memory.    The
attorneys who represented Soffar in that proceeding, however, never
investigated Mr. Garner's police statements or interviewed him
before trial.[3]    Also, "defense counsel were deficient in not

---

[3]The Fifth Circuit elaborated:

Defense counsel knew that Garner, the only surviving
victim and eyewitness to the crime, was still alive and
possibly available for them to interview.  They also knew
(continued...)

seeking out a ballistics expert when there were such readily apparent discrepancies between the ballistics evidence and the State's theory of the case." Soffar v. Dretke, 368 F.3d 441, 476 (5th Cir. 2004). Trial counsel's failure to investigate discrepancies in Mr. Garner's accounts warranted federal habeas relief, resulting in a retrial in 2006.

## E. The Second Trial of Soffar's Guilt

John Niland, Kathryn Kase, and Stan Schneider represented Soffar at his second trial.[4] Because much of the evidence would remain the same throughout both proceedings, trial counsel prepared against the backdrop of Soffar's first trial.

---

[3] (...continued)

that the State had possession of Garner's transcribed statements containing significant exculpatory materials. Because defense counsel knew before trial that there was no evidence independent of Soffar's confessions that tended to connect him with the crimes, that the State would not call Garner as a witness, and that Garner's statements to the police conflicted markedly with Soffar's confessions and substantially tended to exculpate Soffar, there was an apparent reasonable possibility that information and evidence favorable to Soffar's defense could have been obtained through pretrial investigation and interviews of Garner; furthermore, a reasonable lawyer would have made efforts to investigate whether Garner could testify favorably and decide whether Garner's transcribed statements could and should be introduced as exculpatory evidence.

Soffar v. Dretke, 368 F.3d 441, 475 (5th Cir. 2004).

[4] Unless necessary to identify one individually, the court will refer to Soffar's trial attorneys collectively as "trial counsel."

-13-

The evidence against Soffar was not entirely conclusive. As the Court of Appeals for the Fifth Circuit observed on appeal from his first conviction,

[t]his is absolutely not a case where there was clear objective evidence of Soffar's guilt. No eyewitness testimony placed either Soffar or Bloomfield at the crime scene. No fingerprints lifted from the crime scene matched the fingerprints of either Soffar or Bloomfield. Nothing was taken from the crime scene and later found in the possession of either Soffar or Bloomfield. No blood or hair samples were found at the crime scene that matched those of Soffar or Bloomfield. The gun used to commit this crime was neither found nor introduced into evidence. Neither Soffar nor Bloomfield were linked to a weapon of the same caliber as the bullets recovered from the crime scene. Nothing Soffar told the police in his statements led the police to discover any evidence they did not already have relating to the bowling alley murders.

Soffar v. Dretke, 368 F.3d 441, 479 (5th Cir. 2004). With no forensic evidence, Soffar's own statements formed the core of the prosecution against him.

As the defense's preparation progressed, trial counsel later described how their efforts coalesced into "three central themes . . . at guilt/innocence, including that Paul Reid was the true perpetrator of the primary offense, that [Soffar's] confession was false, and that [Soffar] was at home at the time of the offense." State Habeas Record at 8930.

Trial counsel challenged Soffar's confession on several grounds before trial. The defense emphasized that Soffar's statements were not voluntary, reliable, or credible, primarily because of the conditions surrounding the confessions and obvious

-14-

discrepancies with the evidence. After a suppression hearing, the trial court held that Soffar's police statements could come before the jury. Trial counsel's strategy before jurors, however, still emphasized their theory that the police manipulated Soffar until he gave them information, much of which he obtained from media accounts.

Soffar's police statements were the focal point of the prosecution's case. The State's case portrayed Soffar's evolving narrative with the police as one in which he disclaimed any involvement in the actual shooting until Mr. Garner viewed a line up with Soffar. When confronted with evidence confirming his involvement, Soffar gave the police "the best kind of evidence you're ever going to have[,] a person's own words, telling you what happened." Tr. Vol. 35 at 9. The prosecution's heavy reliance on Soffar's confession is reflected in the closing argument when the prosecution characterized the defense's case as "pick[ing] at all the little details in hopes that [jurors] will ignore that the Defendant admitted he committed this crime. His very own words when he talks to the police tell you that he's guilty of capital murder." Tr. Vol. 35 at 9.

The prosecution placed Soffar's police statements in context with other evidence and argument tending to confirm his guilt. Mr. Garner testified at Soffar's retrial. Before Mr. Garner took the stand, the jury had heard extensive evidence about how his head

injury had impacted his memory and mental functioning. In his testimony twenty-six years after the murders, Mr. Garner could not remember numerous details about his interaction with the police and his descriptions of the crime immediately after the shootings. His memory of the crime itself, however, provided the following chronicle of events:

He testified that he planned to stay late at the bowling alley on the night of the offense because someone had broken in the previous night. He parked his car at the church across the street before the bowling alley closed at 11:30 p.m. He was bowling when he noticed Sims talking to a man by the control-booth counter. He did not recall how the man entered the bowling alley. He bowled a few more frames, and then he walked over to Sims and the man to see what they were talking about. When he got near them, he saw the man pointing a gun at Sims. The man asked Garner if he knew how to open the register, and Garner replied, "No, I do not." The man told Garner to lie down and asked if anyone else was in the building. Either Sims or the man called Felsher and Temple to come over from the bar area. The man asked for their wallets; Garner held his in the air, and the man grabbed it. Next, he heard "two or three" gunshots and passed out. After he awoke, he remained still for ten to fifteen seconds to make sure the man was gone. When he got up to use the telephone, he had to move Sims because Sims was lying on his leg. Garner used the telephone in the control booth and called his mother. While he was talking to his mother, Peters called on the other line. Garner put his mother on hold and spoke to Peters. He did not remember what they talked about and did not remember talking to his mother again after ending his conversation with Peters. He remembered seeing headlights come up to the front door and his father walking into the bowling alley. The next thing he remembered was waking up in the hospital.

Garner testified that the assailant was white, in his mid-twenties, about the same height as Garner (5'11"), with a medium build and dark hair that was at least to his shoulders. Garner did not remember whether he had

any facial hair. He testified that the assailant held
the gun in his right hand.

Soffar, 2009 WL 3839012, at *3. The prosecutor's closing argument
underscored the consistency between Mr. Garner's recollection and
Soffar's police statements.

The prosecution also proffered other evidence connecting
Soffar to the murders. The prosecution argued that Soffar
resembled the composite drawing created from Mr. Garner's final
description of the shooter. Soffar told others about his
involvement in the murders. The prosecution read into evidence
Lawrence Bryant's testimony about a conversation he had with Soffar
"around the last week of July" in 1980.[5] While showing Mr. Bryant
and his girlfriend a 9-millimeter automatic pistol with "a clip
that goes in the bottom," Soffar asked Mr. Bryant if he heard
anything about a bowling alley getting robbed. When Mr. Bryant
said that he had heard about it on the news, Soffar asked if he
would believe that he had done it. When Mr. Bryant asked if he was
crazy, Soffar was "grinning and laughing like it was funny."
Soffar said that he "had shot three people in the back" and that
the police would never catch him because "he was too slick."

Mr. Bryant's girlfriend Mabel Cass heard Soffar tell Bryant
that he killed the people at the bowling alley. Saying "let me show
you what I shot 'em with," Soffar brandished the gun and declared,
"this [is] what I shot the motherfuckers with right here."

_____

[5]Witness Lawrence Bryant who had testified at Soffar's first
trial was deceased at the time of Soffar's retrial in 2006.

On another occasion, Soffar asked his sister, Jackie Soffar Butler, if she had heard about the bowling alley murders. Soffar mentioned the $10,000 reward and said that "the composite drawing looked like [Bloomfield] and that he wanted to turn him in."

The defense's case followed the three strategic themes they had outlined. The defense tried to establish an alibi for Soffar. The defense read into evidence prior testimony from Soffar's deceased mother that around the time of the murders Soffar had been home watching television and then went to bed. Tr. Vol. 32 at 257. She could not say with complete certainty that Soffar never left the residence, but she was a light sleeper and would have heard him leave. Tr. Vol. 32 at 247-53.

Having presented testimony tending to place Soffar elsewhere, the defense wanted to adduce evidence blaming the murder on Paul Reid. The crux of Soffar's theory depended on presenting testimony from Stewart Cook that Reid had confessed to the murders. The trial court, however, limited the evidence Soffar could put before the jury. Despite the defense's repeated and strenuous efforts, the trial court disallowed Cook's hearsay testimony. The trial court also prevented the defense from presenting evidence that Reid had committed crimes similar to the bowling alley murders. The defense was left with nothing to support its theory other than "[t]he fact that Paul Reed lived here [in Houston and] what he looked like[.]" Tr. Vol. 5 at 234.

The defense's case depended on convincing jurors that reasonable doubt existed, primarily because of concerns about Soffar's confession. Trial counsel tried to convince jurors that the police had manipulated the childlike Soffar into giving a statement that contained information readily available through media reports. The defense argued that Soffar's police statements conflicted with what Mr. Garner told the police and what the physical evidence showed had happened.

The jury found Soffar guilty of capital murder. The jury instructions allowed for Soffar's conviction as the shooter or as a party to the offense. The general verdict did not specify under which theory the jury convicted Soffar.

## F. Soffar's Second Death Sentence

The jury decided Soffar's sentence by answering special-issue questions:

### SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant, Max Alexander Soffar, that caused the death of Arden Alane Felsher was committed deliberately and with the reasonable expectation that the death of Arden Alane Felsher would result? "Deliberately" means a manner of doing an act characterized by or resulting from careful consideration; a conscious decision involving a thought process that embraces more than mere will to engage in the conduct.

### SPECIAL ISSUE NO. 2

Do you find from the evidence beyond a reasonable doubt that Max Soffar the defendant himself actually caused the death of Arden Alane Felsher on the occasion in question, or if he did not actually cause the death of Arden Alane Felsher that he intended to kill Arden Alane

Felsher or another or that he anticipated that a human life would be taken?

## SPECIAL ISSUE NO. 3

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Max Alexander Soffar, would commit criminal acts of violence that would constitute a continuing threat to society?

## SPECIAL ISSUE NO. 4

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Max Alexander Soffar, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

(Clerk's Record at 4160-66)

The prosecution argued that Soffar's violence extended far into his past. The prosecution presented testimony and evidence about Soffar's problems with the law as a juvenile, including his referral to the probation department for running away, assault, and being uncontrollable. His unsupervised teenage years resulted in other minor infractions until Soffar was found to be delinquent and sent to Boy's Country in Hockley, Texas. There, Soffar engaged in cruelty to animals. Eventually expelled from Boy's Country, Soffar was put in the juvenile detention facility of the Galveston County jail. He later was placed in the Gulf Coast Trade Center and he successfully completed the vocational program.

Upon release Soffar continued to be engaged in criminal activity, such as possession of marijuana, resisting arrest,

enticing a child, theft, public intoxication, and burglary. Soffar was charged with the aggravated assault of a police officer after pointing a gun and threatening to kill him. On other occasions Soffar threatened his girlfriend with a weapon and said that he would kill her. The prosecution presented the jury with testimony, confirmed by Soffar's confession to the offense, of the abduction and rape of a woman. While incarcerated for the instant murders Soffar had several instances of misconduct such as possession of a nine-inch shank, throwing urine and tobacco at a guard, and other offenses.

Soffar's counsel called sixteen witnesses in the punishment phase of trial. As summarized by the state habeas court, "trial counsel's main punishment themes were residual doubt and that [Soffar] had a 'broken brain' but was able to successfully conform to prison life[.]" To the first theme, "trial counsel believed that the 'thin evidence' against [Soffar] regarding the primary offense would cause jurors to decline to vote for death[.]" State Habeas Record at 8931. To the second, "trial counsel also argued for a life sentence on the basis that [Soffar] was mentally ill, [his] parents were ill-equipped to deal with his needs during childhood, [he] had a very low I. Q., and [his] prison records reflected that he was not a disciplinary problem or future danger." State Habeas Record at 8995-96. "[T]rial counsel 'sought to present evidence that [Soffar] had not been right since birth, he had never received effective treatment for his problems, but that

-21-

when he was in a structured environment, his history and incarceration records showed that he was an excellent candidate for life imprisonment.'" State Habeas Record at 8955 (quoting trial counsel's affidavit).

The jury answered the special issues in a manner requiring the imposition of a death sentence.

## II. **Procedural Background**

Soffar appealed his second conviction and death sentence to the Texas Court of Criminal Appeals. The Court of Criminal Appeals affirmed in an unpublished written opinion. Soffar v. State, 2009 WL 3839012 (Tex. Crim. App. 2009). The United States Supreme Court denied Soffar's petition for certiorari review. Soffar v. State, 561 U.S. 1028 (2010).

Under Texas capital procedure the direct appeal and habeas corpus actions advance concurrently. Soffar's application for state habeas relief raised thirty-eight claims. Soffar amended his application twice. During state habeas review Soffar also submitted a supplemental habeas application that the state habeas court construed as an improperly filed successive habeas action. Without holding an evidentiary hearing, the state habeas court issued findings of fact and conclusions of law recommending that the Court of Criminal Appeals deny relief. The Court of Criminal Appeals adopted most of the proposed findings and conclusions and, on that basis, denied relief. Ex parte Soffar, Nos. WR-29980-03,

WR-29980-04, 2012 WL 4713562 (Tex. Crim. App. 2012).[6] The Supreme
Court denied certiorari review of Soffar's habeas action. Soffar
v. Texas, ___ U.S. ___, 133 S. Ct. 2021 (2013).

Through appointed counsel, Soffar filed a timely federal
petition for a writ of habeas corpus. Soffar has amended his
petition. Soffar's amended petition raises the following grounds
for relief:

1.  Insufficient evidence supports Soffar's conviction
    for capital murder.

2.  The trial court should have found that Soffar did
    not voluntarily waive his rights before giving his
    police statements.

---

[6]Specifically, the Court of Criminal Appeals held:

This Court has reviewed the record with respect to the
allegations made by [Soffar]. We agree with the trial
judge's recommendation and adopt the trial judge's
findings and conclusions with the following exceptions:
Conclusions paragraphs 9-10 and Findings paragraphs 142,
181-86, 215, and 232. Based upon the trial court's
findings and conclusions and our own review, we deny
relief.

Additionally, we do not adopt the trial court's findings
and conclusions that address the merits of [Soffar's]
Supplemental Application: Findings paragraphs 271-88 and
Conclusions paragraphs 23-27. Because the Supplemental
Application was filed in the trial court after the
deadline provided for the filing of an initial
application for habeas corpus, we find it to be a
subsequent application. See Art. 11.071. We further
find that it fails to meet any of the exceptions provided
for in Article 11.071, § 5. Therefore, we dismiss
[Soffar's] subsequent application as an abuse of the writ
without considering the merits of the claims.

Soffar, 2012 WL 4713562, at *1.

3. The trial court violated Soffar's right to present a meaningful defense by excluding the introduction into evidence of media reports about the crime.

4. Trial counsel provided ineffective representation by failing to secure admission of the media reports.

5. Trial counsel provided ineffective representation by not presenting all available evidence demonstrating the falsity of his police statements.

6. The police denied Soffar his right to counsel.

7. The police ignored Soffar's invocation of his right to remain silent.

8. Trial counsel provided ineffective assistance by not developing sufficient evidence to allow for suppression of his police statements.

9. The trial court violated Soffar's constitutional rights by excluding evidence that would suggest that another man committed the murders.

10. Trial counsel provided ineffective assistance by not developing additional evidence inculpating another man in the murders.

11. Trial counsel ineffectively investigated, prepared, and presented mitigating evidence.

12. The trial court violated Soffar's constitutional rights by allowing into evidence a signed statement in which he admitted to an earlier rape.

13. Trial counsel investigated, prepared, and presented insufficient evidence to discourage a finding of future dangerousness.

14. Trial counsel should have objected to the introduction of victim impact evidence in the penalty phase.

15. The prosecution made inaccurate and misleading arguments during punishment summation.

16. Trial counsel should have objected to statements in the prosecution's closing argument.

-24-

17. The cumulative effect of errors in Soffar's proceedings requires federal habeas relief.

Respondent William Stephens moved for summary judgment. (Docket Entry Nos. 34, 44) Soffar has filed a reply and cross-motion for partial summary judgment. (Docket Entry Nos. 45-47) Also, given a recent medical diagnosis of untreatable terminal liver cancer, Soffar has filed a motion for expedited federal proceedings. (Docket Entry No. 48) This action is ripe for adjudication.

## III. **Legal Standards**

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence. See Harrington v. Richter, 562 U.S. 86, ___, 131 S. Ct. 770, 787 (2011); Barefoot v. Estelle, 463 U.S. 880, 887 (1983). "The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." Engle v. Isaac, 456 U.S. 107, 128 (1982). With that respect for the state-court system, several principles circumscribe both federal habeas review and the availability of federal habeas relief.

Traditional concerns for comity and finality distinguish federal habeas review from state trial or appellate practice. Throughout his federal filings Soffar premises his plea for habeas

relief on the argument that he "is an innocent man who has spent thirty four years incarcerated, mostly in solitary confinement on death row, for a crime he did not commit." (Docket Entry No. 48 at 6) A person who stands trial enjoys a presumption of innocence, and the State must prove his guilt beyond a reasonable doubt. "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." Wainwright v. Sykes, 433 U.S. 72, 90 (1977); see also McFarland v. Scott, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined"). But "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." Herrera v. Collins, 506 U.S. 390, 399 (1993). Thus, by the time an inmate invokes federal habeas jurisdiction he "comes before the habeas court with a strong – and in the vast majority of the cases conclusive – presumption of guilt." Schlup v. Delo, 513 U.S. 298, 326 (1995); see also Herrera, 506 U.S. at 399–400 (stating that a petitioner "does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law"); Moore v. Quarterman, 534 F.3d 454, 464 (5th Cir. 2008) (stating that there is "no presumption of innocence at a habeas proceeding"); Bosley v. Cain, 409 F.3d 657, 664 (5th Cir. 2005) (same). What a federal court has "to deal with [on habeas review] is not the petitioners' innocence or guilt but

-26-

solely the question whether their constitutional rights have been preserved." Moore v. Dempsey, 261 U.S. 86, 88 (1923).

Federal statutory law limits what and how a federal court reviews whether a State has preserved an inmate's constitutional rights. The Anti-Terrorism and Effective Death Penalty Act (AEDPA) "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" Wilson v. Corcoran, 562 U.S. 1, 16 (2010) (quoting 28 U.S.C. § 2254(a)). Accordingly, "federal habeas corpus relief does not lie for errors of state law." Swarthout v. Cooke, 562 U.S. 216, ___, 131 S. Ct. 859, 861 (2011) (quotation omitted); see also Corcoran, 562 U.S. at 16; Estelle v. McGuire, 502 U.S. 62, 67 (1991).

How an inmate has litigated his federal constitutional claims determines the course of federal habeas adjudication under the exhaustion and procedural-default doctrines. The AEDPA precludes federal relief on constitutional challenges that an inmate has not first raised in state court. See 28 U.S.C. § 2254(b)(1). Also, the federal procedural doctrine prevents consideration of claims that an inmate did not litigate in compliance with state procedural law. See Dretke v. Haley, 541 U.S. 386, 392 (2004); Lambrix v. Singletary, 520 U.S. 518, 523 (1997); Coleman v. Thompson, 501 U.S. 722, 729 (1991). A federal court may review an inmate's unexhausted or procedurally barred claims only if he shows: (1) cause and

actual prejudice; or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'" Haley, 541 U.S. at 393 (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner and the state courts have adjudicated their merits, the AEDPA provides for a deferential federal review. "[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief." Montoya v. Johnson, 226 F.3d 399, 404 (5th Cir. 2000); see also DiLosa v. Cain, 279 F.3d 259, 262 (5th Cir. 2002). A petitioner cannot meet this burden by merely alleging constitutional error. Instead, "focus[ing] on what a state court knew and did," Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011), an inmate must show that the state court's adjudication of the alleged constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" Berghuis v. Thompkins, ___ U.S. ___, 130 S. Ct. 2250, 2258 (2010) (quoting 28 U.S.C. § 2254(d)(1)); see also Thaler v. Haynes, 559 U.S. 43, 47 (2010); Bell v. Cone, 535 U.S. 685, 698 (2002); Early v. Packer, 537 U.S. 3, 7-8 (2002); Williams v. Taylor, 529 U.S. 362, 413 (2000). This requires a "substantially higher threshold" than merely showing the existence of constitutional error. Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

The AEDPA also affords significant deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2) "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). A federal habeas court must presume the underlying factual determinations of the state court to be correct unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Miller-El, 537 U.S. at 341. "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." Valdez v. Cockrell, 274 F.3d 941, 948 n.11 (5th Cir. 2001); see also Young v. Dretke, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit."). As the same judge presided over the second trial proceedings and the state habeas action, the presumption of correctness for state habeas factual findings is especially strong. See Mays v. Stephens, 757 F.3d 211, 214 (5th Cir. 2014); Clark v. Johnson, 202 F.3d 760, 764 (5th Cir. 2000).

Both parties have moved for summary judgment. Summary judgment is proper where the record shows "no genuine issues as to any material fact and that the moving party is entitled to judgment

as a matter of law." FED. R. CIV. P. 56. "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." Clark, 202 F.3d at 764. In ordinary civil cases a district court considering a motion for summary judgment must view all the evidence in a light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

But where the state courts have already resolved a prisoner's factual allegations by express or implicit findings and the prisoner fails to prove by clear and convincing evidence that the presumption of correctness of 28 U.S.C. § 2254(e)(1) should not apply, construing facts in his favor is not appropriate. Traditional summary judgment standards apply only if they do not conflict with the language and intent of the AEDPA or other habeas law. See Smith v. Cockrell, 311 F.3d 661, 668 (5th Cir. 2002), overruled on other grounds by Tennard v. Dretke, 542 U.S. 274 (2004); Rule 12 of the RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS. Because Soffar presented most of his claims in state court and the state courts issued detailed findings of fact and explicit conclusions of law with respect to each exhausted claim, the AEDPA largely guides this court's summary judgment review. With respect to any issue falling outside the AEDPA standards federal law plainly allows for summary dismissal if unexhausted claims lack merit.

With those standards in mind, the court turns to Soffar's federal petition.

## IV. Analysis

### A. Insufficiency of the Evidence (Claim 1)

Soffar contends that insufficient evidence supported his capital murder conviction. As previously noted, the prosecution primarily based its case on three areas of evidence: Mr. Garner's recollection, Soffar's incriminating statements to others, and, most importantly, Soffar's third written police statement. Soffar argues that the prosecution provided the jury with an inadequate basis to find beyond a reasonable doubt that he committed capital murder.

Soffar's insufficiency-of-the-evidence claim raises two challenges to the State's heavy reliance on his incriminating police statements. Starting with a predicate assumption that his police statements were the only meaningful evidence that proved his guilt,[7] Soffar argues that a defendant's conviction cannot constitutionally rest on a confession without adequate corroboration. (Docket Entry No. 42 at 41-42) Soffar also contends that, as a factual matter, his third written police statement "is so implausible that it is not evidence at all." (Docket Entry No. 42 at 44) Soffar asserts that contradictions and

---

[7]Soffar, in fact, argues that "the only evidence against Mr. Soffar is a demonstrably false police-composed confession[.]" (Docket Entry No. 48 at 3)

-31-

inconsistencies between his statement, Mr. Garner's recollection, and forensic evidence prove that Soffar's third police statement lacks any degree of reliability.

Under Jackson v. Virginia, 443 U.S. 307 (1979), a reviewing court affirms a jury's decision if, when considering all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have returned a verdict unfavorable to the defendant. This demanding inquiry is highly deferential to the jury's verdict. See United States v. Harris, 293 F.3d 863, 869 (5th Cir. 2002); United States v. Duncan, 919 F.2d 981, 990 (5th Cir. 1990). The AEDPA augments the Jackson analysis, creating a doubly high barrier to federal habeas relief. See Coleman v. Jackson, ___ U.S. ___, 132 S. Ct. 2060, 2062 (2012); Perez v. Cain, 529 F.3d 588, 599 (5th Cir. 2008). When adjudicating an insufficiency-of-the-evidence claim a federal court only asks whether the state court's assessment of the already-strict Jackson standard was unreasonable. Together, Jackson and the AEDPA create a "double dose of deference that can rarely be surmounted." Boyer v. Bellegue, 659 F.3d 957, 964 (9th Cir. 2011).

When Soffar raised this claim on direct appeal the Court of Criminal Appeals extensively reviewed the relevant evidence, including the conflicting nature of the evidence before the jury.[8]

---

[8] The state habeas court found that Soffar "retooled" his sufficiency-of-the-evidence claim as "a claim of actual innocence with essential similar evidence to that previously considered on appeal[.]" State Habeas Record at 8915.

-32-

Applying Jackson, the Court of Criminal Appeals nonetheless found that the jury could still rationally find him guilty of capital murder. The Court of Criminal Appeals acknowledged that the jury's decision to convict in this case largely depended on his third written police statement. The Court of Criminal Appeals observed, however, that other trial evidence corroborated that account:

- witnesses testified that Soffar bragged that he had committed the crime;

- expert testimony about the caliber of the murder weapon was not inconsistent with Soffar's description of the gun used;

- the jury could rationally find that the murderer fired the same number of shots that Soffar described in his statement;

- Soffar's comment to his sister that he wanted to turn Bloomfield in for the murder matched the manner in which Soffar progressively shifted the blame in his successive police statements, particularly with his full confession once the police released Bloomfield from custody.

Soffar, 2009 WL 3839012, *9-10.

Notwithstanding that corroboration, the Court of Criminal Appeals acknowledged that Mr. Garner provided "varying accounts of what happened." The Court of Criminal Appeals elaborated:

Police began questioning Garner only three days after his brain surgery. Garner's description of the assailant ranged from a "20 foot" tall black man to a white man who was a little taller and bigger than himself. He first told police that the assailant gained entry by asking for water. Later, he said that the assailant asked for air for his tires. When he testified at trial, he did not recall how the assailant entered the bowling alley. He was unclear on the number of shots that he heard. He told police that he laid down next to Felsher after using

-33-

the telephone. However, he testified at trial that the only thing he remembered after using the telephone was seeing headlights, his father walking into the bowling alley, and then waking up in the hospital.

Id. at 10. Additionally, the appellate court acknowledged the differences and similarities between Soffar's and Mr. Garner's description of events.[9]

With conflicts in the various accounts, "the jury was faced with a credibility choice." Id. Both sources of information had inherent problems: "Garner's credibility was affected by his memory loss. And Soffar's credibility was affected by his (1) false confession to the burglary of the bowling alley on July 12th, (2) attempt to blame Bloomfield for the robbery and shooting the victims while he waited outside in the car, and (3) false accusation that Bloomfield robbed the U-Totem convenience store." Id. But "the jury is the sole judge of a witness's credibility, and the weight to be given the testimony," allowing

_____

[9]The Court of Criminal Appeals described how

Garner's and Soffar's accounts about the robbery and shootings varied. Their accounts were inconsistent regarding: whether there were one or two robbers; whether the robber or robbers were disguised; how the robber or robbers gained entry to the bowling alley; whether any of the victims screamed or were kicked; whether a warning shot was fired; the positions of the victims when they were shot; whether the cash register was emptied before or after the shootings; and whether the victims' wallets were taken before or after the shootings.

Soffar, 2009 WL 3839012, at *9.

jurors to "choose to believe some testimony and disbelieve other testimony." Id. Accordingly,

[t]he jury in this case was free to take all of the evidence into account and to believe or disbelieve any portion of Soffar's statements about the offense and other offenses, Garner's statements to police, or Garner's trial testimony. We should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility. With this in mind, we hold that the totality of the evidence, when viewed in the light most favorable to the verdict, was sufficient for a rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. Further, the jury's verdict is not against the great weight and preponderance of the evidence. Nor is the evidence so weak that the jury's verdict seems clearly wrong and manifestly unjust. Having determined that the evidence is legally and factually sufficient to support Soffar's conviction, we overrule his seventh point of error.

Id. (footnotes omitted).

Soffar has not shown that the state court's adjudication of this claim was contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1). The evidence came before the jury in a muddled and contradictory manner because Mr. Garner and Soffar's accounts of the crime varied over time and conflicted with one another at crucial points. Soffar's federal briefing extensively discusses the differences between each of Soffar's evolving police statements. The differences between the various accounts were not inconsequential: they described either one or two robbers, if the man or men wore disguises, how they entered the bowling alley, whether the shooter filed a warning shot, if the robber or robbers were disguised, how the robber or robbers gained

entry, where the victims were located when shot, whether the theft from the cash register and the victims happened before or after the shooting, among other facts. Soffar also meticulously dissects the transcripts of his police interrogations in an effort to prove that the police provided the crucial details found in Soffar's final statement. Soffar notes the disharmony between the account contained therein and objective evidence.

Jurors faced a difficult task in weighing out Soffar and Mr. Garner's credibility. Obviously, time and injury impaired Mr. Garner's account; self-interest and other factors -- including possible mental problems -- impaired Soffar's credibility. The dissonance between the various accounts can lead to various conclusions. The conflicting evidence has posed great concern for judges throughout these proceedings. Still, the Supreme Court has recently cautioned that federal courts engaged in a Jackson analysis should not "unduly impinge[] on the jury's role as factfinder." Coleman v. Johnson, ___ U.S. ___, 132 S. Ct. 2060, 2064 (2012). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" Id. Courts should avoid "fine-grained factual parsing" that would supplant "the only question under Jackson [which] is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." Id.

Under the Jackson standard the Court of Criminal Appeals assumed that jurors resolved credibility questions in a manner favorable to the prosecution. The Court of Criminal Appeals' approach was consistent with federal law. See Cavazos v. Smith, ___ U.S. ___, 132 S. Ct. 2, 6 (2011) (observing that Jackson "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting Jackson, 443 U.S. at 319). This deference toward "all of the evidence" preserves "the factfinder's role as weigher of the evidence[.]" McDaniel v. Brown, 558 U.S. 120, 133-34 (2010) (quotations omitted).[10]

Soffar attacks the integrity of his police statements with the presumption that nothing else inculpated him. Soffar relies on cases in which the United States Supreme Court has held that in a

---

[10]The Jackson analysis is "a solely retrospective analysis of the evidence considered by the jury[.]" Schlup v. Delo, 513 U.S. 298, 340 (1995). Soffar's insufficiency-of-the-evidence claim asks this court to reconsider evidence that did not come before the jury in the guilt/innocence phase. For example, Soffar argues that the confession is not reliable because "at the same time he was confessing to the bowling alley murders, Mr. Soffar also provided exquisitely detailed confessions to a number of other crimes (including murders, robberies, and burglaries) that never occurred." (Docket Entry No. 45 at 4) Because evidence of other false confessions did not come before the jury, any evidence that the jury did not have before it is not appropriate for a Jackson analysis.

<u>federal</u> prosecution "a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." <u>Wong Sun v. United States</u>, 371 U.S. 471, 488-89 (1963). Soffar, however, has not pointed to any Supreme Court case that has held that the Constitution mandates this rule. No federal constitutional principle requires that state prosecutors base their case on something more than a defendant's confession. <u>See</u> <u>Lucas v. Johnson</u>, 132 F.3d 1069, 1078 (5th Cir. 1998) (finding no constitutional basis to a petitioner's argument that the State must present "evidence to corroborate his confession"); <u>West v. Johnson</u>, 92 F.3d 1385, 1393 (5th Cir. 1996) (finding "no authority for the proposition that application of [the confession corroboration] rule is constitutionally mandated in a <u>Jackson v. Virginia</u> analysis"); <u>Aschmeller v. State of South Dakota</u>, 534 F.2d 830, 832, n.1 (8th Cir. 1976) ("The corroboration rule has never been termed a constitutional requirement."). Thus, even if the jury had based his conviction only on Soffar's confession, the Constitution does not require more.

Moreover, the State presented other evidence that corroborated Soffar's guilt. In particular, Soffar made incriminating statements to people suggesting his role in the murders. While Soffar challenges whether that evidence truly substantiated the account in his third written statement, when reviewing the witnesses' testimony in the manner required by <u>Jackson</u> it would not be

-38-

reasonable to find that Soffar's comments to others indicated his involvement in the bowling alley murder.

The evidence in this case contains troubling inconsistencies, omissions, and errors. Reasonable minds may differ on how strongly the prosecution's evidence inculpated Soffar when reviewing the evidence de novo. But at this late stage in the process, the long-held limitations on federal habeas review constrain this court's inquiry to whether a state court would be unreasonable in assessing, in a light most favorable to the verdict, if a rational juror could find Soffar guilty beyond a reasonable doubt. While Soffar argues that another conclusion is not unreasonable, a rational juror could resolve conflicts in the evidence and testimony in a manner supporting his guilt. The state court was not unreasonable in rejecting Soffar's Jackson claim. Soffar has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1).

## B. Soffar's Police Statements (claims 2, 5-8)

Soffar's federal petition renews his attacks on the integrity of his police statements. In his second ground for relief Soffar argues that the trial court should have found that he did not voluntarily waive his rights before being interrogated. Soffar's sixth and seventh claims argue that the police ignored him when he invoked his right to counsel and his right to remain silent.

Soffar's fifth and eighth grounds for relief fault the manner in which trial counsel challenged his police statements. The court will outline the common background of these claims before addressing their merits.

## 1.  Background

The parties have extensively litigated Soffar's police statements, both in his initial trial and in the proceedings leading to the instant federal petition. Courts have repeatedly analyzed the basis for Soffar's attacks on his police statements, with little difference in the substance of the factual review. Since the AEDPA presumes correct the factual findings of a state court, 28 U.S.C. § 22544(e)(1), the court bases its adjudication on the Court of Criminal Appeals' summary on direct appeal from Soffar's second conviction:

Soffar was arrested by League City Police Officer Raymond Willoughby on August 5, 1980, for theft of a motorcycle. Willoughby noticed that Soffar's eyes were bloodshot, his speech was slurred, and that he smelled of alcohol. Willoughby read Soffar his Miranda rights, and Soffar told Willoughby that he understood his rights. Willoughby believed that Soffar understood his rights and that his judgment was not impaired, even though he thought that Soffar was intoxicated. Detective Palmire from the Friendswood City Police Department came to the scene and spoke to Soffar after warning him. Soffar told Palmire, "I'm not going to the penitentiary for any dam [sic] bike. You'd better check Houston for bigger things." When Palmire inquired further, Soffar wouldn't say anything else. Palmire did not believe that Soffar was under the influence of drugs or alcohol.

While Willoughby was transporting Soffar to the police department, Soffar told Willoughby that he would not be

going to prison for theft of a motorcycle but would be going for "something bigger." Soffar then told Willoughby that he had information about the bowling-alley murders in Houston and asked Willoughby to contact Sergeant Clawson, who was a member of the Galveston County Sheriff's Office. Beginning in 1979, Soffar acted as a paid drug informant for Clawson. Clawson usually saw Soffar on a weekly basis, and he believed that Soffar trusted him and, perhaps, regarded him as a friend. Clawson formed the impression that Soffar had a poor sense of reality and was impulsive, child-like, and eager to please law enforcement.

After Willoughby and Soffar arrived at the League City Police Department, Willoughby told Lieutenant Steve Johnson about Soffar's request to talk to Clawson. Johnson called Clawson, and Clawson came to the League City Police Department. Clawson gave Soffar his Miranda warnings. Shortly thereafter, Willoughby, Johnson, and Clawson escorted Soffar to the municipal court so that Soffar could receive warnings from a magistrate. Soffar did not have any questions about the magistrate's warnings and indicated that he understood them. When they returned to the police department, Clawson talked to Soffar a little about the murders. Clawson believed that he was brought in to provide Soffar with a friendly face and to "hold [his] hand during the course of the interrogation."

While Clawson spoke to Soffar, Detective Gil Schultz from the Houston Police Department arrived at the station. After reading Soffar his Miranda rights, Schultz interviewed Soffar about the bowling alley murders, and after learning some basic information about the offense, Schultz called Terry Wilson, an assistant district attorney with the Harris County District Attorney's Office, and requested his assistance. When Wilson arrived, with Schultz present, Wilson warned Soffar per Miranda and questioned him about the murders. According to Wilson, the interview was brief; Schultz told him that Soffar did not want to talk to him anymore because Soffar did not like Wilson. Wilson did not construe Soffar's refusal to talk to him as an invocation of his right to remain silent; it was because Soffar personally disliked him. Wilson was told that Soffar said, "Keep that four-eyed MF away from me." Soffar also informed Clawson that he did not want to talk to Wilson, and Clawson believed that it was because Soffar "did not like"

-41-

Wilson. And sometime earlier, Soffar had told Clawson that he did not want to talk to Palmire. Clawson believed that Soffar had a "personal problem" with Palmire, which Soffar had conveyed in a "graphic manner."

Schultz and Clawson then spoke to Soffar, though Clawson left the room at some point. Schultz later came out and found Clawson and told him that Soffar wanted to talk to him again. Clawson believed that Schultz sought his assistance because Schultz had "hit a brick wall" with Soffar. When Clawson spoke to Soffar, he noticed that he was nervous. Soffar asked Clawson how long it would take to get an appointed attorney in Harris County. Responding, Clawson said: "a day, a week, a month." He did not know how the system worked in Harris County. Soffar also asked Clawson if he should get a lawyer. Clawson told Soffar, "Well, if you're guilty you should talk to police and if you're not guilty you should get an attorney." Clawson also told Soffar that this was "serious." Soffar asked Clawson if he was on his own, and Clawson told him that he was. Clawson viewed the exchange as Soffar's acknowledgment that Clawson could not help him this time, even though Clawson had helped him with previous charges. Clawson did not interpret Soffar's question about a lawyer as a request for counsel. Clawson then asked Soffar if he wanted to talk to Schultz again, and Soffar said that he did.

Soffar later gave a signed written statement to Schultz. Schultz stated that Soffar had told him that he had used drugs earlier that day, but Shultz observed that Soffar did not appear to be under the influence of drugs or alcohol.

Soffar, 2009 WL 3839012 at *25-27.

Before turning to the merits of Soffar's federal challenge to his police statements, the court will review the various related legal issues that Soffar has raised for the past three decades that frame the matters in the instant petition. The state trial court conducted a suppression hearing during Soffar's initial trial proceedings. Based on the testimony from that hearing, the trial

-42-

court found no constitutional error in putting Soffar's statements before the jury.

In Soffar's initial state habeas action the state habeas court held an evidentiary hearing in which Soffar "presented extensive evidence, documentary and lay and expert testimony." State Habeas Record at 8912. The state habeas challenge explored whether Soffar's mental condition made him able to waive his rights voluntarily. The testimony included an expert opinion that Soffar had been born with brain damage that interfered with his ability to appreciate the consequences of his actions, hampered his capacity to reason, and left him with Attention Deficit Disorder.

The first federal habeas proceedings questioned: trial counsel's representation with regard to seeking suppression of the statements, whether Soffar exerted his right to silence and to legal representation, whether the police coerced Soffar, and whether he made his police statements voluntarily.

Because he filed his federal petition two days before the amended statute's effective date, the AEDPA did not apply to Soffar's initial habeas petition. (Soffar v. Johnson, No. 96-cv-1281, Docket Entry No. 37 at 13) The federal district court's analysis followed the same reasoning as the state courts and found no error in the taking of Soffar's police statements. A panel of the Fifth Circuit reversed the denial of habeas relief on the question of whether the police ignored Soffar's exertion of his

-43-

constitutional rights. However, on en banc review the Fifth Circuit concluded that Soffar never invoked his right to silence and that his inquiry about an attorney "did not rise to the level of an unambiguous invocation of his right to counsel. . . ." Soffar, 300 F.3d at 595.[11] Importantly, the Fifth Circuit concluded that "[t]here is no evidence indicating that Soffar's waivers were not fully voluntary. Soffar himself instigated the discussion about the bowling alley murders following his arrest for an unrelated crime. He was not threatened or coerced by the police, and continuously volunteered information about the crime during his interrogation." Soffar, 300 F.3d at 593.

When the en banc Fifth Circuit Court remanded the case to the panel for consideration of the other claims raised by Soffar's appeal, the panel again issued an opinion reversing the denial of habeas relief -- this time because trial counsel failed to investigate adequately problems with Mr. Garner's various accounts of the crime. The district court subsequently granted Soffar's habeas petition on remand.

The admissibility of Soffar's police statements again played a critical role in his defense on retrial. In 2006 the trial courts held a four-day suppression hearing. Numerous witnesses

---

[11] In its first opinion a panel of the Fifth Circuit found that Sergeant Clawson ignored an unambiguous exertion of Soffar's right to counsel. See Soffar, 237 F.3d 455-57. Also, the panel opinion concluded that Sergeant Clawson tricked Soffar into waiving his rights and making police statements. Id. at 458-60.

-44-

provided testimony relating to Soffar's police statements, including various police officers involved in his interrogation. In addition, the trial court agreed to take into account the prior proceedings, including the evidence Soffar had developed in his initial state habeas proceedings. State Habeas Record at 8939. The trial court denied Soffar's motion to suppress, Clerk's Record Vol. 5 at 1412, Vol. 8 at 2140-44, and Soffar's statements came before the jury.

The falsity of Soffar's confession was a central theme in trial counsel's strategy in the second trial. The defense's case placed strong emphasis on Soffar's contention that police manipulation and Soffar's mental impairment caused him to make a false confession. Tr. Vol. 35 at 50-51. Trial counsel also argued that Sergeant Clawson violated Soffar's constitutional rights by ignoring his inquiry about getting an attorney.[12] The jury found

---

[12]Trial counsel moved for the trial court to instruct the jury to disregard any statement taken in violation of the law. Clerk's Record at 4089-99. The trial court denied the specific language in the defense's request, but charged the jury as follows:

> A statement of a defendant made while in custody of the police shall be admissible in evidence against the defendant if the statement was freely and voluntarily made without compulsion or persuasion. Unless you believe from the evidence beyond a reasonable doubt that an alleged statement of the defendant was freely and voluntarily made by the defendant without compulsion or persuasion or if you have a reasonable doubt thereof you shall not consider such alleged statement or any evidence obtained as a result of the statement for any purpose.

Clerk's Record at 4110.

Soffar guilty, presumably concluding that his statements to the police were voluntary and free from compulsion.

In his tenth point of error on direct appeal, Soffar again made a multi-faceted attack on the validity of his police statements. After reviewing the relevant facts, the Court of Criminal Appeals succinctly rejected each challenge to Soffar's police statements. The Court of Criminal Appeals found that Soffar did not make an "unambiguous assertion of his right to remain silent." The Court of Criminal Appeals denied Soffar's allegation that Sergeant Clawson tricked him into waiving his right to counsel by "agree[ing] with the Fifth Circuit's resolution of that claim" during his initial habeas review. Relying on the Fifth Circuit's decision, the Court of Criminal Appeals also "conclude[d] that Soffar's questions to Clawson about hiring an attorney did not amount to an unambiguous or unequivocal request for counsel," particularly because "the substance of each specific inquiry made by Soffar has been rejected as a clear invocation of the right to counsel[.]" The Court of Criminal Appeals also held that the police had no obligation to clarify whether Soffar wanted an attorney. Finally, the Court of Criminal Appeals rejected Soffar's complaint that his statements were involuntary:

> In point of error ten (e), Soffar claims that his statements were involuntary for various reasons. For instance, Soffar claims that he had a "child-like" mentality, that he was misled about his right to counsel by Clawson, and that he was intoxicated when he was arrested. The determination as to whether a confession

was given voluntarily must be analyzed by examining the "totality of the circumstances."

The evidence at the suppression hearing did not establish that Soffar's statements were involuntary because of intoxication. Although Willoughby testified that Soffar seemed to be "somewhat intoxicated," he did not believe that Soffar was intoxicated "to the point that he would not have understood his rights or the circumstances that he was in at the moment." Palmire, Clawson, and Schultz testified that Soffar did not appear to be under the influence of alcohol or drugs. And all of these witnesses testified that Soffar appeared to understand the warnings, which were repeated numerous times, and that he was not subjected to any threats or promises when interrogated. Under the totality of the circumstances, the trial judge did not abuse her discretion in finding that Soffar's statements were voluntary.

Soffar, 2009 WL 3839012 at *27-28.

Soffar also challenged his statements on state habeas review. The state habeas court denied relief, relying primarily on both the Fifth Circuit's prior rejection of his claims and the Court of Criminal Appeals' opinion after his second conviction. State Habeas Record at 8922-23, 8939. The state habeas court also concluded that Soffar "fail[ed] to demonstrate that his statements regarding the primary offense . . . were given in violation of [his] constitutional rights[.]" State Habeas Record at 8980.

In the present action Soffar raises five claims relating to his police statements:

- The trial court should have found that Soffar did not voluntarily waive his rights before giving his police statements (claim 2).

- Trial counsel provided ineffective representation by not presenting all available evidence demonstrating the falsity of his police statements (claim 5).

-47-

- The police denied Soffar his right to counsel (claim 6).

- The police ignored Soffar's invocation of his right to remain silent (claim 7).

- Trial counsel provided ineffective assistance by not developing sufficient evidence to allow for suppression of his police statement (claim 8).

As an initial matter, Soffar argues that the Fifth Circuit's rejection of his claims in the first round of federal review does not govern his new habeas action. The legal analysis from his prior federal action is instructive, however. The evidentiary picture has not meaningfully changed since Soffar's initial state and federal actions. Soffar has not pointed to any intervening Supreme Court authority that would determinatively alter the federal consideration of his claims. Crucially, the federal courts adjudicated his early claims under pre-AEDPA law. Soffar's nearly identical legal challenges now come before the court under a much more deferential standard than those the en banc Fifth Circuit rejected in the first round of habeas review. The adjudication of those claims under the pre-AEDPA standards informs this court's review of whether the state courts were unreasonable in rejecting Soffar's claims.

## 2. Right to Counsel and Right to Remain Silent (claims 6 and 7)

After his arrest on August 5, 1980, Soffar repeatedly received Miranda warnings, including in front of a state magistrate. Soffar waived those rights each time. Soffar's sixth and seventh federal

-48-

habeas claims argue that the police nonetheless violated his right to remain silent and his right to counsel.

(a) Right to Remain Silent (claim 7)

Once the police give Miranda warnings, if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda v. Arizona, 384 U.S. 436, 473-74 (1966). Soffar argues that he "invoked his right to silence well before he signed the first statement," and that he did so "at the very least, just prior to or during his conversation with Sergeant Bruce Clawson." (Docket Entry No. 42 at 125) Soffar, however, does not identify any statement in the record reflecting an explicit invocation of his right to remain silent. Instead, Soffar points to two circum-stances signaling that he wanted to end the interrogation. First, at some indistinct time Soffar expressed that he did not want to speak to the arresting officer, Officer Palmire. At that point Sergeant Clawson, who had a good rapport with Soffar from their previous interaction, and Detective Schultz began questioning Soffar. Second, Soffar subsequently told Harris County Assistant District Attorney Wilson that "he didn't want to speak to [him.]" Tr. Vol. 5 at 45. Soffar argues that when he began "refusing to talk" the police had an affirmative constitutional obligation to cease interrogation. (Docket Entry No. 42 at 125)

-49-

The various courts that have reviewed this question have found that Soffar never invoked his right to silence.[13]   Of most relevance, the Court of Criminal Appeals on Soffar's second direct appeal found that "Soffar's refusal to speak to Wilson and Palmire did not amount to an unambiguous assertion of his right to remain silent." Soffar, 2009 WL 3839012 at *27. The testimony throughout the second prosecution showed that Soffar did not want to talk with those two individuals because of personal preference, not because he wanted to exercise his constitutional rights.   Soffar told Sergeant Clawson that he did not want to speak with Mr. Wilson, which Sergeant Clawson interpreted to mean he "did not like" Wilson because he said "[k]eep that four-eyed MF away from me." Soffar also conveyed in a "graphic manner" that he had a "personal problem" with Officer Palmire.   Soffar, 2009 WL 3839012 at *27. The Court of Criminal Appeals observed that "Soffar merely asserted his preference to avoid speaking to two law-enforcement officials whom he personally disliked." Id.

Soffar has not identified any point in the record where he invoked his right to silence.   Soffar has also not rebutted the state court's factual findings that his personal dislike of police officers, rather than any constitutional right, was his reason for

---

[13]The en banc Fifth Circuit observed on the first round of habeas review, under the "fairly strict standards . . . adopted when evaluating claims of invocation of silence," relief is not available on "[a] third-party statement expressing frustration over the suspect's unwillingness to talk[.]"  Soffar, 300 F.3d at 594.

pausing the discussions. Soffar has not relied on any clearly established Supreme Court precedent holding that circumstances such as those present in this case amount to a valid exertion of the right to silence. Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1).

(b) Right to Counsel (claim 6)

After Soffar stopped speaking to Mr. Wilson, Sergeant Clawson and Detective Schultz continued the interrogation. At that point Soffar asked about getting an attorney. First, Soffar asked Sergeant Clawson how long it would take to receive an appointed attorney in Harris County, to which Sergeant Clawson responded: "a day, a week, a month," because he did not know how the appointment process worked in that jurisdiction. Second, Soffar also asked if he should hire a lawyer, and Sergeant Clawson responded, "Well, if you're guilty you should talk to police and if you're not guilty you should get an attorney." Finally, Soffar asked Sergeant Clawson if he was on his own, which Sergeant Clawson interpreted as Soffar's acknowledgment that Sergeant Clawson could not help him with the instant charges.

After answering that he could not help him, Sergeant Clawson then asked Soffar if he wanted to talk to Detective Schultz again. When Soffar indicated that he wanted to speak, interrogations resumed. Soffar argues that Sergeant Clawson ignored his request for counsel.

"In Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that, once a suspect in custody invokes the Fifth Amendment right to counsel, the police may not interrogate the suspect in the absence of counsel – even if the suspect later attempts to waive that right." United States v. Avants, 278 F.3d 510, 514-15 (5th Cir. 2002); see also Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983) (stating that Edwards set forth a "prophylactic rule, designed to protect an accused in police custody from being badgered by police officers . . . ."). If a criminal suspect asserts his right to counsel, the police must end all questioning until an attorney is available or until the suspect reinitiates the interrogation. See Maryland v. Shatzer, 559 U.S. 98, 103-04 (2010).

Edwards created an objective rule requiring courts to "determine whether the accused actually invoked his right to counsel." Smith v. Illinois, 469 U.S. 91, 95 (1984); see also Davis v. United States, 512 U.S. 452, 458-59 (1994). The "'rigid' prophylactic rule [of Edwards] embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." Smith, 469 U.S. at 95 (citations omitted).

On appeal from the instant conviction, the Court of Criminal Appeals relied on the Fifth Circuit's reasoning in the earlier

proceedings and observed that "[t]he material portions of the
evidence pertaining to Soffar's current allegation are the same as
they were when the Fifth Circuit rejected this claim[.]" Soffar,
2009 WL 3839012 at 27. The en banc Fifth Circuit had observed that
"Soffar's statements to Officer Clawson can be categorized as
follows: he asked whether he should get an attorney; how he could
get one; and how long it would take to have an attorney appointed."
Soffar, 300 F.3d at 595. However, "[c]ourts have rejected each and
every one of these questions as procedural, and too equivocal to
constitute a clear invocation of the right to counsel." Id. The
Fifth Circuit held as follows:

> . . . First, courts have rejected as ambiguous statements
> asking for advice on whether or not to obtain an
> attorney. See United States v. Posada-Rios, 158 F.3d
> 832, 867 (5th Cir. 1998) (holding that a suspect's
> statement that she "might have to get a lawyer then,
> huh?" was not a clear request); United States v. Cherry,
> 733 F.2d 1124, 1130 (5th Cir. 1984) ("Why should I not
> get an attorney?" was not a clear request.); see also
> Davis, 512 U.S. at 462, 114 S. Ct. 2350 ("Maybe I should
> talk to a lawyer" was not a clear invocation.).
>
> Second, a suspect's question about how to obtain an
> attorney does not constitute an unambiguous assertion of
> his right. See United States v. Cruz, 22 F.3d 96, 98
> (5th Cir. 1994) (holding that a suspect's statement that
> he was a "working man" who "couldn't afford an attorney"
> was not a clear request); see also Duckworth, 29 F.3d at
> 1220-21 (the statement, "I can't afford a lawyer but is
> there anyway I can get one?" was not a clear request).
>
> Third, a suspect's inquiry into how long it would
> take to get an attorney is not a clear invocation. See
> United States v. Lux, 905 F.2d 1379, 1382 (10th Cir.
> 1990) (finding question about how long it would take to
> get a lawyer, and whether suspect would wait in jail
> during the interim, was not a clear request);

<u>United States v. Doe</u>, 170 F.3d 1162, 1166 (9th Cir. 1999)
(holding "what time will I see a lawyer" was not a clear
request).

<u>Id.</u>

The Court of Criminal Appeals agreed with the Fifth Circuit
that "the substance of each specific inquiry made by Soffar has
been rejected as a clear invocation of the right to counsel[.]" On
that basis, the Court of Criminal Appeals "agree[d] with the Fifth
Circuit's resolution of that claim" and denied relief. <u>Soffar</u>,
2009 WL 3839012 at 27.

Soffar has not identified any meaningful factual distinction
between the record considered by the <u>en banc</u> Fifth Circuit and that
developed in the second trial proceedings. In fact, Soffar
acknowledges that the Fifth Circuit decided the issue "on a record
that is substantially similar to the current one." (Docket Entry
No. 45 at 34) Soffar has likewise not identified any subsequent
legal development, much less clearly established Supreme Court
precedent that would require reassessment of the previous legal
analysis. Accordingly, Soffar has not shown that the state court's
decision was contrary to, or an unreasonable application of,
federal law. <u>See</u> 28 U.S.C. § 2254(d)(1).

### 3. Voluntariness (Claim 2)

Soffar claims that he did not voluntarily make his police
statements. Soffar argues that his personal characteristics should
have required special caution by the police: "[h]e was mentally

-54-

impaired, had limited cognitive capacity, suffered from an array of serious organic and psychiatric illnesses, was suffering from withdrawal from drugs and alcohol, and had not slept in days." (Docket Entry No. 42 at 62) Given these characteristics, "the interrogating officers chose to exploit Mr. Soffar's weaknesses by employing trickery and subjecting him to unbearable pressure in a successful effort to coerce him into signing statements." (Docket Entry No. 42 at 62)

Soffar received Miranda warnings several times throughout his interaction with law enforcement officers. The en banc Fifth Circuit previously found that "[i]t is clear that Soffar made these statements with full knowledge of the consequences. . . . [D]uring the course of his interrogation, he was warned that he might face the death penalty if convicted, was given at least four Miranda warnings, including one set administered by a magistrate, and waived his Miranda rights at least three times." Soffar, 300 F.3d at 592.

Notwithstanding his repeated waiver of his Miranda rights, Soffar contends that he did not make his statements voluntarily. "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). Even when the police give Miranda warnings and the government has shown that a suspect waived his rights, the due process clause still imposes a separate voluntariness inquiry. A court's due process inquiry evaluates

-55-

"'whether a defendant's will was [overwhelmed]' by the circumstances surrounding the giving of a confession." Dickerson, 530 U.S. at 434 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). "This inquiry 'takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" United States v. Turner, 674 F.3d 420, 432 (5th Cir. 2012) (quoting Dickerson, 530 U.S. at 434).[14] Nevertheless, the Supreme Court has emphasized that "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984); see also Dickerson, 530 U.S. at 444.

"A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free

[14]Soffar contends that the Court of Criminal Appeals' adjudication was unreasonable because "even though the Texas court invoked the 'totality of the circumstances' phraseology, its actual inquiry focused almost exclusively on the issue of intoxication." (Docket Entry No. 45 at 10) A federal habeas court's review under 28 U.S.C. § 2254(d) "should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002). The court focuses on "'determining the reasonableness of the state court's 'decision,' . . . not grading their papers.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Cruz v. Miller, 255 F.3d 77, 86 (2d Cir. 2001)); cf. Dillard v. Blackburn, 780 F.2d 509, 513 (5th Cir. 1986) (observing that "federal courts do not sit as courts of appeal and error for state court convictions"). Accordingly, this court bases its AEDPA examination on "the state court's ultimate conclusion, not on its reasoning." DiLosa v. Cain, 279 F.3d 259, 262 (5th Cir. 2002).

-56-

and rational choice." United States v. Broussard, 80 F.3d 1025, 1033 (5th Cir. 1996).[15] In the first round of habeas proceedings Soffar presented evidence of mental impairment, including expert testimony of brain damage, ADHD, and exposure to toxins, all of which allegedly hampered his ability to reason, learn, and appreciate the consequence of his actions. State Habeas Record at 8911-12 (summarizing testimony from initial state habeas proceeding). The Fifth Circuit, nonetheless, held that "there is no evidence indicating that Soffar's waivers were not fully voluntary. Soffar himself instigated the discussion about the bowling alley murders following his arrest for an unrelated crime. He was not threatened or coerced by the police, and continuously volunteered information about the crime during his interrogation." Soffar, 300 F.3d at 593.

Trial counsel filed a motion to suppress before the second trial asserting that Soffar's statements were not voluntary because

_____

[15]The Supreme Court exhorts that "both the characteristics of the accused and the details of the interrogation" should be considered in determining voluntariness. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); see also Hall v. Thaler, 504 F. App'x 269, 281 (5th Cir. 2012). Factors that courts have considered in determining the totality of the circumstances include (1) the location of the questioning; (2) whether Miranda warnings were given; (3) whether the accused initiated contact with law enforcement officials; (4) the accused's personal characteristics such as youth, intelligence, drug problems, psychological problems, physical condition, and experience with the criminal justice system; (5) length of detention; (6) whether the questioning was repeated or prolonged; and (7) whether physical punishment was used such as the deprivation of food or sleep. See Schneckloth, 412 U.S. at 225-26.

-57-

of his "'child-like' mental state," which caused him to "readily follow the lead of the police authority figures. The police kn[e]w of these limitations and predilections and used them to their advantage." Clerk's Record at 1241, 1243. Trial counsel supported the motion with affidavits from individuals discussing his mental impairments, including one from Sergeant Clawson opining that Soffar had "fried brains," "had a hard time with reality," was an impulsive "short-term thinker," and "was conditioned to reading between the lines to figure out what a policeman wanted to hear." Clerk's Record at 1283-94. Other affiants expressed that Soffar had psychological and mental impairments.

After a lengthy hearing on Soffar's motion to suppress, the trial court found that "[t]he defendant's tape-recorded and written custodial statements were made voluntarily and in accordance with Article 38.22 [of the Texas Code of Criminal Procedure]." Clerk's Record at 2144. On direct appeal the Court of Criminal Appeals examined the "totality of the circumstances" with special emphasis on Soffar's "claims that he had a 'child-like' mentality, that he was misled about his right to counsel by Clawson, and that he was intoxicated when he was arrested." Soffar, 2009 WL 3839012, at *27. The Court of Criminal Appeals relied on the testimony from that hearing to find that Soffar's statement was not involuntarily made. See Soffar, 2009 WL 3839012 at *27-28.

Soffar's due process challenge comes before the court under the AEDPA's deferential standard of review. Soffar relies on the

-58-

evidence presented in both trials and subsequent proceedings to challenge the presumptively correct fact-findings that the mental issues did not render his statements involuntary. While raising questions about his mental capacity, Soffar has not presented clear and convincing evidence that would undermine the state findings. Testimony from the suppression hearing showed that Soffar understood the warnings given to him. Even Sergeant Clawson, who provided an affidavit about Soffar's mental impairment, testified that Soffar seemed to understand his constitutional rights. Tr. Vol. 7 at 102-03.

Soffar emphasizes that mental impairment, such as a low I.Q., strongly signals that his statements were involuntary. But Soffar's mental acumen is only one factor for consideration in deciding the totality of the circumstances. "Federal courts generally reject claims that Miranda waivers are involuntary based upon a defendant's low mental functions, below-average I.Q., or illiteracy[.]" United States v. Sauseda, 526 F. App'x 349, 353 (5th Cir. 2013) (citing United States v. DeCoteau, 602 F. Supp. 2d 1120, 1130 (D.N.D. 2009) (collecting cases)); see also Colorado v. Connelly, 479 U.S. 157, 164 (1986) ("[A] defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"). The state habeas court relied on "Texas case law holding that diminished mentality is a factor to be considered in determining the voluntariness of a confession but is not conclusive of involuntariness." State Habeas Record at 8916.

Soffar emphasizes his record of other mental problems as a reason to find that he did not voluntarily confess. The state habeas court reviewed the evidence from both his first and second trial and found that "alleged mental deficits do not render [Soffar's] statements involuntary[.]" State Habeas Record at 8916. Soffar's mental state is not comparable with the defendants in the cases he cites in which mental impairment strongly called an inmate's voluntariness into question. For example, Soffar relies heavily on Culombe v. Connecticut, 367 U.S. 568, 620 (1961), where the suspect was "a thirty-three-year-old mental defective of the moron class with an intelligence quotient of sixty-four" who had "a mental age of nine to nine and a half years" and was illiterate. Soffar also relies on Jurek v. Estelle, 623 F.2d 929, 950-51 (5th Cir. 1980), where the defendant was "young, poorly educated, highly suggestible, and borderline mentally retarded"; and Blackburn v. State of Ala., 361 U.S. 199, 201 (1960), where the defendant had been categorized "as 100 percent 'incompetent'" and previously placed in institutions for 'schizophrenic reaction, paranoid type.'"

By way of contrast, testing has placed Soffar's Full Scale IQ between 81 and 89 "or in the low average range of intellectual functioning." State Habeas Record at 8968. Soffar does not allege that he is intellectually disabled (formerly called mentally retarded), which would exclude him from execution under Atkins v. Virginia, 536 U.S. 304 (2002). After considering "diminished

mentality [as] a factor . . . in determining the voluntariness of a confession," the state habeas court explicitly found that Soffar's "alleged mental deficits do not render [his] statements involuntary." State Habeas Record at 8916. The testimony from police officers throughout the proceedings has not raised serious doubt about Soffar's ability to understand his rights. A police officer testified in earlier proceedings that Soffar "knew the Penal Code as well as [he did and] could appreciate that there might be negative consequences to his acts." State Habeas Record at 8953. Soffar repeatedly indicated that he understood his rights. The evidence differs fundamentally from those cases that Soffar cites finding that mental illness impaired a suspect's ability to waive his rights voluntarily.

Ultimately, Soffar must show that police overreaching overrode his intention not to speak. See Carter v. Johnson, 131 F.3d 452, 462 (5th Cir. 1997) ("'Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession.'"). Soffar argues that the police used coercion to "exploit[] [his] brain damage, psychiatric conditions, sub-normal intellectual ability, withdrawal symptoms, and desire to please the police[.]" (Docket Entry No. 42 at 66) As evidence of coercion, Soffar cites: (1) the "days-long interrogation"; (2) "Sergeant Clawson exploited Mr. Soffar's mental infirmities to

-61-

deceive him into believing that he had no practical opportunity or right to consult with an attorney"; (3) "the police falsely told Mr. Soffar that Mr. Garner had positively picked him out of a line-up"; (4) "Mr. Soffar reported that an office[r] had verbally threatened him"; and (5) the police played on Soffar's trust of Sergeant Clawson by engaging in a "'good-cop-bad-cop' routine[.]" (Docket Entry No. 42 at 67, 69)

The en banc Fifth Circuit found that Soffar "was not threatened or coerced by the police[.]" Soffar, 300 F.3d at 593. Given the evidence developed in the initial proceedings, which Soffar relied on and augmented in the second criminal action, the totality of the circumstances does not indicate that the state courts were unreasonable in finding that Soffar voluntarily confessed.  Soffar was not unfamiliar with the criminal justice system and, in fact, his close association with police officers prompted Sergeant Clawson's participation in the interviews. While the interrogations spanned three days, the police interviews did not consume that entire period, and Soffar spent significant portions of that time in a jail cell.  The police repeatedly informed Soffar of his constitutional rights.  The physical environment was not oppressive.  The police did not deprive Soffar of food, drink, or sleep.  Other than the statement by Officer Palmire that "I've got you now punk," Tr. Vol. 4 at 84, the record lacks any indication that the police threatened Soffar.  Only one officer observed that Soffar was initially somewhat intoxicated,

though testimony showed that he was not impaired to the extent that he did not understand his rights. Soffar's intoxication would only impair him through the first few hours he was in custody. Nothing in the record shows that he was threatened, harmed, or promised anything to compel his confession. As one police officer testified, "no one forced [Soffar] to do anything." State Habeas Record at 8953. The Court of Criminal Appeals found "that he was not subjected to any threats or promises when interrogated." Soffar, 2009 WL 3839012 at *27.

Given Soffar's extensive previous interaction with the police and repeated indication that he understood the Miranda warnings, the state court could reasonably find no evidence that he was suddenly not aware of, or understanding of, those rights or the consequences of his waiver. Soffar has not shown that he is entitled to relief under the AEDPA.

## 4.   Ineffective Assistance (Claims 5, 8)

Despite trial counsel's efforts to keep Soffar's police statement from coming before the jury, and the subsequent efforts to deaden its impact, Soffar contends that trial counsel should have done more. Soffar contends that "while trial counsel might have identified the correct theme, they failed utterly to investigate, develop, and present the evidence necessary to support it." (Docket Entry No. 42 at 97) In two related claims Soffar argues that trial counsel provided ineffective representation by

"not presenting all evidence establishing that Mr. Soffar's statements are false." (Docket Entry No. 42 at 96) Additionally, Soffar faults counsel for not developing sufficient evidence to allow for suppression of his police statements.

Soffar bases this claim on evidence developed in both his initial and second round of state habeas proceedings. In his initial habeas action Soffar presented affidavits from three mental-health witnesses who explained that Soffar was a brain damaged individual with a low IQ and who has Attention Deficit Disorder. In his more recent habeas action, Soffar adduced affidavits from four additional mental-health experts who similarly concluded that Soffar suffered from various mental disabilities and disorders that would have colored his interaction with the police. (Docket Entry No. 42 at 97-101 (summarizing the affidavit testimony from expert witnesses)) Additionally, Soffar asserts that trial counsel should have called additional lay witnesses to describe his mental impairments.

Soffar also relies on an affidavit from three experts in the field of false confessions, all of whom opine that Soffar's mental condition left him at a high risk for the possibility of confessing to something he did not do. The three experts identify several mental conditions that Soffar suffered which increase the chance of a false confession. With Soffar's mental history the experts would have testified that Soffar was brain damaged, suggestible, eager to please police officers, and impulsive. The experts would have

-64-

explained to the trial court and to jurors that Soffar's police statements were not reliable.

Trial counsel's state habeas affidavits explain why they did not support the suppression hearing and trial testimony with the numerous experts and additional lay witnesses that Soffar relies on in these proceedings. Trial counsel "considered but ultimately rejected presenting psychological or other mental evidence" to show the unreliability of Soffar's confession. State Habeas Record at 6821. Trial counsel explained that his decision was a reasoned one, and ultimately they instead chose to "ask[] the trial court to take into account all prior witnesses and proceedings in deciding the suppression motion." State Habeas Record at 6833.

A reviewing court assesses counsel's representation under the standards established in Strickland v. Washington, 466 U.S. 668, 686 (1984). Under Strickland's two-pronged test, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." Yarborough v. Gentry, 540 U.S. 1, 3 (2003) (emphasis added); see also Rompilla v. Beard, 545 U.S. 374, 387 (2005); Wiggins v. Smith, 539 U.S. 510, 520 (2003). To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687. A petitioner must also show actual prejudice, meaning "there is a reasonable probability

-65-

that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694; see also Wiggins, 539 U.S. at 534.

The state habeas court relied on the Strickland framework and denied each ineffective-assistance claim. "Surmounting Strickland's high bar is never an easy task," but more especially so when considered under the AEDPA's deferential review. Padilla v. Kentucky, 559 U.S. 356, 371 (2010). The question of "whether the state court's application of the Strickland standard was unreasonable . . . is different from asking whether defense counsel's performance fell below Strickland's standard" because "[a] state court must be granted deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Richter, 562 U.S. at ___, 131 S. Ct. at 785. The court will resolve each allegation against counsel in light of the above-stated standards.

In rejecting Soffar's Strickland claim, the state habeas court found that trial counsel

> reviewed records of [Soffar's] prior habeas proceedings in order to prepare for the instant retrial and would have been aware of the extensive documentation, as well as lay and expert testimony, that was developed by former counsel regarding [his] alleged mental deficits and used to support various claims, including claims challenging the voluntariness and reliability of [Soffar's] state-ments to police regarding the primary and extraneous offenses.

State Habeas Record at 8913. Trial counsel did not merely rely on the record but "consulted with a number of mental health

professionals in preparing for [Soffar's] retrial[.]" State Habeas Record at 8914.[16] Trial counsel's argument in the suppression hearing discussed Soffar's "substantial mental disabilities" and supported "the suppression motion with affidavits from law enforcement officials Bruce Clawson, Michael Clawson, and Mitch Wright, stating that [Soffar] had 'fried brains,' brain damage, a mental impairment, or a mental illness, no impulse control, and, subnormal intelligence[.]" State Habeas Record at 8914. Other affiants confirmed Soffar's longstanding mental problems. Also, "[u]pon the request of trial counsel, the trial court agreed to consider evidence generated during prior habeas proceedings in ruling on [Soffar's] suppression motion." State Habeas Record at 8914. While perhaps not in the manner or to the extent Soffar does

---

[16]In state habeas counsel's affidavit, however, counsel admits that they did not have a mental-health expert examine Soffar for the limited purpose of developing additional psychological evidence relative to the voluntariness of his confession. One of the reasons trial counsel did not do so was out of fear that the prosecution would then have a reciprocal right to conduct their own psychological examination under Lagrone v. State, 942 S.W.2d 602 (Tex. Crim. App. 1997). The parties debate whether trial counsel misread Lagrone and whether the prosecution would have been able to order its own examination of Soffar. The state habeas court found, however, that "Lagrone was not the sole reason for counsel's decision regarding the presentation of psychological or other medical evidence." State Habeas Record at 8936. Independent of the Lagrone issue, trial counsel's "decision to forego an evaluation of [Soffar] by a mental-health expert was grounded in additional strategic considerations." State Habeas Record at 8937; see also State Habeas Record at 8937. The mental-health experts who examined Soffar on the first round of state habeas proceedings provided the building blocks for challenging Soffar's ability to confess voluntarily. Trial counsel put those affidavits before the trial court and used them in preparing for trial.

-67-

on federal review, Soffar put much of the same mental-health arguments before the trial court.

On the second round of habeas proceedings Soffar provided additional accounts of his mental problems. Yet, the state habeas court found "little substantive difference between the medical opinions and data generated during the prior habeas and retrial proceedings and [Soffar's] alleged newly discovered evidence." State Habeas Record at 8915. The state habeas court also found that trial counsel's independent investigation of mental-health issues would have informed them "of evidence substantially the same as [Soffar's] alleged newly discovered evidence and such evidence was available for presentation during the instant retrial." State Habeas Record at 8915.

In faulting counsel for not building on prior evidence, Soffar overstates trial counsel's obligation to present evidence. Soffar faults counsel for not adducing "*all* available evidence" for the suppression hearing and the trial. (Docket Entry No. 42 at 3 (emphasis added)) Defense attorneys bear no constitutional obligation to put before jurors all available evidence notwith-standing its value, reliability, relevance, or relative merit. The Strickland standard recognizes, and honors, trial counsel's duty to sort through the evidence they gather and then, in light of the State's projected case and with their weighing of the evidence's effect on the jurors, strategically decide what to present. The Constitution does not require attorneys to compile every fact and then reflexively regurgitate it for jurors or the trial court.

The essence of Soffar's habeas challenge is that trial counsel should have relied on mental-health experts to prove that he did not voluntarily confess. "Counsel's decision not to hire experts falls within the realm of trial strategy." Yohey v. Collins, 985 F.2d 222, 228 (5th Cir. 1993); see also Colburn v. Cockrell, 37 F. App'x 90 (5th Cir. 2002) ("The hiring of expert witnesses and the presentation of their testimony is a matter of trial strategy."). Trial counsel's affidavits convey an awareness of how mental issues may have colored Soffar's interaction with police officers. Trial counsel knew of the evidence developed on state habeas review, and in fact asked the trial court to consider such evidence when adjudicating Soffar's suppression hearing. The state habeas court correctly observed that the evidence trial counsel reviewed did not differ fundamentally from that Soffar developed after trial. Trial counsel framed some questioning in the suppression hearing around the police officer's perception of Soffar's mental state and whether knowledge of his impairments would have impacted their interaction with him. The trial testimony showed that the police knew that Soffar had mental impairments. See, e.g., Tr. Vol. 29 at 200. In fact, trial counsel elicited testimony from Sergeant Clawson about how "Max had fried his brain" that echoed the information he gave in a state habeas affidavit. Tr. Vol. 29 at 134. Trial counsel urged the jury to disregard Soffar's police statements as unreliable because of his mental-health issues. Tr. Vol. 35 at 49-54. While possibly not to the

same breadth and depth as Soffar champions on federal review, trial counsel asked the trial court and jurors to consider Soffar's mental state when assessing his confession.

"There are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Strickland, ___ U.S. at ___, 131 S. Ct. at 1403. The Supreme Court recently emphasized that "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." Bobby v. Van Hook, 558 U.S. 4, 9 (2009) (quoting Roe v. Flores-Ortega, 528 U.S. 470, 479 (2000)). Trial counsel was familiar with the evidence previously developed concerning Soffar's mental issues and consulted with experts in preparing a challenge to his police statements. After considering that evidence, trial counsel strategically decided not to rely on mental-health testimony or additional lay accounts. It was "well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts" to advance their theory that Soffar provided a false confession. Richter, 562 U.S. at ___, 131 S. Ct. at 789.

The major distinction between the theory trial counsel put before the jury and that propounded on federal review is reliance on an expert who specifically focuses on false confessions. The state habeas court specifically found that "counsel elected not to

-70-

retain a testifying or consulting expert in false confessions; that counsel's decision regarding the presentation of an expert in false confessions 'was a considered one[.]'" State Habeas Record at 8936.

It appears that Texas law at the time of trial did not clearly recognize the field of false confessions as scientifically legitimate. See Soffar, 2012 WL 4713562, at *11 (Cochran, J., concurring) (finding that, notwithstanding other concerns about Soffar's statements, failing to hire a false-confession expert was not error "when the trial judge might not have admitted any such evidence in 2006, and the appellate courts of this state would probably uphold the trial judge's discretion on a ruling either way"); see also Scott v. State, 165 S.W.3d 27, 54-58 (Tex. App. -- Austin 2005), overruled on other grounds, Scott v. State, 227 S.W.3d 670 (Tex. Crim. App. 2007); Green v. State, 55 S.W.3d 633, 636-40 (Tex. App. -- Tyler 2001, pet. ref'd); Ruckman v. State, 109 S.W.3d 524, 530-31 (Tex. App. -- Tyler 2000, pet. ref'd).[17] In fact, Texas appellate courts had affirmed the exclusion of testimony from one of the same false-confession experts from whom Soffar obtained affidavits on state habeas review. See Scott, 165

---

[17]The state habeas court specifically found trial counsel's strategy reasonable in light of "case law regarding the admissibility of such testimony" in which "various courts, including the Court of Criminal Appeals in an unpublished opinion, have held that expert testimony on confessions is inadmissible." State Habeas Record at 8914. The Court of Criminal Appeals, however, summarily refused to adopt that fact-finding.

S.W.3d at 55 (excluding testimony from Dr. Richard Leo). Given the unfavorable legal landscape, a reasonable attorney could decide to expend the limited defense resources and time on evidence more likely to be admissible.

Trial counsel placed before the trial court and jurors sufficient information to support their theory that Soffar provided a false police statement. Trial counsel could reasonably decide that putting on an expert's opinion about whether Soffar told the truth would not help further their planned defense. Soffar has not overcome the "strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

Nor has Soffar shown that the state court was unreasonable in deciding that had he supported his challenge to his police statements with expert testimony, his defense would not have fared any better. The state habeas court found that Soffar's "alleged mental deficits do not render [his] statements involuntary, much less establish [his] innocence of the primary offense[.]" State Habeas Record at 8916. The court, therefore, finds that the state habeas court was not unreasonable in finding no Strickland prejudice.

In sum, Soffar has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1).

**C.   Evidence of Media Reports of the Crime (Claims 3, 4)**

As one of the defense's "three central themes," trial counsel sought to prove that "Mr. Soffar's confession was false because it was unreliable."   State Habeas Record at 6819.   Trial counsel stated on state habeas review that the defense's attack on the substance of Soffar's confession took three paths:   (1) the defense tried to show that "Mr. Soffar's statements did not match the forensic evidence of the testimony of the sole surviving victim"; (2) Soffar's "propensity to lie for personal benefit" and "undu[e] trust[] of police officers" made him susceptible to suggestion; and (3) "the major facts of the crime present in Mr. Soffar's confessions had been fully aired by the police to the local news media in the weeks prior to Mr. Soffar's arrest."   State Habeas Record at 6820.   With regard to the third issue, trial counsel sought to prove that Soffar's confession flowed from media reports, not from his participation in the murders.

In the weeks after the murders local news media had publicized numerous details about the murders.   State Habeas Record at 508-11 (listing contemporaneous media accounts containing details about the killings).   During the cross-examination of Detective Schultz the defense asked him to describe "information [contained in Soffar's police statements] that only someone who had been at the bowling alley could know," such as at what time the murders occurred and "about the doors in front to the place of business."   Tr. Vol. 30 at 98-100.   Trial counsel then led Detective Schultz

-73-

through questions to show that, had the media made the information available to the public, then it "wouldn't necessarily corroborate that Max Soffar had been at the bowling alley on the night of the crime[.]" Tr. Vol. 30 at 99-100. Trial counsel asked Detective Schultz if news reports conveyed the name of the bowling alley, to which he expressed a lack of knowledge about the content of news reports. Trial counsel followed by asking Detective Schultz to read a news story. Tr. Vol. 30 at 101. The State, however, objected because it was "a document that's not in evidence" and was "hearsay and not admissible." Tr. Vol. 30 at 101-02. The State also complained that

> those articles contain much speculation on the part of
> officers at different points and time in the situation
> with which I just do not think are relevant. If the
> issue is was the name of the bowling alley in the public
> domain[,] yes. If the issue is was the time of night the
> offense occurred reported in the newspaper or on the news
> immediate[,] yes[,] but to put the entire Chronicle in
> for somebody to say[,] well officer said this and officer
> said that. And I read [in] all these articles numerous
> inaccurac[ies].

Tr. Vol. 30 at 102-03. The State, however, would not "object to them asking was this reported in the paper." Tr. Vol. 30 at 104.

The trial judge refused to admit "entire articles into evidence" because "[t]here's too much irrelevant stuff in the articles." Tr. Vol. 30 at 104, 106. The trial court, however, allowed the defense to "ask . . . if certain things were in the paper, the points." Tr. Vol. 30 at 104. Trial counsel resumed questioning Detective Schultz and elicited that media accounts

contained certain information, such as the bowling alley's location, and that knowledge of facts in news media "doesn't necessarily mean that [a suspect] had been at the crime scene[.]" Tr. Vol. 30 at 107.

The defense prepared "summary charts of all the newspaper articles." Tr. Vol. 31 at 4. On the next day of trial the defense informed the trial court that the prosecution refused to "stipulate to that information, that it was in the public domain[.]" Tr. Vol. 31 at 4. Trial counsel wanted to cross-examine the police officers again "about what was in the public domain[.]" Tr. Vol. 31 at 4. At that point, the prosecution explained:

It's our position Judge what was in the public domain isn't relevant to this case unless tied to the Defendant. If the Defense has some information that the Defendant read a particular article or what information the Defendant read that's one thing but our objection is to the Defense being allowed to cross-examine each witness about what may or may not have been in the public domain. That doesn't have any relevance to this case unless they can connect it to the Defendant so right now we'd ask for a motion in limine regarding any reference to news articles substance not necessarily that there was information news but just the substance of those news articles and offering in the news articles on the basis that it's not relevant. You know what was in the public domain is not relevant. What would be relevant would be you know the Defendant saying I read a particular article or a witness saying the Defendant read a particular article perhaps.

Tr. Vol. 31 at 4-5. The prosecution elaborated:

The fact that there was information that was disseminated through the media that can be said about any criminal case. There's always some information disseminated to the media that doesn't make it necessary to this Defendant. Offering up every single article or news

-75-

broadcast regarding this case unless it can be tied to
this Defendant doesn't have any probative value to this
proceeding and again we would object to the Defense
attempting to I guess use witnesses, officers to sponsor
testimony regarding what was in the newspaper.

Tr. Vol. 31 at 7.   The trial court held:   "Well, I'm not admitting

articles.  I don't know if I'm going to allow cross-examination on

it.   I guess I have to hear the question and hear what the witness

says about that [sic] he read the article and he knows about what

the article says and all that.  So ask your question and then make

an objection and I'll make a ruling."   Tr. Vol. 31 at 8.

When the defense later questioned Detective Williamson about

media reports, the State objected.  Tr. Vol. 31 at 115.  The trial

court refused to allow further questioning about the content of

news reports.   Tr. Vol. 31 at 115-16.   Trial counsel later wished

to call a "summary witness to testify about the . . . details of

publicity that were reported on the news from July 14 through

August 1st" under the theory that it was "relevant . . . and

probative under [Rule] 403 [of the Texas Rules of Evidence]" and

the "right to defense."   Tr. Vol. 33 at 4.   The trial court

summarily denied that request.

On direct appeal Soffar claimed that the trial court's

prohibition on admitting the newspapers violated state law and the

federal constitution.   "Assuming that the trial judge erred in

refusing to admit Soffar's media evidence," the Court of Criminal

Appeals provided four reasons why, "beyond any reasonable doubt,

. . . any constitutional error did not contribute to Soffar's

-76-

conviction." Soffar, 2009 WL 3839012, at *20. First, the Court of Criminal Appeals observed that Soffar's "defensive theory is not particularly compelling," particularly because he "failed to present any evidence showing that he had been generally exposed to all of the various media reports that he submits in support of this trial theory." The Court of Criminal Appeals found his argument "weak" because he did not "establish[] any affirmative link between his statements about the offense and the various media reports that were issued about the offense[.]"

Second, "Soffar was not prevented from presenting general evidence in support of his claim that his confession was unreliable because it could have been gleaned from media reports about the offense." In support of that ground, the Court of Criminal Appeals identified places in the record where the testimony showed that Soffar had been exposed to media accounts of the crime.[19] Also,

---

[19]The Court of Criminal Appeals specifically identified the following testimony:

Schultz and Williamson testified that the media reported on the crime. The evidence showed that when Schultz interrogated Soffar on August 5th, Soffar mentioned that he had seen and heard about the crime, the reward, and the surviving victim on the news. Additionally, when Assistant District Attorney Terry Wilson interrogated Soffar, Soffar told Wilson that he had watched television news coverage about the crime the next night. Soffar's sister also testified that Soffar generally read the newspaper and listened to the news on television and the radio. She also testified that Soffar had told her "[t]hat there was a $10,000.00 reward" and "[t]hat the composite drawing looked like Latt and that he wanted to turn him in."

-77-

"defense counsel highlighted this line of defense during closing argument."

Third, and also relevant to the weakness of Soffar's case, the appellate court observed that "Soffar's August 7th confession to Detective Ladd includes two facts that were not reported to the media – that the office door at the bowling alley was locked and that the victims' wallets were taken during the offense." Thus, "Soffar's statement about the locked office door and the wallets strongly undermine his contention that his knowledge about the offense derived solely from media reports." Accordingly,

Had Soffar's attorneys been permitted to present the media evidence to the jury and compare the specific facts contained in Soffar's statements with those reported by the media to show that Soffar's confession was unreliable, the State could have easily rebutted this argument with Soffar's statement about the locked office door and the victim's wallets. These critical facts would likely have markedly weakened Soffar's "unreliable confession" theory.

Finally, the Court of Criminal Appeals found that other statements by Soffar confirmed his guilt. Importantly, he told others that he "committed the offense, laughed about it, and told them that he was 'too slick' to get caught. Soffar makes no argument in his brief that this particular admission was unreliable." Based on those four factors, the Court of Criminal Appeals "conclude[d] that the exclusion of the media evidence, if error, was harmless beyond a reasonable doubt." Soffar, 2009 WL 3839012, at *20-22.

-78-

Soffar raises two federal claims based on the exclusion of media reports. Soffar's third claim argues that the trial court violated his right to present a meaningful defense by excluding the introduction into evidence of media reports about the crime. Specifically, Soffar contends that the Court of Criminal Appeals' adjudication was an unreasonable application of Crane v. Kentucky, 476 U.S. 683 (1986), and Holmes v. South Carolina, 547 U.S. 319 (2006). (Docket Entry No. 42 at 75) In his fourth ground for relief Soffar contends that trial counsel provided ineffective representation by failing to secure admission of the media reports.

The Court of Criminal Appeals did not discuss whether the trial court's ruling violated Texas evidentiary rules or federal constitutional law. Instead, the appellate court assumed error and proceeded to assess whether the denial had harmed the defense. On that basis, Soffar argues "[t]hat assumption was correct as a matter of well-settled law and need not be reviewed in these proceedings." (Docket Entry No. 42 at 82) Even if the state courts assumed that the lower court ruling was in error, habeas relief is only available if Soffar can show a federal constitutional violation. See 28 U.S.C. § 2254(a). On federal habeas review the question of whether the trial court's ruling violated the federal constitution is antecedent to any discussion of harmlessness.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense[.]'" Crane,

476 U.S. at 690 (quoting California v. Trombetta, 467 U.S. 479, 485 (1984))). "This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." Holmes, 547 U.S. at 324 (quotation omitted). Nevertheless, "[t]he accused does not have an unfettered right to offer evidence that is incompetent privileged or otherwise inadmissible under standard rules of evidence." Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988)). "'[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials[.]'" Holmes, 547 U.S. at 324 (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)). The Supreme Court has "[o]nly rarely . . . held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." Nevada v. Jackson, ___ U.S. ___, 133 S. Ct. 1990, 1992 (2013).

Soffar assumes that the trial court's ruling was in error. He does not provide sufficient briefing on the operation of Texas evidentiary rules for the court to determine whether the trial court's decision was inconsistent with state law. By assuming error Soffar has deprived the court of a meaningful opportunity to assess whether the trial court erred in limiting the evidence.

Moreover, the trial court did not "prohibit *all* inquiry into" media reports. See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (finding a confrontation clause violation in the omission of

testimony). Instead, the trial court applied Texas evidentiary rules to limit how that information came before the jury. Finding hearsay and irrelevant information in the media reports, the trial court constrained the manner in which the information came before the jury, but did not completely prohibit it. Notwithstanding the evidentiary rulings, the defense still tried to convince the jury that Soffar had gleaned facts about the case from news media and then repeated them in his police statements. Because Soffar has not shown that the evidentiary rulings were erroneous under Texas state law, that the operation of Texas law was capricious, or that the exclusion of the evidence was fundamentally unfair, he has not shown a constitutional violation that could serve as a predicate for federal habeas relief.[19]

Once the trial court disallowed admission of the media reports, the defense faced a choice: abandon their effort to verify extraneous sources for the information in the police statements or "call Mr. Soffar to testify for the purpose of establishing that he had seen various media reports about the Bowling Alley murders." State Habeas Record at 6823. Trial counsel "chose not to call Mr. Soffar." State Habeas Record at 6823. Trial counsel explained: "Although I could have done so, I did not prepare Mr. Soffar to testify nor did I call him as a

---

[19]In the alternative, and after a full review of the record, the court concludes that the Court of Criminal Appeals did not err in finding any alleged constitutional error harmless.

-81-

witness to testify for the purpose of establishing that he had seen various media reports about the bowling alley murders because I believed that doing so would have opened the door to Mr. Soffar's cross-examination by the State." State Habeas Record at 6836. Soffar contends that trial counsel's decision amounted to ineffective assistance.

In part, the trial court found that the media reports were inadmissible because nothing concretely linked their contents to Soffar. The defense had not shown that Soffar was aware of the numerous news accounts or had familiarized himself with them well enough to summarize them in the third police statement. Soffar premises this challenge to trial counsel's representation on an assumption that he could have taken the stand for the limited purpose of laying that foundation. The state habeas court, however, found that Texas case law did not support Soffar's habeas strategy of presenting limited testimony. While Soffar argues that other cases have allowed a defendant to give limited testimony, the state habeas court found that Soffar's "assertion that he could have testified for a limited purpose regarding the medical[20] reports is not supported by Texas case law." State Habeas Record at 8954.

Given the state of Texas law, calling Soffar to lay a foundation for the media reports would open him up to wide-ranging

---

[20]From the context of the state court opinion it is clear that the court meant to say "media" reports instead of "medical" reports.

cross-examination. The state habeas court, "based on the trial and habeas records and the affidavit of trial counsel Kase, f[ound] that counsel elected, as a matter of reasonable trial strategy, not to present [Soffar's] testimony for the purpose of establishing his exposure to media reports regarding the instant offense because counsel believed that doing so would have opened the door to cross-examination of [Soffar] by the prosecution." State Habeas Record at 8954. The state habeas court's decision that counsel was not ineffective was not contrary to, or an unreasonable application of, federal law.

## D.  Evidence of a Different Killer (Claims 9, 10)

Soffar bases his ninth and tenth claims on the allegation that another man, Paul Dennis Reid, committed the bowling alley murders. Soffar argues that "there is abundant, concrete evidence against . . . Reid, who recently died of natural causes . . . on death row in Tennessee where he was awaiting execution for committing seven murders using a *modus operandi* that is strikingly similar to that employed by the Bowling Alley killer." (Docket Entry No. 42 at 139)  Soffar alleges constitutional error because "[t]he jury at [his] trial did not even hear Mr. Reid's name, much less the damning evidence against him[.]"  (Docket Entry No. 42 at 139) Soffar asserts that the trial court violated his constitutional rights by excluding evidence that would suggest that Reid committed the murders.  Soffar also faults trial counsel for not presenting additional evidence inculpating Reid in the murders.

-83-

Soffar developed evidence about another killer on his first round of habeas review. Stewart Cook executed an affidavit on April 1, 2000, saying that sometime in 1982 Reid confessed to him that he had committed the bowling alley murders. State Habeas Record at 5041-48. Cook knew Reid well – between 1981 to mid-1982 they committed over 30 robberies together in the Houston area. These robberies were generally not violent; Reid only occasionally fired his pistol. Cook attested:

Although Paul sometimes fired his gun during the robberies, during most of the robberies we committed together, he never shot anyone (often because I persuaded him not to). However, all this changed after one particular robbery, when Paul used his pistol. I did not understand why Paul had used his gun and asked him why he did it. Paul brushed it off, telling me he'd done much worse during a robbery he had committed before we started working together. Specifically, he said that he once had a "problem" while he was robbing a bowling alley out on Route 290, and he shot "four people."

State Habeas Record at 5044-45. While incarcerated years later, Cook learned about the bowling alley murders and

began to realize that the robbery and shootings Paul Reid told [him] about many years before occurred at the same bowling alley as the one involved in Soffar's case, and that there was too much similarity between what Paul told me and the details of Soffar's case to be just a coincidence.

State Habeas Record at 5046. Cook reviewed a copy of the 1980 police sketch of the bowling alley killer and opined that it was "incredibly similar" to Reid's appearance in the summer of 1980. State Habeas Record at 5046.

Soffar's various attorneys have sought to develop evidence that Reid was the real killer. Soffar, however, never secured an

-84-

affidavit or other statement from Reid who was then on death row in Tennessee. At the time of trial Soffar's claim that Reid was the killer rested nearly entirely on Cook's hearsay-laden affidavit.

The State deposed Reid during the first round of state habeas review. Reid admitted that he had known Cook for decades and that they had committed robberies together in 1982. Reid, however, said that in 1997 or 1998 Cook had contacted him to say that the Pasadena, Texas, police were interested in talking to Reid about a convenience-store robbery in which the clerk had been killed. State Habeas Record at 6134. Cook said he would "pawn" off the convenience store murder on Reid because Reid already was on death row in Tennessee. State Habeas Record at 6134. Reid also testified: "Mr. Stewart Cook stated to me in his letters that he is going to sign an affidavit stating that I had committed the Houston bowling alley homicide; that he would get a book deal; and out of the book deal, he would send me half the revenue." State Habeas Record at 6134. Reid said that a television news reporter later visited him and informed him that Cook was planning to write a book about Reid. State Habeas Record at 2523. Cook said he derived all the information he had about the killings from local news media.

Even with that deposition testimony, trial counsel filed a pretrial "Motion to Introduce Evidence Showing Paul Dennis Reid to be the Real Perpetrator of the Bowling Alley Murders." Clerk's Record at 2228. Trial counsel did not propose calling Reid as a

-85-

witness. Instead, trial counsel tried to put that theory before the jury in three ways: (1) having Cook testify that Reid had confessed to the crime to others that he was the killer; (2) having Soffar's initial habeas attorneys confirm what Cook said that Reid had said; and (3) prove that the bowling alley murder was strikingly similar to Reid's other crimes. The lynchpin of this defense was Cook's putative testimony that Reid claimed to be the killer.

Trial counsel knew that the defense would face steep evidentiary hurdles in calling Cook to relay Reid's alleged statements. Trial counsel's pretrial motion argued the constitutional right to present a complete defense, as well as evidentiary exceptions, should override the Texas evidentiary law that would otherwise preclude Cook from relaying Reid's statements. Clerk's Record at 2232-39. Trial counsel subpoenaed Cook as a trial witness. In a hearing outside the jury's presence, Cook testified that he had consulted with an attorney and would assert his Fifth Amendment rights if called at trial. Tr. Vol. 26 at 92-93. Cook said that if the trial court gave him immunity he would "possibly" testify, but he "would not" if the trial court compelled him. Tr. Vol. 26 at 93. He did say, however, that "the affidavit is the truth." Tr. Vol. 26 at 93.

Trial counsel then tried to call Soffar's first state habeas attorneys to have them relay what Cook had told them that Reid had said. The trial court prohibited the defense from putting that

hearsay-within-hearsay testimony before the jury. Tr. Vol. 26 at
99.

Trial counsel still attempted to show that the bowling alley
murders were similar to other crimes Reid had committed in
Tennessee, primarily through "summary witnesses" who would "read
offense reports or transcripts or whatever[.]" Tr. Vol. 5 at 45.
The convicting court, however, refused to admit that *modus operandi*
evidence, apparently ruling that the evidence contained hearsay.
Tr. Vol. 5 at 234; Tr. Vol. 9 at 20-25. The only evidence the
trial court allowed to come before the jury was "[t]he fact that
Paul Reed lived here [in Houston and] what he looked like[.]" Tr.
Vol. 5 at 234.

Soffar argued on direct appeal that the exclusion of testimony
and evidence blaming the murder on Reid was evidentiary error and
violated federal law. The Court of Criminal Appeals held that the
trial court had properly applied Texas law:

> Soffar's attorneys wanted [Soffar's habeas attorney
> Jonathan] Scott to take the stand to testify about
> (1) Reid's statement to Cook and (2) Cook's statement to
> Scott. Thus, in order to be admissible, Scott's testi-
> mony must be justified on two levels: there must be a
> hearsay exception that applies to Reid's statement to
> Cook and a hearsay exception that applies to Cook's
> statement to Scott.
>
> Texas Rule of Evidence 803(24) provides an exception
> to the hearsay rule for statements against the
> declarant's interest. It dictates that a hearsay state-
> ment tending to expose the declarant to criminal
> liability is admissible if corroborating circumstances
> clearly indicate the trustworthiness of the statement.
> Rule 803(24), however, "does not provide an exception for
> a declarant's statements against someone else's interest,
> such as a third party, co-actor, or co-defendant, unless

the statement against the other person's interest is also sufficiently against the declarant's interest to be considered reliable." [Simpson v. State, 119 S.W.3d 262, 269 (Tex. Crim. App. 2003) (citing Guidry v. State, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999))].

Even assuming that the first level of hearsay (Reid's statement to Cook) conforms with the statement against interest exception, Scott's testimony would still be inadmissible because the second level of hearsay (Cook's statement to Scott) does not conform with that exception. Cook admitted in his affidavit that he committed numerous robberies with Reid, but he stated that he had already been convicted and sentenced for some of these crimes. Cook admittedly did not go to the authorities when Reid initially acknowledged his involvement in a robbery and shooting at a bowling alley, but Cook stated in his affidavit that he did not realize the connection to the instant crime until many years later. Even if Cook's statements regarding his participation in uncharged robberies and his failure to report a crime could qualify as statements against interest, Cook's statements regarding Reid's alleged admission of guilt do not. Those particular statements are solely against Reid's interest. Cook's statements to Scott about Reid's admission of guilt were not sufficiently against Cook's interest to be considered reliable. Thus, the trial judge did not abuse her discretion in excluding Scott's testimony on this subject. Point of error one (a) is overruled.

Soffar, 2009 WL 3839012, at *11-12 (footnotes omitted).

Soffar again argues that the state habeas court's evidentiary ruling denied him the due process right to present a complete defense under Holmes v. South Carolina, 547 U.S. 319 (2006) and Chambers v. Mississippi, 410 U.S. 284 (1973). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers, 410 U.S. at 294. In some cases, limitations placed on a defendant's ability to present a fair and complete defense can be severe enough to violate due process. Yet,

"only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." See Jackson, ___ U.S. at ___, 133 S. Ct. at 1992. "Due process is implicated only for rulings of such a magnitude or so egregious that they render the trial fundamentally unfair." Gonzales v. Thaler, 643 F.3d 425, 430 (5th Cir. 2011) (footnotes and internal quotation marks omitted).

The state court was not unreasonable in finding that the application of Texas evidentiary law did not violate Soffar's constitutional rights. The nature of Soffar's defense involving Reid had inherent evidentiary defects. Trial counsel did not, and likely could not, present direct testimony from Reid himself. Soffar's trial team possessed no objective evidence that Reid had committed the bowling alley crimes. The defense could only formulate the core of its case by relying on what Cook could say that Reid allegedly had said.

The trial court could not compel Cook to testify. The prosecution had no obligation to offer him immunity. Even if the prosecution assured Cook he would not face charges, Cook would only guarantee that he would "possibly" testify. Tr. Vol. 26 at 93. Given its hearsay nature, the trial court did not violate Soffar's constitutional rights by applying Texas's traditional evidentiary rules when trial counsel tried to put it before the jury.[21]

---

[21]In a related claim, the state habeas court found: "based on the trial and habeas records, that in alleging trial counsel's (continued...)

Furthermore, Soffar has not made a strong case for constitutional error in the trial court's refusal to allow a second layer of hearsay to come before juror's through a habeas attorney's recollection of what Cook had said. Having another person relate what Cook repeated would only compound the evidentiary unreliability. The trial court allowed the defense to provide the jury with reliable evidence that satisfied Texas evidentiary rules, though that amounted to little more than placing Reid, a man with similar appearance to the police sketch, in the Houston area. Because the operation of long-standing evidentiary principles did not deny Soffar a fundamentally fair trial, Soffar has not shown that the state court erred under state or federal law in limiting the evidence relating to extraneous crimes committed by Reid. The court concludes that the Court of Criminal Appeals' decision was not contrary to, or an unreasonable application of, federal law.

Soffar also contends that trial counsel did not do enough to put evidence before the jury that would blame the murders on Reid. On state habeas review, Soffar claimed that other witnesses could have linked Reid to the bowling alley. Soffar argues that "[h]ad trial counsel properly investigated the crime, they would have

---

²⁻(...continued)
ineffectiveness for failing to present evidence at trial regarding the similarities between the primary offense and Reid's aggravated robberies in Texas, [Soffar] fails to detail the manner in which trial counsel should have presented such evidence to ensure the admissibility of the evidence at trial." State Habeas Record at 6708.

discovered powerful evidence that would not only have established Mr. Reid's guilt but would have facilitated the admission of the alternative perpetrator evidence that the trial court erroneously ruled inadmissible." (Docket Entry No. 42 at 148-49) Soffar bases this argument on affidavits from three individuals he obtained during the second state habeas review. Two individuals said that they had seen a man who looked like Reid at the bowling alley as much as "three or four times" in the weeks leading up to the murders. State Habeas Record at 7234. An affidavit from bowling alley employee Patrick Pye, however, provided even more detail:

I remember telling a member of the Houston Police Department that about a week prior to the event, I was working at the Bowling Alley and recall a verbal altercation involving Steve Sims and a white male customer. The customer had refused to produce what is called a "play sheet," which was used back then to track the number of bowling games a customer would play so that the Bowling Alley could calculate their bill. This customer, who was about 22 or 23 years of age, 6'1'' or 6'2'', with a strong build, told Steve Sims that he never received the play sheet and refused to pay. Steve and I had to remove him from the Bowling Alley. Later we found the customer's play sheet on top of a trash can . . . The customer called and threatened us after we removed him from the bowling alley, saying we should both be looking over our shoulders because he would be getting even. . . . The man on the phone said that we had better have eyes in the back of our heads because "I am going to blow your heads off."

State Habeas Record at 5434. Mr. Pye identified that man as Reid. State Habeas Record at 5434. Soffar argues that trial counsel should have interviewed these men, called them as witnesses, and thus proffered evidence connecting a threatening, violent Reid to the bowling alley.

-91-

Information about each of the three affiants was in the police offense reports, including Mr. Pye's recollection about the confrontation. Trial counsel, however, never contacted those potential witnesses. Soffar contends that this omission amounted to deficient representation that resulted in actual prejudice.

On state habeas review, trial counsel conceded that they did not interview the three men, but talked with other "individuals who bowled in competitive leagues at the time of the murders to determine whether they could provide information regarding the offense." State Habeas Record at 6834. Trial counsel, though, "would have presented [the habeas affiants' testimony] in connection with [their] efforts to secure the admission of alternative-perpetrator evidence" if they had uncovered their remembrances. State Habeas Record at 6822.

Leaving aside the question of whether trial counsel should have interviewed the men, the state habeas court found the three affidavits "unpersuasive" as indicating Soffar's innocence. State Habeas Record at 8917. The state habeas court based this finding on several factors, including credibility problems with the affiants and the fact that decades had passed since they had seen Reid.[22] In addition, Soffar "fail[ed] to demonstrate that those

---

[22]Specifically, the state habeas court found that "identifications by [the three affiants] of Paul Reid as the individual that they saw at the bowling alley are suspect given that their identifications took place more than two decades after the primary offense without indication of any other familiarity (continued...)

-92-

witnesses were available and that their testimony would have benefitted the defense." State Habeas Record at 8946. Even if the affiants were credible and their recollection sound, the state habeas court found that the substance of the affidavits added little to the defense's theory: "Even assuming that Reid appeared at the bowling alley one or more times prior to the primary offense, Reid's mere presence neither establishes his culpability nor [Soffar's] innocence regarding the primary offense." State Habeas Record at 8946.

Taking a broader look at Soffar's theory, however, the state habeas considered the case against Reid to be weak. Even if trial counsel had called those three witnesses to testify, Soffar's allegations turned on Cook's affidavit, which the state habeas court found unpersuasive and not credible. Considering the whole of the evidence, including Reid's deposition which Soffar's briefing does not meaningfully refute or reconcile, the state habeas court summarized:

Cook's 2000 affidavit inculpating Reid in the primary offense is suspect and unpersuasive for the following reasons: Cook's criminal history; Cook's twenty year delay in divulging information concerning Reid's alleged involvement in the primary offense; Cook's invocation of his Fifth Amendment rights regarding his conversation with habeas counsel and the content of his 2000 affidavit

---

[22] (...continued)
with Reid." State Habeas Record at 8917. In fact, one of the affiants "did not actually identify Reid as the individual that he saw at the bowling alley but merely asserted that he saw a person with Reid's same appearance at the bowling alley." State Habeas Record at 8917-18.

-93-

during the instant retrial; the statement by Cook's lawyer that he did not consider Cook a "credible historian" and that Cook tried to implicate Reid in other crimes in exchange for relief on a parole violation; and, Cook's expectation of financial gain from implicating Reid in the bowling alley murders[.]

State Habeas Record at 8921. Not only did Soffar's "alleged newly discovered evidence regarding Paul Reid . . . not unquestionably establish his innocence of the instant offense," but trial counsel's failure to put forth the information in the three affidavits did not mean "that the outcome of the instant trial would have been different." State Habeas Record at 8921, 8946. With deference to the factual findings made by the state court and taking a broader look at the whole evidentiary picture, the state courts were not unreasonable in denying Soffar's denial-of-defense and related ineffective-assistance claims. See 28 U.S.C. § 2254(d)(1).

## E. Trial Counsel's Performance in the Punishment Phase of Trial (Claims 11, 13, 14)

Soffar raises three claims faulting trial counsel for counsel's investigation, preparation, and presentation of evidence for the punishment phase of trial. Specifically, Soffar claims that trial counsel should have developed a more robust case to discourage a finding of future dangerousness, should have objected to the introduction of victim impact evidence in the penalty phase, and should have adduced more mitigating evidence.

Capital defense attorneys bear a heavy burden defending against a death sentence. See Florida v. Nixon, 543 U.S. 175, 191

(2004). As previously discussed, the State's punishment case accentuated Soffar's long-standing criminal and behavioral problems as a forecast of his future danger. The State underscored that the jury had already convicted Soffar of a brutal triple murder, a crime that alone could justify a finding of future-dangerousness under Texas law. See Soliz v. State, 432 S.W.3d 895, 901 (Tex. Crim. App. 2014); Martinez v. State, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); Allridge v. State, 850 S.W.2d 471, 488 (Tex. Crim. App. 1991). The State called witnesses to describe how Soffar's early history included cruelty to people and animals, problems at school, running away, assaulting others, early onset substance abuse, and an uncontrollable nature. Custody in residential facilities and juvenile probation did not blunt Soffar's lawlessness. As he matured, Soffar continued to be engaged in criminal activity, such as possession of marijuana, resisting arrest, enticing a child, theft, public intoxication, and burglary. Soffar threatened to kill police officers and a girlfriend. Soffar confessed that he abducted and raped a woman. His bad behavior extended into the prison context, where he engaged in misconduct such as possessing weapons and throwing urine at guards. In sum, the State argued that the punishment-phase evidence painted a picture of life-long violence and remorselessness.

An attorney must employ "reasonable professional judgment" in deciding the best manner in which to refute the prosecution's case.

Wiggins, 539 U.S. at 533-34. Trial counsel approached the punishment phase against the backdrop of the first trial. Soffar's attorneys knew what evidence the defense had presented at the first trial and the evidence that Soffar argued on the first round of habeas review that his attorneys should have presented. With that background, and their own independent investigation, trial counsel called sixteen witnesses in the punishment phase of trial.

As summarized by the state habeas court, "trial counsel presented testimony that [Soffar] was not violent at various stages of his life in support of the theory that [he] did not present a future danger." State Habeas Record at 8957. This testimony included information from his youth showing that Soffar "was generally not violent," never "engage[d] in activity that endangered another individual," "responded well to authority at Gulf Coast Trade Center," and only had non-violent disciplinary problems. State Habeas Record at 8957. Immediately before the murders Soffar had been an undercover informant. State Habeas Record at 8957. Soffar "followed the rules" when previously incarcerated. State Habeas Record at 8957.

After his arrest Soffar's behavior showed that he "had become more responsible for his behavior," "was concerned about being a good person," was "very polite to correctional officers," "had become very spiritual and a good person," was "very quiet and cooperative," never had "problems with prison guards or inmates," "did not fight," and was kind. State Habeas Record at 8958. Trial

-96-

counsel augmented these lay accounts with expert testimony that Soffar "did not constitute a future danger." State Habeas Record at 8958. Trial counsel "countered any impression that [Soffar's] alleged mental deficits increased his risk for violence through [a] psychiatrist . . . who testified regarding [his] favorable response to a structured environment[.]" State Habeas Record at 8958. A former Texas prison system employee "described for the jury the prison environment of capital murder defendants sentenced to life in Texas and [Soffar's] disciplinary history." State Habeas Record at 8958.

Soffar claimed in his second habeas action that his attorneys did not do enough. The state habeas court found no constitutional error in trial counsel's punishment phase representation. Soffar has not shown that the state-court rejection was contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1).

## 1. Trial counsel ineffectively investigated, prepared, and presented mitigating evidence. (Claim 11)

Soffar contends that "[t]rial counsel's mitigation investigation and presentation was utterly inadequate." (Docket Entry No. 42 at 156) Defense attorneys have "the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." Neal, 286 F.3d at 236-37 (quoting Baldwin v. Maggio, 704 F.2d 1325, 1332 (5th Cir. 1983)). Soffar argues that trial counsel did not conduct an investigation

adequate to present "a mitigation narrative" that would have provided the jury with information about Soffar's birth and adoption, his "disinterested and inadequate adoptive parents," his behavioral problems, especially as he entered the school system, his early interaction with the police, his substance abuse at a young age, childhood diagnosis of brain damage, the lack of support for his problems, and his seeking approval and acceptance from police officers. (Docket Entry No. 42 at 158-70) Soffar characterizes his attorneys as "disregard[ing] their professional obligations" by engaging in a defective investigation because "(1) trial counsel did not uncover and present evidence of maltreatment and neglect during Mr. Soffar's childhood, (2) trial counsel did not adequately develop evidence of Mr. Soffar's developmental disabilities and mental impairments, and (3) trial counsel did not uncover and present evidence of Mr. Soffar's positive, humanizing qualities." (Docket Entry No. 42 at 178)

Soffar bases this claim on the omission of lay and expert testimony. In support of his claim Soffar relies on the affidavits of several people, one of whom testified at trial, who describe Soffar's background, home life, schooling, and interaction with the police. (Docket Entry No. 42 at 179-81 (summarizing habeas affidavits)) Similarly, Soffar asserts that the lay affiants could have testified that he "is not inherently evil and, instead, is a human being with positive qualities." (Docket Entry No. 42 at 186) Soffar emphasizes the affidavit testimony of expert witnesses, most

-98-

of which prior attorneys had developed in the first round of habeas proceedings. (Docket Entry 42 at 183-85 (summarizing habeas affidavits))

A key question in deciding the sufficiency of trial counsel's representation is whether the difference between the mitigating case at trial and that championed in the federal habeas action flows from strategic decision-making or from negligence. See Wood v. Allen, 558 U.S. 290, 303 (2010) (distinguishing between "whether counsel made a strategic decision" and "whether counsel's judgment was reasonable"); Loyd v. Whitley, 977 F.2d 149, 158 (5th Cir. 1992) ("[W]hether counsel's omission served a strategic purpose is a pivotal point in Strickland and its progeny. The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court.").

Trial counsel approached the punishment phase of trial with an awareness of the original state and federal proceedings, including Soffar's claim that his original attorneys had not sufficiently developed mitigating evidence. Trial counsel's review made them "aware of the extensive documentation, as well as lay and expert testimony, that was developed by former counsel regarding [Soffar's] alleged mental deficits and used to support various claims[.]" State Habeas Record at 8913. Trial counsel also conducted their own investigation into Soffar's background. In preparation for his second trial, Soffar's attorneys probed his life history and consulted with experts, including but not limited

to: a mitigation expert, two neuropsychologists, an investigator, and a criminal justice consultant. As a result of that investigation trial counsel augmented the mitigating case that had been developed for the first trial.

Trial counsel chose a multifaceted strategy in the punishment phase. Trial counsel emphasized any residual doubt that the jury may have held considering Soffar's guilt for the crime, particularly given the lack of a positive identification and the concerns about his confession. Given his lengthy incarceration with few disciplinary problems, trial counsel strongly insisted that Soffar would not pose a future danger as he spent the remainder of his days in prison. In an effort to "present in as coherent a manner as possible the information [trial counsel had] about Max Soffar's life," trial counsel called a mental-health expert to describe how Soffar "was born with a broken brain. It was broken at birth and it didn't get better." (Docket Entry No. 42 at 24-25) Trial counsel described how this brain damage "affected his home life, school life, how he acted, his ability to get along with others, and created challenges." Soffar was "further damaged by drug use." (Docket Entry No. 42 at 25) Having presented testimony about Soffar's childhood problems, trial counsel told jurors that Soffar's home life exacerbated his inherent problems because his parents were "too old too busy and too inexperienced as parents to meet Max's many needs as a child and in their efforts to deal with Max," and "whether right or wrong

-100-

they made things worse." (Docket Entry No. 42 at 26) This created an abusive environment where his parents were "very, very hateful, very lashing out at" Soffar. Tr. Vol. 38 at 160. The defense asked jurors to consider how the school system failed to help Soffar. Even with that background, the defense called witnesses to show that Soffar was loved and valued by others, was well-behaved in prison, was religious, and was a friend.

The state habeas court found "based on the trial and habeas records, that trial counsel's strategy decisions regarding the presentation of mitigation evidence were reasonable[.]"[23]  Trial counsel presented a mitigating case to the jury that differs little in substance from what he propounds of federal habeas review. Soffar has not shown that trial counsel ignored obvious leads that would have cast the punishment phase in a substantially different light.

The witnesses whom Soffar faults counsel for not calling would not have presented the jury with different information; they would have only elaborated on that which trial counsel adduced through

---

[23]Soffar contends that "[i]t is self-evident" that the state court's findings and conclusions "are so general as to be next to worthless because they fail to set forth with any specificity what trial counsel did and, more importantly, what Mr. Soffar alleges trial counsel ought to have done." (Docket Entry No. 42 at 157) The state habeas court based its decision on the correct legal standard and applied that to Soffar's habeas claim. A federal habeas court's review under 28 U.S.C. § 2254(d) "should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Neal, 286 F.3d at 246.

other witnesses. The Fifth Circuit has refused to find Strickland prejudice when trial counsel presented similar mitigating evidence, even if only in outline form, at trial. See Coble v. Quarterman, 496 F.3d 430, 437 (5th Cir. 2007); Rodriquez v. Quarterman, 204 F. App'x 489, 501 (5th Cir. 2006); Parr, 472 F.3d at 257-58. No Supreme Court case has yet found Strickland error when post-trial investigation fills in the outlines that trial counsel chalked out at trial.

While a different attorney may have come to a different conclusion about the best approach to take in the punishment phase, "[t]here are countless ways to provide effective assistance in any given case[.]" Strickland, 466 U.S. at 689. "Even the best criminal defense attorneys would not defend a particular client in the same way." Id.; see also Pinholster, ___ U.S. ___, 131 S. Ct. at 1403; Richter, ___ U.S. ___, 131 S. Ct. at 788-89. Soffar has not shown that the state habeas court was unreasonable in deciding that trial counsel was not prejudicially ineffective in the investigation, preparation, and presentation of mitigating evidence.

## 2. Trial counsel investigated, prepared, and presented insufficient evidence to discourage a finding of future dangerousness. (Claim 13)

Soffar contends that trial counsel provided ineffective representation in defending against an affirmative answer to the future dangerousness special issue. Soffar asserts that trial

counsel presented inadequate lay and expert testimony to counteract the prosecution's evidence. Soffar alleges that "trial counsel simply overlooked or, even worse, chose to ignore critical evidence that was already in their possession." (Docket Entry No. 42 at 215) Soffar specifically points to affidavits from seven witnesses he presented on state habeas review who could have provided additional testimony, including:

- a fourth-grade teacher's recollection that Soffar performed well in a structured setting;

- an aunt-in-law's testimony that Soffar could respond to rules and regulations;

- a childhood neighbor's recollection that Soffar responded well to attention because he had a[n] inherent need to please and her opinion that he had adapted well to the prison environment;

- additional testimony by a sister who testified at trial which would discuss how Soffar responded to structure, discipline, and attention;

- a teacher from his teenage years who never considered him to be a discipline problem;

- an aide at a trade school Soffar attended who would have testified that he was never cruel or violent; and

- a fifth-grade teacher's testimony that, while frustrating to teach, Soffar was not a discipline problem.

(Docket Entry No. 42 at 217)

Soffar argues that trial counsel should have used this testimony to militate against a finding of future dangerousness through the testimony of another expert witness, Dr. Mark D. Cunningham. Dr. Cunningham submitted an affidavit in the state

-103-

habeas court that reviewed the evidence and concluded that "[i]n light of Mr. Soffar's prison adjustment history, age, and continuing community relationships, his likelihood of future violence in prison is well below the low base rates of prison violence committed by capital offenders and convicted murderers." State Habeas Record at 7741. By engaging in a statistical comparison between Soffar and other offenders, and referring to past research on capital inmates, Dr. Cunningham would have explained that capital murderers are generally less violent in prison, that Soffar's age makes him less of a threat, that Soffar had not assaulted anyone in two decades, that his links with the outside world make him less violent, and that his past diagnosis of anti-social personality disorder would not make him more likely to be violent. State Habeas Record at 7741. Soffar contends that Dr. Cunningham's opinions "would have been very persuasive and would have provided precisely the type of coherent narrative that was lacking in trial counsel's presentation." (Docket Entry No. 42 at 219)

The court has reviewed the trial record, the state habeas court record, the arguments, and Soffar's new evidence. The court concludes that the state habeas court was not unreasonable in finding no Strickland error. The defense presented a robust case in the penalty phase, calling numerous witnesses whose testimony encompassed a broad review of Soffar's life. The witnesses Soffar faults counsel for not calling would offer evidence similar to that

of the witnesses who testified before the jury.[24] Jurors already had ample information to help them understand how Soffar would react in the prison environment and, in fact, could review his disciplinary history for the many years he spent in state custody. Trial counsel elected to call expert witnesses who, while not adding the exact same statistical veneer as Dr. Cunningham, nevertheless told jurors about Soffar's potential for violent acts.

Against that evidence, the State presented "strong" evidence, not just of the brutal murders for which the jurors had convicted Soffar, but that his "behavioral problems began early in his childhood, and his past is replete with examples of his inability to control his improper and violent behavior. On numerous occasions, he acted violently toward family, friends, law-enforcement officers, and animals." Soffar, 2009 WL 3839012, at *45. With that evidentiary picture, the state habeas court was not unreasonable in concluding that Soffar "fail[ed] to demonstrate that counsel was deficient in the representation . . . at punishment" and Soffar "fail[ed] to establish that the presentation of evidence proposed in the instant habeas proceeding would have been any more effective than that elected by trial counsel." State Habeas Record at 8959.

---

[24]In fact, the state habeas court considered the evidence to be so similar that it characterized Soffar's habeas argument as "merely a roundabout attack on the factual sufficiency of the evidence to support the jury's finding of future dangerousness, a finding that is not subject to appellate review." State Habeas Record at 8959.

### 3. Trial counsel should have objected to the introduction of victim impact evidence in the penalty phase. (Claim 14)

During the penalty phase of trial the prosecution called Brenda Moebius, the widow of victim Steve Sims. Ms. Moebius described her relationship with Mr. Sims and testified about how his murder affected her family. Tr. Vol. 37 at 37, 41-42. Soffar argues that trial counsel should have objected to her testimony as impermissible victim-impact evidence. Specifically, Soffar contends that trial counsel "failed to object to that testimony on the basis that it related to a victim not named in the indictment." (Docket Entry No. 42 at 225)

On direct appeal Soffar claimed that the trial court should not have allowed Ms. Moebius' testimony to come before the jury. The Court of Criminal Appeals, however, held that Soffar had not raised a sufficient objection to preserve error. Soffar, 2009 WL 3839012, at *34. Trial counsel had objected to her testimony in a motion in limine, but "did not ask to approach the bench until Moebius had already testified at length regarding the impact of Sims's death on her and their son." Soffar, 2009 WL 3839012, at *34. Because trial counsel's objection was not timely, and he never obtained a ruling from the trial judge, the Court of Criminal Appeals found that Soffar had procedurally defaulted consideration of his claim. Soffar, 2009 WL 3839012, at *34.

On state habeas review Soffar claimed that trial counsel provided ineffective representation by not making a sufficient

objection to preserve error. The state habeas court rejected this claim.[25] Soffar must show that the state court's decision was unreasonable under the AEDPA.

During the punishment phase of a trial "evidence may be offered . . . as to any matter the court deems relevant." Tex. Code Crim. Pro. art. 37.071 3(a)(1). Such evidence may include extraneous offenses, even those that are unadjudicated. Id. The Supreme Court has found that the Constitution "erects no *per se* bar" to victim impact testimony, leaving the admission of that evidence to the States. See Payne v. Tennessee, 501 U.S. 808, 827 (1991); see also Beazley v. Johnson, 242 F.3d 248, 257 (5th Cir.

---

[25]The state habeas court observed that

the merits of [Soffar's] habeas claim is controlled by Roberts v. State, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007), an appeal of a capital murder defendant sentenced to death, where the Court of Criminal Appeals held that testimony from the victim of an extraneous robbery offense regarding the emotional impact that the crime had on her life was properly admitted at trial and remarking that 'victim impact' evidence is evidence of the effect of an offense on people *other* than the victim.

State Habeas Record at 8799-8800. The Court of Criminal Appeals did not adopt that factual finding. Ex parte Soffar, Nos. WR-29,980-03 and WR-29,980-3 (Tex. Crim. App. Oct. 12, 2012). While the Court of Criminal Appeals did not provide a written reason for not adopting the factual finding, this court observes that the challenged testimony did not come from a victim about the crime's impact on him, as in Roberts. Instead, the challenged testimony was about the impact that a crime had on the family of a victim named in the indictment, but not a victim of the substantive crime. Notwithstanding the lack of clarity between the state court decisions, the Court of Criminal Appeals denied habeas relief on the claim.

-107-

2001). The Supreme Court has elaborated that a State may conclude that "evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated." Payne, 501 U.S. at 827. Texas courts, however, have held that "[t]he danger of unfair prejudice to a defendant inherent in the introduction of 'victim impact' evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high." Cantu v. State, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997). Thus, victim impact testimony is irrelevant when it involves the victim of an extraneous offense who is not named in the indictment. Haley v. State, 173 S.W.3d 510, 517-19 (Tex. Crim. App. 2005); Cantu, 939 S.W.2d at 637.

Soffar must show that trial counsel possessed, and then failed to act on, a viable objection under state law. Soffar contends that "all of Ms. Moebius's testimony was inadmissible as a matter of well-settled Texas law because Mr. Soffar was not on trial for Mr. Sims's murder." (Docket Entry No. 34 at 225) Soffar cites Texas law that disallows victim-impact testimony regarding a victim not named in the indictment. See Cantu, 939 S.W.2d at 637. Soffar argues that "Ms. Moebius's testimony falls squarely within the scope of Cantu because Ms. Moebius gave evidence regarding how she was impacted by a different offense than the one for which Mr. Soffar was being tried." (Docket Entry No. 42 at 227)

-108-

The indictment, however, named Mr. Sims as a victim, just not as a victim of the murder. The indictment read: "while in the course of committing and attempting to commit the Robbery of STEPHEN ALLEN SIMS, intentionally cause the death of ARDEN ALANE FELSHER, hereafter styled the Complainant, by shooting the Complainant with a gun." State Habeas Record at 9124. Because the jury did not convict Soffar of Sims' murder, the circumstances in this case are not on all fours with Cantu. Unlike Cantu in which the defendant had participated in the rape and murder of two girls but was only indicted for the offenses against one of them, the indictment apprised Soffar that he would stand trial for an offense against Mr. Sims. The Court of Criminal Appeals, however, has not read Cantu broadly and has allowed several categories of testimony about victims not named in the indictment.[26] Soffar has not pointed to any state law at the time of trial that would interpret Cantu to

---

[26]The Court of Criminal Appeals, for instance, has allowed testimony that relates to the victim of a crime not named in the indictment, but that still does not fall into the category of "victim impact" testimony. See Mathis v. State, 67 S.W.3d 918, 928 (Tex. Crim. App. 2002) (finding no error in the admission of testimony from the caregiver of a victim injured in the same criminal episode but not named in the indictment because the testimony did not involve the character of the victim or the effect of her injuries on third persons); Roberts, 220 S.W.3d at 531 (finding no error in the admission of testimony from the victim of a previous crime because "'[v]ictim impact' evidence is evidence of the effect of an offense on people other than the victim"); Mays v. State, 318 S.W.3d 368, 393 (Tex. Crim. App. 2010) (finding no error in the admission of testimony from two officers involved in a police shootout but not named as victims of the crimes for which the defendant was indicted because they testified about their own injuries and losses).

disallow victim-impact testimony in a capital trial about the named victim of a predicate offense other than the underlying murder.

In sum, Soffar has not provided any basis in state law at the time of trial that would have guided counsel's choice whether to object. Accordingly, the circumstances of this case and the state of Texas law at the time of trial would not necessarily apprise a reasonable attorney that a viable objection existed. Given the habeas trial court's adjudication on state habeas review, Soffar has not shown a reasonable probability that the trial court would have excluded the victim-impact evidence.

However, even if trial counsel could have made a valid objection under state law, Soffar must show actual prejudice. Much of Ms. Moebius' testimony followed what would be expected, such as explaining how Mr. Sims' death and funeral affected the family. Ms. Moebius' testimony was far from instrumental in securing a death sentence against Soffar, and in fact amounted to only a minor theme in a highly incriminating case. The Court of Criminal Appeals on habeas review, therefore, could reasonably find no Strickland prejudice flowing from trial counsel's failure to object. Soffar has not shown that this claim merits habeas relief.

## F. Evidence of Soffar's Confession to an Extraneous Rape (Claim 12)

Soffar argues that the police violated his Sixth Amendment rights by interrogating him about a rape. On August 8, 1980, the

-110-

State charged Soffar with the bowling alley murders and he was appointed counsel. The police subsequently contacted Harris County Sheriff's Detective Bockel and told him that Soffar had confessed to an unresolved rape during earlier interrogations. Detective Bockel contacted the victim and then sought to interview Soffar without his appointed counsel present on August 19, 1980. Soffar waived both his right to silence and to counsel. Soffar told Detective Bockel that he was mad at his attorneys because they had not contacted him and that he did not want them present. Tr. Vol. 7 at 113-13; Tr. Vol. 37 at 51. During the interrogation Soffar gave a written confession admitting to the rape of the woman who later identified him. The State never charged Soffar with the rape, presumably because he was convicted of these murders.

The victim tentatively identified Soffar from a lineup, but said she could not be positive. She identified Soffar, however, when she testified in the punishment phase of Soffar's first capital murder trial. The State relied on her testimony in that action without putting Soffar's confession into evidence.

During the second punishment phase information about the rape came from three sources: Detective Bockel's testimony about Soffar's oral statements, Tr. Vol. 37 at 44; the victim's account, Tr. Vol. 37 at 67; and evidence confirming the rape, Tr. Vol. 37 at 52. Soffar argues that the State violated his Sixth Amendment right to counsel by admitting his statement into evidence. Because

of that violation Soffar contends that testimony from the victim, including her identification of him as the perpetrator, amounted to "fruit of the poisonous tree."

The Court of Criminal Appeals' resolution of Soffar's Sixth Amendment claim on direct appeal occurred in the context of its previous jurisprudence. Specifically, the Court of Criminal Appeals said that its "decisions in Wesbrook v. State, [29 S.W.3d 103, 116-19 (Tex. Crim. App. 2000) (plurality opinion)] and Thompson v. State, [93 S.W.3d 16, 22-27 (Tex. Crim. App. 2003)] support[ed] Soffar's contention that the trial judge erred in admitting Soffar's confession to the sexual-assault offense into evidence." Soffar, 2009 WL 3839012 at *44. The Court of Criminal Appeals described those cases as follows:

The defendants, formally charged with capital murder and represented by counsel, were questioned by the State about extraneous, uncharged offenses without the assistance of counsel. At the punishment phase of the defendants' trials, the State used the incriminating information given by the defendants about the extraneous, uncharged offenses to prove that the defendants constituted a future danger. We held that the defendants' Sixth Amendment right to counsel was violated.

Soffar, 2009 WL 3839012 at *44. With that background, the Court of Criminal Appeals "found error" in the admission of Soffar's confession to rape, but also found that the error was harmless beyond a reasonable doubt. Id. at *47.

Under both the Fifth and Sixth Amendments, a suspect has a right to counsel at post-arraignment custodial interrogations. The

Fifth Amendment protection against compelled self-incrimination provides the right to counsel at custodial interrogations to protect a suspect's "desire to deal with the police only through counsel." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). The Sixth Amendment right to counsel, which attaches at the "initiation of adversary judicial proceedings," id. at 175, is "offense specific," meaning it applies only "to the specific offense with which the suspect has been charged." United States v. Carpenter, 963 F.2d 736, 739 (5th Cir. 1992); see also Texas v. Cobb, 532 U.S. 162, 167-73 (2001); McNeil, 501 U.S. at 175. In other words, "a defendant's statements regarding offenses for which he ha[s] not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." Cobb, 532 U.S. at 168.

The Court of Criminal Appeals relied on its own case law from Wesbrook and Thompson, which addresses the use of extraneous confessions in the punishment phase of a capital trial to show future dangerousness. The Court of Criminal Appeals, however, has since observed that its "holding in Thompson may have been called into question by the later Supreme Court decision in Kansas v. Ventris, [556 U.S. 586 (2009)] which articulated views similar to those held by the dissents in Thompson." Rubalcado v. State, 424 S.W.3d 560, 572 (Tex. Crim. App. 2014). In Ventris the Supreme Court observed that its prior precedent "was equivocal on what precisely constituted the violation" -- whether the constitutional

violation occurred "at the moment of the postindictment interrogation" or "only when the improperly obtained evidence was 'used against [the defendant] at his trial.'" 556 U.S. at 591-92 (quoting Massiah v. United States, 377 U.S. 201, 206 (1964)). The Ventris court concluded that the relevant right "is a right to be free of uncounseled interrogation, and is infringed at the time of interrogation." Ventris, 556 U.S. at 591.

Thus, the Supreme Court's focus is on what rights have attached, not how the State uses a suspect's confession. While the state courts may limit the admission of other confessions to offenses in the future-dangerousness context, the Supreme Court has not found any constitutional violation in the use of a defendant's voluntary confession to an uncharged offense. Simply, the "decision in McNeil meant what it said: . . . . [:] the Sixth Amendment right is offense specific." Cobb, 532 U.S. at 164.

Nothing in the record suggests that Detective Bockel intended to interrogate Soffar for the purpose of gathering additional evidence about the bowling alley murders. At the time of the questioning about the rape, Soffar's Sixth Amendment right to counsel, an offense-specific right, had not yet attached to the uncharged sexual assault offense. See Kirby v. Illinois, 406 U.S. 682, 688-89 (1972) (explaining that the Sixth Amendment right to counsel attaches at the initiation of adversarial judicial proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"). Because Soffar

-114-

knowingly and intelligently waived his Miranda rights before Detective Bockel questioned him about the uncharged sexual assault offense, the police were free to interrogate him, without counsel present, about that offense. See Cobb, 532 U.S. at 167.

Notwithstanding the fact that the Court of Criminal Appeals found error when considering this issue on the second direct appeal, the court concludes that Soffar has not shown that the police violated his constitutional rights when questioning him about the rape. Soffar, therefore, is not entitled to federal habeas relief on this claim. See 28 U.S.C. § 2254(a) (predicating federal habeas relief on an inmate's showing of a constitutional violation).

The Court of Criminal Appeals concluded that any error in introducing Soffar's sexual-assault confession into evidence was harmless. The Court of Criminal Appeals provided two reasons for this decision. First, the Court of Criminal Appeals found that "other convincing evidence establish[ed] Soffar as Knight's assailant." Soffar, 2009 WL 38339012, at *47. Ms. Knight testified that Soffar raped her, and testimony showed that Soffar later sold a guitar that he stole during the assault. The Court of Criminal Appeals also found that "the remaining evidence of future dangerousness was strong." Soffar, 2009 WL 38339012, at *45. The Court of Criminal Appeals reviewed Soffar's deep-rooted behavioral and legal problems, chronicling his numerous violent acts while a juvenile, his criminal convictions that spanned several years, his

disciplinary infractions while incarcerated, and his repeated threats to hurt others. The Court of Criminal Appeals also placed emphasis on "the current offense - for which Soffar showed no remorse when confessing[.]" Soffar, 2009 WL 3839012, at *47. The Court of Criminal Appeals therefore held that "beyond a reasonable doubt, Soffar's sexual-assault confession did not influence the jury's determination that Soffar is a future danger." Soffar, 2009 WL 3839012, at *47.

The Court of Criminal Appeals was not unreasonable in finding that any error was harmless. The prosecution developed independent evidence that showed his commission of the crime, including an identification by the victim. The evidence of the rape was only one part of a highly incriminating body of evidence showing Soffar's lifelong history of violent acts. On that basis the Court of Criminal Appeals was not unreasonable in finding any Sixth Amendment violation to be harmless. Thus, Soffar has not shown that this claim merits federal habeas corpus relief.

## G. Prosecutorial Argument in the Punishment Phase (Claims 15, 16)

Soffar claims that the prosecution violated his constitutional rights through statements made in closing arguments. Soffar raised portions of these arguments on state direct and on state habeas review. The state courts examined each complained-of-statement and found that none violated Soffar's constitutional rights. For the reasons discussed below, that adjudication was not contrary to, or

-116-

an unreasonable application of, federal law. See 28 U.S.C.
§ 2254(d)(1).

## 1. Background

On direct appeal Soffar challenged four areas of argument that
the prosecution made in its guilt/innocence summation. The Court
of Criminal Appeals, however, found that Soffar had defaulted
appellate review of those prosecutorial arguments. In the first
three complained-of-arguments Soffar argued that the prosecutor
committed constitutional error when he said that:

- Soffar "didn't bring you any evidence that the
  Defendant falsely confessed to this [crime]." Tr.
  Vol. 35 at 9.

- Soffar "didn't bring you any evidence that someone
  other than the Defendant committed this crime."
  Tr. Vol. 35 at 9.

- The statements Soffar signed were credible because
  they contained facts that only the true perpetrator
  of the crime could have known is also improper.
  Tr. Vol. 35 at 11, 22-23.[27]

The Court of Criminal Appeals held that Soffar had not preserved
error with regard to any of those complaints. Specifically,

---

[27]All three statements came from the same portion of the
prosecution's argument:

> . . . but the one thing you need to know that the Defense
> didn't bring you, they didn't bring you any evidence that
> the Defendant falsely confessed to this. They didn't
> bring you any evidence that he didn't commit this crime.
> They didn't bring you any evidence that someone other
> than the Defendant committed this crime.

Tr. Vol. 35 at 9.

because Soffar "failed to object in any of these instances . . . he failed to preserve these particular arguments for review." Soffar, 2009 WL 3839012, at *29. Accordingly, the Court of Criminal Appeals did not rule on the merits of those arguments.

Soffar also argued that the prosecution committed constitutional error by referring to Soffar's confinement to Austin State Hospital as a "criminal commitment," when it had been a civil commitment. Tr. Vol. 35 at 82. At trial, however, trial counsel interjected: "Objection Your Honor. Burden shifting." Tr. Vol. 35 at 82. The Court of Criminal Appeals concluded: "Soffar's 'burden shifting' trial objection does not comport with his argument on appeal; therefore, he has failed to preserve his complaint for our review[.]" Soffar, 2009 WL 3839012, at *29.

On state habeas review Soffar tried to rectify the procedural defects by raising a claim that trial counsel had failed to lodge proper objections to all four categories of argument. Soffar renewed his challenge to the arguments, but cast his grounds for relief as an ineffective-assistance-of-counsel argument for failing to preserve error on the substantive prosecutorial-misconduct claim. The state habeas court found that arguments regarding Soffar not "bring[ing] any evidence" were "proper as a summary of the evidence and as a comment on [Soffar's] failure to present witnesses." State Habeas Record at 8950.

On state habeas review Soffar also raised new complaints about prosecution's closing arguments, but also framed each as an

-118-

allegation that trial counsel should have objected to the summation. Soffar claimed the trial counsel's representation violated constitutional norms by not objecting when the prosecution told the jury that

- Soffar "didn't bring you any evidence that he didn't commit this crime." Tr. Vol. 35 at 9.

- He had "been looking around and [he] just can't find the mental health records of [Mr. Soffar]. . . . and don't you know with his well prepared defense that if they're there we would have them." Tr. Vol. 35 at 82.

- Each juror was entitled to decide whether the mitigating evidence offered by Mr. Soffar was in fact mitigation. Tr. Vol. 41 at 11.

- The crime had impacted the relatives of all four of the victims of the Bowling Alley robbery. For example, the prosecutor argued that "Tommy Temple couldn't be here yesterday for his birthday . . . Steve Sims never got to see his son graduate, marry and him [sic] Steve become a grandfather. And Greg Garner's life has been inalterably changed." Tr. Vol. 41 at 56-57.

- "There's no evidence" that Mr. Soffar's brain was damaged since birth. Tr. Vol. 41 at 38.

- He suffers from "anti-Christ personality disorder." Tr. Vol. 41 at 55-56.

- Soffar did not mention the $15,000 reward for information leading to the capture of the Bowling Alley robber to "anybody anywhere anytime other than his sister," Tr. Vol. 35 at 79, however, Sergeant Clawson recalled Soffar "asking a question about a reward. Is there a reward?" Tr. Vol. 29 at 186; see also Tr. Vol. 30 at 94-95, and Soffar apparently mentioned the reward during one of his first interrogations. Tr. Vol. 43, State Ex. 1A at 36.

With regard to each claim, the state habeas court engaged in a two-part analysis. First, the state habeas court found that

trial counsel had no obligation to object because the prosecutorial statements were not improper. State Habeas Record at 8952, 8953, 8963, 8964, 8966. The only exception was the prosecution's comment that Soffar had an "anti-Christ personality disorder," which the state habeas court considered to be a mistake because "the prosecutor was obviously referring to the criteria for anti-social personality disorder[.]" State Habeas Record at 8966-67.

As the second part of its analysis, the state habeas court concluded that the failure to object did not harm the defense. In a prejudice analysis that also included the statements challenged on direct appeal, the state habeas court found no error in trial counsel's failure to object to all the complained-of comments by the prosecution. The state court held:

Trial counsel was not ineffective for failing to object and/or preserve error regarding the State's proper jury arguments at guilt/innocence and punishment. Harris v. State, 784 S.W.2d 5, 12 (Tex. Crim. App. 1989)(counsel can properly summarize the evidence, make reasonable inferences from the evidence, answer argument of opposing counsel, and make a plea for law enforcement during jury argument). Even assuming error, [Soffar] is not entitled to habeas relief because the complained-of arguments, when considered in light of the entire record, were not "extreme or manifestly improper, violative of a mandatory statute, or inject new facts into the case that [were] harmful to the defendant." Tompkins v. State, 774 S.W.2d 195, 218 (Tex. Crim. App. 1987).

State Habeas Record at 8983.

On federal review Soffar renews his challenge to the prosecutorial arguments referred to on both state appellate and habeas review. Soffar's focuses on two constitutional arguments:

that the statements themselves violated the constitution and that
trial counsel provided ineffective representation in failing to
object to them. The procedural posture of Soffar's arguments raise
several concerns. Soffar procedurally defaulted some claims on
state direct appeal. Soffar presented several arguments on state
habeas review, but only as ineffective-assistance-of-counsel
claims. Soffar did not give the state courts a full opportunity to
consider their merits as prosecutorial-misconduct claims, rendering
them unexhausted. Only the ineffective-assistance claims are fully
before the court.

## 2. Procedural Bar

"In all cases in which a state prisoner has defaulted his
federal claims in state court pursuant to an independent and
adequate state procedural rule, federal habeas review of the claims
is barred" unless an inmate can make particularized showings.
Coleman, 501 U.S. at 750 n.1. A prisoner can either "demonstrate
cause for the default and actual prejudice as a result of the
alleged violation of federal law" or "demonstrate that failure to
consider the claims will result in a fundamental miscarriage of
justice." Id. Soffar argues that his actual innocence and trial
counsel's representation meet the requirements to overcome the
procedural bar of his claims.

First, Soffar argues that "it would be a grave 'miscarriage of
justice' for the Court to ignore arguments that put an innocent man
on death row for more than 30 years." (Docket Entry No. 45 at 75)

-121-

As a safety valve against unfair imposition of a procedural bar, a petitioner may show that a miscarriage of justice exists, which "is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him." Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001); see also Schlup, 513 U.S. at 316. In making a Schlup actual innocence argument, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup, 513 U.S. at 324.[28] The Supreme Court has "often emphasized 'the narrow scope' of the [actual innocence] exception." Calderon, 523 U.S. at 559 (quoting Sawyer v. Whitley, 505 U.S. 333, 340 (1992)). "Given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been

---

[28]Courts are not uniform in defining the modifier "new" in this context. Some courts only recognize evidence as "new" if it relies on a factual predicate that arose well after trial. See Osborne v. Purkett, 411 F.3d 911, 920 (8th Cir. 2005) ("Evidence is only new if it was not available at trial and could not have been discovered earlier through the exercise of due diligence.") (quotation omitted). Other courts treat evidence as "new" if it was available, but not presented, at trial. See Gomez v. Jaimet, 350 F.3d 673, 679 (7th Cir. 2003) ("All Schlup requires is that the new evidence is reliable and that it was not presented at trial."); Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003) (requiring "newly presented," not newly available evidence). The question, in essence, is "whether Schlup requires 'newly discovered' evidence or merely 'newly presented' evidence." Wright v. Quarterman, 470 F.3d 581, 591 (5th Cir. 2006). The Supreme Court and the Fifth Circuit have not yet conclusively spoken on that debate. See id.; cf. United States v. Davies, 394 F.3d 182, 191 n.8 (3d Cir. 2005) (refusing to "weigh in today on the 'newly presented' versus 'newly discovered' issue[ ]").

summarily rejected." Calderon, 523 U.S. at 560 (quotation omitted); see also Schlup, 513 U.S. at 324 ("[C]laims of actual innocence are rarely successful."). In part, this is because a reviewing court does not look at the new evidence in isolation, but makes "a holistic judgment about 'all the evidence' "including "how reasonable jurors would react to the overall, newly supplemented record." House v. Bell, 547 U.S. 518, 539 (2006) (quoting Schlup, 513 U.S. at 328). With the "extremely rare" success of actual innocence arguments in mind, Schlup, 513 U.S. at 324, the court considers whether Soffar has brought forth new, reliable evidence that could cause a reasonable juror not to convict.

Soffar bases his actual innocence argument on Cook's hearsay account that links Reid to the bowling alley murders. To the extent that Soffar points to other factors that would lay the blame on Reid, the effectiveness of that information turns nearly entirely on Cook's allegation that Reid confessed to the murders. Federal law treats Cook's allegations as suspect because they arose years after the trial. See Herrera, 506 U.S. at 417. More importantly, inadmissible hearsay is insufficient to meet the Schlup standard. See Moore, 534 F.3d at 465; Herrera, 506 U.S. at 417 (finding "particularly suspect" claims of actual innocence based on hearsay-filled affidavits). Soffar has not adduced trustworthy evidence that would pin the murder on Reid. Cook's hearsay-laden account, particularly when considered in Reid's statements in the state habeas deposition, cannot amount to

evidence that would cause a reasonable juror not to convict. Soffar has not shown that actual innocence should allow this court to overlook the procedural defects in his claim.

As a second ground for allowing federal review, Soffar argues that "counsel's failure to preserve the issue properly constituted ineffective assistance of counsel." (Docket Entry No. 45 at 74) This argument applies only to those claims that Soffar defaulted on direct appeal - the other allegations were fully before the state courts. Even if Soffar could show that trial counsel ignored a vital objection, he would still need to prove "actual prejudice." Coleman, 501 U.S. at 750. For the reasons discussed in the section that follows below, Soffar has not shown that the prosecution's comments actually prejudiced the defense.

### 3. The Merits

The Due Process Clause protects against prosecutorial excess in closing summation. See Darden v. Wainwright, 477 U.S. 168, 180 (1986); Caldwell v. Mississippi, 472 U.S. 320, 337-38 (1985); Rogers v. Lynaugh, 848 F.2d 606, 608 (5th Cir. 1988). "Prosecutorial misconduct is not a ground for relief unless it casts serious doubt upon the correctness of the jury's verdict." Styron v. Johnson, 262 F.3d 438, 449 (5th Cir. 2001). "[T]he appropriate standard of review for [a prosecutorial misconduct] claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." Darden, 477 U.S.

at 181 (quotation marks and internal citations omitted). A prosecutorial misconduct claim requires a court to consider three factors: "1) the magnitude of the prejudicial effect of the [prosecutorial action]; 2) the efficacy of any cautionary instruction given by the judge; and 3) the strength of the evidence supporting the conviction." Styron, 262 F.3d at 449. "Only where improper prosecutorial [actions] substantially affect the defendant's right to a fair trial do they require reversal." Id.

In the guilt/innocence phase the prosecution said that Soffar did not support his arguments with evidence, inaccurately reported that he had been criminally committed for mental-health care, inferred that the defense had not been forthcoming with medical records, and told jurors that Soffar had never asked about a reward. The state courts found that some of these comments fell well within the bounds of prosecutorial argument. To the extent that they did not, and even accepting that they may have been false, these were not egregious statements that infected the whole trial with unfairness. Instead, the comments were episodic and brief, not of a magnitude that created a toxic environment for the defense. The statements were not the centerpiece of the prosecution's argument, but blips in a highly incriminatory narrative. The complained-of statements were not the egregiously prejudicial type of statements that offend the due process clause.

The prosecution's comments in the punishment phase pose even less constitutional concern. In the punishment summation the

prosecution discussed how each juror could consider mitigating evidence, talked about the murders' impact on family members, called baseless Soffar's arguments about brain damage, and said that Soffar had an "anti-Christ personality disorder." For the most part, these comments fell within the bounds of proper prosecutorial argument. The state court reasonably found that the prosecution's comments about mitigating evidence and the murders' impact were permissible and, in fact, consistent with the jury charge. The State's characterization of the evidentiary basis for Soffar's claim of brain damage fell within accepted areas of argument. In the most troubling statement, that Soffar had an "anti-Christ personality disorder," the prosecutor misspoke. The state habeas court was not unreasonable in finding that these statements, taken either individually or collectively, did not amount to a constitutional violation.

Ultimately, this is not a case where "the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'" United States v. Bernard, 299 F.3d 467, 488 (5th Cir. 2002). While Soffar's "trial was not perfect – few are – but neither was it fundamentally unfair." Darden, 477 U.S. at 183 (quotation omitted). Whether considering Soffar's allegations as substantive prosecutorial-misconduct claims or in the ineffective-assistance-of-counsel context, he has not shown that federal habeas relief is warranted.

## H.  Cumulative Error (Claim 17)

Soffar contends that, if not sufficient individually, the sum of the error cumulatively requires habeas relief.  An independent claim based on cumulative error is viable only where "(1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'"  Derden v. McNeel, 978 F.2d 1453, 1454 (5th Cir. 1992) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  "Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."  Westley v. Johnson, 83 F.3d 714, 726 (5th Cir. 1996); see also Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero.").  The state habeas court found no error, much less any that would cumulate into a separate constitutional violation.  State Habeas Record at 8972.  Because on federal review Soffar has likewise not demonstrated any error of constitutional magnitude at his trial, he "has presented nothing to cumulate."  Yohey, 985 F.2d at 229.  The court will deny his cumulative-error claim.

## V.  Certificate of Appealability

The AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal.  See 28 U.S.C. § 2253(c); FED. R. APP. PRO. Rule 22(b).

Although Soffar has not yet requested that the court grant him a Certificate of Appealability ("COA"), the court can consider the issue sua sponte. See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000). A court may only issue a COA when a petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also Slack v. McDaniel, 529 U.S. 473, 484 (2000). Under that standard, Soffar has not shown that this court should authorize appellate consideration of any of his claims.

## VI. Conclusion and Order

The court does not take the dismissal of Soffar's case lightly. But the law has removed any presumption of innocence, traditional jurisprudence honors the state court's review of a defendant's case, and Congress has cabined federal review into a focus on the reasonableness of a state court's decision making.

With that limited review Soffar has not shown that the police violated his constitutional rights during the interrogations. With Soffar's confession fairly before the jury, measurably bolstered by his incriminating statements to others, the habeas standards allow no result other than that the trial evidence properly provided for a capital-murder conviction. Although Soffar raises numerous errors that allegedly plagued his trial proceedings, he has not shown that the state courts were unreasonable in finding that, whether considered individually or collectively, they did not violate Soffar's constitutional rights.

Soffar has extensively litigated his claims in state court.
The record in this case is lengthy and, in light of the AEDPA's
focus on what happened in the state courts, is sufficient to
adjudicate Soffar's claims without additional discovery or
evidentiary development. Soffar may not have received a perfect
trial, but "taking into account the reality of the human
fallibility of the participants, there can be no such thing as an
error-free, perfect trial, and . . . the Constitution does not
guarantee such a trial." United States v. Hasting, 461 U.S. 499,
508-09 (1983). "[T]he law does not require that a defendant
receive a perfect trial, only a fair one[.]" Michigan v. Tucker,
417 U.S. 433, 446 (1974). Whatever concerns may linger about
Soffar's guilt, Soffar has not shown an entitlement to relief under
the limited review provided by federal habeas law.

For the reasons described above, the court concludes that
Soffar has not shown entitlement to federal habeas relief.
Accordingly, the court **GRANTS** Respondent Stephens's Motion for
Summary Judgment (Docket Entry No. 34), **DENIES** Petitioner's Cross-
Motion for Summary Judgment (Docket Entry No. 46), and **DENIES**
Soffar's federal habeas petition (Docket Entry Nos. 24, 25, 26, and
42). The court **GRANTS** Petitioner Max Soffar's Emergency Omnibus
Motion for Expedited Habeas Proceedings (Docket Entry No. 48) to
the extent that the court has made a diligent effort to adjudicate

Soffar's petition in a prompt manner. The court **DENIES** all remaining requests for relief. The court **DENIES** a certificate of appealability.

**SIGNED** at Houston, Texas, on this 18th day of December, 2014.

SIM LAKE
UNITED STATES DISTRICT JUDGE